No. 24-3367
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

JEFFREY B. SEDLIK,

*Plaintiff-Appellant*,

v.

KATHERINE VON DRACHENBERG, KAT VON D, INC., HIGH
VOLTAGE TATTOO, INC.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-01102
Hon. Dale S. Fischer

_____

## APPELLANT'S OPENING BRIEF

_____

Robert E. Allen
Jason C. Linger
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., Floor 19
Los Angeles, CA 90067
(310) 553-3000

William F. Patry
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
(212) 506-2364

*Attorneys for Plaintiff-Appellant Jeffrey B. Sedlik*

# <u>TABLE OF CONTENTS</u>

**Page**

I.     PRELIMINARY STATEMENT .................................................. 1

II.    JURISDICTIONAL STATEMENT .......................................... 3

III.   STATEMENT OF THE ISSUES ............................................. 4

IV.   STATEMENT OF THE CASE .................................................. 5

     A.    Summary of Relevant Facts .................................................. 5

     B.    Summary of Relevant Procedural History .........................12

V.    SUMMARY OF ARGUMENT .................................................17

VI.   STANDARD OF REVIEW ......................................................25

VII.  ARGUMENT ...........................................................................26

     A.    Sedlik's Photograph is Entitled to Broad Copyright Protection. ........26

     B.    Defendants Made Unauthorized Derivative Works. ..........................30

     C.    The Photograph and Defendants' Derivative Works Are Substantially Similar As a Matter of Law................................................................33

          1.    Legal Standard for Substantial Similarity................................33

          2.    The Extrinsic Test is Met as a Matter of Law..........................35

               a.    The Tattoo Meets the Extrinsic Test. ............................35

               b.    The Social Media Posts Meet the Extrinsic Test. ..........40

          3.    The Intrinsic Test is Met as a Matter of Law for All of Defendants' Derivatives of the Photograph............................41

     D.    Defendants Do Not Meet Their Burden of Proving Fair Use.............43

          1.    Introduction to Fair Use ........................................................43

2.      Factor 1 – Purpose and Character of the Use...........................44

        a.      The Law of Transformative Use Under *Warhol* ............44

        b.      Defendants' Tattoo Is Not Transformative. ..................46

        c.      Defendants' Social Media Posts Are Not
                Transformative...............................................48

        d.      All of Defendants' Derivative Uses Were
                Commercial. ................................................50

3.      Factor 2 – Nature of the Copyrighted Work ...........................55

4.      Factor 3 – Amount and Substantiality Copied ........................56

5.      Factor 4 – Effect on the Actual and Potential Market.............56

E.      The Jury Instructions Did Not Correctly State the Law. ...................59

F.      The District Court Erred in Excluding Sedlik's Testimony. .............64

VIII.   CONCLUSION ........................................................68

STATEMENT OF RELATED CASES .................................................. 1

CERTIFICATE OF COMPLIANCE ..................................................... 2

CERTIFICATE OF SERVICE.......................................................... 3

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andy Warhol Foundation v. Goldsmith,*
 11 F.4th 26 (2d Cir. 2021)..................................................................passim

*Andy Warhol Foundation v. Goldsmith,*
 598 U.S. 508 (2023)..........................................................................passim

*Antonick v. Elec. Arts, Inc.,*
 841 F.3d 1062 (9th Cir. 2016)...................................................................35

*Bell v. Wilmott Storage Servs., LLC,*
 12 F.4th 1065 (9th Cir. 2021)...........................................................34, 42

*Benay v. Warner Bros. Entm't,*
 607 F.3d 620 (9th Cir. 2010)....................................................................42

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
 448 F.3d 605 (2d Cir. 2006).....................................................................64

*Bleistein v. Donaldson Lith. Co.,*
 188 U.S. 239 (1903).................................................................................27

*Brammer v. Violet Hues Productions, LLC,*
 922 F.3d 255 (4th Cir. 2019)....................................................................54

*Burrow-Giles Lithographic Co. v. Sarony,*
 111 U.S. 53 (1884)................................................................................... 1

*Campbell v. Acuff-Rose Music, Inc.,*
 510 U.S. 569 (1994).................................................................................44

*Comerica Bank & Tr., N.A. v. Habib,*
 433 F. Supp. 3d 79 (D. Mass. 2020)........................................................54

*Crispin v. Christian Audiger, Inc.,*
 839 F. Supp. 2d 1086 (C.D. Cal. 2011)...................................................58

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.,*
 111 F.4th 125 (1st Cir. 2024)...................................................................64

iv

*De Fontbrune v. Wofsy*,
   39 F.4th 1214 (9th Cir. 2022)...................................................57

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.* ("*Penguin Books*"),
   109 F.3d 1394 (9th Cir. 1997).....................................23, 38, 57

*Dr. Seuss Enters., L.P. v. ComicMix LLC* ("*ComicMix*"),
   983 F.3d 443 (9th Cir. 2020).............................43, 55, 56, 57

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
   122 F.3d 1211 (9th Cir. 1997)......................................19, 31, 38

*Ets-Hokin v. Skyy Spirits, Inc.*,
   225 F.3d 1068 (9th Cir. 2000)...................................................27

*Fierro v. Smith*,
   39 F.4th 640 (9th Cir. 2022)...................................................60

*Fisher v. Dees*,
   794 F.2d 432 (9th Cir. 1986)...................................................34

*Google v. Oracle*, 593 U.S. 1 (2021)..............................24, 26, 59, 60

*Gracen v. Bradford Exch.*,
   698 F.2d 300 (7th Cir. 1982)...................................................31

*Grant v. Trump*,
   563 F. Supp. 3d 278 (S.D.N.Y. 2021) ......................................55

*Gray v. Hudson*,
   28 F.4th 87 (9th Cir. 2022)..............................19, 25, 35, 39

*Griner v. King*,
   104 F.4th 1 (8th Cir. 2024)...................................................45

*Hachette Book Grp., Inc. v. Internet Archive*,
   115 F.4th 163 (2d Cir. 2024)...................................................47

*Hanagami v. Epic Games, Inc.*,
   85 F.4th 931 (9th Cir. 2023)...................................................33

*Hardy Life, LLC v. Nervous Tattoo, Inc.*,
   2008 WL 11338698 (C.D. Cal. Aug. 4, 2008)...........................58

*Harper & Row Publishers, Inc. v. Nation Enter.*,
   471 U.S. 539 (1985)..............................22, 50, 55, 64

v

*In re Bard IVC Filters*,
    969 F.3d 1067 (9th Cir. 2020)....................................................26

*Jarvis v. K2 Inc.*,
    486 F.3d 526 (9th Cir. 2007).....................................................31

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
    676 F.3d 841 (9th Cir. 2012).....................................................34

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008)..............................................20, 54

*Leonard v. Stemtech Int'l Inc.*,
    834 F.3d 376 (3d Cir. 2016).....................................................64

*Lin-Brook Builders Hardware v. Gertler*,
    352 F.2d 298 (9th Cir. 1965).....................................................27

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
    658 F.3d 936 (9th Cir. 2011).....................................................60

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
    922 F.3d 946 (9th Cir. 2019).....................................................41

*Mazer v. Stein*,
    347 U.S. 201 (1954)................................................................27

*McGucken v. Pub Ocean Ltd.*,
    42 F.4th 1149 (9th Cir. 2022).............................................passim

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*,
    856 F.2d 1341 (9th Cir. 1988)...................................................31

*Monge v. Maya Mags., Inc.*,
    688 F.3d 1164 (9th Cir. 2012)...........................................passim

*Murphy v. City of Long Beach*,
    914 F.2d 183 (9th Cir. 1990).....................................................60

*Northland Family Plan. Clinic v. Ctr. for Bio-Ethical Reform*,
    868 F. Supp. 2d 962 (N.D. Cal. 2012)..................................21, 54

*Peralta v. Dillard*,
    744 F.3d 1076 (9th Cir. 2014) (en banc) ...................................60

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010)..................................................25, 42

*Philpot v. Indep. J. Rev.*,
    92 F.4th 252 (4th Cir. 2024).........................................45, 47, 54

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014)...................................................68

*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017)..................................................26

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018).......................................28, 29, 34

*Ringgold v. Black Ent. Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997).....................................................29

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992).............................................19, 37

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) (en banc) ...................................26

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012)....................................................33

*Stromback v. New Line Cinema*,
    384 F.3d 283 (6th Cir. 2004)...................................................41

*Tattoo Art Inc. v. TAT Intern. LLC*,
    498 F. App'x 341 (4th Cir. 2012)..............................................58

*Teradyne, Inc. v. Astronics Test Sys., Inc.*,
    2023 WL 9284863 (C.D. Cal. Dec. 6, 2023) ..............................61

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
    715 F.2d 1327 (9th Cir. 1983)...............................17, 25, 34, 42

*U.S. v. Hamilton*,
    583 F.2d 448 (9th Cir. 1978)...................................................27

*UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.*,
    --- F.4th ----, 2024 WL 4449684 (5th Cir. Oct. 9, 2024) ............60

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
    52 F.4th 1054 (9th Cir. 2022)....................................................25

*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
    853 F.3d 980 (9th Cir. 2017)............................................passim

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019).......................................................44

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989)....................................................50

*White v. Ford Motor Co.*,
    500 F.3d 963 (9th Cir. 2007)....................................................60

*Worldwide Church of God v. Phil. Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000).......................................21, 50, 54


**STATUTES**

17 U.S.C. § 101 ................................................................................ 3

17 U.S.C. § 106(2)............................................................................30

17 U.S.C. § 107 ........................................................................43, 50

28 U.S.C. § 1291.............................................................................. 3


**OTHER AUTHORITIES**

Pierre Leval, Toward a Fair Use Standard. 103 Harv. L. Rev. 1105 (1990)...........56


**RULES**

Fed. R. Civ. P. 50..............................................................................26

viii

## TREATISES

Nimmer on Copyright § 13.05[A] ........................................................................63

Nimmer on Copyright § 13.03[B][1][a] .............................................................34

Patry On Copyright § 9:78 ...............................................................................41

## ARTIST WORKS FROM CASELAW

"Puppies" Photograph by Art Rogers:

http://www.artrogers.com/uploads/7/6/3/7/7637792/9023457_orig.jpg

"String of Puppies" Sculpture by Jeff Koons:

https://arthur.io/img/art/jpg/0000173452fbe3b4e/jeff-koons/untitled-18/large-2x/jeff-koons--untitled-18.webp

Lynn Goldsmith's Photograph of Prince and Andy Warhol's Prince Series:

https://graphicartistsguild.org/wp-content/uploads/2023/05/news-Warhol-v-Goldsminth.jpg

Napoleon Sarony's Photograph of Oscar Wilde and The Infringing Lithograph:

https://oscarwildeinamerica.blog/wp-content/uploads/2023/08/burrow-giles-ehrich-comparison.jpeg

**Note**: The remaining artist works may be found in the court decisions themselves.

## I.   PRELIMINARY STATEMENT

This is a copyright case.  Plaintiff invested significant resources and creativity to produce an original work of art.  Defendants, who include a famous celebrity, admitted that they directly copied nearly all of Plaintiff's work into a derivative work without Plaintiff's permission.  Defendants used the derivative work for extensive promotion, distributing about 15 videos and photographs on social media, where their millions of followers could see and share these posts, make comments, and proceed to purchase Defendants' products and services.  One Defendant bragged on Instagram that the derivative work was "100% exactly the same as" and "directly traced from" Plaintiff's work.

