No. 24-3367

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JEFFREY B. SEDLIK,

*Plaintiff-Appellant,*

v.

KATHERINE VON DRACHENBERG,
KAT VON D, INC., HIGH VOLTAGE
TATTOO, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Case No. 2:21-cv-01102
Hon. Dale S. Fischer

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 1 OF 3

Robert E. Allen
Jason C. Linger
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., Floor 19
Los Angeles, CA 90067
(310) 553-3000

William F. Patry
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
(212) 506-2364

*Attorneys for Plaintiff-Appellant Jeffrey B. Sedlik*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY B. SEDLIK,<br>     Plaintiff,<br><br>          v.<br><br>KATHERINE VON<br>DRACHENBERG, et al.,<br>     Defendants. | CV 21-1102 DSF (MRWx)<br><br>ORDER ON RENEWED<br>MOTION FOR JUDGMENT AS A<br>MATTER OF LAW AND<br>REQUEST FOR A NEW TRIAL<br><br>(Dkt. 234) |

Plaintiff Jeffrey B. Sedlik moves for judgment as a matter of law and a new trial.  Dkt. 234.  Defendants Kat von D and High Voltage Tattoo oppose.  Dkt. 236.  The Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.  For the reasons stated below, the motions are DENIED.

## I. Judgment as a Matter of Law

### A.    Legal Standard

Federal Rule of Civil Procedure 50(a) permits a party to move for judgment as a matter of law after the close of evidence but before the case is submitted to a jury.  Dupree v. Younger, 598 U.S. 729, 731 (2023).  "This standard largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record."  Id. at 731–732.  If the motion is denied, Rule 50(b) permits a renewed motion for judgment as a matter of law after the jury renders a verdict.  Id. at 732.

**ER-2**

The standard for overturning a jury verdict is "very high"; it requires a showing that there is no legally sufficient basis for a reasonable jury to find for the prevailing party on the challenged issue. Costa v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002). The court must review all evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000). Because Rule 50(b) permits only a renewed motion, "[a] party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003).

## B.   Substantial Similarity

Sedlik asks the Court to displace the jury's verdict on substantial similarity. The jury found that the Tattoo, the Sketch (Ex. 202), the "Messy Progress" Social Media Post (Exs. 207, 208), the Final Tattoo Social Media Post (Ex. 209, 210, 211, 214, 215, 216, 240, 242), the Instagram Story (Ex. 253), and the photo of KVD at the lightbox (Exs. 338, 339) were not substantially similar to Sedlik's photograph of Miles Davis (the Portrait). Dkt. 218.

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)), overruled on other grounds by Skidmore as Tr. For Randy Craig Wolfe Tr. v. Led Zeppelin, 952 F.3d 1051 (9th Cir. 2020). "[T]he second element has two distinct components: copying and unlawful appropriation." Rentmeester v. Nike, Inc., 883 F.3d 1111, 1117 (9th Cir. 2018) (internal quotation marks omitted), overruled on other grounds by Skidmore, 952 F.3d 1051.

To determine whether the defendant has engaged in unlawful appropriation, courts consider whether the alleged infringement is

2

"substantially similar" to the original.  See Skidmore, 952 F.3d at 1064. The Ninth Circuit applies a two-part test to determine whether a defendant has engaged in unlawful appropriation: the extrinsic test and the intrinsic test, both of which must be satisfied.  Id.  The extrinsic test "compares the objective similarities of specific expressive elements in the two works," distinguishing between the protected and unprotected material in a plaintiff's work.  Id.  The intrinsic test considers "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance."  Id. (citing Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 637 (9th Cir. 2008)).

"The intrinsic test requires a more holistic, subjective comparison of the works to determine whether they are substantially similar in 'total concept and feel.'"  Rentmeester, 883 F.3d at 1118.  This Court has already concluded that a reasonable juror could find the two works different in total concept and feel.  Dkt. 69 (Summ. J. Order) at 16.  The Court must draw the reasonable inference that the jury did.  Reeves, 530 U.S. at 150 (all reasonable inferences must be drawn in favor of non-moving party).

The Ninth Circuit has stated that "[i]t is not the courts' place to substitute our evaluations for those of the jurors" in unlawful appropriation cases.  Williams v. Gaye, 895 F.3d 1106, 1127 (9th Cir. 2018) (citing Union Oil Co. of Cal. v. Terrible Herbst, Inc., 331 F.3d 735, 743 (9th Cir. 2003)).[1]  The intrinsic test for unlawful appropriation

---

[1] It is true that in "exceptional cases," both copying and unlawful appropriation may be decided as a matter of law.  Unicolors, Inc. v. Urb. Outfitters, Inc., 853 F.3d 980, 986 (9th Cir. 2017).  But this is not an exceptional case.  It concerns a derivative work, which is the second most frequently discussed right in cases concerning substantial similarity analyses.  Clark D. Asay, An Empirical Study of Copyright's Substantial Similarity Test, 13 U.C. Irvine L. Rev. 35, 73 (2022).  Here, there is direct evidence of copying.  This is true of approximately 17% of cases where copying or unlawful appropriation are disputed.  Id. at 78.  And the contested issues in this case concern unlawful appropriation, which is true of most

3

ER-4

is "'uniquely suited for determination by the trier of fact' because of its focus on the lay [person], and so '[a] court must be reluctant to reverse' a jury's finding that two works are intrinsically similar." <u>Gray v. Hudson</u>, 28 F.4th 87, 97 (9th Cir. 2022) (citing <u>Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.</u>, 562 F.2d 1157, 1166 (9th Cir. 1977)).  Persuading a court to second guess the jury's application of the intrinsic test is a "significant, if not unsurmountable, hurdle[.]" <u>Williams</u>, 895 F.3d at 1127.

Sedlik argues that he has satisfied the intrinsic test because Defendants have not presented any evidence showing that the works have a different total concept and feel.  Dkt. 241 (Reply) 8.  Sedlik cites trial testimony concerning the mood of the photograph and the Tattoo. <u>Id.</u>  However, the entire point of the intrinsic test is that it is from the perspective of the ordinary person without expert assistance.  The only evidence that a jury needs in order to apply the intrinsic test is the original work and the alleged infringement.  Again, the Court must draw the reasonable inference that considering the works, the jury concluded that they had a different total concept and feel from the Portrait.[2]

Sedlik also argues that application of the substantial similarity test was unnecessary because Defendants admitted to evidence of direct copying.  For this principle he cites <u>Norse v. Henry Holt & Co.</u>, 991 F.2d 563 (9th Cir. 1993) and <u>Range Rd. Music, Inc. v. E. Coast Foods, Inc.</u>, 668 F.3d 1148 (9th Cir. 2012).  Dkt. 234-1 (Mem.) 9.  This is the fourth time that Sedlik has raised this argument, which is clearly contradicted by black letter copyright law.  As explained above, the second prong of the infringement analysis contains two separate

_____

cases in the subject area.  <u>Id.</u> at 40.  The legal issues in this case are in many ways run of the mill.

[2] The Court has already explained that it found a triable issue of fact on this issue.  Dkt. 69 (Summ. J. Order) at 16.  Considering the two works, the Court finds that the jury's verdict is also not against the clear weight of the evidence and a new trial is not warranted.

4

components: "copying" and "unlawful appropriation." Skidmore, 952 F.3d at 1064 (citing Rentmeester, 883 F.3d at 1117).

Even "after proving that the defendant's work is the product of copying rather than independent creation, the plaintiff must still show copying of protected expression that amounts to unlawful appropriation." Rentmeester, 883 F.3d at 1124. "Proof of unlawful appropriation— that is, illicit copying—is necessary because copyright law does not forbid all copying." Id. at 1117. "Unfortunately, . . . [the Ninth Circuit has] used the same term—'substantial similarity'—to describe both the degree of similarity relevant to proof of copying and the degree of similarity necessary to establish unlawful appropriation." Id.

Sedlik continues to confuse these two concepts. If copying is admitted, then there is no need to prove copying under the first prong of the infringement test. But it is still necessary to prove the second prong: unlawful appropriation. In both Norse and Range Road, it was indisputable that copyrightable original expression was used, and thus the second prong was satisfied. Norse concerned idiosyncratic phrases from unpublished letters, and Range Road concerned the public performance of copyrighted songs. Here, for several of the challenged uses (including the Tattoo), Defendants argue that the elements copied from the Portrait (such as Miles Davis's face) are not copyrightable. The first prong was not in dispute, but the second prong was. The Court must draw the reasonable inference that the jury found that it was the unprotected elements of the Portrait that were copied.

## C.    Fair Use

Sedlik also moves for judgment as a matter of law on the issue of fair use. Mem. at 17. Rule 50(b) allows for a *renewed* motion for a judgment as a matter of law after the entry of judgment. "As explicitly stated in the Rule, a Rule 50(b) motion may be considered only if a Rule 50(a) motion for judgment as a matter of law has been previously made." Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d 1075, 1081 (9th Cir. 2009). Otherwise, the motion is not *renewed*.

"The purpose of this rule is twofold. First it preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of judgment as a matter of law instead of forcing it to 'engage in an impermissible reexamination of facts found by the jury.'" Freund, 347 F.3d at 761 (quoting Lifshitz v. Walter Drake & Sons, 806 F.2d 1426, 1428–29 (9th Cir.1986)).  "Second, it calls to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them."  Freund, 347 F.3d at 761.

At trial, Sedlik moved for a directed verdict only on substantial similarity, not fair use.  Dkt. 237-1 (Ex. B) 467:6–13; Ex. C at 535:25–536:7.  Sedlik argues that he has preserved the issue because he raised numerous objections to the jury instructions on substantive grounds.  Reply at 12–13. "[A]n objection to a jury instruction on the ground that insufficient evidence was presented on an issue to allow it to be submitted to the jury may constitute a 'sufficient approximation' of a motion for a directed verdict to satisfy the requirements of Rule 50(b)."  McClaran v. Plastic Indus., Inc., 97 F.3d 347, 360 (9th Cir. 1996) (quoting Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342, 1346–47 (9th Cir.1985)).  However, Sedlik's objections regarded the language of the instructions, and whether the jury should be instructed on the Court's prior findings, not the sufficiency of the evidence.  See infra II.C.  Sedlik neither preserved the sufficiency of the evidence as an issue of law, nor gave Defendants fair notice to correct any alleged deficiencies in the evidence.  Sedlik's Rule 50(b) motion is "procedurally foreclosed" by his failure to file a Rule 50(a) motion.  Tortu, 556 F.3d at 1083.

## II. Motion for a New Trial

### A.    Legal Standard

A court may grant a new trial under Federal Rule of Civil Procedure Rule 59 "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P. 59(a).  These reasons, include, but are not

limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (citation and quotation marks omitted). A new trial is appropriate where "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." Id. (citation and quotation marks omitted). On a motion for new trial, "the district court has 'the duty . . . to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" Id. (citation and quotation marks omitted). "However, a district court may not grant a new trial simply because it would have arrived at a different verdict." Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir. 2001).

**B.     Fair Use**

Sedlik contends that the jury's verdict on fair use is against the clear weight of the evidence. The jury found that Defendants' reproduction of the Portrait on her social media was a fair use. Verdict at 3. The image determined to be a fair use depicts Kat von D inking the Tattoo with the Portrait in the background. Exs. 203, 204, 212, 213. It was posted to several of Defendants' social media pages. The Court need consider only whether the jury's verdict is contrary to the clear weight of the evidence as to the social media posts, not the other uses that were not considered substantially similar.[3]

---

[3] The jury found that several exhibits were both not substantially similar and a fair use. This was contrary to the form's instructions. Superfluous answers on a verdict form are to be disregarded. See Floyd v. L., 929 F.2d 1390, 1398 (9th Cir. 1991). Sedlik argues that the findings that a work is "not substantially similar and fair use – [are] not inconsistent with each other because they [are] paths to the same result." Reply at 14. The Court disagrees. Fair use is an affirmative defense; therefore, there must be a copyright infringement for the application of the doctrine. A finding that

Sedlik argues that that the jury's finding of fair use is contrary to the clear weight of the evidence because the social media uses were not transformative, were commercial, and harmed the market for Sedlik's photograph. Reply at 18–23. While the Court cannot read the jurors' minds, it is not persuaded that the clear weight of the evidence (and law) favors any of Sedlik's positions.

First, Sedlik argues that the social media post is not transformative because it does not target the original work itself. The Supreme Court has held that a work that targets another, such as criticism, commentary, and parody, is transformative because it needs to conjure up the other to make its point or fulfill its purpose. See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 598 U.S. 508, 530 (2023). However, targeting is not required. Id. at 547 n.21. The Supreme Court noted in Warhol that the proponent of a fair use defense must either show that they targeted the original work or offer another "compelling justification for the use." Id. at 540.

In Kelley v. Morning Bee, Inc., No. 1:21-CV-8420-GHW, 2023 WL 6276690, at *12 (S.D.N.Y. Sept. 26, 2023), the district court found that the incidental appearance of copyrighted images in the background of a documentary about Billy Eilish was a transformative use of the images. The court reasoned that "the momentary and incidental depiction of Plaintiff's photographs in the documentary-style Film (sic) comprises 'a transformative purpose of enhancing the biographical story, a purpose separate and distinct from the original artistic and promotional purpose for which the images were created.'" Kelley, 2023 WL 6276690 at *12 (quoting Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609 (2d Cir. 2006)) (simplified). Similarly, Defendants' social media posts have the biographical purpose of documenting Kat von D's life and creative process. This purpose is distinct from the original

---

there is no substantial similarity is a finding that there was no infringement, so the fair use doctrine is inapplicable.

artistic and commercial purposes of the Portrait.[4]  However, Sedlik's contention that targeting is required is false as a matter of law.  As discussed above, it may be a sufficient condition for fair use, but it is not a necessary condition.

But even if the jury found that the social media posts were not transformative, they still could have found that evidence of non-commerciality tipped the first factor (and perhaps all of the factors) towards fair use.  The Supreme Court has stated that "[t]here is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." Google LLC v. Oracle Am., Inc., 593 U.S. 1, 32 (2021).  Citing Worldwide Church. Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1117 (9th Cir. 2000), Sedlik argues that the social media posts were "a paradigmatic commercial use." Reply at 20.  But a paradigmatic commercial use is surely one where copyrighted material is exploited for monetary profit.  None of the posts included a link to purchase anything.  And testimony at trial revealed that the posts did not generate any sort of direct profit.  Dkt. 231-1 (Ex. C) 520:11–521:8.

It is true that "the crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price[.]" Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 (1985).  However, construing the term "profit" too broadly would render everything commercial.  Not all social media posts are for profit.  See Bell v. Moawad Grp., LLC, 326 F. Supp. 3d 918, 926 (D. Ariz. Sept. 4, 2018) (finding a genuine dispute of fact as to whether infringing social media post was non-commercial inspirational information or marketing); see also Hannley v. Mann, No. 2:21-CV-02043-JLS, 2023 WL 3407183, at *4 (C.D. Cal. Mar. 8, 2023)

_____

[4] One could argue that the social media posts actually *did* target the Portrait, because including the Portrait was necessary to make the social media post's point, which was to show Kat von D's use of source material to create a tattoo and her prowess in replication.

(finding use non-commercial where there is no evidence that the Twitter, website, or Youtube pages generated any profits); but see Northland Fam. Plan. Clinic, Inc. v. Ctr. for Bio-Ethical Reform, 868 F. Supp. 2d 962, 979 (C.D. Cal. 2012) ("Generating traffic to one's website or conveying one's message effectively using copyrighted material is within the type of 'profit' contemplated by Worldwide Church."). Whether an infringing social media post that generates no-direct revenue is a commercial use is a fact-sensitive inquiry. This case is admittedly a close call, which is why it was sent to a jury. However, the clear weight of the evidence does not allow the Court to disturb the jury's verdict and grant a new trial.

Finally, Sedlik argues that the social media posts harmed the market for his photograph license. Reply at 22. The fourth fair use factor requires the jury "to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994). Sedlik does not contend that the social media posts served as a direct market substitute for the Portrait (nor could he), but instead argues that they harm a potential licensing market for him. Reply at 22.

"[I]t is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar." Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n, 953 F.3d 638, 652 (9th Cir. 2020) (quoting 4 Nimmer § 13.05[A][4]). "However, a copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing'" other markets. Tresona, 953 F.3d at 652 (quoting Bill Graham Archives, 448 F.3d at 614–15).

Sedlik offered evidence of licenses for sculptures, paintings, t-shirts and even tattoos (albeit for $0). Dkt 241-2 (Ex. A) 175:17-21, 176:6-20, 202:8-13. However, Sedlik never offered any evidence of a license for a social media post. None of the licenses offered by Sedlik

are quite analogous to the use at bar, which reproduces the Portrait to document Kat von D's process in creating a tattoo. Defining the scope of this potential market is difficult.  But the jury could have reasonably concluded based on the evidence that the social media posts did not displace a potential market for Sedlik.

In conclusion, under the existing state of the law, the jury could have reasonably concluded that factors one and four favor fair use. Therefore, the finding of fair use was not against the clear weight of the evidence.  See Lucasfilm Ltd. LLC v. Ren Ventures Ltd., No. 17-CV-07249-RS, 2018 WL 5310831, at *6 (N.D. Cal. June 29, 2018) ("[C]ourts often give more weight to the first and fourth factors of the fair use test because they are more closely related to incentivizing the creation of new arts[.]").

