**24-3367**

# In the United States Court of Appeals for the Ninth Circuit

JEFFREY B. SEDLIK,
*Plaintiff-Appellant*

*v.*

KATHERINE VON DRACHENBERG,
KAT VON D, INC., HIGH VOLTAGE
TATTOO, INC.,
*Defendants-Appellees*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:21-cv-01102 (Hon. Dale S. Fischer)

**BRIEF OF TATTOO ARTISTS ROSS C. BERG, JONNY GOMEZ,
AND MAXIME PLESCIABUCHI IN SUPPORT OF PLAINTIFF-
APPELLANT AND IN SUPPORT OF REVERSAL**

Sandra Aistars
Clinical Professor and Director
Arts & Entertainment Advocacy Clinic
George Mason University,
Antonin Scalia Law School
3301 Fairfax Drive,
Arlington, VA 22201
703-993-8158
Saistars@gmu.edu

Matthew Hersh*
MESTAZ LAW
5090 N. 40th Street
Suite 200
Phoenix, AZ 85018
(602) 806-2068
matt@mestazlaw.com

*Lead Counsel

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................1

SUMMARY OF ARGUMENT ....................................................... 4

ARGUMENT ............................................................................... 9

I.    The Decision Unmoors Tattooing From the Copyright Law. ...........9

II.    If Tattooing Is Unmoored from Copyright Law, Creativity in the Tattoo Industry Will Be Impoverished. ...................................20

III.    The Decision Below Threatens the Well-Being of Tattooers Just as the Industry is Coming Into Its Own. ...............................25

CONCLUSION ........................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) ......21

*Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151 (1975) .............22

*Whitmill v. Warner Bros. Ent. Inc.*, No. 4:11-CV-752 (E.D. Mo. filed April 28, 2011) ...................................................................................28

**Statutes**

Circuit Rule 29-3 .................................................................................... 1

Fed. R. App. 29(a) .................................................................................. 1

Fed. R. App. P. 29(a)(4)(E) .................................................................... 1

**Other Authorities**

Aaron K. Perzanowski, Tattoos & IP Norms, 512 Minn. L. Rev. 511 (2013) ............................................................................ 9, 20, 22

Garcia-Merritt, Gabriel, Inked Lives: Tattoos, Identity, and Power (2014). Iowa State University Graduate Theses and Dissertations, https://lib.dr.iastate.edu/etd/13880 ............................................... 12

Margo DeMello et al., Bodies of Inscription: A Cultural History of the Modern Tattoo Community (Duke University Press 2000) .... 26, 27

Michael C. Minahan, Copyright Protection for Tattoos: Are Tattoos Copies?, 90 Notre Dame L. Rev. 1713 (2015) ............................... 28

Ronan Deazley, The Myth of Copyright at Common Law, 62 Camb. L.J. 106 (2003). ......................................................................................5

Sion Smith, 2 The Tattoo Bible (2011)....................................... 11, 12, 16

William Ryan Force, Tattooing in the Age of Instagram, 43 Deviant Behavior 415 (2022) .................................................................... 16

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Ross C. Berg, Jonny Gomez and Maxime Plescia-Buchi have lived at the intersection of creative arts and copyright law for much of their lives. They are accomplished artists who have made names for themselves in the field of tattooing. But they also have studied, and worked with, a wide range of other visual art forms as well. And they have been longtime advocates for the idea that creators—of all stripes—must be given the fullest protection under the law. It is in that role that they appear as *amici curiae* before this Court. As tattooers they know that great body art depends on great visual artistry of all forms—artistry that might be rendered in paintings, drawings, sculptures, or photographs (and that is to name only a few). As industry leaders, they know that no form of visual art can survive very long unless all forms of visual arts are protected under law. That advocacy has led them here.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party or counsel authored this brief in whole or in part and no person other than *amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. Pursuant to Fed. R. App. 29(a) and Circuit Rule 29-3, all parties consented to the filing of this amicus curiae brief. Counsel and *amici* both wish to acknowledge the inestimable contributions of Natalie S. Nachman, a student at the Antonin Scalia Law School and a member of the Arts & Entertainment Advocacy Clinic.