In district court, Defendants claimed a lack of substantial similarity and fair use.  But the Supreme Court rejected similar arguments made by defendants in 1884 in *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, and again in 2023 in *Andy Warhol Foundation v. Goldsmith*, 598 U.S. 508.  One might expect a 140-year history of Supreme Court precedent would have led to a grant of summary judgment below, sparing everyone unnecessary time and money.  The district court, however, erroneously let infringement and fair use go to a jury, along with faulty jury instructions, while excluding critical and relevant evidence.

Like *Burrow-Giles* and *Warhol*, this case involves a photograph of a famous person.  In *Burrow-Giles*, Napoleon Sarony photographed Oscar Wilde, who upon

1

arrival in New York announced to customs that he had nothing to declare except his genius. Portrait photography of celebrities is not easy; they are notoriously short of time and patience. Creating iconic photographs of them is nearly impossible. Copyright protects the photographer's creativity against pirates.

Sarony's pirate was a department store ripping off his photograph of Wilde on an advertising card lithograph:



*Burrow-Giles* established that that the medium of the piracy does not matter, and this was reaffirmed by *Warhol*.[1] 598 U.S. at 535 ("[T]he fact that Martin Scorsese's recent film *The Irishman* is recognizably 'a Scorsese' does not absolve him of the obligation to license the original book."). The Supreme Court found

---

[1] The sources for the artistic works shown in this brief can be found in the Table of Authorities.

that Warhol did not make transformative use of Lynn Goldsmith's photograph of Prince even though Warhol added new expression.

Like Sarony in *Burrow-Giles* and Goldsmith in *Warhol*, Plaintiff is a photographer who makes his living licensing derivative works in various media. Whenever a derivative work is made, whether a photograph into an advertising card, or a book into a film, there will be some degree of changes. But, when carried out without permission, it is still an infringement of the copyright owner's exclusive right to prepare derivative works.

This appeal involves legal issues, not factual disputes. Copyright infringement should have been decided by the district court as a matter of law, not at trial by a poorly-instructed jury swayed by a celebrity defendant. It defies one's eyes and the law that there could be any result other than summary judgment in Plaintiff's favor. A crushing weight of precedent confirms that this was not a fair use. The strange verdict below was the result of a jury that was badly instructed on the law and the improper exclusion of evidence favorable to Plaintiff.

## II.  <u>JURISDICTIONAL STATEMENT</u>

This is an appeal by photographer Plaintiff Jeffrey B. Sedlik ("Sedlik") in a copyright infringement action brought under 17 U.S.C. § 101 *et seq.* The jurisdiction of this Court is proper under 28 U.S.C. § 1291. This appeal challenges various rulings made in the district court.

3

Sedlik's motion for summary judgment was denied on May 31, 2022.  1-ER-107.  Sedlik's motion for reconsideration was partly denied and partly granted on October 10, 2023.  1-ER-94.  Sedlik was excluded from offering expert testimony on January 11, 2024 and from offering various testimony during trial.  1-ER-73–74, 1-ER-66–69.  Over Sedlik's objection, the district court ruled it would not inform the jury about its previous fair use findings on factors 2 and 3.  1-ER-45–46, 1-ER-48, 1-ER-64–65, 1-ER-70–72.  The jury issued its verdict on January 26, 2024.  1-ER-59.  Final judgment was entered on January 30, 2024.  1-ER-16.  Sedlik's motion for judgment as a matter of law and for a new trial was denied on May 3, 2024.  1-ER-2.  Sedlik timely filed his appeal on May 22, 2024.  3-ER-522.

## III.  <u>STATEMENT OF THE ISSUES</u>

1.    Whether Sedlik's Photograph of Miles Davis and Defendants' derivative uses replicating the Photograph, consisting of a tattoo and 15 social media posts, are substantially similar.

2.    Whether Defendants met their burden of demonstrating fair use for each of their uses of the Photograph.

3.    Whether the jury instructions correctly stated the law when, over Sedlik's objection, the instructions failed to inform the jury about the district court's legal rulings on certain fair use factors in favor of Sedlik and tasked the jury with re-considering those same fair use factors, even though the district court

4

decided there were no genuine factual disputes on those factors.

4.      Whether the district court erred in excluding Sedlik's fact and expert testimony on his license fee, the licensing marketplace, and photography practices and standards, which were relevant to damages and fair use.

## IV.    STATEMENT OF THE CASE

### A.      Summary of Relevant Facts

The undisputed facts are as follows.  Sedlik is a professional photographer and professor of photography.  2-ER-315.  He earns his living licensing photographs and their derivative works in a variety of media.  2-ER-318, 2-ER-302, 2-ER-253, 2-ER-164, 3-ER-485–90.  Sedlik is known for his photographic portraits of celebrities and musicians, including Dizzy Gillespie, B.B. King, and Miles Davis.  3-ER-483.

This suit involves Sedlik's Miles Davis Photograph (the "Photograph"), one of the most celebrated photographs of Davis, who is widely considered the greatest trumpet musician of all time.  2-ER-317.  Sedlik registered the Photograph with the U.S. Copyright Office in 1994, and it remains registered today.  2-ER-318.  Sedlik pre-conceived and then created the Photograph at a private shoot in 1989 at Davis' home in Malibu, California, and it was first published in a cover story of a leading music magazine.  2-ER-292.



3-ER-508.  Sedlik invested significant research, planning, and creative

development to create the Photograph.  2-ER-356.  He studied Davis'

performances and music to brainstorm concepts, and refined and conceived various

ideas for photographs in hand-drawn sketches.  *Id.*  He designed a studio and

transported it to Davis' home.  2-ER-357.  On the day of the shoot, Sedlik covered

the studio walls and ceiling with translucent material, then added a layer of black

cloth, blocking the sunlight.  2-ER-358.  He carefully shaped  an opening in the

black cloth, to allow a shaft of light to enter the studio and illuminate Davis' face

and hand. *Id.* Sedlik positioned reflectors behind the camera to reflect diffused light onto Davis and create "catchlights" in Davis' eyes. *Id.*

During the shoot, Sedlik selected and controlled the camera position, angle, height, shutter speed, lens focal length, and aperture for a desired creative result. 2-ER-358–59. Sedlik paid exacting attention to Davis' hair, expression, and makeup. 2-ER-360–61. He instructed Davis how to tilt his head, where to position his body, and the direction and intensity of his gaze. *Id.* He instructed Davis to put his finger to his lips, symbolizing Davis' famous use of pauses between musical notes. 2-ER-361. Sedlik adjusted Davis' fingers to represent a series of musical notes. *Id.* He directed Davis to tense his face to bring out an intensity of expression. *Id.*

Since 1989, the Photograph has appeared in posters, fine art prints, shirts, magazine covers, advertisements, movies, television, paintings, music videos, albums, museum exhibitions, paintings, social media, a sculpture in France, and a variety of other media. 1-ER-130, 2-ER-185–90. It was used by a tattooist as an artistic reference for a tattoo in 2014. 3-ER-493–94. Each of these uses was authorized in a license agreement between Sedlik and the licensee. 1-ER-130, 2-ER-185–88. The license fees arising from these and other agreements are how Sedlik makes his living. 2-ER-318, 2-ER-253, 3-ER-485–90.

Defendant Katherine Von Drachenberg ("KVD") is a tattooist and reality

7

TV star. 2-ER-288; 2-ER-319. Defendant High Voltage Tattoo, Inc. ("HVT") was

KVD's tattoo shop, located in West Hollywood, California. 2-ER-289. KVD and

HVT (together, "Defendants")[2] were featured on the hit TV show "LA Ink," which

brought them wealth and worldwide fame. 2-ER-319.

 In 2017, KVD made a tattoo, replicating the Photograph on her client, Blake

Farmer (the "Tattoo"). KVD inked the Tattoo on Farmer at HVT. 2-ER-289.

Farmer asked KVD to make a tattoo that matched Sedlik's Photograph as closely

as possible. 2-ER-200, 2-ER-207, 2-ER-212. KVD agreed and then meticulously

traced and replicated nearly every detail:

 

3-ER-480, 3-ER-468. She did so by downloading the Photograph, printing it,

placing it on a lightbox, tracing it on paper, transferring the tracing to Farmer's

---

[2] The district court dismissed Defendant Kat Von D, Inc. from the case. 1-ER-131–32. Sedlik does not challenge that ruling in this appeal.

arm, and then inking the Tattoo with the Photograph directly next to her as a reference. 2-ER-233, 2-ER-210–16. KVD admitted that her tracing "match[ed] up exactly" with the Photograph. 2-ER-212, 2-ER-294. KVD referred to no other photographs of Davis. 2-ER-220. The result was a near-identical copy of the Photograph in tattoo form:



3-ER-491. As a reality TV star, KVD understood the commercial value of promotion. So Defendants made promotional photographs and videos of KVD tattooing Farmer at HVT, and the resulting Tattoo. 3-ER-468. While making the Tattoo in 2017, and over the next couple of years, Defendants repeatedly posted these photographs and videos—about 15 posts in all—to their commercial social media accounts, including this post on HVT's corporate, verified Instagram:



3-ER-468–79, 3-ER-481–82, 3-ER-484, 3-ER-510–12.  KVD has 9.7 million

followers on Instagram and millions more on her Facebook Business Page and

Twitter.  2-ER-229.  On all of KVD's posts, she tagged her business

"@HighVoltageTat" to drive her millions of followers to visit HVT's social media

accounts, advertising their tattoo services.  3-ER-472.  Likewise, HVT tagged

"@theKatVonD" in all of its posts to drive their followers to KVD's accounts to

promote her products and services.  3-ER-475, 2-ER-224–29.  In total, Defendants'

15 posts received hundreds of thousands of likes, shares, and comments.  *E.g.*, 3-

ER-468.  Followers praised the Tattoo, and some expressed a desire to buy their

own tattoos from Defendants.  *E.g.*, 3-ER-470 ("How long is the wait to get a

tattoo done by you?"); 3-ER-478 ("Need a tat by Kat").  It is undisputed that KVD and HVT use social media to advertise and offer their products and services, including tattoos, books, concerts, music, cosmetics, eyewear, and footwear—all of which are interspersed with the posts of the Tattoo and Photograph.  3-ER-513–21, 2-ER-224–29.

In one post, HVT wrote that the Tattoo was "100% exactly the same as" the Photograph and was "traced directly from the actual [Photograph]":



3-ER-510.  Defendants have continued to exploit these videos and photographs, as their posts remain online as of this writing.

11

### B.     Summary of Relevant Procedural History

Sedlik discovered Defendants' social media posts and contacted KVD's agent to try to discuss and resolve the matter.  3-ER-455–56.  Sedlik received no response.  2-ER-173.  Sedlik then filed an action for copyright infringement against Defendants in early 2021.  3-ER-527.