## C.   Jury Instructions

Sedlik also contends that Jury Instruction Nos. 24, 25, and 27 were misleading and incorrectly stated the law.  Mem. at 15–16.  "Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading."  White v. Ford Motor Co., 312 F.3d 998, 1012 (9th Cir. 2002).  An erroneous jury instruction may warrant a new trial unless the error was harmless. Madrigal v. Allstate Ins. Co., 215 F. Supp. 3d 870, 908 (C.D. Cal. May 19, 2016).  "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was not fairly and correctly covered."  Swinton v. Potomac Corp., 270 F.3d 794, 802 (9th Cir. 2001) (simplified).  A new trial should be ordered "only if the jury's understanding of the issues was seriously affected to the prejudice of the complaining party." Havoco of Am., Ltd. v. Sumitomo Corp. of Am., 971 F.2d 1332, 1343 (7th Cir. 1992) (citing Simmons, Inc. v. Pinkerton's, Inc., 762 F.2d 591, 597 (7th Cir. 1985)).

Sedlik argues that Jury Instruction Nos. 24 and 25 were incorrect as a matter of law because the court failed to instruct the jury that it

11

**ER-12**

had previously found that factors two and three weigh against fair use. Reply at 16.  Jury Instruction No. 24 states:

> The second fair use factor is the nature of the copyrighted work. Copyrighted works that are creative in nature are more protected. It is agreed that the Miles Davis Photo is creative in nature, and therefore this factor is more likely to weigh against fair use.

Dkt. 219 at 29.  Sedlik does not contend that this is an inaccurate statement of law.  Rather, he argues that the jury should have been told that the second factor *does* weigh against fair use, rather than is "more likely to weigh against fair use."  Id.  The Court finds that the applicable law was fairly and correctly covered here, and that the jury's understanding of the issues would not have been seriously affected by changing "more likely" to "does."

> Jury Instruction No. 25 states:

> The third fair use factor is the amount and substantiality of the portion used in relationship to the copyrighted work as a whole. This factor looks to the amount of the original work used and the importance of the portion copied.

> When an accused work copies little of the original work, this factor weighs in favor of fair use. When an accused work copies most of the original work or its most important parts, then this factor more likely weighs against fair use. If the secondary user copies only as much as is necessary for a transformative use, then this factor will not weigh against fair use.

Dkt. 219 at 30.  Again, Sedlik does not contend that "the substance of the applicable law was not fairly and correctly covered." Swinton, 270 F.3d at 802.  Instead, he argues that the Court should have told the jury that it found the third factor to favor Sedlik in its summary judgment and reconsideration orders.

> An instruction that the Court had already considered and made a finding on the third factor would not have seriously affected the jury's

understanding of the substance of the third factor.  Moreover, the Court was concerned that instructing the jury on its prior rulings would confuse the jury and prevent them from weighing all of the factors, as is required by section 17 U.S.C. 107.  It is firmly within the district court's discretion to forego "potentially confusing jury instructions and information regarding the procedural history of the case."  Fryar v. Curtis, 485 F.3d 179, 183 (1st Cir. 2007).  An instruction that the third factor favored fair use would not have seriously affected the jury's verdict because Defendants conceded that the factor weighed against fair use in their closing argument.  Dkt. 237-1 (Ex. D) 681:6–15.

Similarly, instruction No. 27, that the jury weigh all relevant factors, was also not prejudicial to Sedlik.  Sedlik does not argue that this instruction was an inaccurate statement of law.  He argues that the jury should have been told about the Court's prior findings regarding the second and third factors.  The jury was accurately informed of the law.  The jury was told that the second factor likely weighed against fair use.  And Defendants conceded in their closing argument that the third factor weighed against fair use.  The decision not to explain the Court's prior findings to the jury was firmly within the Court's discretion and did not prejudice Sedlik.

Finally, Sedlik argues that the issue of fair use should not have been put to the jury at all.  Mem. at 17.  He cites Google LLC v. Oracle Am., Inc., 593 U.S. 1, 24 (2021) for the proposition that fair use is a mixed question of fact and law.  The factual issues should be determined by a jury, and the legal questions should be decided by a judge.  Id.  However, this is the first time that Sedlik, or any party, has raised this argument.

"One who by his conduct induces the commission of some error by the trial court, or, in other words, who has invited error, is estopped from insisting that the action of the court is erroneous[.]"  Deland v. Old Republic Life Ins. Co., 758 F.2d 1331, 1336 (9th Cir. 1985).  Sedlik "had no objection to submission of this issue to a jury" prior to the jury's verdict against him.  Deland, 758 F.2d at 1337.  Actually, Sedlik represented to the Court that "the last time the Supreme Court

13

**ER-14**

addressed this issue, which is <u>Oracle v. Google</u>, the [Supreme Court decided the] jury is entitled to make the determination of fair use."[5] Sedlik was intimately involved in the drafting of the jury instructions and the verdict form.  Never once did he suggest that the issue of fair use was not fit for a jury, or that the Court should bifurcate the verdict between factual and legal issues.  Sedlik went "beyond mere acquiescence" and invited this purported error.  <u>Deland</u>, 758 F.2d at 1337.  He cannot now ask for a second bifurcated or bench trial because the jury trial that he demanded did not go as planned.

### III. Conclusion

For the reasons stated above, the motions are DENIED.

IT IS SO ORDERED.

Date: May 3, 2024

Dale S. Fischer
United States District Judge

---

[5] That this was done by Sedlik's prior counsel is immaterial. "Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent[.]" <u>Link v. Wabash R. Co.</u>, 370 U.S. 626, 633–34, (1962).

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY B. SEDLIK,<br>    Plaintiff,<br><br>    v.<br><br>KATHERINE VON<br>DRACHENBERG aka KAT VON<br>D, et al.,<br>    Defendants. | 2:21-cv-01102-DSF-MRW<br><br>JUDGMENT |

The Court having granted summary judgment as to all claims against Kat Von D, Inc. and a jury having rendered a verdict in favor of Katherine Von Drachenberg aka KAT VON D and High Voltage Tattoo, Inc.,

IT IS ORDERED AND ADJUDGED that Plaintiff take nothing, that the action be dismissed on the merits with prejudice, and that Defendants recover costs of suit pursuant to a bill of costs filed in accordance with 28 U.S.C. § 1920.

Date:  January 30, 2024

_____
Dale S. Fischer
United States District Judge

**ER-16**

**F I L E D**
CLERK, U.S. DISTRICT COURT

1/26/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ pk _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEFFREY B. SEDLIK,

              Plaintiff,

v.

KATHERINE VON DRACHENBERG
aka KAT VON D, et al.,

              Defendants.

2:21-cv-01102-DSF-MRW

**JURY INSTRUCTIONS**

1

## **INSTRUCTION NO. 1**

Members of the Jury: Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you on the law that applies to this case.

A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

**ER-18**

<u>**INSTRUCTION NO. 2**</u>

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

3

**<u>INSTRUCTION NO. 3</u>**

You should decide the case as to each defendant separately. Unless otherwise stated, the instructions apply to all parties.

**ER-20**

## INSTRUCTION NO. 4

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;

2. the exhibits that are admitted into evidence.

## **INSTRUCTION NO. 5**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements and at other times, and will say in their closing arguments is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

6

**ER-22**

**INSTRUCTION NO. 6**

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a garden hose that was left turned on, may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

**ER-23**

**INSTRUCTION NO. 7**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the

8

**ER-24**

number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

## **INSTRUCTION NO. 8**

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

The deposition of Jeffrey B. Sedlik was taken on January 11, 2022, and the deposition of Katherine Von Drachenberg was taken on January 18, 2022. The deposition of Brian Vanegas was taken on July 31, 2023. Insofar as possible, you should consider deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

**ER-26**

## **<u>INSTRUCTION NO. 9</u>**

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer, projector, printer, and accessory equipment will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment; how to locate and view the exhibits on the computer; and how to print the exhibits. You will also be provided with a paper list of all exhibits received in evidence. You may request a paper copy of any exhibit received in evidence by sending a note through the bailiff. If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the bailiff, signed by your foreperson or by one or more members of the jury. Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with the bailiff present for the sole purpose of assuring that the only matter that is discussed is the technical problem. When the court technician or any non-juror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any non-juror other than to describe the technical problem or to seek information about operation of the equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any "outside" website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform the court immediately and refrain from viewing

such materials. Do not remove the computer or any electronic data from the jury room, and do not copy any such data.

# **INSTRUCTION NO. 10**

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

**ER-29**

## <u>INSTRUCTION NO. 11</u>

Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of their authority.

14

**ER-30**

## INSTRUCTION NO. 12

The plaintiff, Jeffrey B. Sedlik, claims ownership of a copyright and seeks damages from the defendants, Katherine Von Drachenberg and High Voltage Tattoo, Inc., for copyright infringement. The defendants deny infringing the copyright, and assert the affirmative defense that they made fair use of the work. To help you understand the evidence, I will explain some of the legal terms you will hear during this trial.

### DEFINITION OF COPYRIGHT

The owner of a copyright has the right to exclude any other person from reproducing, distributing, performing, displaying or preparing derivative works from the work covered by copyright for a specific period of time.

A copyrighted work can be a literary work, musical work, dramatic work, pantomime, choreographic work, pictorial work, graphic work, sculptural work, motion picture, audiovisual work, sound recording, architectural work, or computer program.

Facts, ideas, procedures, processes, systems, methods of operation, concepts, principles, or discoveries cannot themselves be copyrighted.

The copyrighted work must be original. An original work that closely resembles other works can be copyrighted so long as the similarity between the two works is not the result of copying.

### PLAINTIFF'S BURDEN OF PROOF

In this case, the plaintiff contends that defendants Katherine Von Drachenberg and High Voltage Tattoo, Inc. have infringed the plaintiff's copyright. The plaintiff has the burden of proving by a preponderance of the evidence that he is the owner of the copyright and that the defendants copied original expression from the copyrighted works. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the copyrighted work was

15

**ER-31**

infringed.

The plaintiff must also prove that the defendants' use of the copyrighted work was substantial. In determining whether the defendant's use of the copyrighted work was substantial, you may consider how important the copied portion was to the copyrighted work as a whole.

## PROOF OF COPYING

To prove that the defendants copied the plaintiff's work, the plaintiff may show that the defendants had access to the plaintiff's copyrighted work and that there are substantial similarities between the defendants' work and the plaintiff's copyrighted work.

## LIABILITY FOR INFRINGEMENT

One who reproduces, prepares derivative works from, publicly displays, or publicly distributes a copyrighted work without authority from the copyright owner during the term of the copyright, infringes the copyright.

## DEFENSES TO INFRINGEMENT

The defendants contend (1) that they did not copy protectible elements in the copyrighted work and (2) there is no copyright infringement because the defendants made fair use of the work.

16

**ER-32**

## **INSTRUCTION NO. 13**

Copyright is the exclusive right to copy. This right to copy includes the exclusive rights to:

(1) reproduce the copyrighted work in copies;

(2) recast, transform, or adapt the work, that is prepare derivative works based on the copyrighted work;

(3) distribute copies of the copyrighted work to the public by sale or other transfer of ownership; and

(4) display publicly a copyrighted graphic work.

It is the owner of a copyright who may exercise these exclusive rights. In general, copyright law protects against reproduction, adaptation, public distribution, and public display of identical or substantially similar copies of the owner's copyrighted work without the owner's permission. An owner may enforce these rights to exclude others in an action for copyright infringement.

## **INSTRUCTION NO. 14**

The work involved in this trial, the Miles Davis Photograph, is a pictorial work that can be protected by copyright law.

Only that part of the work comprised of original works of authorship fixed in any tangible medium of expression from which it can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device, is protected by the Copyright Act.

Copyright protection for an original work of authorship does not extend to any idea, concept or principle, regardless of the form in which it is described, explained, illustrated, or embodied.

18

**ER-34**

## **INSTRUCTION NO. 15**

Copyright law allows the author of an original work to stop others from copying the original expression in the author's work. Only the particular expression of an idea can be copyrighted and protected. Copyright law does not give the author the right to prevent others from copying or using the underlying ideas contained in the work, such as any procedures, processes, systems, methods of operation, concepts, principles or discoveries. In order to protect any ideas in the work from being copied, the author must secure some other form of legal protection because ideas cannot be copyrighted.

19

**ER-35**

## **INSTRUCTION NO. 16**

Anyone who copies original expression from a copyrighted work during the term of the copyright without the owner's permission infringes the copyright.

Plaintiff is the owner of a valid copyright in the Miles Davis Photograph. For each of plaintiff's copyright infringement claims, the plaintiff has the burden of proving by a preponderance of the evidence that the defendants copied original expression from the copyrighted work.

If you find that the plaintiff has proved this, your verdict should be for the plaintiff unless you find that plaintiff's claim is barred by an affirmative defense, which I will discuss later.

If, on the other hand, you find that the plaintiff has failed to prove that the defendants copied original expression from the copyrighted work, your verdict should be for the defendants.

**ER-36**

## <u>INSTRUCTION NO. 17</u>

A copyright owner is entitled to exclude others from creating derivative works based on the owner's copyrighted work. The term derivative work refers to a work based on one or more pre-existing works, such as an art reproduction or any other form in which the pre-existing work is recast, transformed, or adapted. The owner of a copyrighted work is entitled to exclude others from recasting, transforming, or adapting the copyrighted work without the owner's permission, unless the derivative work is itself found to be a fair use.

The copyright owner of the pre-existing work may enforce the right to exclude others in an action for copyright infringement to the extent that the material copied derived from the pre-existing work.

21

**ER-37**

## **<u>INSTRUCTION NO. 18</u>**

The plaintiff may show the defendants copied from the work by proving by a preponderance of the evidence that the defendants had access to the plaintiff's copyrighted work and that there are substantial similarities between the defendants' work and original elements of the plaintiff's work.

There is no dispute that Defendants had access to Plaintiff's copyrighted work. If you find that the plaintiff has failed to prove substantial similarities between the defendants' work and original elements of the plaintiff's work, your verdict should be for the defendants.

**ER-38**

**<u>INSTRUCTION NO. 19</u>**


In order to establish copyright infringement, plaintiff must prove by a preponderance of the evidence that the defendant's work is substantially similar to what is protected by copyright law in the plaintiff's work.

Substantial similarity is determined by an extrinsic and intrinsic test, and the plaintiff must satisfy both tests to meet his burden.

23

**ER-39**

## **INSTRUCTION NO. 20**

For the extrinsic test, you are to examine the similarities between what is protected by copyright law in the Miles Davis Photograph, on the one hand, with each of the accused infringements, on the other hand.

Photographs can be broken down into elements that reflect the various creative choices the photographer made in composing the image. These creative choices are elements such as the photograph's subject matter, pose, lighting, camera angle, depth of field, and almost every other variant involved in the works.

The individual elements standing alone are not copyrightable.  But if sufficiently original, the combination of subject matter, pose, camera angle, etc., receives protection as original expression.  It is the plaintiff's burden to identify the particular combination, selection, or arrangement of elements in his photograph that he claims is protected by copyright law. He must show that each of the accused infringements is substantially similar to this particular combination, selection, or arrangement.

If there is no substantial similarity at this first step, then the plaintiff has not met his burden.

24

**ER-40**

## **<u>INSTRUCTION NO. 21</u>**

The intrinsic test is a holistic comparison that focuses on whether the works are substantially similar in the total concept and feel of the works.

**ER-41**

## **INSTRUCTION NO. 22**

One who is not the owner of the copyright may use the copyrighted work in a reasonable way under the circumstances without the consent of the copyright owner if it would advance the public interest. Such use of a copyrighted work is called a fair use. The owner of a copyright cannot prevent others from making a fair use of the owner's copyrighted work.

Defendants contend that they made fair use of the Miles Davis Photograph. Defendants have the burden of proving this defense by a preponderance of the evidence.

In determining whether the use made of the work was fair, you should consider the following factors:

(1) the purpose and character of the use, including whether the use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole;

(4) the effect of the use on the potential market for or value of the copyrighted work.

If you find that the defendants have proved by a preponderance of the evidence that the defendants made fair use of the plaintiff's work, your verdict should be for the defendants as to that particular use.

**ER-42**

## <u>INSTRUCTION NO. 23</u>

The first fair use factor concerns the purpose and character of the accused use. It considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the degree of difference must be balanced against other considerations like commercialism.

If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use.

The fair use analysis, and the first factor in particular, requires an analysis of each specific use of a copyrighted work that is alleged to be an infringement. The same copying may be fair when used for one purpose but not another.

A work that has a different purpose is said to be "transformative." But to be transformative, the secondary work must have a purpose that goes beyond that required to qualify as a derivative work. For example, criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, and research are all different purposes. The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to gain a benefit or advantage from exploitation of the copyrighted material without paying the customary price.

The court has already determined that the tattoo is not transformative, meaning that it does not imbue the copyrighted work with a new purpose beyond recasting the copyrighted work in a new visual medium, like turning a painting into a sculpture. You must decide whether the tattoo is of a commercial nature. If you find that it is, the first factor should weigh against fair use.