Ross Berg is a fast-rising creator and educator in the tattoo industry. He began tattooing in 2015 and opened Bloomington, Indiana's first tattoo "salon"—a venue that provides a more upscale, refined experience and aesthetic compared to the traditional, casual setting of a tattoo parlor or tattoo shop. He also works as a professional fine arts photographer, specializing in photographing paintings & mixed media. He is known for his educational online content, his unique tattoo style, and his work with local attorneys to help tattoo business owners in Indiana comply with health and safety regulations. Currently, he is working as an artist in residence at Inkindle Tattoo Studio in Rolling Hills Estates, California, where he specializes in large-scale fine line tattoos. During the pandemic he and a colleague created a free resource, called Miss U Tattoo, that serves as a clearinghouse of rules and regulations that govern many aspects of tattooing. He also created a series of downloadable legal templates and other standardized forms that his fellow tattooers can use for free.

Jonny Gomez is a multi-faceted artist and mentor to emerging talent. He is a well-known artist who runs his own tattoo studio and artist collective, Macondo, in Brooklyn, New York. There, he mentors

emerging tattoo artists by providing them space and guidance to develop their own voice and practice. He has a master's degree in fine arts and a bachelor's degree in film and video with a concentration in animation. He was an artist-in-residence at the Arizona State University Museum and has taught painting, visual art, drawing, and animation at various universities and art centers. He has been featured in more than a dozen art exhibitions around the country. He is in high demand as an exceptional Chicano artist and tattooer.

Maxime Plescia-Buchi is a tattooist, designer and entrepreneur who, in the past 20 years, has built a universe inside and around the tattoo world. He is the founder of Sang Bleu magazine, TTTISM magazine, Swiss Typefaces studio, and Novembre magazine. He also is the brand ambassador and designer for the Swiss Watch brand Hublot, for whom he has designed best-selling watches. He has owned and run tattoo studios in London, Los Angeles, Zurich and New York, has trained many apprentices and mentored tattoo artists throughout his career, and is currently developing his tattoo studio franchise. Championing a progressive and ambitious vision of tattoo culture and industry, Plescia-Buchi developed tattoo designs for movies, and fashion design. His

company Swiss Typefaces develops fonts for industries and individuals. They are used by the likes of K-Pop band Twice, Google, the Swiss Confederation and Virgin Galactic.

The three *amici* described above have very different backgrounds and very different pedigrees in the field of tattooing. But they have one thing in common. Not once has any of them spoken out on a lawsuit while it was making its way through the courts. This case has inspired them to do so—for the reasons that follow.

## SUMMARY OF ARGUMENT

Tattoo artists should not celebrate this decision. The *amici* who submit this brief have dedicated their careers and much of their lives to the calling of their art. They know what it is like to build upon the works of others—and to be accused, at times unfairly, of borrowing too much. They could be forgiven for applauding the decision below. But they do not. The decision below does no favor to the tattoo industry. To the contrary, it poses great challenges to that industry just as it is coming into its own. There are several reasons why.

1. For one thing, the decision sets the tattoo industry apart from the rest of the creative world—and in a way that harms visual artists of

4

all stripes. Tattoo artists like the *amici* are creators as well as consumers of art. They conjure up, imagine, conceive, shape, render, animate, and bring to life in countless other ways the original expression that goes into modern body art. But they do so within the cultural *quid pro quo* that is the copyright law.[2] Tattoo artists rightfully demand protection for the fruits of their creative labors. But they cannot expect to receive protection for their works if they will not offer it to other artists in return. Tattooers must give respect if they are to get respect.

The decision below only further undoes this creative balance. The court promised to apply the law equally to tattooing as to other forms of art. One look at the works in this case shows that it did not. The celebrity tattooer at the center of this case took a photograph of a famous musician, traced it out precisely with a light box, and then applied it, unchanged, directly to her subject. That made the work not just substantially similar, but strikingly so. And that is to say nothing of the inestimable publicity she generated when she shared that work with her millions of social media followers. There may be other cases and other contexts where the

---

[2] Ronan Deazley, The Myth of Copyright at Common Law, 62 Camb. L.J. 106, 108 (2003).