Sedlik moved for summary judgment on copyright infringement.  The district court denied Sedlik's motion in May 2022.  1-ER-107.  The district court wrongly found that Sedlik did not articulate *any* similarities between the Photograph and Defendants' uses.  1-ER-121.  The district court also erred in emphasizing the slight differences between the works, while ignoring their overwhelming similarities.  1-ER-121–22.  On fair use, the district court misapplied and ignored precedent in finding triable issues on commerciality and transformative use (factor 1) and market harm (factor 4).  1-ER-123–30.  For example, on factor 4, the district court found that "no one has told [Sedlik] they would not buy a copy of the [Photograph] because they had seen the Tattoo or social media posts about the Tattoo."  1-ER-130.  Of course, Sedlik could not know of potential customers who chose not to contact him to purchase licenses. The district court correctly found that the amount and substantiality of original expression taken by Defendants (factor 3) weighed against fair use.  1-ER-129.

12

In November 2022, the district court stayed the case pending *Warhol*. 2-ER-277. After *Warhol*, the parties moved for reconsideration of the summary judgment order. The district court partially granted reconsideration and correctly found that the Tattoo was not a transformative use (factor 1) and that the Photograph's creativity (factor 2) weighed in Sedlik's favor for all uses. 1-ER-101–03. However, the district court erroneously ruled that a jury should decide transformative use for the social media posts (factor 1), commerciality for all uses (factor 1), market harm for all uses (factor 4)—and make an overall fair use decision. 1-ER-97–106.

The case proceeded to trial in January 2024. The jury heard testimony from Sedlik, KVD, Farmer, one of KVD's employees, and tattooist Bryan Vanegas. Vanegas had entered into a license agreement with Sedlik in 2014 to make a tattoo using the Photograph as a reference. 3-ER-493–94, 2-ER-159. The district court excluded Sedlik from testifying about several important aspects of his licensing history, including his license fee for use on social media, or his past work with a licensing standards organization that developed guidelines for the entire visual arts industry. 1-ER-69; 1-ER-74. Over Sedlik's objection, the district court ruled that it would not instruct the jury on its fair use rulings on factors 2 and 3, even though there were no factual disputes on these factors. 1-ER-64, 1-ER-70–71.

13

After resting their defense, Defendants stipulated that four of the social media posts (3-ER-468–69, 3-ER-475–76),[3] depicting the Photograph itself, were substantially similar, such as this one:



3-ER-475, 2-ER-238.  The jury found that all of Defendants' other uses were *not* substantially similar.  1-ER-60.  For the four stipulated posts, the jury found fair use.  1-ER-61.  But the jury determined that eight posts (3-ER-472–74, 3-ER-477–79, 3-ER-481–82)[4] that were found to be *not* substantially similar *were* a fair use

---

[3] The four stipulated posts were Trial Exhibits 203, 204, 212 and 213.

[4] The eight posts were Trial Exhibits 209, 210, 211, 214, 215, 216, 240 and 242.

14

(1-ER-61–62), a legal impossibility that the district court would later find to be "contrary to the form's instructions" (1-ER-8).

Sedlik moved for judgment as a matter of law and for a new trial. The district court denied Sedlik's motion in May 2024. 1-ER-2. The district court made a slew of factual and legal errors. First, the district court again ignored *all* of the objective similarities between the works, instead relying on an "inference" that the jury had found the works to have a different "concept and feel." 1-ER-5. Yet Defendants admitted (and the district court had previously found) that Defendants' works evoked a feeling of moodiness, melancholy, and movement. 1-ER-111. There was undisputed evidence that the Photograph also had a feeling of moodiness, melancholy, and movement. 2-ER-181–82, 2-ER-164.

Second, on factor 4 (market harm), the district court erroneously found that Sedlik "never offered" a license for the use of the Photograph on social media (1-ER-11), when in fact, he presented several such licenses at trial (3-ER-493–94, 3-ER-495–99). Sedlik presented evidence of a decades-long history of licensing the Photograph for derivative uses, including on social media. 2-ER-155–56, 2-ER-162, 2-ER-190 ("Social media and the web are the primary markets for the licensing of photography today."), 3-ER-485–90. The district court also failed to consider whether widespread copying carried out by others would affect the potential market for licensing the Photograph and its derivatives. 1-ER-11–12.

15

Third, under fair use factor 1 (nature of the use), the district court should have found that all of the uses were non-transformative and commercial as a matter of law because (1) Defendants did not target the Photograph or provide a "compelling" justification for their use, (2) HVT was a corporation, (3) KVD is a professional tattooist, and (4) Defendants used the Tattoo on their commercial social media accounts to promote and offer their products and services for sale without paying the customary license fee. There was no explanation for how the social media posts, seen and shared by millions of Defendants' followers and potential customers, could be transformative when the district court found the Tattoo itself was *not* transformative. 1-ER-101.[5]

Finally, the district court found that the jury instructions accurately stated the law. 1-ER-12–15. They did not. The district court had determined that two of the four factors (plus transformative use for the Tattoo) weighed in Sedlik's favor, and that no factor weighed in Defendants' favor. 1-ER-102–05; 1-ER-129. But, over Sedlik's objection, the district court refused to inform the jury about these legal rulings, with the exception that it had found the Tattoo to be a non-transformative use. 1-ER-43 ("The court has already determined that the tattoo is not transformative …"), 1-ER-45–46. This allowed the jury to make conclusions

---

[5] The district court stated during trial that she was unfamiliar with how social media works. 2-ER-139 ("I know nothing about social media").

16

that were contrary to law. Defendants erroneously argued to the jury that factor 3 weighed "heavily in favor" of fair use, when the district court had ruled that it weighed *against* fair use. 2-ER-247. The district court provided no reason for instructing the jury on one ruling on fair use, while withholding the rest.

## V.     SUMMARY OF ARGUMENT

This case illustrates why summary judgment exists, why judges are charged with acting as gatekeepers, and how, when they fail in that duty, injustice can and does occur. The injustice here was compounded by faulty jury instructions on issues the jury should never have decided. The district court excluded relevant, critical evidence. It is up to this Court to correct the injustices that occurred, by granting summary judgment to Sedlik on substantial similarity and fair use, and remanding only for damages.

**1.     Substantial Similarity:** Sedlik's Photograph and Defendants' derivative works based on the Photograph are substantially similar as a matter of law. "When the works are so overwhelmingly identical that the possibility of independent creation is precluded, there is simply no genuine dispute as to any material fact." *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 987 (9th Cir. 2017); *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983) ("A grant of summary judgment for plaintiff is proper where works are

17

so overwhelmingly identical that the possibility of independent creation is precluded.").  This is one of those cases.

Here, the works are "overwhelmingly identical."  There is no "possibility of independent creation" because Defendants admitted they copied the Photograph at every single step in making the Tattoo.  2-ER-208, 2-ER-220.  Defendants admitted that the Tattoo was "100% exactly the same as" and "directly traced from" the Photograph.  3-ER-510.  As anyone can see, the Tattoo is a copy of Sedlik's Photograph containing the same original expression:



3-ER-508.  The social media posts, which show videos and photographs of the Tattoo, along with a caption, include the same copied expression.  3-ER-468–79, 3-ER-481–82, 3-ER-484, 3-ER-510–12.  Based on their overwhelming similarities,

the district court should have found the extrinsic test satisfied for all uses. *Gray v. Hudson*, 28 F.4th 87, 97 (9th Cir. 2022) ("the extrinsic test is objective and is often resolved as a matter of law.").

Under the intrinsic test, all of the works have an identical "concept and feel." KVD admitted that the Tattoo "evoked melancholy." 2-ER-291. The district court repeatedly noted the Tattoo's "melancholy" sentiment. 1-ER-127–29. Sedlik's Photograph has the same sense of melancholy. 2-ER-181–82, 2-ER-164. The intrinsic test is met here for all uses. *Unicolors*, 853 F.3d at 984.

Any differences between the Photograph and Tattoo are immaterial because (1) they pale in comparison to the similarities, and (2) they arise from functional considerations in adapting the Photograph into a different medium. *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992) (finding substantial similarity as a matter of law between a black-and-white photograph and a 3D, colorful sculpture based on the photograph); *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1222 (9th Cir. 1997) ("making decisions that enable one to reproduce or transform an already existing work into another medium or dimension – though perhaps quite difficult and intricate decisions – is not enough to constitute the contribution of something recognizably his own." ); *Andy Warhol Foundation v. Goldsmith*, 11 F.4th 26, 53 (2d Cir. 2021), *aff'd sub nom.*, 598 U.S. 508. KVD admitted that, as a practical matter, she "can't make something exactly the same as

19

a photo." 2-ER-218. The Tattoo need not be identical to the Photograph. The works are substantially similar as a matter of law.

2. **Fair Use:** Each of the four factors weighs strongly in Sedlik's favor. Defendants do not meet their burden of proving fair use for any factor.

A. **Factor 1 (Nature of Use):** Defendants' derivative uses were non-transformative and commercial. None of Defendants' uses have any "critical bearing" or "shed light" on the Photograph, and Defendants offered no other "compelling" justification for their copying. *Warhol*, 598 U.S. at 540, 546-47 ("Because [the use] 'has no critical bearing on' [the] photograph, the commentary's 'claim to fairness in borrowing from' her work 'diminishes accordingly (if it does not vanish).'"). KVD admitted (and the district court found) that Defendants could have used *any photograph* to make the Tattoo. 1-ER-101 ("[KVD] admits that had the [Photogragh] not existed, she would have 'just used another image.'"). Defendants' replication of the Photograph in a different medium and on social media does not constitute a "compelling" justification.

Defendants' uses were commercial. HVT was a business and KVD is a professional tattooist and TV star, with millions of social media followers, who shared and commented on the posts depicting the Tattoo and Photograph. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) ("basic purpose" of the corporation was to sell devices); *Worldwide Church of God v. Phil.*

20

*Church of God, Inc.*, 227 F.3d 1110, 1117-18 (9th Cir. 2000) (attracting new members and fostering the organization's growth is a commercial use); *Northland Family Plan. Clinic v. Center for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 979 (N.D. Cal. 2012) ("Generating traffic to one's website or conveying one's message effectively using copyrighted material is within the type of 'profit' contemplated by *Worldwide Church.*").

There can be no dispute that the Tattoo was used as a means to make social media content for Defendants' millions of followers. On all of her posts, KVD tagged HVT to drive traffic to her business. *E.g.*, 3-ER-468. HVT tagged KVD on its posts to drive traffic to KVD's pages, where she promotes and sells an assortment of products, from music to footwear, and intersperses sales offers and product links. 3-ER-513–21. At trial, KVD admitted that she uses social media to promote her products and that she used the Tattoo and Photograph to "engage with [her] fans and followers." 2-ER-224–29, 2-ER-223. That is a commercial use under *Worldwide Church.*

**B.     Factor 2 (Nature of Copyrighted Work):** Sedlik's Photograph is highly creative and the result of Sedlik's myriad artistic choices. The district court correctly found that factor 2 weighed against fair use (1-ER-102–03), and this Court should do the same. *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1161-62

(9th Cir. 2022) (factor 2 weighed against fair use for creative photographs, even though they were previously published).