For each social media post, you must determine whether the post has a further purpose or different character than the copyrighted work. You must then determine whether each social media post is of a commercial nature. Then you must balance the

degree of difference against the commercial nature, if any, of the post.

# **INSTRUCTION NO. 24**

The second fair use factor is the nature of the copyrighted work. Copyrighted works that are creative in nature are more protected.  It is agreed that the Miles Davis Photo is creative in nature, and therefore this factor is more likely to weigh against fair use.

29

**ER-45**

## **INSTRUCTION NO. 25**

The third fair use factor is the amount and substantiality of the portion used in relationship to the copyrighted work as a whole. This factor looks to the amount of the original work used and the importance of the portion copied.

When an accused work copies little of the original work, this factor weighs in favor of fair use. When an accused work copies most of the original work or its most important parts, then this factor more likely weighs against fair use. If the secondary user copies only as much as is necessary for a transformative use, then this factor will not weigh against fair use.

30

**ER-46**

**<u>INSTRUCTION NO. 26</u>**

The fourth fair use factor is the effect of the accused infringer's use on the potential market for or value of the copyrighted work. This is the single most important factor, but it must be weighed with all other factors and is not necessarily dispositive. It weighs against fair use if the accused use materially impairs the marketability or value of the copyrighted work. In connection with the fourth factor, the term "potential market for or value of" refers to the value of the entire copyrighted work itself and licensing opportunities for the copyrighted work via derivative works in traditional, reasonable, or likely to be developed markets.

A derivative work, as I explained earlier, is a work based on one or more preexisting copyrighted works, such as a musical arrangement, dramatization, or art reproduction based on a book, to name only three specifics, or any other form in which a work may be recast, transformed or adapted.

Defendants have the burden of bringing forward favorable evidence about relevant markets. To negate fair use, plaintiff need only show that if the copying should become widespread, it would hurt the potential market for the copyrighted work or its derivatives.

**ER-47**

# **INSTRUCTION NO. 27**

It is up to you to decide whether all relevant factors, when considered fully and together, favor or disfavor fair use. All of these factors must be explored, discussed, and evaluated by you. No single factor is dispositive. Your evaluation of all factors must be weighed together in light of the purpose of copyright law, which is to promote the progress of science and useful arts. Some factors may weigh in favor of fair use and some against fair use. You must decide, after giving the factors such weight as you find appropriate based on the evidence and my instructions, whether or not, on balance, the defendants have shown by a preponderance of the evidence that they made a fair use. If you find that the defendants have proved by a preponderance of the evidence that the defendants made a fair use of plaintiff's work, then your verdict on the copyright infringement claim should be for the defendants on the particular alleged infringement.

## **INSTRUCTION NO. 28**

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for the plaintiff, you must determine the plaintiff's damages. The plaintiff has the burden of proving damages by a preponderance of the evidence.

It is for you to determine what damages, if any, have been proved.

Your award must be based on evidence and not upon speculation, guesswork, or conjecture.

## **INSTRUCTION NO. 29**

The copyright owner is entitled to recover hypothetical license damages - that is, the amount a willing licensor would have been reasonably required to pay a willing licensee at the time of the infringement for the actual use made by the infringer of the copyright owner's work.  The amount is not what the licensor would have charged, but what a willing licensor would have charged after negotiation, that is the fair market value of the license for that particular use.

## **INSTRUCTION NO. 30**

If you find for the plaintiff on the copyright infringement claim, you must determine the plaintiff's damages. The plaintiff seeks a statutory damage award, established by Congress for the work infringed. Its purpose is not only to compensate the plaintiff for his losses, which may be hard to prove, but also to penalize the infringer and deter future violations of the copyright laws.

The amount you may award as statutory damages is not less than $750, or more than $30,000.

If you find the infringement was innocent, you may award as little as $200.

However, if you find the infringement was willful, you may award as much as $150,000.

## **INSTRUCTION NO. 31**

An infringement is considered innocent when the defendant has proved both of the following elements by a preponderance of the evidence:

1. the defendant was not aware that her or its acts constituted infringement of the copyright; and

2. the defendant had no reason to believe that her or its acts constituted an infringement of the copyright.

36

## **INSTRUCTION NO. 32**

An infringement is considered willful when the plaintiff has proved both of the following elements by a preponderance of the evidence:

1. the defendants engaged in acts that infringed the copyright; and

2. the defendants knew that those acts infringed the copyright, or the defendants acted with reckless disregard for, or willful blindness to, the copyright holder's rights

37

## INSTRUCTION NO. 33

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

38

**ER-54**

## **INSTRUCTION NO. 34**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, via text messaging, or any Internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to

tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to outside information, you must notify the court immediately.

40

**ER-56**

## **INSTRUCTION NO. 35**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

41

**ER-57**

## **INSTRUCTION NO. 36**

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the bailiff that you are ready to return to the courtroom.

**ER-58**

FILED
CLERK, U.S. DISTRICT COURT

1/26/2024

CENTRAL DISTRICT OF CALIFORNIA
BY_____pk_____DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JEFFREY B. SEDLIK,

     Plaintiff,

  vs.

KATHERINE VON DRACHENBERG aka KAT VON D, et al.,

     Defendants.

2:21-cv-01102-DSF-MRW

**VERDICT FORM**

We, the jury in the above-entitled case, find the following on the questions submitted to us:

## Question 1

Has Plaintiff shown by a preponderance of the evidence that the following works are substantially similar to the Miles Davis Photograph? Please check either "Yes" or "No" for each work.

| | Yes (Substantially Similar) | No (Not Substantially Similar) |
|---|---|---|
| Tattoo | | ✓ |
| Sketch (Ex. 202) | | ✓ |
| "Messy Progress" Social Media Post (Exs. 207, 208) | | ✓ |
| Final Tattoo Social Media Post (Exs. 209, 210, 211, 214, 215, 216, 240, 242) | | ✓ |
| Instagram Story (Ex. 253) | | ✓ |
| KVD at Light Box Post (Exs. 338, 339) | | ✓ |

**Please proceed to Question 2.**

-2-

**ER-60**

## Question 2

Have Defendants shown by a preponderance of the evidence that the following constitute a "fair use"?  Please check either "Yes" or "No."  **Skip any work for which you answered "no" in Question No. 1.**

|  | Yes (Fair Use) | No (Not Fair Use) |
|---|---|---|
| Tattoo Sketch (Ex. 202) |  |  |
| Posts of KVD working on tattoo on KVD Social Media  (Exs. 203, 204) | ✓ |  |
| Posts of KVD working on tattoo on High Voltage social media (Ex. 212, 213) | ✓ |  |
| Messy Progress Social Media Posts on KVD Social Media (Exs. 207, 208) |  |  |
| Final Tattoo Social Media Posts on KVD Social Media (Exs. 209, 210, 211) | ✓ |  |
| Final Tattoo Social Media Posts on High |  |  |

-3-

**ER-61**

| | | |
|---|---|---|
| Voltage Social Media (Exs. 214, 215, 216, 240, 242) | ✓ | |
| Instagram Story (Ex. 253) | | |
| KVD at Light Box Posts (Exs. 338, 339) | | |

**If you answered "No" to <u>any</u> work in Question 2, then proceed to Question 3. Otherwise, stop, answer no further questions, and please sign and date this form.**

### Question 3

What amount do you award as actual damages in the form of a hypothetical license fee against Defendants?

$ _____

**Proceed to Question 4.**

### Question 4

Has the Plaintiff shown by a preponderance of the evidence that at least one of the Defendants' infringements was willful infringement?

Yes \_\_\_\_        No \_\_\_\_

**If you answer "Yes" to Question 4, skip Question 5 and go to Question 6.**

-4-

ER-62

**If you answer "No" to Question 4, go to Question 5.**

### Question 5

Have the Defendants shown by a preponderance of the evidence that all of their infringements were innocent?

Yes _____          No _____

**Please proceed to Question 6.**

### Question 6

What amount do you award as statutory damages?

$ _____

**After answering Question 6, have the jury foreperson sign and date this form below.**

**Signature of Jury Foreperson**

Dated: 1/24 1/26/24      _____
                                              Foreperson

-5-

**ER-63**

251

**LOS ANGELES, CALIF.; WEDNESDAY, JANUARY 24, 2024, 7:46 A.M.**

**-oOo-**

*(The following was held outside the jury's presence:)*

THE COURT:  Good morning.

MR. ALLEN:  Good morning, Your Honor.

MR. GRODSKY:  Good morning, Your Honor.

THE COURT:  Is there anything we need to discuss?

MR. ALLEN:  Yes, Your Honor.

I've had a chance to review your draft jury instructions, at least some of them.  The good news is I think that we may be withdrawing some of them.

THE COURT:  Okay.

MR. ALLEN:  That's always good for everybody.

There's some significant problems with the fair use instructions.  Most importantly, the instructions do not incorporate the Court's findings on the second and third factor.

THE COURT:  That's deliberate.  I don't think I can -- I don't think I can tell them what my findings were.  They need to balance.  They can't balance if I tell them -- it's not like a checkmark where it's a plus or a minus.  It's a weighing.

MR. ALLEN:  It is a weighing but there's already been a factual determination and I'm concerned that if the jury is not properly instructed, then we're just going to

*Day 2 of Jury Trial, January 24, 2024*

**ER-64**

252

end up back here.

THE COURT:  Sometimes that happens.

MR. ALLEN:  True.  Especially since the second and third factors the finding was with respect to all of the infringements, not just the tattoo.

Is it possible that you might be able to craft an instruction somewhere --

THE COURT:  No.  It's possible that you could try to craft one.

MR. ALLEN:  Okay.

THE COURT:  And propose it to opposing counsel and then I'll consider it.

MR. ALLEN:  Yes.

THE COURT:  But I've spent a lot of time thinking about this; and if it was a plus or a minus and you just added those up, then it would make sense.

But it's not.  It's not.  It's like one could be very heavily and one could be just weaker, and I can't tell them where on that scale because I didn't make that determination.

And since they have to consider them holistically, my telling them they don't know whether it's 51 percent or 99 percent.

MR. ALLEN:  I was thinking -- and I'll try to draft something sort of to the effect that the Court has

297

granted that?

A.    (No response.)

Q.    Assuming you came to terms.

A.    Yes, absolutely.

Q.    Were the social media posts showing the tattoo in the photograph a type of usage that you license?

A.    Yes.  Social media and the web are the primary markets for the licensing of photography today.  It used to be different but, of course, most publishing is done on the web these days so those are the main markets.

Q.    Assuming you came to terms if Ms. Von D had come to you seeking a license to post a copy of your photograph and/or a copy of tattoo online, is that a type of license that you have considered issuing?

A.    It's a type of license I've considered issuing but I've never considered offering a license like that without an attribution requirement.

Q.    Are you concerned that Ms. Von D's unlicensed adaptation and use of your photograph will encourage others to use your work without a license?

          MR. GRODSKY:  Objection; relevance.

          THE COURT:  Sustained.

          MR. ALLEN:  Actually, sidebar, Your Honor, on that?

          THE COURT:  No.

*Day 2 of Jury Trial, January 24, 2024*

**ER-66**

302

relevant question first.

MR. ALLEN: Okay. And I mean, I could say: Putting aside that you may not want to have given her a license, if she had come to you and you were to calculate an amount based upon her usages, because Mr. Sedlik is going to testify and he has testified. It's based upon all the difference usages.

So you can't look at a prior license because that is not equivalent. So we can ask Mr. Sedlik what -- I get your point. He could say a million dollars. He's not going to say a million dollars. Trust me. I'm actually surprised because you're going to be happy with his number because it's low.

THE COURT: Is it zero?

MR. ALLEN: It's $5,000.

THE COURT: That's not low.

MR. ALLEN: For the tattoo.

THE COURT: What tattooist in their right mind would pay $5,000 to do that one when there's a bunch of them out on the Internet. So it has to be a willing seller, too.

MR. ALLEN: Sorry?

MR. GRODSKY: The problem is that it has to be a willing buyer and a willing seller.

MR. ALLEN: Right.

MR. GRODSKY: And what he would have charged isn't

*Day 2 of Jury Trial, January 24, 2024*

**ER-67**

303

what's relevant; and I think if you want to prove a hypothetical license, you can do it two ways. You either have an expert witness who says: I've looked at a million licenses like this and this is what people charge.

THE COURT: Or five licenses.

MR. GRODSKY: Or whatever, yes. Or he can certainly rely on evidence in the record of other licenses; and I suppose you could argue: Look. This is similar to this license. This is similar to this license. This shows the kind of things he would charge. But I just don't think based on this instruction that his testimony of what he would charged is relevant.

THE COURT: Unless it's zero because that's what he charged for the one time that he did a tattoo.

MR. ALLEN: Well, actually, he charged 5,000 and give a discount.

THE COURT: Nonsense. I don't know what the jury is going to think but that's what I think.

No. I don't think you can do much with the tattoo. I think some of the other stuff is closer with the social media. I don't think it's actually very close but at least it's closer for what kinds of things he's had on social media. That's. . . .

MR. GRODSKY: I just don't think you can ask that question. I think you can rely on the evidence that's in

*Day 2 of Jury Trial, January 24, 2024*

**ER-68**

314

attribution?

THE COURT: You said by use by a follower?

MR. ALLEN: Let me rephrase.

Q. When you issue a license for social media you use for one of your photographs with attributions to a social media user that has greater than a million followers, is there a range of the amount that you charge?

MR. GRODSKY: Objection; relevance.

THE COURT: Overruled.

THE WITNESS: Yes. And it really depends on the circumstances as you've seen.

THE COURT: All right. Move on.

BY MR. ALLEN:

Q. Is there a number?

THE COURT: Move on.

BY MR. ALLEN:

Q. Did you have an opportunity to determine Ms. Von D's -- the number of followers Ms. Von D had on her Facebook account?

A. Yes.

Q. And was it greater than ten million?

A. Yes.

Q. And when you typically charge licenses for social media use to a user that has over ten million followers, what do you typically charge for a license to use one of your

**ER-69**

572

MR. ALLEN:  Your Honor, this is a draft.  I mean, we can delete the -- the quotation marks are meaningless.

THE COURT:  Okay.

MR. ALLEN:  And the third point is -- I think that we found a case that found that -- a Ninth Circuit case Mr. Linger found.  I think it was -- was it *Ford Motor*? What was it called?

That where there's already been a finding by the Court in a summary judgment ruling or a prior jury has found an issue that it's -- that the jury has -- the new jury has to be informed of that finding.  I think it was *White v. Ford Motor Company*, 500 F.3d 963 at 973.  It's a Ninth Circuit case from 2007.

And so we talked about this yesterday and so we've drafted this language which identifies that the Court has determined that the third factor weighs against fair use and it's up to you, meaning the jury, to weigh how much the third factor weighs against fair use both as an individual factor and when weighing all the factors together.

So it leaves the discretion -- I think Your Honor was trying to give the jury to weigh it how it wants but also respects the fact that this issue has already been decided by the Court and let me get the language that I got about this also was from your order, 160 on page -- page 12, where Your Honor said:  The reasoning applicable to the

**ER-70**

597

LOS ANGELES, CALIF.; FRIDAY, JANUARY 26, 2024; 7:47 A.M.

-oOo-

*(The following was held outside the jury's presence:)*

THE CLERK:  All rise.  This United States District Court is again in session.

**DISCUSSION RE JURY INSTRUCTION**

THE COURT:  All right.  You may be seated.

Is there anything we need to discuss?

MR. ALLEN:  Just one thing, Your Honor, for the record.

We received the final jury instructions last night.  Thank you very much for the changes that you made. We still object to the fact that the Court has not put into the third factor, fair use factor, the information --

THE COURT:  Okay.  You object. Let's go.  The jurors are here.  I'd like to get started.

MR. ALLEN:  Okay.  We object that that instruction for the third factor does not reflect the Court's prior opinion and finding.

MR. GRODSKY:  Nothing from the defense, Your Honor.

THE COURT:  Okay.

Ms. Cuneo, are you ready to go?

THE COURT REPORTER:  Yes, Your Honor.

THE COURT:  All right.

*Day 4 of Jury Trial, January 26, 2024*

**ER-71**

630

no doubt that the two works -- the photo and the tattoo -- are substantially similar.

Let's move to fair use.

It's defendant's burden to prove each factor. So Instruction No. 22 are the four factors. Important, I'd like to point out, is Factor 1, the purpose and character of the use.

And you'll see in Instruction 21, it including whether the use is of a commercial nature or is for a nonprofit educational purposes.

Going to the first factor, the purpose and character of the use -- that's Instruction No. 23 -- again, burden on defendants to prove.

Let's talk about transformative use. The Court's already determined the tattoo is not transformative.

MR. GRODSKY: Your Honor, I object to the slide. It says something about Factor 3 that is not in the instructions.

THE COURT: All right. Take that down.

*(Pause in the proceedings.)*

MR. ALLEN: A work that has a different purpose is called transformative. The different purposes include criticism, comment, news reporting, teaching, scholarship, and research about the original work which would be the photo.