5

use of someone's photograph for tattooing purposes is protected by the law. The *amici* limit themselves to the facts of this particular work and this particular usage. But if this tattoo is not copyright infringement, then no tattoo is. Tattooing has now been unmoored from the law.

2. The decision runs counter not only to basic traditions of copyright law, but to traditions within the field of tattooing itself. There have always been rogues in the industry—as this case illustrates. But most tattooers have a deep respect for the creations of others. Modern-day tattooers have grown up in a world in which licensed work is readily available in the form of published catalogues, flash art, and other widespread resources and publications. And the internet and social media make it even easier to identify new sources for tattoo inspiration and to reach out and obtain permission—in some cases, with the payment of a token license—before using someone else's work. A growing number of tattooers are making use of these resources to do just that. But the decision below threatens that evolution in its tracks. It tells them, in effect, take all you want—the law will not touch you. Every creator in the industry will suffer the consequences.

3. The decision below also needlessly denigrates photography—to the detriment, again, of all forms of cultural expression. Tattoo artists and photographers need each other. They share a creative ecosystem and they build off of the works of each other. Neither can flourish if the other is impoverished. Yet too many tattooers reject this form of thought. They view photography as a lesser sibling of the visual arts—one whose work product can be taken freely without compensation or even without credit. The decision below amplifies that destructive point of view—and gives those who share it a bully pulpit to denigrate photography even further. Both traditions of art will suffer as a result.

4. And the decision to fence off tattooing from the law could not come at a worse time. Tattooing has elbowed its way from the corner shop to the cultural mainstream in the span of mere decades. Consumers from all walks of life and all social classes now sport body art with elegance and pride. In short, tattooing is now big business—to the tune of billions of dollars per year. But like all big businesses, tattooing can only prosper within a reliable legal framework. Tattoo artists have learned to embrace health and safety regulations, tax laws and other financial obligations, and all manner of other state and municipal oversight. Respect for

7

intellectual property goes hand in hand with those laws. But this decision returns tattooing to a veritable wild west, where anyone can scavenge from the works of others. That is the last thing this growing industry needs.

The decision threatens not only the economic clout of the tattoo industry but also its ability to protect that clout in the courts. Tattoo artists are turning more and more to the law to protect their creations. They have taken on movie studios, video game makers, and multi-million-dollar apparel merchandisers for using their works without permission. Not all of these cases have merit; the courts will have to separate the wheat from the chaff. But this decision throttles those cases in their cribs. If tattoo artists are shielded from the reach of the law, the courts will not indulge them the protection of the law. Billions of dollars of creative activity will become free for the taking—to the impoverishment of everybody in the cultural space. The decision below should be reversed.

8

## ARGUMENT

## I.   The Decision Unmoors Tattooing From the Copyright Law.

1. The decision below was wrong. Some in the tattooing industry celebrate it because, they believe, it gives them access to wider variety of source materials with which to practice their art. In fact, the opposite is true. This decision will reduce, not increase, the variety and quality of resources that tattooers have at their disposal. Worse, it will undermine the ability of those in the tattooing industry to prevent others from taking their *own* art. Photographers like Jeffrey Sedlik might be hurt in the short term by this decision. But it is tattooers like the *amici* who will suffer in the long term.[3]

Many in the tattooing industry underestimate the implications of this decision. The artist Katherine Von Drachenberg, known to her many fans as Kat Von D, inked an almost perfect copy of Sedlik's photograph of Miles Davis onto a customer's arm—and then repeatedly blasted the tattoo to her millions of followers on social media. Von D argued, in effect,

---

[3] "Practitioners in the tattoo industry refer to themselves by a number of terms, including 'tattooists,' 'tattoo artists,' and 'tattooers.'" Aaron K. Perzanowski, Tattoos & IP Norms, 512 Minn. L. Rev. 511, 512 (2013). We use the latter two in this brief.