**C.    Factor 3 (Amount and Degree of Copying):**  A visual comparison of the Photograph and Tattoo—and Defendants' undisputed actions of tracing and replicating the Photograph—demonstrates that Defendants copied the "heart" of the Photograph.  *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 544 (1985).  Defendants used no other photographs or references.  2-ER-220. Even if the use of the Photograph to make the Tattoo was justified (it was not), Defendants provide no justification for their extensive use of the Tattoo and the Photograph in at least *15 social media posts over a three-year period*.  3-ER-468– 79, 3-ER-481–82, 3-ER-484, 3-ER-510–12.  The district court correctly found that factor 3 weighs against fair use.  *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1181- 82 (9th Cir. 2012) (use of six photos not fair use, where one would suffice).

**D.    Factor 4 (Market Harm):**  Defendants unquestionably harmed the market for licensing the Photograph and its derivative works.  Sedlik is a professional photographer who makes his living licensing photographs for use in a variety of media, such as advertising, apparel, book covers, billboards, product packaging, magazine covers, websites, and social media.  2-ER-253, 3-ER-485–90. Sedlik also licenses his photographs to other artists as artistic references for derivative works, such as illustrations, paintings, and tattoos.  3-ER-493–94, 3-ER-

22

495–507; 2-ER-302, 104-106.  Defendants, "as the proponent of the affirmative defense of fair use, must bring forward favorable evidence about relevant markets." *McGucken*, 42 F.4th at 1163.  Defendants presented no real evidence of relevant markets. *Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc*. ("*Penguin Books*"), 109 F.3d 1394, 1403 (9th Cir. 1997) (unsupported testimony "that there was no likely effect on the market of the original" did not constitute favorable evidence about relevant markets).

"[T]o negate fair use, [Sedlik] need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." *McGucken*, 42 F.4th at 1163.  Sedlik presented significant evidence regarding his licensing of the Photograph, including uses on T-shirts, album covers, television, statues, and magazines.  3-ER-485–506, 332; 2-ER-147–56, 2-ER-162, 2-ER-253.  Sedlik presented past artist-reference licenses, including for use on social media, of the Photograph for a derivative painting (3-ER-495–500) and for a derivative tattoo (3-ER-493–94)—the same uses made by Defendants.  *See* 3-ER-495 (authorizing the licensee to "display printed and digital copies of the Painting … *on social media*").

This Court has found market harm even where the photographer has *never* licensed his photographs before. *McGucken*, 42 F.4th at 1163; *Monge*, 688 F.3d at 1181-82.  Factor 4 further considers the potential effects if similar use is carried

23

out in "widespread or unrestricted fashion." *McGucken*, 42 F.4th at 1163. Should others follow Defendants' example of making and exploiting unlicensed derivative works, it would certainly affect Sedlik's actual and potential market for licensing the Photograph and its derivatives.

**3.     Jury Instructions:** The handling of fair use by the district court defies explanation. The jury instructions erroneously tasked the jury with analyzing all fair use factors, including those previously decided as a matter of law, without informing them of the district court's legal rulings. 1-ER-45–46. This tasked the jury with considering factors with no remaining factual disputes, and Defendants took full advantage by making arguments contrary to the district court's rulings. 2-ER-247. The jury instructions were also incompatible with *Google v. Oracle*, holding that courts should defer to the jury's findings of underlying facts for certain factors, but the overall fair use determination is for judges to decide de novo. 593 U.S. 1, 23-24 (2021).

**4.     Exclusion of Evidence:** The district court abused its discretion by excluding evidence offered by Sedlik. The district court excluded Sedlik from testifying about photography licensing standards and practices based on the faulty reasoning that they were Sedlik's own views. 1-ER-83–84. Not so. These standards apply across the visual arts world and have been adopted by various industries, as Sedlik explained in his expert report and declaration. 3-ER-374–80,

24

2-ER-254–55.  The district court also erroneously believed these standards were developed after the this suit was filed in 2021, when in fact, they were published in 2007 and 2008.  1-ER-84.

The district court also excluded evidence tied to damages and factor 4, market harm, when it ruled that Sedlik could not discuss his license fees for social media use.  1-ER-67–69.  Licensing is essential to the ability of photographers to make a living.  "Such licenses, for photographs or derivatives of them, are how photographers … make a living.  They provide an economic incentive to create original works, which is the goal of copyright."  *Warhol*, 598 U.S. at 535.  The district court's rulings made a reasonable verdict impossible.

## VI.  STANDARD OF REVIEW

1.  **Substantial Similarity:**  Substantial similarity is a question of law reviewed de novo.  *Gray*, 28 F.4th at 95; *Unicolors*, 853 F.3d at 984.  "A grant of summary judgment for [Sedlik] is proper where works are so overwhelmingly identical that the possibility of independent creation is precluded."  *Twentieth Century–Fox*, 715 F.2d at 1330.  "Denials of motions for judgment as a matter of law are reviewed de novo."  *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1063 (9th Cir. 2022).  The review is de novo "because credibility is not at stake and all that is required is a visual comparison of the works."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010).

2.     **Fair Use:** "[F]air use is a legal question for judges to decide de

novo." *Google*, 593 U.S. at 23-24.  A jury verdict on fair use is *not* reviewed for

"substantial evidence."  *Id.*  That is because "the ultimate 'fair use' question

primarily involves legal work."  *Id.*  Questions of law are reviewable if raised by a

party at summary judgment, whether or not they are raised post-trial under Fed. R.

Civ. P. 50.  *In re Bard IVC Filters*, 969 F.3d 1067, 1072-73 (9th Cir. 2020).

3.     **Jury Instructions:**  This Court "review[s] de novo whether the [jury]

instructions accurately state the law."  *Skidmore as Tr. for Randy Craig Wolfe Tr.

v. Led Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020) (en banc).

4.     **Exclusion of Evidence and Testimony:**  The exclusion of testimony

and evidence is reviewed for abuse of discretion.  *Reed v. Lieurance*, 863 F.3d

1196, 1208 (9th Cir. 2017).  "A district court abuses its discretion if it does not

apply the correct law or if it rests its decision on a clearly erroneous finding of

material fact."  *Id.*

## VII.  <u>ARGUMENT</u>

### A.     <u>Sedlik's Photograph is Entitled to Broad Copyright Protection.</u>

Photographs are original, artistic, and creative expressions, warranting broad

copyright protection, "even though photographs capture images of reality."

*Monge*, 688 F.3d at 1177.  "Decisions rendering the photograph a protectable

'intellectual invention' included:  the posing and arrangement of [the subject] 'so

26

as to present graceful outlines'; the selection and arrangement of background and accessories; the arrangement and disposition of light and shade; and the evocation of the desired expression." *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074-75 (9th Cir. 2000). The "selection of subject, posture, background, lighting, and perhaps even perspective alone [are] protectible elements of a photographer's work." *U.S. v. Hamilton*, 583 F.2d 448, 452 (9th Cir. 1978).

Sedlik is not claiming a copyright in Davis' face or the "SHH" symbol. Sedlik's copyright is in his creative combination of expressive elements in the Photograph. 2-ER-317. While ideas or concepts are not protected, a photographer's expression is protected. *Mazer v. Stein*, 347 U.S. 201, 217-18 (1954). Another artist may go back to the original subject and offer their own expression, but the artist cannot make a copy of another artist's photograph. *Bleistein v. Donaldson Lith. Co.*, 188 U.S. 239, 249 (1903) ("Others are free to copy the original. They are not free to copy the copy."); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 301 (9th Cir. 1965).

Defendants could have made a tattoo of Davis by studying any of the thousands of available photographs of Davis in a variety of settings:

27



3-ER-492.  Instead, Defendants did what *Bleistein* prohibits; they traced and

replicated the combination of Sedlik's highly-original expression in the

Photograph, down to the gaze, finger positioning, composition, lighting, and pose.

2-ER-217–18.  The combination of these elements is Sedlik's protected,

copyrighted expression.  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1119 (9th Cir.

2018) ("If sufficiently original, the combination of subject matter, pose, camera

angle, etc., receives protection").

    In closing argument, Defendants misinformed the jury that the Photograph

merely documented Davis making a "SHH" pose.  2-ER-243 ("Mr. Sedlik had a

very good idea and his was – I'm going to take a photo of Miles Davis going

'shh.'").  But that's like saying the "Mona Lisa shows only a painting of a woman

with a wry smile."  *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 77 (2d

28

Cir. 1997).  It further ignores that Defendants did *not* copy the "idea" in the

Photograph, but rather, they copied the Photograph *itself*.  *Warhol*, 11 F.4th at 54

("Nor did [Warhol] attempt to copy merely the 'idea' conveyed in the Goldsmith

Photograph. Rather, he produced the Prince Series works by copying the

Goldsmith Photograph itself – i.e., Goldsmith's particular expression of that

idea.").

    Sedlik's Photograph is a unified, creative work of art.  Pirates try to atomize

a holistic work and focus on isolated parts.  But "photographs cannot be dissected

into protected and unprotected elements in the same way" as other works, such as

novels, plays, and motion pictures.  *Rentmeester*, 883 F.3d at 1118-19.  In closing,

Defendants argued that even if the works "as a whole … look alike, but the

individual elements" do not match, the works are not substantially similar.  2-ER-

244.  That argument was incompatible with *Rentmeester*.

    At summary judgment, the district court correctly determined that the

Photograph was entitled to "broad protection because there were a great number of

choices involved in creating [the Photograph]."  1-ER-120.  Indeed, Sedlik made

innumerable artistic choices to create the Photograph in a private shoot with Davis.

2-ER-363–67.  The result was a highly creative photograph earning broad

copyright protection.

**B.**     **Defendants Made Unauthorized Derivative Works.**

The Copyright Act specifically grants copyright owners the exclusive right to prepare derivative works based upon their copyrighted works.  17 U.S.C. § 106(2).  Derivative works "recast, transform or adapt the original, add new expression, meaning or message, or otherwise provide new information, new aesthetics, new insights and understandings."  *Warhol*, 598 U.S. at 541.  The right to prepare derivative works is a fundamental exclusive right, critical to a creator's ability to generate revenue from his works, and a key incentive for creators to create new works for the benefit of the public.  *Id.* at 535 ("Such licenses, for photographs or derivatives of them, are how photographers … make a living.").

The Supreme Court has confirmed that photographers license their works to others as an artistic reference to make derivative works.  *Warhol*, 598 U.S. at 529, 535 ("the owner has a right to derivative transformations of her work" and "[s]uch transformations may be substantial, like the adaptation of a book into a movie."). "A film or musical adaptation . . . might win awards for its 'significant creative contribution' … [or] add 'important new expression,' …. But that does not in itself dispense with the need for licensing."  *Id.* at 541.

Defendants admitted that, without Sedlik's authorization, they traced and used the Photograph as an artistic reference in a different medium.  2-ER-213. That is by definition a derivative work.  *Jarvis v. K2 Inc.*, 486 F.3d 526, 532 (9th

30

Cir. 2007) (combining photographs with other graphics and images for use as an ad was an infringing derivative where photographs "still recognizable"); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co*., 856 F.2d 1341, 1343-44 (9th Cir. 1988) (use of art prints on ceramic tiles was an infringing derivative); *Ent. Resch. Grp.*, 122 F.3d at 1218 (3D costumes based upon the defendant's two-dimensional cartoon characters were derivative works of those characters).