*Day 4 of Jury Trial, January 26, 2024*

**ER-72**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY B. SEDLIK,<br>    Plaintiff,<br><br>        v.<br><br>KATHERINE VON<br>DRACHENBERG, et al.,<br>    Defendant. | CV 21-1102 DSF (MRWx)<br><br>ORDER ON MOTIONS *IN LIMINE* (Dkts. 76, 78, 80, 83, 84, 85, 86) |

Before the Court are motions *in limine* filed by Defendants Katherine Von Drachenberg, Kat Von D, Inc., and High Voltage Tattoo, Inc. and Plaintiff Jeffrey Sedlik.[1]

### 1.    Defendants' Motion *in Limine* #1 (Dkt. 76)

Defendants move to exclude Sedlik as an expert.  In addition to arguments about the substance of Sedlik's opinions, his qualifications, and whether his testimony is proper rebuttal testimony, Defendants argue that Sedlik should be precluded from testifying in his own case because he has a financial stake in the litigation.  Dkt. 77.

As a preliminary matter, the Court notes there is a dispute about whether this motion is an untimely <u>Daubert</u> motion.  Dkt. 100 at 3. The scheduling order set May 19, 2021 as the deadline for all motions other than motions in limine as April 18, 2022.  Dkt 19 at 1, 5.  Sedlik

---

[1] All rulings on motions in limine are tentative.  The issues may be raised again during trial—outside the presence of the jury—if circumstances change.

filed his Daubert motion on March 16, 2022.  Dkt. 34.  "A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area."  United States v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009).  In the absence of a specific deadline for Daubert motions, it was reasonable to file this motion as a motion in limine.

Sedlik seeks to serve as a rebuttal expert witness to Catherine Monty or David Lane (who will testify if Catherine Monty is unavailable).  Monty and Lane have been permitted to testify on licensing in the tattoo industry exclusively "for the purpose of establishing lack of willfulness[.]"  Dkt. 71 at 8.  Sedlik's expertise does not clearly bear on this issue.  While he may have experience in setting aspirational licensing standards for the tattoo industry, he has not shown any expertise when it comes to the norms of that industry relating to willful infringement.  Dkt. 152 (Supp. Mem.) at 3–5.  Sedlik is not permitted to testify as to whether tattoo artists should seek licenses.

Defendants' MIL #1 is GRANTED.

## 2.    Defendants' Motion *in Limine* #2 (Dkt. 78)

Defendants seek an order excluding Sedlik from introducing any evidence or argument related to Defendants' profits because there was no timely disclosure pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii) and because there is no causal nexus between the infringement and Defendants' profits.  Dkt. 79.

A "copyright infringement plaintiff seeking to recover indirect profits damages under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement."  Mackie v. Rieser, 296 F.3d 909, 911 (9th Cir. 2002) (emphasis added).  The "district court must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and subsequent indirect profits."  Id. at 915.  A "copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally

2

significant relationship to the infringement" and "a plaintiff seeking to recover indirect profits must 'formulate the initial evidence of gross revenue duly apportioned to relate to the infringement.'" Polar Bear Prods. v. Timex Corp., 384 F.3d 700, 711 (9th Cir. 2004) (quoting 4 Nimmer on Copyright § 14.03[B], 14-39).  A "trial court is entitled to reject a proffered measure of damages if it is too speculative." Mackie, 296 F.3d at 915 (quoting Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 513 (9th Cir. 1985)).

The bar for showing causation is low, but there is still a bar – one that Sedlik cannot clear.  In opposing the motion, Sedlik points to no evidence that creates any link between the photos of the Tattoo on social media and profit Defendants earned.  Sedlik simply claims that "[t]here is no question that Katherine Von Drachenberg received profits from her infringement of Sedlik's Iconic Miles Davis Photograph.  That is why she posted it on social media, to get those profits by enhancing her business and obtaining new business through notoriety and promotion." Dkt. 101 at 3.

However, if Defendants' social media profiles are profitable, it is more likely that Defendants' use of the copyrighted material was commercial under the first fair use factor.  Compare Fed. R. Evid. 401 with 17 USC §107.  Particularly if profits were yielded from the allegedly infringing posts.  Evidence of Defendants' profits to demonstrate damages is inadmissible, but evidence of profits may be admitted to demonstrate commercialism under the first fair use factor.

Defendants' MIL #2 is GRANTED in part.

### 3.    Defendants' Motion *in Limine* #3 (Dkt. 80) and Sedlik's Motion *in Limine* #2 (Dkt. 84)

The parties dispute whether Blake Farmer can testify as to the meaning he assigns his tattoo.  Defendants move to clarify this Court's prior rulings and seek an order allowing testimony from Blake Farmer as to the meaning of his tattoo. Dkt. 80.  Sedlik opposes. Dkt. 102. Sedlik also filed his own motion seeking an order preventing Blake

3

**ER-75**

Farmer from discussing the reasoning and meaning behind the tattoo. Dkt. 84.  Defendants oppose.  Dkt. 96.

Since filing the *motions in limine*, Defendants have represented to the Court that they do not seek to elicit testimony from Blake Farmer about the meaning he ascribes to the Tattoo.  Rather if they call Farmer "it will be for nothing other than to say: I didn't pay anything for this tattoo and here's what it looks like."  Tr. Oct. 30, 2023 9:3–7. Defendants would like to show the jury what the Tattoo looks like on Farmer's arm, "which is a little bit different than on the photograph." Id.  The Court deems this to be relevant and potentially helpful testimony.  Id.  However, the personal meaning Farmer attaches to the Tattoo is not.

Sedlik's MIL #2 is GRANTED and Defendants' MIL #3 is DENIED.

### 4.     Sedlik's Motion *in Limine* #1 (Dkt. 83)

The parties dispute whether Katherine Van Drachenberg can use the word "free-hand" in her testimony.  Sedlik argues that the "tattoo industry" commonly understands free-hand tattooing to mean the artist sketches the tattoo directly on skin and does not use a stencil as Drachenberg did here.  Dkt. 83 at 3.  Defendants counter that Sedlik has not presented any evidence of this definition and that it is clear from Katherine Van Drachenberg's testimony that she used a stencil.

The Court agrees with Defendants.  This can properly be addressed through cross-examination.  Drachenberg's description of her process clearly describes the use of a stencil.  Dkt. 95-3.  She uses "free-hand" to describe how she fills in and creates the rest of the tattoo after the initial stencil.  Id. ¶¶ 11-12.  The jury is unlikely to be made up of members of the "tattoo industry" who might construe "free-hand" to indicate no stencil was used at all.  The risk of confusion and prejudice is low if it exists at all.  Fed. R. Evid. 403.

Sedlik's MIL #1 is DENIED.

4

**ER-76**

### 5.     Sedlik Motion *in Limine* #3 (Dkt. 85)

Sedlik moves to exclude evidence and argument related to nine of Defendants' affirmative defenses because of lack of evidence or because Defendants did not raise arguments related to these affirmative defenses at summary judgment.  Dkt. 85 (claiming that Defendants' First, Second, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh affirmative defenses have "been abandoned as Defendants failed to raise [them] in their motion for summary judgment" and claiming that Defendants' Second, Seventh, Eighth, Ninth, and Tenth affirmative defenses are moot because "Defendants have offered no evidence" to support them).

Defendants were not required to move for summary judgment on these issues in order to assert them at trial.  They have not abandoned these defenses.

Sedlik's MIL #3 is DENIED.

### 6.     Sedlik's Motion *in Limine* #4 (Dkt. 86)

Sedlik moves to bifurcate damages and liability.  Dkt. 86.  Fed. R. Civ. P. 42(b) allows a court to "order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims" for "convenience, to avoid prejudice, or to expedite and economize."  District courts have broad discretion over trial management and the decision to bifurcate claims.  <u>Graves v. Arpaio</u>, 623 F.3d 1043, 1047 (9th Cir. 2010).  "Factors to be considered when deciding whether to bifurcate a trial include: complexity of issues, factual proof, risk of jury confusion, difference between the separated issues, the chance that separation will lead to economy in discovery, and the possibility that the first trial may be dispositive of the case."  <u>Bordegaray v. Cnty. of Santa Barbara</u>, No. 2:14-CV-8610-CAS(JPRx), 2016 WL 7260920, at *9 (C.D. Cal. Dec. 13, 2016).

Sedlik has not shown that the factors weigh in favor of bifurcation.  The Court declines to bifurcate.

Sedlik's MIL #4 is DENIED.

### 7.   Sedlik's Motion *in Limine* #5 (Dkt. 157)[2]

Sedlik moves to preclude Defendants from arguing, suggesting, or presenting evidence that the license agreement for the Davis Photograph between Bryan Vanegas and Sedlik is unusual or not a valid license.  Sedlik argues that this evidence will confuse the jury and prejudice Sedlik.  Dkt. 157 at 3.  Sedlik never explains the relevance of the Vanegas license.  However, he presumably wishes to present evidence of this license in order to show that there is a derivative market for tattoo licenses of his photograph under the fourth factor of 17 U.S.C. § 107.  Dkt. 50 at 17–18; Dkt. 143 at 1; Dkt. 150 at 7–9.  Sedlik provides authority for the proposition that his license to Vanegas is valid and legally enforceable.  Dkt. 157 at 3–5.  The validity of the license is not at issue.  Defendants may present evidence rebutting that the license shows a derivative market in the tattoo industry for photographic references, including testimony that Vanegas did not seek a license prior to using Sedlik's photograph as a reference for the tattoo he inked (dkt. 165-2 (Ex. 1) at 9:7–14), the fabricated nature of the request for the license (id. at 12:4–13:18), the fact that the license was not signed by Vanegas (dkt. 165-3 (Ex. 2)), and the lack of payment from Vanegas (id.).

Sedlik also seeks to preclude evidence that he bullied Vanegas to obtain the license.  When Vanegas was deposed, he characterized his encounters with Sedlik as "bullying."  Dkt. 165-2 23:3–8, 29:14–18.  If Sedlik introduces evidence of the license, he opens the door to evidence of the circumstances surrounding it.  Vanegas's testimony is relevant to

---

[2] The Court is told that Sedlik's attorneys have failed to comply with the Court's Order by filing *motions in limine* without meeting and conferring with opposing counsel.  Dkt. 165-1 (Decl. Grodsky) ¶4.  "Counsel are to meet and confer to determine whether opposing counsel intends to introduce the disputed evidence, etc. and to attempt to reach an agreement that would obviate the motion[.]"  Dkt. 19 (Order Re Jury Trial) 5.  Future disregard of the Court's orders may result in sanctions.

6

**ER-78**

the fourth fair use factor and its probative value is not substantially outweighed by unfair prejudice.

Sedlik's Mil #5 is DENIED.

IT IS SO ORDERED.


Date: January 11, 2024

_Dale S. Fischer_
Dale S. Fischer
United States District Judge

7

**ER-79**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

JEFFREY B. SEDLIK,                    )
                                      )
                    Plaintiff,        )
                                      )
                                      )
            v.                        )   No. CV 21-1102-DSF-MRW
                                      )
KATHERINE VON DRACHENBERG (aka KAT    )
VON D, et al.,                        )
                                      )
                    Defendants.       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Monday, November 13, 2023, 2:57 P.M.

Pretrial Conference

PAT CUNEO CSR 1600, CRR-CM
Official Reporter
First Street Courthouse
Room 4311
350 West 1st Street
Los Angeles, California 90012
213-894-1782
patcuneo1600@gmail.com
www.patcuneo.com

**ER-80**

2

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:     GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP
                       BY:  JASON C. LINGER, ATTORNEY AT LAW
                       10250 Constellation Boulevard
                       Nineteenth Floor
                       Los Angeles, California  90087
                       310-553-3000
                       jlinger@glaserweil.com


FOR THE DEFENDANTS:    GRODSKY OLECKI & PURITSKY LLP
                       BY:  ALLEN B. GRODSKY, ATTORNEY AT LAW
                       AND  TIM HENDERSON, ATTORNEY AT LAW
                       11111 Santa Monica Boulevard
                       Suite 1070
                       Los Angeles, California  90025
                       310-315-3009
                       allen@thegolawfirm.com

*Pat Cuneo CSR 1600, Official Reporter*

**ER-81**

7

about that?

THE COURT: Yes.

MR. GRODSKY: I just would like to know what format you want those in. In other words, do you want those to be filed and then a chambers copy to be delivered?

THE COURT: Yes.

MR. GRODSKY: Okay. Because some of those exhibits, I think on both sides are --

THE COURT: Well, the exhibits don't have to be filed.

MR. GRODSKY: Oh, so we just deliver a chambers copy to you?

THE COURT: Yeah. I mean, I assume there's --

MR. GRODSKY: Some of those exhibits on both sides will be video files so we'll just --

THE COURT: I don't need them if there's not an objection.

MR. GRODSKY: I understand.

THE COURT: I need them if there is an objection.

MR. GRODSKY: All right. Understood.

THE COURT: All right.

We had talked the last time about Mr. Sedlik. Mr. Sedlik is not an expert on custom and practices in the tattoo industry or the lack of custom and practices.

The issue is not whether a tattoo is a derivative

8

work or whether there's a market for licenses. What he or the photography industry or the art world thinks should require a license or does require a license is not relevant.

It's not the issue here. The issue isn't the licensing of art in general or photographs. It's specific to custom and practice for tattoos and it only goes to willfulness, not to whether there was infringement or not.

In addition and separately, although I said that I disagree with some of my colleagues who found that parties could not act as their own expert witnesses, he appears to have specifically prepared for this testimony allegedly to verify that his existing opinion is accurate.

But that methodology is not a valid approach especially when performed by someone with a patently clear bias, even though bias would certainly be obvious to the jury.

So as I said, even though I wouldn't necessarily exclude a party from acting as an expert in his own case, he doesn't have the requisite expertise here.

So those are my thoughts.

Anything else we should discuss?

MR. LINGER: Your Honor, if I may address -- Jason Linger for the plaintiff.

THE COURT: Yes.

MR. LINGER: Regarding the Plus Coalition and the

**ER-83**

9

standards, it's not what Professor Sedlik thinks.

THE COURT:  Regarding the what?  Oh, yes, I remember.  Okay.

MR. LINGER:  Mr. Sedlik is the president of the Plus Coalition which developed these standards.

THE COURT:  We're not talking from that perspective, the standards.  We're talking about the custom and practice in the tattoo industry and it goes only to willfulness.

MR. LINGER:  Professor Sedlik went to various tattoo shops as part of his work and --

THE COURT:  I just said I find that unacceptable.

MR. LINGER:  Understood.

THE COURT:  So if he had had an opinion before that was established, that's one thing.  Now, as a party who goes out and forms an opinion based on going around and talking to people -- don't bother writing him a note.  I'm not allowing it, period, end of story.

MR. LINGER:  For the rest of his expert testimony --

THE COURT:  There is no other expert testimony.

MR. LINGER:  So you are now allowing Professor Sedlik to testify at all?

THE COURT:  He was designated as a rebuttal expert.  The only expert testimony I was allowing was expert

10

testimony on custom and practices for willfulness.

MR. LINGER:  Okay.

THE COURT:  Anything else?

MR. GRODSKY:  Your Honor, I just want to understand procedures going forward.  I understand what we're filing.  We will take care of the jury instructions. The two of us will meet immediately afterwards and get them in order and get them to you right away.

We'll get you the copy of the depo transcripts and we'll get you the exhibits so my understanding is that you're available to start on the 28th but as of now we only have those four days?

THE COURT:  Correct.

MR. GRODSKY:  So is it that you want us to appear that day and tell you if we think we can do it or should we call your clerk to see if -- in other words, what's the next step between now and then other than us attempting to settle which we will absolutely, you know, I think both sides will give their best --

THE COURT:  Well, as far as I'm concerned, it's set to start on the 28th.  If I find out that both of those cases have gone away, then I will immediately let you know that you then have at least, you know, an additional couple of days.  But other than that, I would call the day before.  If you haven't heard from me, call the day before

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING


JEFFREY B. SEDLIK,                    )
                                      )
                Plaintiff,            )
                                      )
                                      )
        v.                            )  No. CV 21-1102-DSF-MRW
                                      )
KATHERINE VON DRACHENBERG (aka KAT    )
VON D, et al.,                        )
                                      )
                Defendants.           )
_____  )


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Los Angeles, California

Monday, October 30, 2023, 2:56 P.M.

Pretrial Conference


PAT CUNEO CSR 1600, CRR-CM
Official Reporter
First Street Courthouse
Room 4311
350 West 1st Street
Los Angeles, California 90012
213-894-1782
patcuneo1600@gmail.com
www.patcuneo.com


*Pat Cuneo CSR 1600, Official Reporter*

**ER-86**

2

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:     GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP
                       BY:  ROBERT E. ALLEN, ATTORNEY AT LAW
                       AND   JASON C. LINGER, ATTORNEY AT LAW
                       10250 Constellation Boulevard
                       Nineteenth Floor
                       Los Angeles, California  90087
                       310-553-3000
                       rallen@glaserweil.com
                       jlinger@glaserweil.com


FOR THE DEFENDANTS:    GRODSKY OLECKI & PURITSKY LLP
                       BY:  ALLEN B. GRODSKY, ATTORNEY AT LAW
                       AND   TIM HENDERSON, ATTORNEY AT LAW
                       11111 Santa Monica Boulevard
                       Suite 1070
                       Los Angeles, California  90025
                       310-315-3009
                       allen@thegolawfirm.com

**ER-87**

14

MR. ALLEN: In addition to the issue about whether the license was signed, there are a bunch of additional arguments made by the defense that were equally irrelevant with respect to the law as, for example, whether or not the license was signed before permission was granted.