9

that tattooers have always been free to liberally borrow photographs and other non-tattoo creative works and use them as reference works for their own art. The Court purported to reject the argument. 1-ER-130 ("To the extent Defendants' experts argue that tattoo artists should be able to commit what would otherwise be copyright violations, that opinion is inadmissible and the Court does not consider it in rendering its decision."); 2-ER-284 (refusing to allow "expert opinions in this action that argue tattoo artists should be able to commit what would otherwise be copyright violations merely because it is the custom or practice of the tattoo industry"). But in the end, it not only entertained the argument—it gave the argument the fullest blessing of the law. To understand why, it is necessary to consider the striking facts that were before the court.[4]

2. Consider first the similarity between the photograph and the tattoo. The court refused to decide this question on summary judgment,

---

[4] Petitioner Sedlik noticed 13 different sets of rulings in his appeal to this Court. 3-ER-523-524. This brief limits its focus to two of them: the rulings adverse to Sedlik in the trial court's summary judgment order, 1-ER-107, and the rulings adverse to Sedlik in the trial court's order on the parties' motions for reconsideration of the summary judgment order. 1-ER-94. The *amici* believe, as does Sedlik, that the facts of this case are so glaring that it should have been decided on summary judgment instead of being given to a jury.

concluding that a reasonable jury could find that the Kat Von D tattoo and the underlying Miles Davis photograph were not "substantially similar." 1-ER-122. The *amici* are tattoo artists and not lawyers. The legal definitions of summary judgment and "substantial similarity" are analyzed in Sedlik's brief and not here. But the *amici* have collectively created thousands of tattoos in their careers, and they have reviewed and evaluated countless more. And as a matter of practice, to say nothing of common sense, the Von D tattoo is as identical to the underlying reference as any tattoo can be. It is hard to imagine any reasonable person disagreeing on this point.

To further explain this, it is helpful to appreciate a few things about the different forms of tattooing. The tattoo community is made up of artists with a wide range of different styles. There are artists who practice, for example, in the "traditional" or "American traditional" style (think: anchors, roses, and pin-up girls). Other artists practice the so-called "new school" or "neotraditional" form—a form that, as one venerable source cheekily describes, is "what appears to be a traditional design that looks like it has spent a weekend in the desert with Jim Morrison." Sion Smith, 2 The Tattoo Bible 41 (2011) ("Tattoo Bible").

Others might focus on Japanese artworks, watercolors, traditional tribal body art, scripts and lettering, geometric forms, and countless others. But none of those forms of tattooing are relevant to this case. This case, instead, is about the increasingly popular style of tattooing called "photorealism."

Photorealism is practiced exactly as it sounds. It is "[a] form of tattoo where emphasis is placed on making the image as lifelike as possible." Garcia-Merritt, Gabriel, Inked Lives: Tattoos, Identity, and Power (2014). Iowa State University Graduate Theses and Dissertations, https://lib.dr.iastate.edu/etd/13880. Or to put it more succinctly, a work of photorealism "looks as real as a photograph." Tattoo Bible at 44. It is not an easy task. To the contrary—it is considered one of the hardest tattoo styles to learn. To make a quality realistic portrait tattoo, a tattooer begins with a high-definition photograph as a reference. The tattooer then uses a lightbox to trace, or "map," the lines, shadows, contrasts, and other key elements onto a form of tracing paper known as a parchment. (One might envision a cartographer laying out key elements of a hilly wilderness onto a topographic map). The parchment is then transferred, by means of a thermal copier, to a carbon paper that

12

is affixed to the skin—forming a "stencil" for the tattooer to follow with her tattoo gun. It is a rigorous, and time-consuming, task.

Photorealism, like other tattooing styles, comes in different forms. Every work of photorealism requires *some* change to accommodate the different medium. Imagine adapting a photograph to create a sculpture, rendering a three-dimensional landscape onto a two-dimensional canvas, or serving up once-hardbound books over the internet. Tracing a work onto a living, three-dimensional tissue, with its inevitable contours of flesh and muscle, will never result in a perfect replica. What matters is the choice that follows. There are photorealist tattooers who make deliberate artistic changes to the underlying photo when they apply it to their subject. They might add different coloring, additional features, or other elements that give the work a new expression, meaning or message. Others will be content to leave things as they are—a knock-off unchanged except for its underlying medium. Kat Von D fell squarely into the latter category.