Numerous authority confirms the same. The Seventh Circuit considered a painting of Judy Garland from *The Wizard of Oz* and found that it was a derivative work of the motion picture, despite the addition of new design. *Gracen v. Bradford Exch*., 698 F.2d 300, 302 (7th Cir. 1982) (Posner, J.). The image from the film and the derivative painting are shown below:



*Id.* at 306-07.  Likewise, the Second Circuit held that Warhol's work was a derivative work, given that Warhol used Goldsmith's photograph "as the raw material":



*Warhol*, 11 F.4th at 53.

The Second Circuit held that "there can be no reasonable debate that the works are substantially similar."  *Id.*  "[A]ny reasonable viewer with access to a range of such photographs including the Goldsmith Photograph would have no difficulty identifying the latter as the source material for Warhol's [work]."  *Id.*  Here, there is also "no reasonable debate" that the Photograph and Defendants' derivative works are substantially similar, as discussed next.

32

### C.     The Photograph and Defendants' Derivative Works Are Substantially Similar As a Matter of Law.

#### 1.     Legal Standard for Substantial Similarity

Copyright infringement is simple to articulate, as this Court recently did in *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 940 (9th Cir. 2023): "to state a claim for copyright infringement against [Defendants], [Sedlik] must show that (1) he owns a valid copyright …, and (2) [Defendants] copied protected aspects of his work." Here, Defendants do not dispute Sedlik owns a valid copyright in the Photograph (2-ER-317–18), so it is only the second prong, whether Defendants copied protected aspects of the Photograph, that is at issue. "To demonstrate the second prong, [Sedlik] must plausibly allege both (1) copying and (2) unlawful appropriation." *Hanagami*, 85 F.4th at 940. Copying is not in dispute since Defendants admitted to directly copying the Photograph into a derivative Tattoo, and posting photographs and videos of the Tattoo and Photograph to social media. 3-ER-510. "Plagiarists rarely work in the open and direct proof of actual copying is seldom available." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 49 (1st Cir. 2012). Thus, the dispute is whether Defendants carried out unlawful appropriation (i.e., whether the works are substantially similar).

When determining whether two works are substantially similar, this Court employs a two-part test. First, the extrinsic test assesses the objective similarities of the two works, focusing on the protected elements of the plaintiff's expression.

33

*Rentmeester*, 883 F.3d at 1118. The focus is on the similarities, not the differences. *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 851 (9th Cir. 2012) ("It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown.") (citing Nimmer on Copyright § 13.03[B][1][a]). "[A] copyright defendant need not copy a plaintiff's work in its entirety to infringe that work. It is enough that the defendant appropriated a substantial portion of the plaintiff's work." *Id.*. Second, the intrinsic test uses a holistic, subjective comparison to determine whether the works are substantially similar in "total concept and feel." *Rentmeester*, 883 F.3d at 1118.

"When the works are so overwhelmingly identical that the possibility of independent creation is precluded, there is simply no genuine dispute as to any material fact." *Unicolors*, 853 F.3d at 987 (finding substantial similarity as a matter of law where the works were "overwhelmingly similar" yet had "minor differences" in color and background); *Twentieth Century-Fox*, 715 F.2d at 1330.

So long as the "the appropriation would be recognized instantly by anyone familiar with the original," there is substantial similarity. *Fisher v. Dees*, 794 F.2d 432, 434 (9th Cir. 1986) (two works were substantially similar as a matter of law where the new work copied the first six bars of music, even though lyrics were changed); *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021)

34

(substantial similarity "clearly" exists when the defendant engages in "literal or verbatim" copying).

Jury verdicts on substantial similarity may be reviewed and reversed by this Court. *Gray*, 28 F.4th at 102-03; *Antonick v. Elec. Arts, Inc*., 841 F.3d 1062, 1066 (9th Cir. 2016).

### 2.    The Extrinsic Test is Met as a Matter of Law.

The district court should have granted summary judgment in Sedlik's favor due to the overwhelming and obvious similarities between the Photograph and Defendants' derivative works.  Few cases present a stronger case of substantial similarity.

### a.    The Tattoo Meets the Extrinsic Test.

Sedlik presented unrefuted evidence of Defendants caught red-handed in the act of directly copying, tracing, and referencing the Photograph.  3-ER-468, 3-ER-480.  Defendants' client, Farmer, requested the Tattoo appear exactly like the Photograph.  2-ER-207, 2-ER-200.  Defendants agreed, downloaded a copy of the Photograph, printed it, directly traced it on a lightbox, and transferred that tracing onto Farmer's skin.  2-ER-233, 2-ER-210–16.  KVD referenced the printed copy to precisely replicate Sedlik's expression.  2-ER-216.  HVT bragged on social media the works were "100% exactly the same" and "traced directly from" the Photograph.  3-ER-510.

Defendants' Tattoo is a "near duplicate[] [of the Photograph] save for superficial differences," and thus, "no reasonable jury could find that the [Tattoo is] not substantially similar." *Unicolors*, 853 F.3d at 987. "[G]iven the degree to which [Sedlik's] work remains recognizable within [Defendants'], there can be no reasonable debate that the works are substantially similar." *Warhol*, 11 F.4th at 53. A side-by-side comparison leaves no doubt:



3-ER-491. Any reasonable observer would recognize the substantial similarities between the Photograph and the Tattoo, including the combination of lighting, shadows, perspective, pose, composition, and gaze. 2-ER-174–82. Sedlik re-positioned Davis' fingers to form a symbolic, non-natural cascading configuration, and this was replicated by Defendants in the Tattoo. 2-ER-163, 2-ER-165–66, 2-

ER-172.  KVD did not refer to any other photographs to make the Tattoo.  2-ER-220.  KVD admitted to copying nearly *all* of Sedlik's protected expression:

> Q.    The pose of Miles Davis is the same?
> A.    Yes, yes.
> Q.    And it's the same perspective, isn't it?
> A.    Yes, uh-huh.
> Q.    And looking in the same direction?
> A.    Yep. It's a photo, yeah.
> Q.    And the fingers are arranged the same?
> A.    Yes.
> Q.    And the lighting direction is the same?
> A.    Yeah.
> Q.    And the perspective is the same?
> A.    Yes. …
> Q.    And the tattoo shadows and highlights match the shadows and highlights of the photo, don't they?
> A.    A lot of them, yeah.

2-ER-217–22.  It defies one's eyes—and HVT's own admission—that the works were found *not* to be substantially similar.

It is not appropriate to scour the works under a microscope to detect any trivial or superficial variation. "Substantial similarity does not require literally identical copying of every detail." *Rogers*, 960 F.2d at 308.  In *Rogers*, the Second Circuit found substantial similarity as a matter of law between the following black-and-white photograph and colorful, 3D sculpture, where the defendant, like here, admitted that the photograph served as a reference for the sculpture:



This Court in *Penguin Books* found substantial similarity involving *The Cat in the Hat* and a parody, including the cat and its hat on the front covers, where the defendant admitted to using the "style of the illustrations":



109 F.3d at 1407-08. None of the illustrations were copied identically, but this Court concluded "that substantial similarity exists on an objective and subjective level." *Id.* at 1398; *Ent. Rsch. Grp.*, 122 F.3d at 1224 (involving photographs and 3D costumes, "no reasonable trier of fact would see anything but a direct replica of the underlying characters.").

38

Applying that precedent here, there is substantial similarity as a matter of law. How can the works in *Warhol*, *Rogers*, and *Penguin Books* be substantially similar as a matter of law, but the works in this case not be? The same expression is present in the Photograph and Tattoo, and the differences are "superficial," "minor," and the result of "imperfect copying." *Unicolors*, 853 F.3d at 985 ("minor" differences arising from "artifacts from imperfect copying" are irrelevant). KVD admitted that, as a practical matter, she "can't make something exactly the same as a photo." 2-ER-218. Other than KVD's biased testimony, Defendants presented no evidence on the alleged lack of similarity between the works.[6]

The district court should have granted summary judgment or judgment as a matter of law on the issue of substantial similarity. *Gray*, 28 F.4th at 95. At summary judgment, Sedlik identified 51 original elements in the Photograph (2-ER-348, 2-ER-363–68) and argued that each of them were copied by Defendants (2-ER-348). Yet the district court ignored Sedlik's evidence and erroneously found that he did not articulate *any* similarities between the works. 1-ER-121. When Sedlik moved for JMOL based on testimony and evidence at trial, including

---

[6] The district court excluded Defendants' expert, Anna Friedman, on this topic shortly after its summary judgment order. 2-ER-282.

KVD's admissions, the district court declined to address *any* objective similarities in its order.  1-ER-5.

### b.    The Social Media Posts Meet the Extrinsic Test.

Defendants posted photographs and videos depicting the Tattoo about 15 times to social media.  Some posts included an actual copy of Sedlik's Photograph:



3-ER-468.  Sedlik's original expression is recognizable in these photos and videos, and indeed, the posts prominently display the Tattoo with a caption.  3-ER-477. As the district court found, "[t]he same elements and pose copied from the [Photograph] for the Tattoo were necessarily reproduced in the social media posts of the Tattoo."  1-ER-118.

The addition of a caption does not obviate substantial similarity, nor does it transform a copyrighted work.  *McGucken*, 42 F.4th at 1158 ("[a]dding informative

captions does not necessarily transform copyrighted works"). Nor can KVD avoid liability by pointing to the fact that some of the posts show a cropped or partially-completed version of the Tattoo. "[C]ropping and angle" are not "real differences in the designs." *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 954 (9th Cir. 2019). Substantial similarity "rests solely upon a comparison of the plaintiff's work and the defendant's final version." Patry On Copyright § 9:78; *Stromback v. New Line Cinema*, 384 F.3d 283, 299 (6th Cir. 2004) (refusing to consider earlier versions of screenplay for substantial similarity). The Tattoo is referred to in all of these posts. 3-ER-468. Defendants stipulated that four progress posts (3-ER-468–69, 3-ER-475–76), all of which depicted both the Photograph and an incomplete, partially obscured Tattoo along with a caption, were substantially similar. 2-ER-238 ("I can't really argue [those] social media post[s] [are] not substantially similar because his photograph is in it."). Thus, Defendants cannot point to variations due to the "progress" being made on the Tattoo. The progress shots show the same features from the Photograph, including the combination of lighting, shadows, perspective, pose, composition, and gaze. 3-ER-468, 2-ER-174–82.

### 3. The Intrinsic Test is Met as a Matter of Law for All of Defendants' Derivatives of the Photograph.

Because the objective similarities between the works are overwhelming, and the differences so trivial, the intrinsic test is not needed. *Unicolors*, 853 F.3d at

41

987 ("Where the extrinsic similarity is so strong … the court need not delve into a complex subjective analysis of the works to assess substantial similarity and does not risk supplanting the jury's subjective interpretation with its own."); *accord Bell*, 12 F.4th at 1074.  The intrinsic test is nonetheless met.