Retroactive licenses by the owner are perfectly valid.

THE COURT: But that's not the point that -- I don't know. You're not going to suggest that the license isn't valid, are you?

MR. GRODSKY: Absolutely not.

THE COURT: Okay. So we can tell the license is valid but the circumstances surrounding it are relevant.

MR. ALLEN: Okay, Your Honor. Thank you.

THE COURT: And with regard to Mr. Sedlik, I disagree with my colleagues who have found that a party cannot act as his or her own expert.

And so I think I indicated that at the last hearing but it wasn't clear to me how much of his testimony was even expertise for either because he's not an expert in it and, therefore, can't give testimony on it at all or it's just percipient witness testimony.

So you can either meet and confer on that or I'll take another look at it and tell you what, if anything, I think is expert testimony and whether he's an expert in that

15

topic. But to the extent that it's just going toward an expert -- is rebuttal for an expert who's going to say something about the tattoo industry, that is not expertise that he has.

MR. ALLEN: Well, Your Honor, Robert Allen. Actually, two things. One is -- and we put in our brief which was not disputed by the defense is that Mr. Sedlik does have expertise in the tattoo industry with respect to the licensing of photographs and we laid that all out in our brief.

Secondly --

THE COURT: Is that true? You're not disputing that?

MR. GRODSKY: I'm absolutely disputing that. Mr. Sedlik has testified and provided information that he has provided standards for the photography industry to be used in case any tattoo artist wants to enter into a license.

THE COURT: Yeah, good for him.

MR. GRODSKY: He does not have experience in what tattoo artists do and whether they ever enter into those licenses.

THE COURT: That's because he's telling them what he thinks they ought to do.

MR. GRODSKY: That's right. What he thinks he

16

ought to do isn't the issue. The only issue that you have allowed expert testimony on is the willful innocent infringement issue and what photographers think ought to be done is not relevant to that issue.

MR. ALLEN: Your Honor, that's just not accurate. We've put in the record in our brief. Mr. Sedlik has signed his declaration of what his expertise is. And to get those standards, how he -- as experts do -- spoke with other tattoo artists.

The issue in the case that Mr. Sedlik is going to testify -- we offer Mr. Sedlik to testify about -- is whether tattoo artists obtain licenses for photographs as use as a reference.

Their expert is going to testify from the tattoo industry perspective and say: Well, I'm a tattoo artist or I know the tattoo artist really well and they don't require licenses.

And Mr. Sedlik, who is an expert clearly in photography and with his work with respect to creating standards for the tattoo industry with respect to photographs, is going to testify that photographers do receive licenses to use their photographs and illustrations in tattoos.

It's two sides of the same coin. Their expert is coming from the tattoo industry perspective and Mr. Sedlik

22

monopoly is.

So on the subject of substantial similarity, is that only relevant to the tattoo? Or maybe the line drawing? No, no. Not to the social media post; right?

MR. GRODSKY: I think it is relevant to the -- it's relevant to the tattoo. It's relevant to the line drawing. It's certainly relevant to some of the social immediate posts. There's a social media post that's just a partial version of an unfinished tattoo and my --

THE COURT: So any aspects of a line drawing or tattoo carry over to the social media posts.

THE WITNESS: Right. I mean, to be fair, there are social media posts, as Mr. Allen indicated, that show the entire photograph. I can't really argue that those social media posts are not substantially similar.

THE COURT: Right.

MR. GRODSKY: On the other hand, I can certainly argue that the partial unfinished tattoo; that if you compare that with Mr. Sedlik's photo, it is not substantially similar; that the protectable elements are not the same. So I do think it's different for the different accused works.

THE COURT: All right. With regard to the extrinsic and intrinsic test, the last time I said I had no problem with three instructions. I generally think that's

23

better.  It's easier to deal with for the jury as well than having one just really long instruction.

So I will give something between the two side's proposals so you can either try harder to come to some agreement or risk that I will come to something less advantageous to both of you.

So I've never had a copyright trial so you probably have more experience with trials on this issue than I do.  But how in the world does a jury deal with a fair use issue?

*(No response.)*

THE COURT:  You had a jury trial with a fair use issue?

*(No response.)*

MR. ALLEN:  Not where -- this is Robert Allen on behalf of plaintiff -- not where some of the factors have already been decided as a matter of law.

THE COURT:  Well, what do you do when they haven't been decided as a matter of law?  I mean, how the heck do they know how to balance.  Do they flip a coin back there?

MR. ALLEN:  I don't believe there -- there's language from the Supreme Court that, you know, all factors are to be considered.  No factor is, you know -- there's language that -- I can't remember which particular Supreme Court.  They all pretty much say the same thing.  That all

24

the factors are to be weighed.

The problem is we have two factors and half -- or a significant portion of one factor has already been ruled as a matter of law so it would be inappropriate for the jury to consider those.

THE COURT: But it's part of the balancing which makes it hard because I can say I've already decided it but that doesn't tell them how heavily or how strong it was or how it relates to anything else.

MR. ALLEN: That's true.

THE COURT: Somebody would have been better off if I hadn't been asked to do that. I don't know.

MR. ALLEN: I guess we can think about it a little bit more. I hadn't really -- I understand the dilemma that we're in but I don't know a way around it.

THE COURT: Hmm. You're the two of the four people who were supposed to tell me the way around it. I'm not supposed to tell you.

MR. GRODSKY: I have not had a fair use trial and I don't think there have been very many fair use trials. These things are often decided on motion or resolved in another way so it's difficult.

I will say that Google court, if you look at it -- and this makes things even more complicated -- all it says is that the disputed issues of fact are decided by the jury.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY B. SEDLIK,<br>Plaintiff,<br><br>v.<br><br>KATHERINE VON<br>DRACHENBERG, et al.,<br>Defendants. | CV 21-1102 DSF (MRWx)<br><br>Order GRANTING Defendants'<br>Motion for Reconsideration (Dkt.<br>140); Order GRANTING<br>Plaintiff's Motion for<br>Reconsideration (Dkt. 142)[1] |

Jeffrey Sedlik moves for reconsideration of the Order DENYING Plaintiff's Motion for Summary Judgment or Summary Adjudication. Defendants move for reconsideration of the Court's Order GRANTING in part and DENYING in part Defendants' Motion for Summary Judgment and Partial Summary Judgment. Both motions for reconsideration are GRANTED. However, even after finding that the Tattoo is not transformative, the Court finds that neither side has satisfied its summary judgment burden on the affirmative defense of fair use.

---

[1] "A motion for reconsideration is considered granted when the district court thoroughly reconsiders its previous ruling, even if it reaches the same outcome." Valcom, Inc. v. Vellardita, No. 2:13-CV-3025-WHW-CLW, 2014 WL 2965708, at *2 (D.N.J. July 1, 2014) (simplified) (citing Pena–Ruiz v. Solorzano, 281 Fed. App'x 110, 111 n. 1 (3d Cir. 2008)).

## I. Legal Standard

In the Central District of California, a motion for reconsideration may be made only on grounds of:

> (a) a material difference in fact or law from that presented to the Court before such decision that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered.

L.R. 7-18. "No motion for reconsideration may in any manner repeat any oral or written argument made in support of, or in opposition to, the original motion." Id.

## II. Procedural History

This case concerns Jeffrey Sedlik's photographic portrait of Miles Davis (Portrait). The Portrait was used as a reference by the tattoo artist Katherine Von Drachenberg, famously known as Kat Von D, to ink a tattoo for her friend Blake Farmer (Tattoo). She did this free of charge, and later posted photos and videos of the Tattoo in progress and completed form on her personal and business social media accounts.[2]

Both parties moved for summary judgment on the claim of copyright infringement. Defendants raised the affirmative defense of fair use. In the summary judgment orders, the Court conducted a fair use analysis, considering and weighing the determinative factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used

---

[2] The facts and the parties' positions are set forth at length in the summary judgment orders. See Dkt. 69 (Summ. J. Orders) at 2–7.

in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

The Court found that Defendants had "met their burden of showing the Tattoo has a purpose or meaning distinct from that of the Portrait by virtue of the way Kat Von D changed its appearance to create what she characterizes as adding movement and a more melancholy aesthetic." Summ. J. Orders at 21. But because Sedlik raised a triable issue in response, the Court found that the decision as to whether the Tattoo was transformative was more appropriately left to a jury. Id. The Court found after weighing all the fair use factors that "the issue of fair use as to the Tattoo and the associated social media posts is more appropriately left to a jury." Id. at 25.

The Court agrees with the parties that there has been a material change in controlling law since the Court issued the summary judgment orders. On May 18, 2023, the United States Supreme Court decided Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith, 143 S. Ct. 1258 (2023) (Warhol), giving lower courts new instructions on how to evaluate the first factor under 17 U.S.C. § 107(1)'s fair use analysis. Warhol changes the Court's analysis. The Court now finds that Defendants have not produced evidence that the Tattoo is transformative and that the social media posts must be analyzed separately, but the Court still finds that "the issue of fair use as to the Tattoo and the associated social media posts is more appropriately left to a jury." Summ. J. Orders at 25.[3]

_____

[3] Sedlik argues that the Court should reconsider its finding that there were triable issues of fact as to the substantial similarity between the Portrait and alleged infringements, citing Lorador v. Kolev, No. 22-15491, 2023 WL 3477834 (9th Cir. May 16, 2023)(unpublished) and a host of district court opinions for the proposition "that a court does not engage in substantial similarity analysis where there is direct evidence of copying[.]" Dkt. 143 (Pl. Mem. Supp. Recons.) 14. This repeats an argument Sedlik made in his

3

### III. Fair Use

"Fair use is a mixed question of law and fact."  McGucken v. Pub Ocean Ltd., 42 F.4th 1149, 1158 (9th Cir. 2022).  "Where no material, historical facts are at issue and the parties dispute only the ultimate conclusions to be drawn from those facts, [the Court] may draw those conclusions without usurping the function of the jury."  Id.  But where there is a triable issue of fact and a jury could "reasonably conclude that the work constitutes a fair use," summary judgment cannot be granted. See Morris v. Young, 925 F. Supp. 2d 1078, 1089 (C.D. Cal. 2013).

Sedlik claims Warhol requires that the Court grant his motion for summary judgment because "Defendants have admitted to copying Plaintiff's photograph of Miles Davis ["the Portrait"] by (1) tracing the [the Portrait] to create a tattoo of it (the "Tattoo"), (2) using the [Portrait] as a reference in creating the Tattoo, [and] (3) publicly displaying both the [Portrait] and the Tattoo on the Internet."  Dkt. 142 (Pl. Mot. Recons.) at 3.  Sedlik contends that "defendants cannot prove that any of the factors favor fair use as a matter of law."  Id.

Defendants argue that in light of Warhol, the Court should find that "(1) the Tattoo is a non-commercial use under the first fair use factor; (2) as specifically applied to the Tattoo, the first factor of the fair use analysis weighs in favor of a finding of fair use; and (3) weighing all the factors together, as a matter of law given the facts in this case, the Tattoo is a fair use."  Dkt. 140 (Def. Mot. Recons.) at 2.

A.    Warhol

Warhol concerned an orange silkscreen portrait of the recording artist Prince that was a derivative of a photograph by Lynn Goldsmith. 143 S. Ct. at 1268.  The Andy Warhol Foundation, which owned the silkscreen, licensed it to Condé Nast for a retrospective magazine issue on Prince.  Id. at 1266.  The Foundation argued that the silkscreen was transformative because it imbued Goldsmith's photo with new

---

motion for summary judgment.  Dkt 53 (Reply) at 2.  For the reasons stated in the summary judgment orders, Plaintiff's argument is unpersuasive.

meanings and messages. Id. at 1282. The Supreme Court affirmed the Second Circuit's holding that the first factor of 17 U.S.C. § 107 did not support the Foundation's claim of fair use of Goldsmith's photograph. 143 S. Ct. at 1287. In rejecting the Foundation's argument and the proposition that the first factor "weighs in favor of any use that adds some new expression, meaning, or message," id. at 1282, the Supreme Court stated that even if the silkscreen could "be perceived to portray Prince as iconic, whereas Goldsmith's portrayal is photorealistic, that difference must be evaluated in the context of the specific use at issue," id. at 1284. The relevant use was the Foundation's "commercial licensing of Orange Prince to appear on the cover of Condé Nast's special commemorative edition[,]" not Orange Prince's meaning or aesthetic. Id.

Even after Warhol, it is not always inappropriate to examine art's meaning or message. "But new meaning or message [is] not sufficient. [...] Instead meaning or message [is] simply relevant to whether the new use served a purpose distinct from the original, or instead superseded its objects. That was, and is the 'central' question under the first factor." Id. at 1282-83. For example, in parody the meaning of the infringing work must be considered to determine whether the secondary work comments on the original or is satire that "can stand on its own two feet[.]" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 581 (1994). A "court should not attempt to evaluate the artistic significance of a particular work[.]" Warhol, 143 S. Ct. at 1283.

One clear example of a transformative use that survives Warhol is Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007). In Perfect 10, the Ninth Circuit held that Google's use of thumbnails was highly transformative. Id. at 1165. The circuit reasoned that "[a]lthough an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information." Id. Although Google's use reproduced copyrighted images in their entirety, it had a function different from the copyrighted work.

5

In light of <u>Warhol</u>, the Court recognizes that its prior analysis "assess[ed] the aesthetic character of the resulting work," instead of focusing on the purpose of its use as required by <u>Warhol</u>.  143 S. Ct. at 1289 (Gorsuch, J., concurring).  The Court therefore must reconsider its finding that Defendants met their burden.  Summ. J. Orders at 21.  In addition, in the summary judgment orders, this Court looked at the Tattoo and social media posts together instead of analyzing each use separately.  Summ. J. Orders at 18–21.  But <u>Warhol</u> has clarified that the Court must now look at the purpose of each use, because "[t]he same copying may be fair when used for one purpose but not another." 143 S. Ct. at 1277.

## B.    The Tattoo

Sedlik argues that under <u>Warhol</u> there is no evidence that the Tattoo is transformative beyond being a derivative work, which is insufficient for a fair use defense.[4]  "A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version,

---

[4] The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  To prevail at summary judgment, a moving party without the burden of persuasion "may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).  "Because fair use is an affirmative defense, on which the defendant bears the burden at trial, when a plaintiff challenges it on summary judgment, he may satisfy his Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case."  <u>O'Neil v. Ratajkowski</u>, 563 F. Supp. 3d 112, 128 (S.D.N.Y. 2021).  Thus, the Court must consider whether Sedlik has shown that there is an absence of evidence that the Tattoo was a fair use.  If so, then it must consider whether Defendants have produced enough evidence to create a genuine issue as to whether the Tattoo was a fair use, or in the alternative, whether Defendants are entitled to a finding of fair use as a matter of law on their cross-motion for summary judgment.

6

sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C.§ 101.  The Tattoo has recast the Portrait in a new visual medium, akin to a "translation" or "motion picture version."  Id.  This is a violation of the copyright owner's exclusive right "to prepare [and authorize] derivative works based upon the copyrighted work." 17 U.S.C. § 106(2).  This exclusive right is limited by the fair use doctrine. 17 U.S.C. § 107.

After Warhol, the first factor of a fair use defense "considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use." Warhol, 143 S. Ct. at 1277.  A work is transformative when it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[.]" Campbell, 510 U.S. at 579.  The parties agree that Kat Von D's use of the work is at issue, not Farmer's use.  Tr. Oral Arg. 23:2–3.

Warhol does not change the longstanding rule that recasting a photograph into a different visual medium is not sufficiently transformative.  See Rogers v. Koons, 960 F.2d 301, 309 (2d Cir. 1992) (holding transformation of photograph into sculpture was not fair use).  To preserve the copyright owner's right to make and authorize derivatives, "the degree of transformation required to make 'transformative' [fair] use of an original must go beyond that required to qualify as a derivative." Warhol, 143 S. Ct. at 1275.  Defendants have not explained why the medium of tattoos should be treated differently from other visual mediums like sculpture or film.  Nor have they pointed to a transformative purpose that goes "beyond that required to qualify as a derivative[,]" Warhol, 143 S. Ct. at 1275, like the way a thumbnail transforms an image "into a pointer directing a user to a source of information." Perfect 10, 508 F.3d at 1165.

Sedlik points to the record to show the lack of a genuine issue as to the Tattoo's transformative purpose.  The burden shifts to Defendants to provide evidence of one.  The evidence Defendants previously relied

7

on to meet their burden no longer shows a transformative purpose after Warhol, and there is now an absence of evidence on the issue. Dkt. 33 (DSUF) ¶¶74–77. Defendants rely on the same fair use defense that the Court accepted before Warhol. They argue that the environments of the two uses are distinct and different: "[Sedlick's] photograph was used to illustrate an article about Miles Davis in a jazz magazine. Kat Von D hand-inked a tattoo on the arm of her friend." Dkt. 145 (Def. Opp'n) 15. And the Tattoo is transformative because Kat Von D has added "movement" and a "melancholy aesthetic." Dkt. 141 (Def. Mem. Supp. Recons.) 11. Defendants' argument relies on a formal analysis of the Tattoo's aesthetic character. This is precisely the type of argument foreclosed by Warhol. See 143 S. Ct. at 1282.