Von D's own words at trial made this eminently clear. She testified that a potential client texted her a digital file of the Miles Davis photograph and asked her to ink it onto his arm. 2-ER-207. The client did

13

not request a single change to the photograph. *Id*. Von D used the photograph as an artist reference when inking her tattoo. 2-ER-208. She used a lightbox to map out the photograph onto her parchment; used a thermal copier to replicate that tracing onto carbon paper; placed the carbon on her subject to create a stencil; and used her tattoo gun (in this case, a liner tattoo machine), to fill in the stencil. 2-ER-211-214. The result, Von D herself acknowledged, was an image of Miles Davis from the same perspective, with the same pose, and the same lighting. 2-ER-217-219. Von D even acknowledged in testimony that she replicated the shadows on Davis's nose, under his nose, on his cheeks, and around his eyes. 2-ER-219. Von D herself testified that she "did a pretty good job" replicating the photograph onto her subject's skin. 2-ER-219.[5] The *amici* could not agree more. To their trained eyes, the work was not merely substantially similar. It was strikingly so.

Kat Von D's words alone are enough to show substantial similarity. The actual image, to pawn a phrase, is worth a thousand words more. The mockup on the next page tells it all:

---

[5] One of Von D's colleagues agreed, posting on Instagram that the tattoo was "100% exactly the same as the reference." 3-ER-510.



On the left is the original photograph. On the right is the tattoo.
The *amici* do not speak for the law, but they do speak for the art of
tattooing. And from their trained review of these works—a review that
has taken place multiple times as this brief has been prepared—there is
no difference between the two works that is not explained by the medium
in which the former was replicated into the latter. The court made much
of "the light and shading on Davis's face, the hairline and flowing hair on
Davis's head, and [the] background," 1-ER-122, to justify sending this
case to a jury. But given the subtlety and complexity of the underlying

black and white photograph, these difference were simply inevitable. Kat Von D, to her credit, is highly talented at doing accurate photorealism—the kind that "looks as real as a photograph." Tattoo Bible at 44. The images above could not say that more clearly.

3. Consider next the question of commerciality. The court found that it was "a triable issue of fact" as to whether Kat Von D's social media posts were commercial. 1-ER-105. The court rationalized this unlikely conclusion by noting that none of Von D's social media posts included a link to purchase anything—so they did not generate any sort of "direct profit." 1-ER-10. The *amici* defer again to Sedlik to explain, in the legal vernacular, what the word "profit" means and how it applies here. But the *amici* know what it means to make a profit in plain English. Von D's social media posts made a profit. It is impossible to understand how a reasonable jury could have thought otherwise.

To understand why this is so, it is essential to appreciate the role that social media plays in the life of a tattooer. "[S]ocial media like Instagram have become part of the tattooist's craft and the cultural backdrop on which it is practiced." William Ryan Force, Tattooing in the Age of Instagram, 43 Deviant Behavior 415, 417 (2022). It is also now one

16

of the principal ways that a tattooer can publicize their work. "It has become common for tattoo artists to credit social media like [Instagram] with much of their success." *Id*. at 23. Indeed, for the tattooing community, "regular and consistent posting on social media [is] mandatory." *Id*.

Most tattooers use social media for just this purpose—to get name recognition and to bring in clients. But for the celebrity tattooer, the calculus is different. A celebrity can use their social media accounts to bring in *money*. There is a direct link between social media posting and financial income. The linkage can even be documented mathematically. One prominent site has what it calls an "Instagram Money Tracker"—a calculator that "helps influencers estimate their earnings" on the platform so that they can "determine [their] worth as an influencer." https://influencermarketinghub.com/instagram-money-calculator/. Instagram even devotes an entire webpage about how creators can achieve success by "[m]ixing creativity and money." https://creators.instagram.com/lab/content-monetization. None of that is the slightest surprise to the *amici* who join this brief—all of whom

17

maintain an active social media presence and rely on it as their primary manner of publicity.