All of the works have a "mood and sentiment" of melancholy, moodiness, and movement.  2-ER-181–82, 2-ER-164.  As the district court found, Defendants stated that they wanted to create a "melancholy" sentiment in the Tattoo.  1-ER-111.  The district court confirmed that KVD was trying to create "a more melancholy aesthetic."  1-ER-96.  This is the same concept and feel as the Photograph.  2-ER-181–82, 2-ER-164.

This Court has squarely rejected the position that "only a jury may apply the intrinsic test."  *Unicolors*, 853 F.3d at 986 (such a position "cannot be reconciled" with precedent); *Benay v. Warner Bros. Entm't*, 607 F.3d 620, 624 (9th Cir. 2010) ("Substantial similarity requires a fact specific inquiry, but it may often be decided as a matter of law."); *Gaito*, 602 F.3d at 63 ("The question of substantial similarity is by no means exclusively reserved for resolution by a jury."), *Twentieth Century– Fox*, 715 F.2d at 1330.

\*   \*   \*

Both the extrinsic and intrinsic tests are met, and all of Defendant's derivatives works are substantially similar to the Photograph as a matter of law.

42

### D.  Defendants Do Not Meet Their Burden of Proving Fair Use.

#### 1.  Introduction to Fair Use

Courts analyze the following four factors in determining fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  Defendants bear the burden of proving that their uses were fair.

*Dr. Seuss Enters., L.P. v. ComicMix LLC* ("*ComicMix*"), 983 F.3d 443, 459 (9th Cir. 2020).  The district court should have determined that Defendants failed to meet their burden.  The district court correctly found that factors 2 and 3 weighed *against* fair use for all of Defendants' uses, and that the Tattoo was *not* transformative under factor 1, so there were no factual disputes on these factors.  1-ER-102–04; 1-ER-129.  The district court made *no* finding that any factor weighed in favor of fair use.

But the district court declined to make an overall fair use determination, punting the decision to the jury, while refusing to instruct it on the previous rulings.  1-ER-61–62.  The district court's analysis was incompatible with this Court's precedent.  This Court routinely rejects fair use defenses in cases involving

43

vastly weaker facts for the copyright owner. *McGucken*, 42 F.4th at 1158 (no

evidence of past licensing); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 744 (9th

Cir. 2019) (similar). All four factors weigh against fair use as a matter of law.

### 2.      Factor 1 – Purpose and Character of the Use

#### a.      The Law of Transformative Use Under *Warhol*

*Warhol* confirms that this factor weighs against fair use for all of

Defendants' uses. Warhol created a work using Goldsmith's photograph of the

musician Prince and licensed it to a magazine. 598 U.S. at 515. The Supreme

Court held that this factor favored Goldsmith, even though Warhol added new

expression, and made several critical holdings with respect to transformative use.

First, the addition of "something new" does not, by itself, "render such use

fair," and the smaller the difference, the less likely factor 1 weighs in favor of fair

use. *Id.* at 529. The degree of transformation must go beyond that required to

qualify as a derivative work. *Id.* Indeed, in discussing its earlier *Campbell*

decision, *Warhol* stated that because *Campbell* determined that 2 Live Crew had

created a parody, "a distinct purpose of commenting on the original or criticizing

it," factor 1 favored fair use. *Id.* (citing *Campbell v. Acuff-Rose Music, Inc.*, 510

U.S. 569, 580-83 (1994)). The Supreme Court noted that the types of copying that

are typically fair involve criticism, comment, news reporting, teaching,

scholarship, or research. *Id.* at 528. Here, Defendants did not argue that any of

44

their uses falls into any of these categories, nor did they argue that their uses

extend beyond the creation of derivative works, which was their burden to prove.

*Warhol*, 598 U.S. at 529.

Second, to be transformative, the use should "target" or have a "critical

bearing" on the original work itself, not what it depicts. *Id.* at 546-47 ("Because

[the secondary work] 'has no critical bearing on' Goldsmith's photograph, the

commentary's 'claim to fairness in borrowing from' her work 'diminishes

accordingly (if it does not vanish).'"). If the use does not "target" the original

work, the defendant must present a "compelling" justification for the use. *Id.*

Using a photograph for its content—without commenting on the photograph

*itself*—is neither targeting nor a compelling justification. *Philpot v. Indep. J. Rev.*,

92 F.4th 252, 260 (4th Cir. 2024) (applying *Warhol*, holding that using a

photograph "expressly for its content," does not add new meaning and is not

transformative); *Griner v. King*, 104 F.4th 1, 10 (8th Cir. 2024) (use of Internet

meme for political ad was not a "compelling" justification); *McGucken*, 42 F.4th at

1158 (use of photos not transformative when used to depict the same subject).

While the Warhol Foundation argued that Warhol's work commented on

"celebrity," the Supreme Court found that was not transformative, reasoning that

either targeting of the original work or a "compelling" justification must exist.

*Warhol*, 598 U.S. at 540-41. For example, satire (which ridicules society, but does

45

not necessarily target the work) is not transformative because it "can stand on its own two feet and so requires justification for the very act of borrowing." *Id.* at 530. Parody, on the other hand, is transformative because it "targets" an author or work for humor or ridicule and "needs to mimic an original to make its point." *Id.*

Finally, *Warhol* considered how the photographer Goldsmith had previously used her photograph, one of which was to license it to a magazine to serve as an artistic reference for a derivative work. *Id.* at 535. The Supreme Court found that "[s]uch licenses, for photographs or derivatives of them, are how photographers like Goldsmith make a living. They provide an economic incentive to create original works, which is the goal of copyright." *Id*.

### b.    Defendants' Tattoo Is Not Transformative.

Defendants' use of the Photograph in the Tattoo was not transformative. Defendants have never argued or provided evidence that the creation of the Tattoo had a critical bearing on, commented, criticized, parodied, or otherwise targeted the Photograph itself. Nor have they offered any "compelling" justification for their use. Rather, Defendants made a derivative work in the form of a Tattoo as a means to engage with their followers and promote their businesses. 2-ER-223.

The district court correctly found the Tattoo to be non-transformative. 1-ER-101. It rejected Defendants' claim that the allegedly different "aesthetic character" of the Tattoo made it transformative, and found that the Tattoo did not

46

"shed light on" the Photograph itself: "Nor does the Tattoo require borrowing from the original like parody, criticism, or commentary, which are transformative because they conjure 'up the original work to shed light on the work itself, not just the subject of the work.'" *Id.* (citing *Warhol*, 598 U.S. at 540). KVD admitted "that had the [Photograph] not existed, she would have 'just used another image.'" 1-ER-101.

This Court should also find that the Tattoo was not transformative. Defendants copied the Photograph to make a Tattoo and broadcast that Tattoo to their millions of followers to promote their business interests, not to "shed light on" the Photograph. 2-ER-208, 2-ER-220, 2-ER-224–29. Where an infringer copies a photograph "simply to illustrate what that work already depicts, the infringer adds no 'further purpose or different character.'" *McGucken*, 42 F.4th at 1158; *Philpot*, 92 F.4th at 260. KVD copied the Photograph into a different medium—exactly what the Supreme Court held is not a transformative use. *Warhol*, 598 U.S. at 543-44, 546; *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 181 (2d Cir. 2024) ("Changing the medium of a work is a derivative use rather than a transformative one.").

Defendants' use of the Photograph as an artistic reference and on social media are the same uses that Sedlik exploits with his Photograph. *Warhol*, 598 U.S. at 530. For decades, Sedlik has licensed the Photograph to other artists,

47

including a tattooist, to make derivative works in various media, such as social media. Sedlik makes his living licensing all of his photographs, including the Photograph. *E.g.*, 3-ER-493–505, 3-ER-485–90; 2-ER-307–09.

### c.    Defendants' Social Media Posts Are Not Transformative.

Defendants' 15 social media posts depict the Tattoo and, sometimes, a printed copy of the Photograph, in videos and photographs. 3-ER-468–79, 3-ER-481–82, 3-ER-484, 3-ER-510–12. These uses do not "shed light on" or "target" the Photograph itself. *Warhol*, 598 U.S. at 530. Defendants offer no "compelling" justification for their extensive promotion on social media, displaying the Tattoo and Photograph 15 times during a three-year period to their millions of followers. *Warhol*, 598 U.S. at 530 (a "compelling justification" is needed where "wide dissemination of a secondary work would otherwise run the risk of substitution for the original or licensed derivatives of it").

Defendants use their social media accounts to promote their brands, products, and services. 3-ER-513–21, 2-ER-224–29. The district court offered no explanation as to how the Tattoo was *not* transformative, but the social media posts, seen by millions of potential customers, could be transformative. There was nothing "incidental," as the district court found, about Defendants' exploitation of the Photograph. 1-ER-9–10.

48

The district court found that Sedlik "never offered" evidence of a license for social media. 1-ER-11. This was incorrect. In fact, Sedlik licenses the Photograph and its derivatives for reproduction, distribution, and display on social media. 2-ER-146–49, 2-ER-190 ("Social media and the web are the primary markets for the licensing of photography today."). Sedlik's license agreements include specific provisions permitting the licensee to use the derivative works on social media. 3-ER-493–94, 3-ER-495 ("Licensee may display printed and digital copies … *on social media*"), 3-ER-485–86 ("I offer limited licenses … [for use on] corporate social media accounts, social media profile image or cover image, and memes employed to promote products, services, brands or causes.").

The district court invented a novel justification for Defendant's copying, not made by Defendants: "including the [Photograph] was necessary to make the social media posts' point, which was to show [KVD's] use of source material to create a tattoo and her prowess in replication." 1-ER-10. Sedlik is aware of no decision in the history of copyright jurisprudence permitting copying so that an infringer may showcase their "prowess" in carrying out infringement. *Warhol* rejected this argument: "[the defendant] bears the burden to justify its taking of [] work with some reason other than, 'I can make it better.'" *Warhol*, 598 U.S. at 547, n.21. Defendants did not engage in transformative use.

49

### d.    All of Defendants' Derivative Uses Were Commercial.

The commerciality inquiry asks "whether such use is of a commercial nature or is for nonprofit educational purposes." *Warhol*, 598 U.S. at 527 (quoting § 107(1)). Commerciality is not limited to the direct payment of money, and instead, is determined by "whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. "Profit" includes any advantage or benefit, including gaining recognition among followers and authorship credit. *Worldwide Church*, 227 F.3d at 1117-18; *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) (finding commercial use where the defendant gained recognition among his peers in the profession and authorship credit).

Defendants profited from the Tattoo by using it as a means to promote KVD, HVT, and their other business interests. Defendants made extensive use of the Tattoo, posting it about 15 times to their millions of followers on Twitter, Instagram, and Facebook. 3-ER-468–79, 3-ER-481–82, 3-ER-484, 3-ER-510–12. KVD testified that she did so "to engage with [KVD's] fans and followers." 2-ER-223. Indeed, KVD and HVT have tens of millions of followers across their social media accounts, including 9.7 million followers on KVD's Instagram account alone. 2-ER-229. Defendants' posts received hundreds of thousands of likes and reactions, including praise for KVD's "amazing" and "beautiful" work. 3-ER-

50

472–73.  Seeing the Tattoo, some followers expressed an interest to get their own tattoos from KVD.  3-ER-470 ("How long is the wait to get a tattoo done by you?"); 3-ER-478 ("Need a tat by Kat!!!"), 3-ER-469 ("Would you be able to fly me out to you for a tattoo[?]").