Nor does the Tattoo require borrowing from the original like parody, criticism, or commentary, which are transformative because they conjure "up the original work to shed light on the work itself, not just the subject of the work." Warhol, 143 S. Ct. at 1281. Kat Von D admits that had the Portrait not existed, she would have "just used another image." Dkt, 143-3 (Ex. 1) 184:9–10. Like satire, the Tattoo can "stand on its own two feet and so requires justification for the very act of borrowing." Campbell, 510 U.S. at 581.

Sedlik has met his burden of showing that there is no evidence the Tattoo is transformative. Defendants have not produced any evidence creating a genuine issue. But this is not the only fair use factor, nor the only consideration under the first factor.

The Court previously found a triable issue as to whether the Defendants' use was commercial because "Defendants 'received and enjoyed indirect economic benefit in the form of advertising, promotion, and goodwill' by posting photos of the Tattoo on their various social media platforms." Summ. J. Orders at 21. Defendants continue to argue that the Tattoo is a non-commercial use because Kat Von D has not charged a client for a tattoo for over a decade. Def. Mem. Supp. Recons. at 8–9; DSUF ¶31. The Tattoo, like her others, was inked for free. DSUF ¶31.

8

**ER-101**

But "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1117 (9th Cir. 2000) (citing Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 (1985)). The social media posts may be seen as evidence of a commercial purpose. Kat Von D had a photo taken of her while she was inking the Tattoo, and later posted it to both her Facebook and Instagram accounts as well as her shop's social media accounts. Dkts. 35-19 (Ex. 203); 35-20 (Ex. 204); 35-26 (Ex. 212); 35-27 (Ex. 213). A reasonable factfinder could conclude that Kat Von D inked the Tattoo for the commercial purpose of building her personal brand and attracting customers to her shop.

Conversely, a reasonable factfinder could also conclude that the Tattoo was an "incidental use as part of a commercial enterprise" and not done for the purpose of marketing Kat Von D's brand or shop. See Seltzer v. Green Day, Inc., 725 F.3d 1170, 1178 (9th Cir. 2013).[5] Whether the Tattoo was done for a commercial purpose is a material factual issue that must be resolved by a jury. Neither side has met the burden of showing that there is no triable issue as to whether the first factor favors Sedlik or Defendants. The outcome of the Court's summary judgment remains the same: the first factor cannot be determined as a matter of law.

Warhol does not change the Court's analysis of the second or third factor.[6] The fourth factor, the effect of the use on the potential market

---

[5] Seltzer directly contradicts Sedlik's claim that only non-profit educational uses are protected by the fair use doctrine. Pl. Mot. Recons. at 10–11.

[6] The Court notes that in its summary judgment orders it found that "[b]ecause the Portrait was previously published several decades ago, [the second factor] weighs in favor of fair use." Summ J. Orders at 22. This was a mistake. Dr. Seuss Enterprises, L.P. v. ComicMix LLC, 983 F.3d 443, 456 (9th Cir. 2020)("[N]either Harper & Row nor any principle of fair use counsels that the publication of the copyrighted work weighs in favor of fair use.").

for or value of the copyrighted work, is "undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566. Nothing in Warhol disturbs the Court's finding that there is a "triable issue as to whether there is a market for future use of the Portrait in tattoos." Summ. J. Orders at 24.[7]

After reconsideration, the Court again "finds triable issues as to the [first and fourth] statutory factors." Summ. J. Orders at 25. The "four statutory factors [should not] be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright[.]" Campbell, 510 U.S. at 578. Because there are triable issues of fact as to the two most important factors, whether the Tattoo is a fair use as a matter of law cannot be determined and both motions for summary judgment as to the Tattoo are DENIED.

## C.   The Line Drawing

Sedlik now argues that Kat Von D infringed his copyright by making a line drawing based on the Portrait. Pl. Mot. Recons. at 3. But Sedlik did not argue that the line drawing was an infringement in his summary judgment motion. See Dkt. 37 (Pl. Mot. Summ. J.). A motion for reconsideration is "not the place for parties to make new arguments not raised in their original briefs." Woulfe v. Universal City Studios

---

The second factor thus weighs against fair use because the Portrait is a creative work. Summ J. Orders at 22. However, the second factor "typically has not been terribly significant in the overall fair use balancing[.]" Dr. Seuss Enterprises, 983 F.3d at 456.

[7] Sedlik submitted additional undisputed facts regarding the past licensing of his work to a tattoo artist. Dkt. 143-1, ASUF ¶41. Defendants object that this is not a new material fact because Sedlik has already offered evidence that he has previously licensed the Portrait as a reference for a tattoo. Def. Opp'n at 21. The Court already heard evidence of past licenses Sedlik granted to tattoo artists and found a triable issue of fact. Summ. J. Orders at 24. Testimony concerning evidence already considered does not raise a new material fact under C.D.Cal.R. 7-18.

LLC, No. 222CV00459SVWAGR, 2023 WL 3321752, at *1 (C.D. Cal. Mar. 9, 2023).

## D.    Social Media Posts

In Sedlik's summary judgment motion, he argued that Defendants' reproduction of the Portrait on social media infringed his copyright.  Pl. Mot. Summ. J. at 15.  Defendants argued that the "social media posts depicting the tattoo in various states of progress – three distinct photographs, and one video – are also protected by fair use[.]"  Dkt 32 (Def. Mot. S. J.) at 24.  The Court's previous fair use analysis did not consider the Tattoo separately from the social media posts, let alone each separate use on social media as required by Warhol.  Compare 143 S. Ct. at 1277 with Summ. J. Orders at 18–21.  On reconsideration, Sedlik seeks summary judgment on the issue of fair use as to the social media posts.  Pl. Mot. at 3.  Defendants do not.  See Def. Mot. at 2. Sedlik must show that there is no evidence in the record supporting a fair use defense of the social media posts.  Fed. R. Civ. P. 56(a).  He has not carried his burden.

### 1.    Process Images

Sedlik identifies three allegedly infringing images documenting the process of inking the Tattoo: the picture of the Tattoo in progress posted to Kat Von D's and High Voltage's Instagram and Facebook pages (Exs. 203, 204, 212, 213), the "messy progress shot" on Instagram and Facebook, dkt. 35-21 (Ex. 207), dkt. 35-22 (Ex. 208), and a video posted to Kat Von D's Instagram Stories of the work in progress, dkt. 35-31 (Ex. 217).

Defendants argue that these images "do not in any way achieve a purpose that is the same as, or highly similar to, that of the original work[.]"  Def. Opp'n at 17.  Sedlik argues that the posts were for the purpose of displaying a portrait of Miles Davis.  Dkt. 148 (Pl. Opp'n) at 14.  This appears doubtful as a reasonable juror could have trouble even discerning that the "messy progress shot" depicts Miles Davis, and both parties seem to agree that the Portrait accounts for only about 10% of the other images.  Id. at 15; Def. Mot. S. J. at 24.  This is

11

evidence that the posts have a different purpose or function than the Portrait. Whether the process images have a transformative purpose is a triable issue of fact.

There is also a triable issue of fact as to whether these posts were commercial. Generating traffic to one's social media page using copyrighted material is "within the type of 'profit' contemplated by Worldwide Church." Northland Fam. Plan. Clinic, Inc. v. Ctr. For Bio-Ethical Reform, 868 F. Supp. 2d 962, 979 (C.D. Cal. 2012). Kat Von D testified that her social media posts were not for the purpose of generating profit or customers for High Voltage Tattoo. Dkt. 35-11 (Ex. 26), Dep. Kat von D 32:7–25, 33:15–23. A jury may find otherwise. Even if she did not seek to generate financial profit with her posts, a jury may conclude that Kat Von D "stood to gain recognition among [her] peers in the profession" and increase the value of her brand. See Weissmann v. Freeman, 868 F.2d 1313, 1324 (2d Cir. 1989). Weighing the alleged transformative purpose of the social media posts against their commercial nature, the Court finds there is a triable issue of fact as to whether the first factor favors fair use.

The reasoning applicable to the second and third factors under the Court's analysis of the Tattoo is also applicable to the social media posts, because the second and third factors consider the original work. The same elements and pose copied from the Portrait for the Tattoo were necessarily reproduced in the social media posts of the Tattoo.

The fourth factor "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works." McGucken, 42 F.4th at 1163. Neither Sedlik nor Defendants have identified evidence or law that allows for a determination with respect to the potential markets for the social media posts. Defendants argued before Warhol that "[o]n the fourth factor, social media photographs and videos of the tattoo in various states of progress are not remotely substitutes for the primary market for Sedlik's Photograph." Def. Mot.

12

**ER-105**

Summ. J. at 24. But this conclusory statement is not sufficient. The section of Sedlik's brief analyzing the social media posts does not mention the fourth factor. Pl. Opp'n at 14–16.

Where neither party meets its burden on cross motions for summary judgment "due to the inadequate briefing on the relevant legal issues and the insufficient factual support provided therein," both motions will be denied. Sheedy v. BSB Properties, LC, No. 2:13-CV-00290-JNP, 2016 WL 6902513, at *5 (D. Utah Mar. 1, 2016). There is a triable issue of fact as to whether the social media posts caused actual market harm to Sedlik, and whether widespread use of the portrait on social media would have an adverse impact on the potential markets for the Portrait and its derivatives.

### 2. Completed Picture

The completed Tattoo was posted to both Kat Von D's and High Voltage's social media profiles. Dkts. 35-23 (Ex. 209), 35-24 (Ex. 210), 35-25 (Ex. 211), 35-28 (Ex. 214), 35-29 (Ex. 215), 35-30 (Ex. 216), 35-31 (Ex. 217). Both sides acknowledge that the analysis with respect to these photos is different. Def. Opp'n 18–19; Pl. Opp'n at 15. However, neither side applies the four factors to both the process images and completed images separately. The analysis and conclusions with respect to the first and fourth factor likely differ between the two. The Court cannot decide whether these social media posts are fair uses as a matter of law. Therefore, Sedlik's motion for summary judgment as to the social media posts is DENIED.

### IV. Conclusion

The Court GRANTS both parties' motions for reconsideration. Having reconsidered, the Court revises its determinations as described above.

IT IS SO ORDERED.

Date: October 10, 2023

_Dale S. Fischer_

Dale S. Fischer
United States District Judge

13

**ER-106**

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY B. SEDLIK,<br>    Plaintiff,<br><br>         v.<br><br>KATHERINE VON<br>DRACHENBERG, et al.,<br>    Defendants. | CV 21-1102 DSF (MRWx)<br><br>Order GRANTING in Part and<br>DENYING in Part Defendants'<br>Motion for Summary Judgment<br>and Partial Summary Judgment<br>(Dkt. 31); Order DENYING<br>Plaintiff's Motion for Summary<br>Judgment or Summary<br>Adjudication (Dkt. 37) |

Defendants Katherine Von Drachenberg (Kat Von D), Kat Von D, Inc. (KVD, Inc.), and High Voltage Tattoo, Inc. (High Voltage) move for summary judgment as to Plaintiff Jeffrey Sedlik's claims for copyright infringement and under Section 1202(a) and (b) of the Digital Millennium Copyright Act (DMCA).  Dkt. 31 (KVD Mot.) at 8.  Sedlik opposes.  Dkt. 50 (Opp'n to KVD Mot.).  Sedlik moves for summary judgment on his claims.  Dkt. 37 (Sedlik Mot.) at 2.  Defendants oppose. Dkt. 50 (Opp'n to Sedlik Mot.).  The Court deems these matters appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.  Defendants' motion is GRANTED in part and DENIED in part.  Sedlik's motion is DENIED.

**ER-107**

## I. UNDISPUTED FACTS

### A.     The Parties

Sedlik is a world-renowned, award-winning professional photographer and professor.  PSUF ¶¶ 1-2.[1]  Sedlik's work has been featured in numerous publications, and he has an extensive fine art repertoire.  Id. ¶¶ 3-4.

In 1989, Sedlik independently conceived and created the iconic photographic portrait depicting world-famous jazz musician Miles Davis (the Portrait) that is the subject of this litigation.  Id. ¶ 5.  Sedlik is the sole and exclusive owner of the copyright for the Portrait, which was published in Jazziz Magazine in 1989.  Id. ¶ 6.  The Portrait appears as follows:

---

[1] Citations to DSUF refer to Sedlik's Statement of Genuine Disputes, dkt. 50-2, which incorporates Defendants' proposed uncontroverted facts and Sedlik's responses to those facts.  Citations to PSUF refer to Defendants' Statement of Genuine Disputes, dkt. 42, which incorporates Sedlik's proposed uncontroverted facts and Defendants' responses to those facts.  Where the Court cites to a disputed fact, the Court has found the dispute was not valid or was irrelevant, unless otherwise indicated.  The Court has independently considered the admissibility of the evidence and has not considered facts that are irrelevant or based on inadmissible evidence.

2

**ER-108**



Dkt. 35-17.

In creating the Portrait, Sedlik intended to comment on Miles Davis's use of "negative space" in his musical work, meaning his use of silence, low volumes, and pauses in between notes.  DSUF ¶ 138.

Sedlik has offered and sold non-exclusive copyright licenses authorizing limited reproduction, distribution, display, and creation of derivative works of his Portrait for commercial and non-commercial purposes since its creation.  PSUF ¶ 7.  Sedlik registered his copyright with the United States Copyright Office, which issued a registration with an effective date of registration of July 6, 1994.  Id. ¶ 8.  Sedlik's copyright registration remains valid.  Id. ¶ 9.

Kat Von D is a tattooist who has appeared on reality television shows such as "Miami Ink" and "LA Ink."  Id. ¶ 10.  Kat Von D has special expertise in inking black and gray portrait tattoos.  DSUF ¶ 3.  Kat Von D owns and operates High Voltage, which operated a tattoo shop in Los Angeles named "Kat Von D's High Voltage Tattoo."

3

**ER-109**

PSUF ¶ 11.[2]  Kat Von D was an employee of High Voltage at all times relevant to this litigation.  Id. ¶ 12.  Other tattoo artists at High Voltage contributed a small percentage of their fees, which were used to cover the cost of the shop's rent, but kept the majority of their earnings.  DSUF ¶¶ 12-13.

Kat Von D owns and operates KVD, Inc., a corporation of which she is the CEO, Secretary, CFO, sole owner, and sole shareholder.  PSUF ¶ 13.  Kat Von D is also the sole employee of KVD, Inc.  Id. ¶ 15.  KVD, Inc. has never held an ownership interest in High Voltage.  DSUF ¶¶ 18-19.

Kat Von D has not been paid by a customer for inking a tattoo since 2012 and considers tattoos she inks to be a gift for those individuals.  Id. ¶¶ 4, 6.

**B.     The Miles Davis Tattoo**

Over two sessions in 2017, Kat Von D inked a tattoo of Miles Davis (the Tattoo) on Blake Farmer, a lighting technician with whom Kat Von D had worked on a film project.  DSUF ¶¶ 20, 32.  Farmer considered Miles Davis an important figure, and had thought of getting a portrait tattoo of Miles Davis since Farmer was in college.  Id. ¶¶ 24-25.  Farmer played trumpet from the sixth grade through college, and developed a particular appreciation for Miles Davis while studying jazz music in college.  Id. ¶¶ 26-28.  Farmer also believed that he, like Davis, had a "rebellious spirit" and identified with Davis.  Id. ¶¶ 29-30.

To select the image that was used to ink the Tattoo, Farmer did a Google search and found a photograph of Miles Davis (the Portrait), then texted the image to Kat Von D's assistant.  Id. ¶¶ 33-34.  The photograph did not contain a copyright symbol.  Id. ¶ 36.  Farmer did not pay Kat Von D or High Voltage for inking the Tattoo.  Id. ¶ 31.

To ink the Tattoo, Kat Von D first created a line drawing on tracing paper, the purpose of which was to map out the image so that

_____

[2] High Voltage's physical location closed in November 2021.  DSUF ¶ 8.

4

she could ink the Tattoo by a freehand method and to show Farmer the size of the tattoo.  Id. ¶¶ 40-43.  Kat Von D created the line drawing by placing both the Portrait and the tracing paper on a light box, and then tracing the outlines and contours.  Id. ¶ 45.  She then created a stencil using a thermal-fax machine.  Id. ¶¶ 46-47.  The line drawing appears below:



Dkt. 35-18.  Kat Von D used the stencil to temporarily transfer the drawing onto Farmer's skin, after which she began inking the Tattoo. DSUF ¶¶ 48-51.  Her goal in inking the Tattoo was to create a sentiment that both evoked melancholy and had movement in it. Id. ¶ 90.

## C.   Social Media Posts

On March 18, 2017, Kat Von D and High Voltage posted to their social media accounts a photo showing Kat Von D in the middle of creating the Tattoo.  PSUF ¶ 16.  The image depicts Kat Von D in the process of inking the Tattoo, with a printout of the Portrait in the background as a reference.  Id. ¶¶ 17, 31.  Kat Von D and High Voltage posted a second photo to their social media accounts, which was a progress photo of a portion of the Tattoo.  Dkt. DSUF ¶ 96; dkts. 35-19 – 35-22, 35-26 – 35-27.  The social media posts appear below:

5

**ER-111**

 

None of the Defendants obtained Sedlik's permission or a license prior to inking the Tattoo.  PSUF ¶ 21.