This makes it impossible to understand how Kat Von D's use of the photograph could not have been commercial. Von D is, to put it mildly, a celebrity. She is a tattoo artist, recording artist, television personality, New York Times bestselling author, makeup artist with her own line of makeup and fragrances, and shoe and clothing designer with her own product lines. She promotes the sale of books, shoes, tickets to her musical shows, and all sorts of other products on her social media. 2 ER-223-229. Von D's revenue streams also include being a content creator for social media platforms which pay her for clicks, likes, and views. As of the time of this writing, she has over 9.8 million followers on Instagram, 889,900 followers on Tiktok and over 3.9 million likes, 709,000 subscribers on YouTube with over 12 million views, and over 1.6 million followers on X. That kind of social media celebrity has the potential to make between $19,000-$28,600 *per post* on Instagram. https://influencermarketinghub.com/instagram-money-calculator/. Her posting of the photograph at issue in this case—both directly and in the form of the finished tattoo—was commercial in every way possible.

18

Von D did not just post her final work product to her social media as many tattooers do. As an astute businesswoman, she apparently recognized the commercial value of the photograph and the value that sharing the photograph side by side with her in-process work would have for her business. The record is littered with Instagram posts by her company, High Voltage Tattoo, showing her in various stages of the process of replicating Sedlik's photo onto tracing paper and then onto her subject's arm. 3-ER-468-484. In several of these posts the actual photograph itself hangs noticeably in the background. 3-ER-475-476. And Von D tagged these business accounts from her personal account—all to drive viewers to visit her commercial social media accounts and engage with her brands, sales offers and other commercial deals. If this is not commercial use in the eyes of the law, then nothing is.

4. The doctrine that inevitably arises from this decision is this: Any artist can take someone else's work, replicate it as identically as humanly possible on the flesh of another subject, distribute it to millions of eager followers on social media, and still face no consequences. Perhaps another work of photorealism would not raise the same concerns. The *amici* applaud those photorealists that transform the underlying work

19

into something new and original. But the work at issue in this case—a work that was plastered by the tattooer all over the internet, to boot—did nothing of the sort. If this tattoo is not infringing, then no tattoo can ever be. That will harm creators of all forms.

## II.    If Tattooing Is Unmoored from Copyright Law, Creativity in the Tattoo Industry Will Be Impoverished.

1. The decision below harms everyone in the tattoo industry. But the creators of original tattoos will suffer the most. With the growth of tattooing as an industry over the last half century, "[e]xperienced and trained fine artists, many with graduate-level education, began to see tattooing as a viable and legitimate career path." Aaron K. Perzanowski, Tattoos & IP Norms, 512 Minn. L. Rev. 511, 522 (2013) ("Tattoos & IP Norms"). The tattooers of today study color theory, drawing, light, movement, and composition. They apply for apprenticeships at tattoo shops. And while they will still take walk-in clients who pick a design off the wall or from the pre-published works that the industry knows as "flash," today's generation of tattooers prefer to create one-of-a-kind pieces of artwork in collaboration with their clients. "We do not profess to understand the work of tattoo artists to the same degree as we know the finely wrought sketches of Leonardo da Vinci or Albrecht Dürer," this

20

Court has observed. "[B]ut we can take judicial notice of the skill, artistry, and care that modern tattooists have demonstrated." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010). The Court has already shown that it values the art and creativity of tattooing. It should do so again—by ensuring that tattooers' work remains protected.

2. Tattooers also profit from their skill, as any creative artist does. Of course they earn money from the act of inking itself. But they are increasingly making money from licensing their work. In the old days, a tattooer might create a set of designs and market them as a bound volume for others to use as reference. *See* 2-ER-258-276 (collection of covers of "flash" books). These days, online tattoo licenses—or "tattoo tickets," as they are called—are more the norm. They can be found in use on artist websites and e-commerce sites like etsy—or for that matter, with the search feature of any internet browser. A search for shops on etsy offering tattoo tickets returned over 2,000 results—many costing between $40-$60. https://www.etsy.com/market/tattoo_ticket. A search on Google yielded countless more.