On these accounts, Defendants promote and offer various products and services, such as tattoos, cosmetics, books, footwear, eyewear, and concert tickets, providing links to their websites, where anyone can make purchases:









3-ER-513–21, 2-ER-224.  At trial, KVD admitted that she posts sales offers to her social media to direct her followers to purchase her products and services.  2-ER-224–29.  HVT posted photographs of the Tattoo to HVT's corporate accounts as an example of its service offering (tattoos).  3-ER-477.  There can be no dispute that Defendants used the Photograph and Tattoo to attract attention, engage with their followers, promote products and services, and boost their businesses—all of which are commercial uses.

KVD is a professional tattooist who charged $1,000 to $3,000, and sometimes more, for tattoos.  2-ER-201, 2-ER-203.  KVD inked the Tattoo at HVT, her tattoo shop.  Other tattooists worked at HVT, and they brought in paying customers wanting their own tattoos.  2-ER-204.  HVT provided employees, maintained equipment, and paid rent, and KVD received a percentage of the other

53

artists' earnings.  2-ER-204, 2-ER-232.  The employees managed HVT's social

media.  2-ER-221.

The district court found that Defendants' uses of the Photograph were

"incidental" and done to "document[] [KVD's] life and creative process."  1-ER-9.

Not so.  As a business, HVT's activities, and those of its owner KVD, were

commercial as a matter of law.  *Leadsinger*, 512 F.3d at 530 (rejecting a

corporation's proffered "educational" purposes); *Philpot*, 92 F.4th at 260 (article

was commercial because it was posted by a corporation to generate attention and

views); *Brammer v. Violet Hues Prods., LLC*, 922 F.3d 255, 265 (4th Cir. 2019)

("[Defendant's] website did not generate direct revenue or run advertising.  But

[Defendant] is a limited liability company, and it used the Photo on its website to

promote a for-profit film festival.").  Defendants cannot disguise their plainly

commercial uses as non-profit educational ones.

By generating millions of likes and views, Defendants garnered attention

and made it more likely that their followers would buy their products advertised on

these same platforms.  *Worldwide Church*, 227 F.3d at 1117-18; *Northland*, 868 F.

Supp. 2d at 979 ("Generating traffic to one's website or conveying one's message

effectively using copyrighted material is within the type of 'profit' contemplated

by *Worldwide Church*."); *Comerica Bank & Tr., N.A. v. Habib*, 433 F. Supp. 3d

79, 93 (D. Mass. 2020) (commercial use where the defendant sought to drive

traffic to his YouTube channel); *Grant v. Trump*, 563 F. Supp. 3d 278, 287

(S.D.N.Y. 2021) (commercial use where the political candidate used copyrighted

work to spread message to supporters).  Here, at least ten prospective jurors were

previously familiar with KVD through social media and some had previously

purchased her products.  2-ER-140–43.

Sedlik licenses his works for artist reference and for display on the Internet,

including social media.  3-ER-493–94, 3-ER-495–99; 2-ER-190, 3-ER-485–90.

Defendants exploited the Photograph "without paying the customary price" as held

by *Harper & Row*.

\* \* \*

Defendants fail to show that their uses were transformative or for nonprofit

educational purposes.  Factor 1 weighs against fair use.

### 3.      Factor 2 – Nature of the Copyrighted Work

The district court held that the Photograph is highly creative, enjoys broad

copyright protection (1-ER-128), and that factor 2 weighs against fair use (1-ER-

102–03).  That was correct.  *McGucken*, 42 F.4th at 1162-63 (the second factor

weighs against fair use where the published photographs at issue "were the product

of many technical and artistic decisions."); *ComicMix*, 983 F.3d at 456; *Monge*,

688 F.3d at 1177.  Sedlik's highly-creative Photograph resulted from years of

research and artistic development.  2-ER-356–62.  Factor 2 weighs against fair use.

55

### 4. Factor 3 – Amount and Substantiality Copied

The district court found that factor 3 weighed against fair use for all uses because Defendants copied "numerous elements from" the photograph, including the composition, perspective, and lighting. 1-ER-129. That was correct. Defendants copied and repeatedly published "the heart" of the Photograph without justification. *McGucken*, 42 F.4th at 1162; Pierre Leval, Toward a Fair Use Standard. 103 Harv. L. Rev. 1105, 1122-1123 (1990) ("The larger the volume (or the greater the importance) of what is taken, the greater the affront to the interests of the copyright owner, and the less likely that a taking will qualify as a fair use.").

Even if the use of the Photograph to create the Tattoo was justified (it was not), Defendants provide no justification for their excessive use of the Tattoo and the Photograph in at least *15 social media posts over a three-year period.* Such copying was "far more than was necessary." *McGucken*, 42 F.4th at 1162; *Monge*, 688 F.3d at 1179. Factor 3 weighs strongly against fair use.

### 5. Factor 4 – Effect on the Actual and Potential Market

Defendants, "as the proponent[s] of the affirmative defense of fair use, 'must bring forward favorable evidence about relevant markets.'" *McGucken*, 42 F.4th at 1163 (quoting *ComicMix*, 983 F.3d at 459). To negate fair use, Sedlik "need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." *Id.* (quoting *Monge*, 688

56

F.3d at 1182).  But where a defendant offers *no* evidence about the effect on the market for licensing of the copied work, the defendant cannot meet his burden.  *Id.* (citing *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1226 (9th Cir. 2022)).

"This factor encompasses both (1) "the extent of market harm caused by the particular actions of the alleged infringer," and (2) "'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original" and "the market for derivative works."  *McGucken*, 42 F.4th at 1163.  Even where there is little evidence of actual market harm, factor 4 weighs against fair use if similar conduct carried out by others would adversely affect the market, including the market for derivative works.  *Id.* at 1164; *ComicMix*, 983 F.3d at 460.

There can be no dispute that Defendants significantly harmed the actual and potential market for licensing the Photograph and its derivatives.  2-ER-307–09.  KVD cannot meet her burden because she presented no evidence about the effect on the market for licensing the Photograph.  *ComicMix*, 983 F.3d at 460 ("Nor does [defendant] address a crucial right for a copyright holder—the derivative works market, an area in which Seuss engaged extensively for decades."); *Penguin*

57

*Books*, 109 F.3d at 1403 (unsupported testimony "that there was no likely effect on the market of the original" did not constitute evidence about relevant markets).[7]

Sedlik negated fair use by presenting evidence of market harm in the form of past licenses for the Photograph, including as artistic references for derivative works and on social media (3-ER-493–94, 3-ER-495–99).  Sedlik's license history includes T-shirts, paintings, advertising, album covers, television, statues, and magazines, and an artist reference license to a tattooist.  2-ER-144–55, 2-ER-185–90, 2-ER-162. Sedlik's license with the painter will generate over $100,000 in license fees.  2-ER-158.  Another license included a fee of $18,150 for a one-time editorial use of the Photograph.  3-ER-501.  Defendants' actions damaged Sedlik's licensing market, and if similar uses were carried out by others, it would damage the potential licensing market for the Photograph.  *ComicMix*, 983 F.3d at 459.

Tattooists have long had their own marketplace to acquire the rights to use artwork for tattoos.  In *Tattoo Art Inc. v. TAT Intern. LLC*, 498 F. App'x 341 (4th Cir. 2012), the Fourth Circuit affirmed a judgment of contract damages due to failure to pay licensing royalties for use of copyrighted tattoos.[8]  Additionally,

---

[7] Defendants' only evidence about the tattoo marketplace, in the form of expert testimony by David Lane and Catherine Montie, was excluded by the district court.  2-ER-283–86.

[8] One need not go to Virginia to find cases involving the licensing of tattoos. *Crispin v. Christian Audiger, Inc.*, 839 F. Supp. 2d 1086 (C.D. Cal. 2011); *Hardy Life, LLC v. Nervous Tattoo, Inc.*, 2008 WL 11338698  (C.D. Cal. Aug. 4, 2008).

tattoo shops purchase and display "tattoo flash" books, the purchase of which provides a limited license to create derivative tattoos based on included illustrations. 2-ER-255, 2-ER-258–76 (example of tattoo flash book). Tattoo flash websites license rights to tattoo artists and their customers to use illustrations in creating derivative tattoos. 3-ER-401–04. Thus, there is clearly a market for licensing artwork for use in derivative tattoos, just as Sedlik has a current and potential market for licensing the Photograph for artist reference use, including to tattoo artists.

Factor 4 weighs against fair use as a matter of law.

*   *   *

All four factors weigh against fair use as a matter of law for all uses.

### E.  The Jury Instructions Did Not Correctly State the Law.

The jury's strange verdict on substantial similarity and fair use was not surprising given the district court's mismanagement of the trial and the flawed jury instructions. The jury instructions were erroneous as a matter of law for two main reasons: (1) they contradict the Supreme Court's decision in *Google v. Oracle*, stating that fair use should be decided by judges, not juries, and (2) they failed to inform the jury of the district court's legal rulings on fair use.

"[E]rroneous jury instructions, as well as the failure to give adequate instructions, are [] bases for a new trial." *Murphy v. City of Long Beach*, 914 F.2d

59

183, 187 (9th Cir. 1990). Courts "must presume prejudice where an erroneous jury instruction is given." *Fierro v. Smith*, 39 F.4th 640, 643 (9th Cir. 2022). "Jury instructions must be supported by the evidence, fairly and adequately cover the issues presented, correctly state the law, and not be misleading." *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc).

When an instruction conflicts with the law, or fails to inform the jury about previous legal rulings, the instructions are erroneous and warrant a new trial. *White v. Ford Motor Co.*, 500 F.3d 963, 974 (9th Cir. 2007) (district court's decision to withhold from the jury critical information related to compensatory damages determined in earlier action was an abuse of discretion); *see also Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) ("The district court did not err by narrowing the instruction on material contribution to the only genuine question as to that element"); *UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.*, --- F.4th ----, 2024 WL 4449684, at *15 (5th Cir. Oct. 9, 2024) (jury instructions properly asked jury to consider factual disputes, not legal issues).

First, the instructions contradict *Google v. Oracle*—subsidiary fair use determinations, such as market harm under factor 4, may be left to the jury, but the "ultimate question" of fair use is a "legal question" to be decided by the court.

60

*Google*, 593 U.S. at 24-25.[9]  The jury instructions erroneously tasked the jury with considering all factors, including those previously decided, and making an overall fair use determination.  1-ER-45–48.