On April 26, 2018, Kat Von D and High Voltage posted a photo of the completed Tattoo on their social media accounts:



6

**ER-112**

PSUF ¶ 25; dkts. 35-23 – 35-25, 35-28 – 35-30.  The caption on Kat Von D's posts stated: "portrait I tattooed at @highvoltagetat."  Dkts. 35-23 – 35-25.  High Voltage's posts stated, "It still amazes us that @thekatvond can make a face as majestic & deep as this emerge from the flesh!!!"  Dkts. 35-28 – 35-30.  Kat Von D also posted a short video to her Instagram account showing her in the process of inking the Tattoo.  PSUF ¶ 26.

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "This burden is not a light one."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  But the moving party need not disprove the opposing party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  Id. at 323-24; Fed. R. Civ. P. 56(c)(1).  A non-moving party who bears the burden of proof at trial as to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment.  See Celotex Corp., 477 U.S. at 322.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party.  Id. at 250-51.  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury . . . could find by a preponderance of the evidence that the [non-movant] is entitled to a

7

verdict . . . ." Id. at 252. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

"[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992). Summary judgment is improper 'where divergent ultimate inferences may reasonably be drawn from the undisputed facts.'" Fresno Motors v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014). Instead, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (simplified).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (simplified). In doing so, the Court must consider the evidence submitted in support of both motions before ruling on each of them. Id.

### III. DISCUSSION

**A.    Evidentiary Objections**

Sedlik objects to numerous statements made by Defendants in support of their motion for summary judgment, as well as some of the underlying evidence. Dkt. 50-3 (Evidentiary Objections). As an initial matter, the Court notes that Sedlik has submitted objections to the statements in Defendants' Separate Statement, rather than the underlying evidence. The Court considers the underlying evidence.

"A district court's ruling on a motion for summary judgment may only be based on admissible evidence." Oracle, 627 F.3d at 385. A party seeking to admit evidence bears the burden of proof to show its admissibility. Id. "At the summary judgment stage, [the Court does] not focus on the admissibility of the evidence's form. [The Court]

8

**ER-114**

instead focus[es] on the admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).

Sedlik objects to Defendants' statements regarding whether Farmer brought a printout of the Portrait to High Voltage, and whether it contained Sedlik's name or a copyright symbol. Evidentiary Objections at 2. The Court does not rely on these statements.

Several of Sedlik's objections are to the relevance of the underlying evidence. See Evidentiary Objections at 3, 5. Generally, an objection to evidence on the ground that it is "irrelevant . . . [is] duplicative of the summary judgment standard itself" and thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").

Sedlik objects to statements made by Defendants' experts, Evidentiary Objections at 4-5, 8-9, but the Court does not rely on those statements.

## B.   Claim for Copyright Infringement

Sedlik moves for summary judgment on his copyright infringement claim. Sedlik Mot. at 2. Defendants also move for summary judgment, asserting that their use of the Portrait in creating the Tattoo was fair use. KVD Mot. at 7. The Court first addresses Sedlik's arguments.

### 1.   Liability

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)), overruled on other grounds by Skidmore as Tr. For Randy Craig Wolfe Tr. v. Led Zeppelin, 952 F.3d 1051 (9th Cir. 2020). "[T]he second element has two distinct components: copying and unlawful

9

**ER-115**

appropriation."  Rentmeester v. Nike, Inc., 883 F.3d 1111, 1117 (9th Cir. 2018) (internal quotation marks omitted), overruled on other grounds by Skidmore, 952 F.3d 1051.  "The hallmark of 'unlawful appropriation' is that the works share *substantial* similarities." Skidmore, 952 F.3d at 1064 (citing Newton v. Diamond, 388 F.3d 1189, 1193 (9th Cir. 2004).

The Ninth Circuit applies a two-part test to determine whether a defendant's work is substantially similar to the plaintiff's work: the extrinsic test and the intrinsic test, both of which must be satisfied for the works to be found substantially similar.  Id.  The extrinsic test "compares the objective similarities of specific expressive elements in the two works," distinguishing between the protected and unprotected material in a plaintiff's work.  Id.  The intrinsic test considers "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance."  Id. (citing Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 637 (9th Cir. 2008)).

Defendants do not dispute that Sedlik owns a valid copyright in the Portrait.  PSUF ¶ 9.  They also do not appear to dispute the "copying" prong, as they do not address it in their Opposition. However, Defendants do argue that they did not copy "protectible elements" of the Portrait under the extrinsic and intrinsic tests.  Opp'n to Sedlik MSJ at 10.

### a.   Extrinsic Test

Under the extrinsic test, the plaintiff first must identify the alleged similarity between his work and the defendant's work.  See Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994).  Then, "the court must determine whether any of the allegedly similar features are protected by copyright."  Id.  Finally, the court must consider "whether the work is entitled to 'broad' or 'thin' protection."  Id.

The Court first considers the elements of the Portrait that are allegedly similar to the Tattoo.  Sedlik provides only a statement that the Tattoo copies the "*combination* of subject matter, pose, light and

10

**ER-116**

shadow, camera angle, [and] juxtaposition of elements within the composition" that are present in the Portrait.  Sedlik Mot. at 17.  He further concludes that the "constituent elements and selection and arrangement of those visual elements in the Iconic Miles Davis Portrait remain completely unchanged in the tattoo, with only de minimis variation arising from the medium of reproduction."  Id.  In support of his argument, Sedlik cites his supplemental interrogatory responses, which describe in significant detail the steps Sedlik took to create the Portrait.  Id.; see also dkt. 37-7 (supplemental interrogatory responses).  As Defendants argue, this evidence does not comply with the Court's Order re Motions for Summary Judgment, see Opp'n to Sedlik Mot. at 12, but this is not the basis on which the Court denies Sedlik's motion.  For the purpose of this motion only, the Court assumes Sedlik has met his burden of identifying elements in the Tattoo that he claims are similar to the Portrait.

The Court next considers whether any of the allegedly similar features are protected by copyright.  Defendants argue some of the features are not protectible and cite several cases in support.

First, Defendants cite Rentmeester, a copyright infringement action by a renowned photographer against Nike.  Rentmeester, 883 F.3d at 1115.  Rentmeester photographed Michael Jordan "leaping toward a basketball hoop with a basketball raised above his head in his left hand, as though he is attempting to dunk the ball."  Id.  The photograph later appeared in *Life* magazine.  Id.  Afterward, Nike hired a photographer to produce its own image of Jordan, and Nike's photograph was similar to Rentmeester's photograph, though it had a different background, and Jordan wore different clothing and Nike shoes.  Id.

In its analysis of the extrinsic test, the Ninth Circuit noted that while "photos can be broken down into objective elements that reflect the various creative choices the photographer made in composing the image"; they "cannot be dissected into protected and unprotected elements in the same way" as other works, such as novels, plays, and motion pictures.  Id. at 1118-19.  This is because none of the creative

11

**ER-117**

choices made by a photographer in composing an image, such as camera angle or lighting, "is subject to copyright protection when viewed in isolation." Id. at 1119. "A subsequent photographer is free to take her own photo of the same subject, again so long as the resulting image is not substantially similar to the earlier photograph." Id. However, "[w]hat is protected by copyright is the photographer's selection and arrangement of the photo's otherwise unprotected elements." Id.

The Ninth Circuit found Nike's photograph of Jordan did not infringe on Rentmeester's photograph as a matter of law, because while the photographs were similar, they contained significant differences in Jordan's pose, the specific setting and backdrop, position of the basketball hoop, and Jordan's positioning within the frame of the photograph. Id. at 1122-23. While Jordan's pose was similar in Nike's photograph, the Ninth Circuit found that Rentmeester's copyright "does not confer a monopoly on that general 'idea' or 'concept'; he cannot prohibit other photographers from taking their own photos of Jordan in a leaping, *grand jeté*-inspired pose. Because the pose Rentmeester conceived is highly original, though, he is entitled to prevent others from copying the details of that pose as expressed in the photo he took." Id. at 1121. The circuit further stated: "Had Nike's photographer replicated those details in the Nike photo, a jury might well have been able to find unlawful appropriation even though other elements of the Nike photo, such as background and lighting, differ from the corresponding elements in Rentmeester's photo." Id.

In Reece v. Island Treasures Art Gallery, Inc., 468 F. Supp. 2d 1197 (D. Haw. 2006), the plaintiff sought to enjoin the defendant from selling and displaying stained glass art that was similar to plaintiff's photograph in that they both "depict, from the same angle, a woman kneeling on Oahu's Kailua beach performing an 'ike motion from the hula noho (sitting) position." Id. at 1200-01. The court found the works were not substantially similar even though the women in each work had the same pose, similar clothing, and were depicted in the same orientation. Id. at 1204. While the 'ike movement depicted in the photograph was not protectible, the expression of those ideas, including

12

**ER-118**

"the angle, timing, and lighting of the photograph, as well as the expression of the hula kahiko performance and dress," was protectible. Id. at 1206. The court examined the protectible elements, and determined that the images were not substantially similar because (1) the appearance of the dancers in the stained glass image was different because it lacked detail; (2) the dancer in the stained glass image had "no facial features, hand details, or muscular differentiation"; (3) [t]he mountains and ocean dominate the upper half of the stained glass, but not the photograph"; (4) [t]he dancers' hairstyles are notably different lengths and shapes"; and (5) "the sepia tone of the photograph is markedly contrasted by the vibrant colors of the stained glass." Id. at 1208.

In Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d 382, 384 (S.D.N.Y. 2005), a photographer claimed copyright infringement of his photograph from outside a bathroom stall of a woman's feet and a handbag resting on the floor. The court found that while the allegedly infringing photograph contained many similarities to the one taken by the plaintiff, the pose alone depicted in the original was not protectible. Id. at 394.

Drawing on these cases, Defendants argue that the subject matter and pose in the Portrait are not protectible. With respect to the positioning of Davis's fingers, Defendants argue "Sedlik does not and cannot own a legal monopoly [on] the idea of Miles Davis making a 'Sssh!' symbol with his fingers" because that pose is an idea. Opp'n to Sedlik Mot. at 17. The Court agrees that Davis's pose is not separately protectible. However, the selection and arrangement of the elements of the Portrait, including the lighting and camera angle, are protectible. See Rentmeester, 883 F.3d at 1119.

Sedlik argues Defendants' cited cases are inapposite because they do not sanction the copying of a work by using a *copy* of the original, rather than by recreating or closely replicating the original. Reply at 7. Sedlik cites Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249 (1903) for the proposition that making a copy of a copyrighted image is itself copyright infringement. The Supreme Court in Bleistein

13

stated that "[o]thers are free to copy the original" work but that "[t]hey are not free to copy the copy." Id. at 249. The Court declines to address this argument because it was made for the first time in a reply brief. See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (a "district court need not consider arguments raised for the first time in a reply brief."). Additionally, this argument does not appear to be relevant to determining substantial similarity.

The Court next considers whether the Portrait is entitled to broad or thin protection. "A copyrighted work is entitled to thin protection when the range of creative choices that can be made in producing the work is narrow." Rentmeester, 883 F.3d at 1120. "[T]he greater the range of creative choices that may be made, the broader the level of protection that will be afforded to the resulting image." Id. (finding photograph was entitled to broad protection because the range of creative choices was "exceptionally broad" and "very few of those choices were dictated by convention or subject matter."). Here, the Court finds the Portrait is entitled to broad protection because there were a great number of choices involved in creating the Portrait, such as Davis's highly specific pose, facial expression, lighting and shadows, camera angle, and background for the image.

The Court next considers whether the Tattoo is objectively similar to the Portrait. The two works appear below:

14

**ER-120**





In his motion, Sedlik does not articulate the *nature* of the similarities between the Portrait and the Tattoo, other than that there are some.  Instead, he concludes that "[t]he two works are so remarkably similar that the ordinary observer, unless she set out to detect the disparities, would overlook them."  Sedlik Mot. at 17.  This merely restates the standard for the extrinsic test and is not sufficient to meet Sedlik's summary judgment burden as to substantial similarity.  While the two works share some obvious similarities, it

15

**ER-121**

does not take an expert to identify differences in the composition and selection and arrangement of the unprotectible features – such as the light and shading on Davis's face, the hairline and flowing hair on Davis's head, and background – that a reasonable jury could find to be more than de minimis.   Sedlik and Defendants both offer expert testimony comparing the two works, but neither Defendants' expert nor Sedlik (who authored a rebuttal report) purport to be an expert on comparing photographs and tattoos – or even to be an expert on both photography and tattoos.  See dkt. 34-2 (Friedman Report); dkt. 50-5 (Sedlik Rebuttal Report).[3]  The Court finds there is a triable issue of substantial similarity under the extrinsic test.  See Apple, 35 F.3d at 1443 (explaining expert testimony should be used "if necessary" to "determine whether any of the allegedly similar features are protected by copyright.").

        b.     Intrinsic Test

The Court next considers whether, under the intrinsic test, an ordinary, reasonable observer would find the two works to be substantially similar.  "The intrinsic test requires a more holistic, subjective comparison of the works to determine whether they are substantially similar in 'total concept and feel.'"  Rentmeester, 883 F.3d at 1118.  The Court finds a reasonable juror applying the intrinsic test could conclude that the works are not substantially similar in total concept and feel.  See Swirsky v. Carey, 376 F.3d 841, 845 (9th Cir. 2004), as amended on denial of reh'g (Aug. 24, 2004) ("subjective question [of] whether works are intrinsically similar must be left to the jury").  Because there are triable issues as to substantial similarity under both the extrinsic and intrinsic tests, the Court DENIES Sedlik's motion as to copyright infringement.

_____

[3] The Court will address the motion to exclude Defendants' experts in a separate order.  The Court's ruling here would be the same whether or not the experts' reports are considered.

### 2.     Fair Use

Defendants argue their use of the Portrait was fair.  KVD Mot. at 13.  The fair use doctrine "permits unauthorized use of copyrighted works 'for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research.'"  Micro Star v. Formgen Inc., 154 F.3d 1107, 1112 (9th Cir. 1998) (quoting 17 U.S.C. § 107).  "This listing was not intended to be exhaustive, or to single out any particular use as presumptively a 'fair' use."  Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561 (1985) (citation omitted).  The Court must consider and weigh the determinative factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  But the "statutory factors are not exclusive."  Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1522 (9th Cir. 1992).  "Rather, the doctrine of fair use is in essence 'an equitable rule of reason.'"  Id. (quoting Harper & Row, 471 U.S. at 560).

Additionally, "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor.  Instead, all factors must be explored, and the results weighed together in light of the purposes of copyright and the fair use defense."  NXIVM Corp. v. Ross Inst., 364 F.3d 471, 476-77 (2d Cir. 2004) (citations omitted); see also Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994) ("All [four statutory factors] are to be explored, and the results weighted together, in light of the purposes of copyright.").  "Fair use is a mixed question of law and fact.  If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work."  Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1115 (9th Cir. 2000).  Because the fair use inquiry

17

**ER-123**

requires a case-by-case analysis, the Court addresses each of the four statutory factors.

a.    <u>Purpose and Character</u>

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  Several principles may bear on this factor, including, as relevant here, transformation and commerciality.  <u>See</u> <u>Monge v. Maya Mags., Inc.</u>, 688 F.3d 1164, 1173 (9th Cir. 2012).

Transformation, "a judicially-created consideration that does not appear in the text of the statute," <u>id.</u>, has been described as "the most important component of the inquiry into the 'purpose and character of the use.'" <u>L.A. News Serv. v. CBS Broad., Inc.</u>, 305 F.3d 924, 938 (9th Cir. 2002), <u>as amended</u>, 313 F.3d 1093 (9th Cir. 2002).  "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." <u>Campbell</u>, 510 U.S. at 579.  Transformation is a "key factor in fair use" but is often a "highly contentious topic." <u>Seltzer v. Green Day, Inc.</u>, 725 F.3d 1170, 1176 (9th Cir. 2013).

A work is transformative when it does not "merely supersede the objects of the original creation" but "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." <u>Id.</u> at 579 (internal quotation marks, alteration, and citation omitted).  The question is whether the appropriation of the original leads to a "new creation," either through changes to the work itself or through placement of the work in "a different context." <u>Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't</u>, 447 F.3d 769, 778 (9th Cir. 2006).  A work can be transformative even where "the allegedly infringing work makes few physical changes to the original or fails to comment on the original." <u>Seltzer</u>, 725 F.3d at 1177.  In <u>Seltzer</u>, the Ninth Circuit affirmed a finding that a band's use of artwork depicting a screaming face was transformative where it was used as a

18

**ER-124**

video backdrop for a song about the hypocrisy of religion, and the original "clearly sa[id] nothing about religion." Id.

A work's separate purpose "by itself, does not necessarily create new aesthetics or a new work that 'alters the first work with new expression, meaning or message.'" Monge, 688 F.3d at 1176 (brackets omitted) (quoting Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 (2d Cir. 1998)). A "difference in purpose is not quite the same thing as transformation, and Campbell instructs that transformativeness is the critical inquiry under this factor." Id. (quoting Infinity, 150 F.3d at 108). However, making an exact copy of a protected work may be transformative provided "the copy serves a different function than the original work." Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir. 2007); see also Kelly v. Arriba Soft Corp., 336 F.3d 811, 818-19 (9th Cir. 2002) (finding transformative use where the original purpose of the copied images was aesthetic, while the new purpose was to improve access to information).