And like any artists, tattooers need to protect their art from appropriation. They would otherwise have little reason to invest in their

21

art. "Creative work is to be encouraged and rewarded," the Supreme Court has noted. "[B]ut private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975). Or as one tattooing scholar put it, "a custom tattoo derives its value largely from the fact that it will not be reproduced, even by the tattooer who created it." Tattoos & IP Norms at 577. The evidence in this very trial proves the point. 2-ER-258-276 (collection of covers of flash books that allow use as a reference but prohibit outright copying).

3. The decision is not merely a loss for creators. It is also a lost opportunity for anyone who interacts with the visual arts. Many tattooers rely on "a set of informal social norms to structure creative production and mediate relationships within their industry." Tattoos & IP Norms at 512. But informal norms go only so far. Licensing is a better option.

Licensing is the traditional way in which artists of all stripes share, and borrow from, each others' works. We have already seen one form of tattoo licensing, in the form of the tattoo tickets described above. With a properly motivated community, this would be only the tip of the iceberg. Licensing and other forms of open communication bring countless

22

advantages. Licenses clear up ambiguity, for example, over who may do what—and with what works. Imagine a tattooer incorporating a photograph into his work. Now imagine another artist copying that work and selling it in clothing lines or bumper stickers. In this scenario there are multiple creators who are unclear on what rights and responsibilities they have. Working through the issues beforehand is the solution.

Licensing brings many other advantages. Most importantly, it opens up lines of communication. The *amici* can relate many experiences where they have communicated with other artists about the possibility of using their works. Permission will often be given, typically for a token fee. And all parties benefit from that sort of transaction. The person who sought the license may benefit most of all—as the original grantee may well broadcast the derivative work on their *own* social media. In other words, everyone wins.

And for those interested in seeking or giving licenses, there are ample resources available. Many creators have templates available that can be readily downloaded. One of the *amici* has created a website that does just that. Volunteer lawyer associations, pro bono groups, and law clinics—like the one that is counsel to this brief—offer ample other

opportunities for training and resources. Those efforts are building—slowly but surely—within the tattooing community. But this decision threatens to cut off those efforts at the knees.

4. Finally, the decision is a lost opportunity to restore a sense of balance between tattooers and other creative artists. "Despite its countercultural origins, the tattoo industry shares much in common with other, more familiar creative industries. Fundamentally, it capitalizes on market demand for original creative works." Tattoos & IP Norms at 512. To put it another way, tattooers need other visual artists like photographers—and photographers and other visual artists need tattooers. As one tattooer put it: "For me, everything is connected. It's the same subject with a different medium, and they are complementary. It's like a loop. Photography brings forms, and forms bring designs for tattoos." https://www.inbtwnmag.com/blog/photography-and-tattoo-a-living-documentation. Kat Von D amplified this view in her testimony. She did not choose the Sedlik photograph—her client did—but she valued it because it was unique. "I liked that it was simple," she testified. 2-ER-200. "Most other ones had him playing the trumpet which wouldn't be suitable for an arm-piece, I didn't think." *Id.*; see also 2-ER-202 ("Q: And

24

good photographs make great tattoos, don't they? They do."). Tattooers and photographers need one another—and that means they must respect one another's work. In the long run, there is no practical alternative.

## III. The Decision Below Threatens the Well-Being of Tattooers Just as the Industry is Coming Into Its Own.

1. The decision below could not have come at a worse time. Tattooing, once shunned by the cultural elite, has now become a part of it. In 2023, the global tattoo market was valued at $2 billion. In 2024, it was valued at $2.2 billion—and by 2032, industry forecasts predict, it could reach $5 billion. https://www.fortunebusinessinsights.com/tattoo-market-104434. But dollars tell only part of the story. As of 2023, a recent polling study finds, 32% of American adults had a tattoo—and 22% had more than one. https://www.pewresearch.org/short-reads/2023/08/15/32-of-americans-have-a-tattoo-including-22-who-have-more-than-one/.