Second, the district court found that factors 2 and 3 weighed against fair use as a matter of law for all of Defendants' uses.  1-ER-101–04; 1-ER-129.  There were no factual disputes on these factors.  *Id.*  Yet, over Sedlik's objection, the district court refused to inform the jury about these rulings.  1-ER-64, 1-ER-70–71.  The instructions tasked the jury to explore and evaluate "all" four factors (1-ER-48), rendering those legal rulings null and void and giving the jury authority to decide them in a way contrary to law.  This was highly prejudicial error, distorting the entire fair use analysis.  It would be similar to asking the jury to analyze the validity of Sedlik's copyright in the Photograph, even though the district court found it to be valid.  1-ER-116.

For example, for factor 3, even though it weighed against fair use as a matter of law, the instructions asked the jury to find that this factor weighed in *favor* of fair use.  1-ER-46.  It stated:  "When an accused work copies little of the original work, *this factor weighs in favor of fair use.* … If the secondary user copies only as

---

[9] One court found the decision below to be incompatible with *Google*. *Teradyne, Inc. v. Astronics Test Sys., Inc.*, 2023 WL 9284863, at *15 n.16 (C.D. Cal. Dec. 6, 2023).

much as is necessary for a transformative use, *then this factor will not weigh against fair use*." 1-ER-46.  The district court grasped the problem it faced, but threw its hands up in the air:

> THE COURT.  Well, what do you do when [some factors] haven't been decided as a matter of law? I mean, how the heck do [the jury] know how to balance? Do they flip a coin back there?

1-ER-92.  Since the district court did not know how to instruct the jury, and declined to instruct them about its rulings, the jury did not know what to do either.  A coin flip may well have been what the jury did.  Sedlik tried to rectify the problem by asking the district court to inform the jury about the district court's rulings, but the district court refused:

> [Sedlik's Counsel]: There's some significant problems with the fair use instructions. Most importantly, the instructions do not incorporate the Court's findings on the second and third factor.
> THE COURT:  That's deliberate.  I don't think I can -- I don't think I can tell them what my findings were.  They need to balance.  They can't balance if I tell them – it's not like a checkmark where it's a plus or a minus.  It's a weighing.
> [Sedlik's Counsel]:  It is a weighing but there's already been a factual determination and I'm concerned that if the jury is not properly instructed, then we're just going to end up back here.
> THE COURT: Sometimes that happens.

1-ER-64–65.  The district court *did* inform the jury that it found the Tattoo to be non-transformative.  1-ER-43.  There was no sound basis for this inconsistency, and it suggested to the jury that the remaining factors weighed in Defendants' favor (even though, as a matter of law, they did not).

Defendants' closing arguments directly conflicted with the district court's orders. Defendants argued that factor 3 weighed "heavily in favor" of Defendants. 2-ER-247 ("Factor 3, … *Weighs heavily in favor*."). The district court had ruled that factor 3 weighed against fair use. 1-ER-129. The treatment of this factor by the district court was both prejudicial and unfair to Sedlik, as Sedlik was ordered not to discuss the district court's ruling on factor 3. 2-ER-242.

The jury's confusion was demonstrated by the fact that they found that Defendants *had* engaged in fair use for eight uses (3-ER-472–74, 3-ER-477–79, 3-ER-481–82) that were *not* substantially similar (1-ER-61–62). That is a legal impossibility. "[T]he question of substantial similarity is logically antecedent to that of fair use … there would be no need to invoke the fair-use defense in the absence of actionable infringement." *Warhol*, 11 F.4th at 52-53; 4 Nimmer § 13.05[A] ("[F]air use is a defense not because of the absence of substantial similarity but rather despite the fact that the similarity is substantial."). The district court recognized that these findings were "contrary to the form's instructions," but did nothing. 1-ER-8. This establishes that the instructions were misleading and harmful, and is a sufficient basis for this Court to reverse the verdict.

The failure to inform the jury about its prior rulings as a matter of law on factors 2 and 3 – and to allow Defendants to mislead the jury about those factors – was highly prejudicial to Sedlik and led to a confused, badly instructed jury.

63

F.    **The District Court Erred in Excluding Sedlik's Testimony.**

The district court's systematic exclusion of evidence favorable to Sedlik rendered a reasonable jury verdict impossible. Sedlik is an experienced, well-regarded expert on licensing, and his opinions on standards, practices, markets, and damages have been endorsed by numerous courts. *See D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 111 F.4th 125, 141 (1st Cir. 2024); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 393 (3d Cir. 2016). Here, Sedlik attempted to offer (1) lay testimony grounded in his personal experience regarding his license fee, including for social media, and (2) expert testimony regarding market impact and various photography licensing practices and standards. But this testimony was excluded, even though it was relevant to actual damages and market harm.

First, Sedlik attempted to present evidence of his past license fee for the use of the Photograph in a tattoo on social media. This was grounded in Sedlik's personal experience. Such evidence is relevant to factor 4, which is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006) ("a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."). But the district court

excluded it because, in the district court's view, the fee was not "low" enough and there were "a bunch of [photographs] out on the Internet":

> [AT SIDEBAR] THE COURT:  Is it zero?
>
> [Sedlik's Counsel]:  It's $5,000.
>
> THE COURT:  That's not low.
>
> [Sedlik's Counsel]:  For the tattoo.
>
> **THE COURT:  What tattooist in their right mind would pay $5,000 to do that one when there's a bunch of them out on the Internet?**
>
> THE COURT:  Unless it's zero because that's what he charged for the one time that he did a tattoo.
>
> [Sedlik's Counsel]: Well, actually, he charged $5,000 and [gave] a discount.
>
> THE COURT:  Nonsense. I don't know what the jury is going to think but that's what I think.
>
> … [BACK IN FRONT OF JURY]
>
> [Sedlik's Counsel]:  When you issue a license for social media you use for one of your photographs with attributions to a social media user that has greater than a million followers, is there a range of the amount that you charge?  …
>
> MR. SEDLIK:  Yes. And it really depends on the circumstances as you've seen.
>
> THE COURT: All right. Move on.
>
> [Sedlik's Counsel]:  Q. Is there a number?
>
> THE COURT:  Move on.

1-ER-67–69.

Second, the district court excluded Sedlik's expert testimony about the prospect of potential market harm should KVD's use became widespread. 1-ER-66 ("Q. Are you concerned that Ms. Von D's unlicensed adaptation and use of your photograph will encourage others to use your work without a license? [Defendants' Counsel:] Objective; relevance." THE COURT: Sustained. [Sedlik's Counsel:] Actually, sidebar, Your Honor, on that? THE COURT: No."). That was wrong. *McGucken*, 42 F.4th at 1163; *Monge*, 688 F.3d at 1182.

The district court believed that Defendants' conduct, stealing a copyrighted work and making a "100%" copy, is the way the world should work. This baseless belief was so strongly held by the district court that it manifested itself in it mocking Sedlik's expert report on this issue:

> [Sedlik's Counsel]:   Mr. Sedlik does have expertise in the tattoo industry with respect to the licensing of photographs and we laid that all out in our brief.  Secondly --
>
> THE COURT:  Is that true? You're not disputing that?
>
> [Defendants' Counsel]:  I'm absolutely disputing that. Mr. Sedlik has testified and provided information that he has provided standards for the photography industry to be used in case any tattoo artist wants to enter into a license.
>
> THE COURT:  Yeah, good for him.

1-ER-89.

The district court refused to allow Sedlik to testify about licensing standards. 1-ER-74. Sedlik's declaration explained that in 2005 and 2006 he had conducted

66

research into the tattoo industry and its licensing practices at the request of a

licensing standards organization.  2-ER-255.  The organization, the PLUS

Coalition, made the decision to include tattoos as a media type in its licensing

standards, and included "artist reference" as a defined term for use in license

agreements.  2-ER-254–55.  These standards were published in 2007 and 2008 as

the result of a collaborative multi-industry process and have been adopted by

numerous companies, such as Google and Adobe.  2-ER-253.

Yet the district court excluded Sedlik's expert testimony, stating that it was

somehow tainted because Sedlik had re-confirmed his opinions by conducting

further research at tattoo shops after filing his complaint.  1-ER-83.  The district

court stated that it was *not* excluding Sedlik's testimony because he was a party.

*Id.*  But the district court ignored that Sedlik's declaration stated that these

standards were developed in 2005 and 2006.  2-ER-255.[10]

Sedlik performed supplemental site visits to tattoo shops during the suit to

determine whether they were still using licensed artistic references, as they had

been doing in 2005 and 2006.  2-ER-255 ("during the period 2005 through 2006, I

personally visited multiple tattoo parlors in the Los Angeles area, and observed

---

[10] During the hearing, Sedlik wrote a note to his counsel explaining that his declaration stated that the research was performed 15 years before he filed the complaint.  The district court blocked Sedlik from consulting with counsel and admonished Sedlik, stating "don't bother writing him a note. I'm not allowing it, period, end of story."  1-ER-84.

that without exception, each business included 'tattoo flash,' primarily in the form of books and point-of-purchase display posters. … In the course of the instant Action, I again visited tattoo parlors in the Los Angeles area"). This Court has firmly rejected the proposition that an expert cannot perform research after a complaint is filed. In *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, the expert performed two "site visits" *after* the lawsuit was filed. 752 F.3d 807, 815 (9th Cir. 2014). This Court found that these visits, along with other investigation, provided a sufficiently reliable basis for the expert's opinions. *Id.* Indeed, experts routinely conduct investigation after the lawsuit is filed precisely because that is usually when they hired – while a lawsuit is pending. To say that makes Sedlik's opinions unreliable, as the district judge did, is absurd. 1-ER-83. The district court abused its discretion in excluding Sedlik's opinions for this reason.

Given the exclusion of critical evidence on the most critical part of fair use, it is unsurprising that the jury verdict came out as it did: fatally wrong.

## VIII.  CONCLUSION

Tattooists, like all other creators and artists, must follow copyright law. Sedlik respectfully submits that the Court reverse the judgment below, find copyright infringement as a matter of law, and remand for a new trial, limited solely to damages.

Dated:     October 15, 2024                    Respectfully submitted,

By:  */s/ Robert E. Allen*

Robert E. Allen
Jason C. Linger
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., Floor 19
Los Angeles, CA 90067
(310) 553-3000


By:  */s/ William F. Patry*

William F. Patry
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
(212) 506-2364

*Attorneys for Plaintiff-Appellant*
*Jeffrey B. Sedlik*

69

## <u>STATEMENT OF RELATED CASES</u>

Plaintiff-Appellant Jeffrey B. Sedlik is not aware of any related cases

pending in this Court.

Dated:     October 15, 2024          Respectfully submitted,

By: _/s/ Robert E. Allen_
Robert E. Allen

*Attorney for Plaintiff-Appellant*
*Jeffrey B. Sedlik*

1

## <u>CERTIFICATE OF COMPLIANCE</u>

I am the attorney for Plaintiff-Appellant Jeffrey B. Sedlik.  I certify that this brief contains 13,621 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).  I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated:     October 15, 2024          Respectfully submitted,

By:  */s/ Jason C. Linger*
Jason C. Linger

*Attorney for Plaintiff-Appellant
Jeffrey B. Sedlik*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All counsel of record in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Dated:     October 15, 2024          Respectfully submitted,

By:  */s/ Jason C. Linger*
Jason C. Linger

*Attorney for Plaintiff-Appellant*
*Jeffrey B. Sedlik*