Defendants argue the Tattoo is transformative for at least three reasons.

First, Defendants contend the Tattoo presents a "new expression, meaning, or message" that is personal to Farmer because it relates to his study of jazz music in college, and because he personally identifies with Davis and "remains an avid listener of jazz and Miles Davis's music." KVD Mot. at 15. Defendants also contend the Tattoo should be considered in conjunction with Farmer's other tattoos. Id. Defendants point out that in contrast to the personal significance Farmer apparently attaches to the Tattoo, Sedlik's purpose in creating the Portrait was to comment on Davis's use of silence and negative space in his music. Id. Sedlik argues Defendants' statements about the subjective meaning or purpose of the Tattoo are irrelevant to the issue of transformativeness and that Defendants have not established any material difference between the purposes of the Tattoo and the Portrait. Opp'n to KVD Mot. at 9. Sedlik further argues Farmer's personal motivation for getting the Tattoo is irrelevant and that to find otherwise would create an absurd result. Id. at 7. Courts do consider

19

the motivation of the parties in analyzing fair use, see, e.g., Seltzer, 725 F.3d at 1174, 1177 (considering plaintiff's and defendant's purposes in creating their respective works); Furie v. Infowars, LLC, 401 F. Supp. 3d 952, 973 (C.D. Cal. 2019) (considering defendant's purpose in creating work and finding triable issues as to transformativeness). However, Farmer is not a party to this action, and while Defendants have articulated how Farmer's subjective purpose differs from Sedlik's, Defendants have not cited authority that a work has a different meaning for the purpose of the fair use analysis simply because an individual who commissions a copy of the original attaches some different personal significance to it.

Second, Defendants argue that tattoos inherently create a new expression, meaning, or message as a result of being permanently imprinted on a human body because tattoos have personal meanings, which may not be immediately obvious to someone unfamiliar with the significance of the tattoo to its wearer.  KVD Mot. at 16 (citing PSUF ¶¶ 121-22).  As explained above, the subjective belief of the wearer of a tattoo as to the tattoo's purpose is not dispositive of transformativeness.  Defendants also point to the Ninth Circuit's decision in Anderson v. City of Hermosa Beach, in which the court acknowledged that "a permanent tattoo 'often carries a message quite distinct' . . . and 'provide[s] information about the identity of the 'speaker.'" 621 F.3d 1051, 1067 (9th Cir. 2010) (alteration in original). In striking down a city's total ban on tattoos, the Ninth Circuit stated it disagreed with the city that "'[there is nothing inherently or distinctly expressive" about tattoos.  Id.  However, Anderson does not establish that the Tattoo inherently created a different meaning by virtue of its location on the human body.

Third, Defendants argue that the Tattoo is transformative because while Kat Von D used the Portrait as a reference, she inked the Tattoo in the "freehand" method and added her own interpretation to it: "one that added the appearance of movement by adding and shading waves of smoke around the perimeter of Miles Davis's hair and hand; created a sentiment of melancholy; and eliminated the stark, black background that dominates the Photograph."  KVD Mot. at 17.

Defendants contend that by making these modifications to the Portrait, Kat Von D transformed it into a new, more melancholy aesthetic. Id. The Court finds this argument more convincing, as Defendants have identified visual differences between the Portrait and the Tattoo resulting from Kat Von D's techniques in inking the Tattoo. The Court finds Defendants have met their burden of showing the Tattoo has a purpose or meaning distinct from that of the Portrait by virtue of the way Kat Von D changed its appearance to create what she characterizes as adding movement and a more melancholy aesthetic. However, Sedlik disputes whether Kat Von D's rendering of the Tattoo was transformative by virtue of the small changes she made, see DSUF ¶ 91 (citing Sedlik Rebuttal Report at 13-15); Sedlik opines that all of the alleged dissimilarities between the Portrait and the Tattoo result from Kat Von D's replication of the Portrait onto a three-dimensional surface (Farmer's arm), Sedlik Rebuttal Report at 16. The Court finds Sedlik has raised a triable issue as to transformativeness that is more appropriately left to a jury.

Defendants also argue their use of the Portrait was not commercial because neither Kat Von D nor High Voltage charged Farmer for inking the Tattoo and Kat Von D stopped tattooing for payment in 2012. KVD Mot. at 17-18. "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use. But the inverse is not necessarily true, as many common fair uses are indisputably commercial." Google LLC v. Oracle Am., Inc., 141 S. Ct. 1183, 1204 (2021). Commerciality is not "dispositive of the first factor" of the fair use analysis. Id. Here, Sedlik disputes that Defendants' use of the Portrait was not commercial because Defendants "received and enjoyed indirect economic benefit in the form of advertising, promotion, and goodwill" by posting photos of the Tattoo on their various social media platforms. Opp'n to KVD Mot. at 12. The Court finds Sedlik has raised a triable issue as to whether Defendants' use was commercial.

Considering commerciality and transformativeness together, the Court finds triable issues remain as to both elements of the factor, and therefore the first factor cannot be determined as a matter of law.

> b.   Nature of the Copyrighted Work

Under the second factor, the Court addresses two aspects of the work: the extent to which it is creative and whether it is unpublished. Harper & Row, 471 U.S. at 563-64.

Photos are generally viewed as creative, aesthetic expressions of a scene or image and have long been protected by copyright.  See 17 U.S.C. § 102(a)(5) (extending copyright protection to "pictorial, graphic, and sculptural works").  The Ninth Circuit has recognized that individual photographs merit copyright protection.  See, e.g., Ets-Hokin, 225 F.3d at 1074 ("Indeed, the idea that photography is art deserving [copyright] protection reflects a longstanding view of Anglo-American law.").  Here, the Portrait is a photograph and is a creative work.

"[T]he unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use."  Harper & Row, 471 U.S. at 554 (internal quotation marks and brackets omitted).  "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use."  Id. at 555.  Here, the Portrait was published in an issue of Jazziz Magazine in 1989 that was widely published throughout the United States.  DSUF ¶¶ 142-43.  Because the Portrait was previously published several decades ago, this factor weighs in favor of fair use.  See Seltzer, 725 F.3d at 1178 (finding fact that original work was "widely disseminated" weighed in favor of fair use).

> c.   Amount and Substantiality of the Portion Used

In assessing the amount and substantiality of the portion used, courts consider not only "the quantity of the materials used" but also "their quality and importance."  Campbell, 510 U.S. at 587.  "While 'wholesale copying does not preclude fair use per se,' copying an entire work 'militates against a finding of fair use.'"  Worldwide Church of God, 227 F.3d at 1118 (quoting Hustler Mag. Inc. v. Moral Majority Inc., 796 F.2d 1148, 1155 (9th Cir. 1986)).  If the subsequent user of the

work "only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." Kelly, 336 F.3d at 820-21. Thus, the use of an entire image may be reasonable if a more limited use would not serve the defendant's intended purpose. See Perfect 10, 508 F.3d at 1167-68 (finding the use of an entire image necessary when the defendant used the image in its search engine).

As discussed above, the Tattoo copied numerous elements from the Portrait. Defendants argue that Davis's pose in the Portrait is not meaningfully divisible from the rest of the image, and that tattoo artists generally need to have a reference when creating a tattoo. KVD Mot. at 19-20. However, as Sedlik points out, Defendants explained how Kat Von D created a line drawing on paper before inking the Tattoo, see Opp'n to KVD Mot. at 15-16, which suggests Kat Von D chose which elements from the Portrait to include in the Tattoo. Kat Von D presumably did not need to copy the pose from the Portrait in order express a sentiment of melancholy. See DSUF ¶ 77. The Court finds this factor weighs against fair use.

### d.    Effect on the Potential Market

The fourth factor is "undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566. "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." Sony, 464 U.S. at 450. "[O]ne need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" Harper & Row, 471 U.S. at 568 (quoting Sony, 464 U.S. at 451). "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." Seltzer, 725 F.3d at 1179 (citing Campbell, 510 U.S. at 591). The Court must also "take into account the public benefits the copying will likely produce." Google, 141 S. Ct. at 1206.

There is no evidence that the Tattoo is a substitute for the primary market for the Portrait. Here, Sedlik testified at deposition

23

**ER-129**

that no one has told him they would not buy a copy of the Portrait because they had seen the Tattoo or social media posts about the Tattoo. KVD Mot. at 20 (citing DSUF ¶¶ 153-54). The Portrait was originally taken in connection with a photoshoot for Jazziz Magazine, DSUF ¶ 136, not for use in the market for tattoos.[4] The Court finds that Defendants have pointed to sufficient evidence to meet their burden.

Sedlik attempts to raise a triable issue by arguing that he has offered evidence that he licensed the Portrait for use as a tattoo design. Opp'n to KVD Mot. at 17. Sedlik points to his deposition testimony, in which he stated he intended for his work to be licensed for use in various types of media. Id. (citing dkt. 50-18 (Sedlik Dep.) 24:10-13, 24:24-25:11, 30:7-31:2). Indeed, Sedlik listed in his deposition the various licenses he has given for the Portrait, ranging from use in television productions to a statue in a city in France. Sedlik Dep. 104:2-106:20. Sedlik also testified that he believed he licensed the Portrait for use in the making of a tattoo, id. 113:21-114:4, and that he has been approached several times by tattooists or their clients to request a license to use the Portrait in a tattoo and that he may have rejected at least some of their requests if he did not approve of the quality of their work, id. 114:5-22. The Court finds Sedlik has raised a triable issue as to whether there is a market for future use of the Portrait in tattoos.

_____

[4] Defendants also point to expert testimony that the use of copyrighted and copyrightable source materials as reference materials for creating tattoos is pervasive within the tattoo profession, and that requiring tattooists to obtain licenses would stifle creativity and "disrupt the settled practices of the tattoo profession." KVD Mot. at 22. The Court is not convinced that tattooists, unlike other visual artists, should as a matter of law be immune from licensing requirements, or that the procedures of the tattoo industry cannot change to accommodate the time needed to obtain a license if required. To the extent Defendants' experts argue that tattoo artists should be able to commit what would otherwise be copyright violations, that opinion is inadmissible and the Court does not consider it in rendering its decision.

e.      Non-Statutory Factor

Defendants urge the Court to consider a non-statutory factor in addition to the four-factor test outlined above: "fundamental rights of bodily integrity and personal expression." KVD Mot. at 22. The Court may consider Defendants' arguments because the statutory factors are "not exclusive." Sega Enters. Ltd., 977 F.2d at 1522. However, because the Court finds triable issues as to the statutory factors, the Court need not address the non-statutory factor, and the issue of fair use as to the Tattoo and the associated social media posts is more appropriately left to a jury.

**3.      Partial Summary Judgment as to KVD, Inc.**

Defendants move in the alternative for summary judgment as to KVD, Inc. because KVD, Inc. is not liable for direct, vicarious, or contributory infringement. KVD Mot. at 25-27.

To prove direct infringement, Sedlik must demonstrate that each of the defendants "cause[d] the copying." Fox Broad. Co. v. Dish Network L.L.C., 747 F.3d 1060, 1067 (9th Cir. 2014). There is no evidence that KVD, Inc. caused the alleged copying of the Portrait; KVD, Inc. did not ink the Tattoo, nor did it post an image of the Tattoo or the Portrait on social media, as did Kat Von D and High Voltage. See DSUF ¶ 94.

Sedlik also cannot prevail on his claims against KVD, Inc. for vicarious or contributory infringement. A defendant is liable for vicarious infringement when it has "(1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." Perfect 10, 847 F.3d at 673. Liability for contributory infringement occurs when the defendant "(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." Id. at 670. There is no evidence that KVD, Inc. had the ability to supervise the infringing conduct, for purposes of the vicarious infringement claim, nor that it induced the infringement, for purposes of the contributory infringement claim.

Sedlik argues KVD, Inc. is liable because it was in the business of "body art" and that Kat Von D was KVD, Inc.'s sole employee at the time of the creation of the Tattoo.  Opp'n to KVD Mot. at 22.  Sedlik does not explain how either of these facts indicates that KVD, Inc. had any role in the creation and sharing online of the Tattoo.

The Court DENIES Sedlik's and Defendants' motions for summary judgment as to the copyright infringement claims and GRANTS Defendants' motion as to the copyright infringement claims against KVD, Inc.

## C.    DMCA Claims

Sedlik and Defendants each move for summary judgment on Sedlik's DMCA claims.  Sedlik Mot. at 20-21; KVD Mot. at 27.  Sedlik moves for summary judgment on the falsification claim, while Defendants move for summary judgment on both claims: removal and falsification.  Id.

### 1.    Falsification of CMI

Section 1202(a) of the DMCA provides,

No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement--

> (1) provide copyright management information that is false, or

> (2) distribute or import for distribution copyright management information that is false.

17 U.S.C. § 1202(a).

The DMCA defines copyright management information (CMI) as "information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form," including, among other things, the title and name of the work and the name of the copyright owner.  Id. § 1202(c).

26

**ER-132**

Defendants argue Sedlik cannot establish liability because neither the Tattoo nor the related social media posts contain any CMI, and because Sedlik has not put forward evidence establishing the requisite mental state.  KVD Mot. at 29.  Sedlik's argument in response and in his own motion is that Kat Von D altered the CMI of the Portrait by "claiming to be the author" of the Portrait.  Opp'n to KVD Mot. at 25; see also Sedlik Mot. at 20-21.  Sedlik argues that the language of Defendants' social media posts suggests that Kat Von D was the creator of the Portrait.  Sedlik Mot. at 20-21.  The caption on Kat Von D's posts stated: "portrait I tattooed at @highvoltagetat."  Dkts. 35-23 – 35-25.  High Voltage's posts stated, "It still amazes us that @thekatvond can make a face as majestic & deep as this emerge from the flesh!!!"  Dkts. 35-28 – 35-30.  The Court finds a reasonable jury could find this language identified Kat Von D as the original creator of the Portrait, rather than Sedlik.  While Sedlik argues Defendants had "intent to mislead the public," he does not put forward any evidence in support.

The Court finds Defendants have met their burden, and Sedlik has failed to meet his burden as to the claim for falsification in violation of the DMCA.

### 2.    Removal of CMI

Section 1202(b) of the DMCA provides,

No person shall, without the authority of the copyright owner or the law--

> (1) intentionally remove or alter any copyright management information,
>
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

27

**ER-133**

> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b).

Sedlik claims Defendants knowingly removed, altered, and falsified CMI with the intent to induce, enable, facilitate, or conceal infringement.  Dkt. 1 (Compl.) ¶ 10.  Defendants argue that the version of the Portrait provided to Kat Von D did not contain Sedlik's name, a copyright symbol, a watermark, or any other CMI; Sedlik disputes this, but does not provide any evidence that any CMI was present on the image such that Kat Von D could remove it, or that she actually did so. See DSUF ¶¶ 36-39.  Defendants argue that even if there was CMI, Sedlik has not pointed to any evidence that Kat Von D had the requisite intent.  KVD Mot. at 28.  The Court finds Defendants have met their burden, and Sedlik has failed to raise a triable issue as to the claim for removal in violation of the DMCA.

The Court GRANTS Defendants' motion as to the DMCA claims for falsification and removal of CMI and DENIES Sedlik's motion as to the falsification claim.

**D.    Partial Summary Judgment as to Remedies**

Defendants move in the alternative for partial summary judgment as to remedies because Sedlik cannot establish actual damages or Defendants' profits.  KVD Mot. at 29.

An infringer of copyright is liable for either (1) "the copyright owner's actual damages and any additional profits of the infringer" that "are attributable to the infringement and are not taken into account in

28

**ER-134**

computing the actual damages," or (2) statutory damages. 17 U.S.C. § 504(a)-(b). "Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 708 (9th Cir. 2004). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Id. § 504(b).

Defendant argues Sedlik cannot prove actual damages because Sedlik cannot establish the market value of the Portrait and whether it decreased as a result of the Tattoo. KVD Mot. at 30. Sedlik does not address this argument, and indeed he has put forward no such evidence.

With respect to profits, it is undisputed that Farmer did not pay Kat Von D or High Voltage for inking the Tattoo, DSUF ¶ 31, so Sedlik cannot establish direct profits. As for indirect profits, Defendants argue Sedlik cannot prove evidence of Defendants' gross revenues because he did not request that information in discovery, and Defendants did not provide it. KVD Mot. at 30-31. Sedlik responds that he did request that information, and that therefore Defendants' argument that he will be unable to prove indirect profits is not accurate. Opp'n to KVD Mot. at 22; see also id. at 5 (describing requests for production regarding Defendants' revenue from publication of the Tattoo online). As explained above, a triable issue exists as to whether Defendants profited off their social media posts.

The Court GRANTS in part and DENIES in part Defendants' motion for partial summary judgment as to remedies.

## IV. CONCLUSION

The Court DENIES Sedlik's motion for summary judgment and GRANTS in part and DENIES in part Defendants' motion for summary judgment.

IT IS SO ORDERED.

Date: May 31, 2022

_____
Dale S. Fischer
United States District Judge

**ER-136**