Views towards people with tattoos are also changing. Two-thirds of Americans *without* tattoos would not judge negatively one *with* tattoos. *Id.* These sentiments are echoed in the business world too. Disney, UPS, Virgin Atlantic, and even the Army have relaxed visible tattoo restrictions in the workplace. And that is to say nothing of the many

25

television shows now dedicated to the art of tattooing—of which Kat Van D, perhaps not coincidentally, plays a major part.

2. But cultural phenomena cannot fully explain the rise in the popularity of tattoos. Tattooing has also gained in popularity because tattooers are following the law. This is most conspicuous in the area of health regulations. Many states and local jurisdictions require tattoo artists and shops to be licensed. Requirements vary, but licensing often involves a certain number of training hours, an exam, and maintaining strict hygiene standards. One of the *amici* on this brief, Ross Berg, even helped develop those standards in Indiana—one of the last states to legalize the art of tattooing. These efforts at sanitation, one scholar has noted, "helped bring tattooing into the modern era and to a middle-class audience." Margo DeMello et al., Bodies of Inscription: A Cultural History of the Modern Tattoo Community 79 (Duke University Press 2000) ("Bodies of Inscription").

The decision below threatens all of that. The deliberate copying by Kat Von D sends a message from the tattooing community to everyone else in the creative community: we can take your work for free. And the decision below sends an even more destructive message: the courts will

26

do nothing to protect you. Tattooing was once relegated to "small spaces located alongside barber shops, in dirty corners of arcades, under circus tents, or on carnival midways"—"hidden away," in other words, "at the margins of society." Bodies of Inscription at 59. It now has a "new reputation as a fine art with cross-cultural connections." *Id*. at 112. We are unlikely to ever go back to the dark old days before the "Tattoo Renaissance" of the 1960s. *Id*. at 3. But this decision could stop further evolution in its tracks—just when the industry can least afford it.

3. The rise of tattoos as big business also opens up another avenue for tattoo artists—to bring lawsuits in the (rare) cases where it is needed. Tattooers rarely sue other tattooers for infringement. The *amici* never have—and hope they will never need to. But the conduct of third parties is a different matter altogether. Suppose a major clothing retailer lifts an original tattoo from a creator and uses it as a printed pattern on a retail fabric (as happened to a friend of one of the *amici*). Or—even worse—suppose that same tattoo is lifted from social media by a corporation and used to create a *logo* for a consumer good. The tattooer and perhaps the client should be entitled to pursue appropriate remedies in court. This decision would make that all but impossible.

27

The decision also flies in the face of rulings by other courts that tattoos deserve protection. Attempts by mass media to argue to the contrary have been dismissed by courts as "silly." *Whitmill v. Warner Bros. Ent. Inc.*, No. 4:11-CV-752, Dkt. No. 46 at 3 (E.D. Mo. filed April 28, 2011) (rejecting the argument that human flesh cannot be a "medium of expression" embodying legally protectible authorship).[6] But like the smile of the Cheshire Cat, this wrongheaded doctrine refuses to fade away. *E.g.*, Michael C. Minahan, Copyright Protection for Tattoos: Are Tattoos Copies?, 90 Notre Dame L. Rev. 1713, 1737 (2015) (arguing that "tattoos are not copyrightable subject matter protected by the Copyright Act"). The decision below threatens to give it new life. It should be wholly rejected.

---

[6] The *amici* take no position on the merits of the case.

28

## CONCLUSION

The Court should reverse the grant of judgment to Appellees.

Sandra Aistars                                    Matthew Hersh*
Clinical Professor and Director                   MESTAZ LAW
Arts & Entertainment Advocacy Clinic              5090 N. 40th Street
George Mason University,                          Suite 200
Antonin Scalia Law School                         Phoenix, AZ 85018
3301 Fairfax Drive,                               (602) 806-2068
Arlington, VA 22201                               matt@mestazlaw.com
703-993-8158
Saistars@gmu.edu                                  *Lead Counsel


Dated: October 22, 2024

29

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-3367

I am the attorney or self-represented party.

**This brief contains** | 5,822 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [       ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Matthew Hersh | **Date** | 10/22/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*