No. 24-3367

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

JEFFREY B. SEDLIK,

Plaintiff-Appellant,

v.

KATHERINE VON DRACHENBERG, KAT VON D. INC.,
HIGH VOLTAGE TATTOO, INC.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-01102
Hon. Dale S. Fisher, United States District Judge

_____

**BRIEF OF *AMICI CURIAE* LYNN GOLDSMITH & DIGITAL
JUSTICE FOUNDATION IN SUPPORT OF REVERSAL**

_____

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
Gregory@DigitalJusticeFoundation.org

*Attorneys for Amici Curiae*

# DISCLOSURE STATEMENTS

## Rule 26.1 Disclosure Statement

*Amicus curiae* Lynn Goldsmith is a natural person.[1]  *Amicus curiae* Digital Justice Foundation is a nonprofit, public-benefit corporation.  It has no parent corporation.  Likewise, no publicly held corporation owns 10% or more of the stock (or other ownership interest in) in the Digital Justice Foundation.

## Rule 29(a)(4)(E) Disclosure Statement

(i) No Party's counsel authored this Brief, either in whole or in part.  (ii) No Party or Party's counsel contributed money that was intended to fund preparing or submitting this Brief.  (iii) No person contributed money that was intended to fund preparing or submitting this Brief.  The Brief was prepared by the *pro bono* work of *amicus* counsel at the Digital Justice Foundation.

## Rule 29(a)(2) Consent Statement

*Amicus Curiae* proffer this Brief on the blanket consent of the Parties.

Date: October 22, 2024                    Respectfully submitted,

                                          */s/ Andrew Grimm*
                                          Andrew Grimm

---

[1] At time of filing, Ms. Goldsmith has not had a chance to finalize her review of all content, so *amicus* counsel will seek to confirm her assent to the brief in full and provide an update, if needed.

ii

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS ................................................................. ii

TABLE OF AUTHORITIES ................................................................. iv

IDENTITY & INTEREST OF *AMICI CURIAE* ...................................................1

ARGUMENT .........................................................................5

    I.    IT IS CRITICALLY IMPORTANT TO FOCUS ON THE SPECIFIC USE AT ISSUE TO BALANCE COPYRIGHT'S AND FAIR USE'S IMPORTANT VALUES, TO PROVIDE A LIMITING PRINCIPLE, AND TO PERMIT A NARROW BUT IMPORTANT REVERSAL...................................................5

    II.    UNDER THE FIRST FACTOR, THE LACK OF TARGETING OR OTHER STRONG JUSTIFICATION FOR THE USE OF THIS PARTICULAR WORK RENDERS IT PLAINLY NOT A TRANSFORMATIVE USE AS A MATTER OF LAW.................................................15

    III.    THE DISTRICT COURT OVERLOOKED THE IMPORTANCE OF THE ARTISTIC-REFERENCE DERIVATIVE MARKET THAT WAS ADDRESSED BY THE SUPREME COURT IN *WARHOL*. .............................25

    IV.    THE DISTRICT COURT'S JURY INSTRUCTION PLAGUED THE FAIR-USE DECISION BY CONFUSING HOW HEAVILY A FACTOR WEIGHED WITH WHICH DIRECTION IT POINTED. .................................28

CONCLUSION .......................................................................31

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ..............................33

CERTIFICATE OF SERVICE .........................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    11 F.4th 26 (2d Cir. 2021) ............................................................. 5, 8, 14, 16

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023)........ 1, 2, 5, 6, 8, 9, 11, 13, 15, 17, 18, 19, 24, 25, 26, 31

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006) .................................................................... 18, 19

*Brammer v. Violent Hues Prods., LLC*,
    922 F.3d 255 (4th Cir. 2019) ......................................................... 3, 18, 19, 20

*Burrow-Giles Lithographic Co. v. Sarony*,
    111 U.S. 53 (1884).........................................................................................23

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)........................................................................................9

*Dr. Seuss Enters., Ltd. P'ship v. ComicMix Ltd. Liab. Co.*,
    983 F.3d 443 (9th Cir. 2020) .........................................................................11

*Ets-Hoking v. Skyy Spirits, Inc.*,
    225 F.3d 1068 (9th Cir. 2000) .......................................................................23

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021)...........................................................................................8

*Harper & Row, Publrs. v. Nation Enters.*,
    471 U.S. 539 (1985)................................................................................. 10, 19

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    568 U.S. 519 (2013)........................................................................................9

*McGucken v. Pub. Ocean Ltd.*,
    42 F.4th 1149 (9th Cir. 2022) .................................................................. 10, 18

*Smith v. Thomas*,
    911 F.3d 378 (6th Cir. 2018) ..........................................................................3

iv

*Sofa Entm Inc. v. Dodger Prods.*,
    709 F.3d 1273 (9th Cir. 2013) ........................................................28

*Tresóna Multimedia, Ltd. Liab. Co. v. Burbank High Sch. Vocal Music
    Ass'n*,
    953 F.3d 638 (9th Cir. 2020) ..........................................................12

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 72 (9th Cir. 2019) ............................................................29

**Statutes**

17 U.S.C. §  107 ...............................................................................6, 10

## IDENTITY & INTEREST OF *AMICI CURIAE*

*Amicus curiae* Lynn Goldsmith is a world-renowned photographer best known for her portraits of rock musicians like Michael Jackson, Bruce Springsteen, Bob Dylan, Madonna, James Brown, the Beatles, and the Rolling Stones, to name a few. Her work graces more than 100 album covers. Museums across the country—from the Smithsonian National Portrait Gallery to the Brooklyn Museum of Art—showcase her photography. National magazines, like Vanity Fair, Rolling Stone, Time, and Sports Illustrated have frequently featured her work. Goldsmith herself has published many books of her photographs, including a *New York Times* bestseller. She also founded Lynn Goldsmith, Ltd., the first photo agency focused on celebrity photo-portraiture. For her accomplishments in photography, on October 26, 2021, Goldsmith won a Lucie Award—which is photography's equivalent of an Oscar.

Lynn Goldsmith found herself at the center of what became the Supreme Court's most recent foray into the law of fair use when she, as the copyright-holder in her own photography, was sued by the Andy Warhol Foundation in an attempt to diminish her rights in her works. Her case began in the Second Circuit, reached the U.S. Supreme Court, and led to the Supreme Court's most recent decision on fair use—*i.e.¸ Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 515 (2023).

1

In that decision, the Supreme Court recognized, Ms. Goldsmith as a "trailblazer":

> [She] was a trailblazer.  Goldsmith began a career in rock-and-roll photography when there were few women in the genre.  Her award-winning concert and portrait images, however, shot to the top. Goldsmith's work appeared in Life, Time, Rolling Stone, and People magazines, not to mention the National Portrait Gallery and the Museum of Modern Art.  She captured some of the 20th century's greatest rock stars: Bob Dylan, Mick Jagger, Patti Smith, Bruce Springsteen, and, as relevant [in her Supreme Court case], Prince.

*Id.* at 515.

Lynn Goldsmith is interested in the proper and fair resolution of this case, especially insofar as what this Court says affects millions of creators and artists both within the Ninth Circuit and beyond it.  She is interested in the proper application of the precedent she lived through—*i.e.*, of the *Warhol* decision—and in ensuring that fair uses truly are *fair*, rather than attempts to use fame, celebrity, and social (and social-media) exposure, and legal teams, to end run around paying artists fairly, contrary to the Constitutional and Congressional purposes of copyright law.  Ms. Goldsmith is interested in ensuring that those who are most able to obtain a license do so—especially when the consistent failure to do so would decimate the livelihood of creative professionals (while profiting off the fruits of their labors) and where getting a license so often leads to creative collaborations that advance the arts.

2

*Amicus curiae* Digital Justice Foundation ("DJF") is a nonprofit, public-benefit corporation that focuses on education and public-interest advocacy for underserved and underrepresented persons on issues at the intersection of law, technology, and online rights. The DJF is dedicated to protecting individual rights in digital spaces and to ensuring that traditional notions of justice thrive in our digital age. As part of this mission, the DJF advocates for individual rights, including copyrights, implicated by the Internet and other technologies, especially in relation to how those laws affect populations with lesser access to legal representation.

The DJF has submitted numerous *amicus* briefs to the Courts of Appeals and to the Supreme Court in an effort to give voice to the perspectives and interests of underrepresented creators and/or users and their rights, especially where the DJF believes that its perspectives and expertise can be helpful to the Court in addressing perspective of interested non-parties and other persons not before the Court. E.g., Brammer v. Violent Hues Prods., LLC, 922 F.3d 255, 268 (4th Cir. 2019) (adopting DJF's view that infringer "could just as easily have accomplished its goal of depicting [a Washington D.C. neighborhood] by taking its own photograph or finding an image under free license" *without* harming a photographer's livelihood); Smith v. Thomas, 911 F.3d 378, 382 (6th Cir. 2018) (citing and quoting DJF's amicus brief in favor of *pro se* appellee).

3

The subject matter of this appeal implicates the DJF's nonprofit mission and it shares an interest in the correct application of the law—of ensuring balance in copyright's doctrine of fair use that protects and insulates not-for-profit, educational, and private uses from being haled into court, but also that ensures that smaller artists' livelihoods are protected from major commercial encroachment by well-resourced actors that commit fair-use abuse by abusing the important and publicly beneficial doctrine of fair use to simply avoid paying artists for uses of their creations—which undermines the core purposes of copyright and leads to unnecessary litigation.

**ARGUMENT**

I.     **IT IS CRITICALLY IMPORTANT TO FOCUS ON THE SPECIFIC USE AT ISSUE TO BALANCE COPYRIGHT'S AND FAIR USE'S IMPORTANT VALUES, TO PROVIDE A LIMITING PRINCIPLE, AND TO PERMIT A NARROW BUT IMPORTANT REVERSAL.**

In his concurrence joining the Second Circuit's decision in *Warhol*, CIRCUIT JUDGE JACOBS provided an important caveat: it's easy to *overread* fair-use decisions as applying to other uses not at issue.  He noted that the courts only decide the *specific uses* in front of them asserted to be infringing:

> The sixteen original works have been acquired by various galleries, art dealers, and the Andy Warhol Museum.  This case does ***not*** decide their rights to use and dispose of those works because Goldsmith does not seek relief as to them.

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 54 (2d Cir. 2021) (Jacobs, J., concurring).  In turn, JUSTICE SOTOMAYOR's opinion in *Warhol* took note of JUDGE JACOBS' wise caveat:

> Judge Jacobs concurred.  He stressed that the Court of Appeals' holding "did not consider, let alone decide, whether the infringement here encumbers the original Prince Series works."  Instead, "the only use at issue" was "the Foundation's commercial licensing" of images of the Prince Series.

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 525 (2023).

This all makes sense.

5

After all, a fair-*use* analysis is naturally going to focus on the specific *use* at issue and asserted to be infringing or, alternatively, fair. 17 U.S.C. § 107 ("fair *use* of a copyrighted work"); 17 U.S.C. § 107(1) ("purpose and character of the *use*").

It's in this vein that the Supreme Court has repeatedly emphasizes that fair-use analysis must be conducted by looking at the "***specific use***" in question—with sometimes strong language regarding the dissent's failure to do just that. *E.g.*, *Warhol*, 598 U.S. at 526 ("Here, the ***specific use*** of Goldsmith's photograph alleged to infringe her copyright is AWF's licensing of Orange Prince to Condé Nast."); *id.* at 533 ("The fair use provision, and the first factor in particular, ***requires an analysis of the specific 'use'*** of a copyrighted work that is alleged to be 'an infringement.'"); *id.* at 549 (The "[dissent] ignores the statute's focus on the ***specific use*** alleged to be infringing."); *id.* at 557-558 ("Under the law Congress has given us, ***each challenged use must be assessed on its own terms***."); *id.* at 534 n.10 ("The dissent, however, focuses on a case that is not before the Court. […] Preferring not to focus on the ***specific use*** alleged to infringe Goldsmith's copyright, the dissent begins with a sleight of hand and continues with a false equivalence between AWF's commercial licensing and Warhol's original creation.").

6

The Supreme Court's repeated emphasis on the need to focus on the specific use is critical. That focus serves fundamentally important purposes that shouldn't overlooked. Three are key:

1. It is through this focus on _specific use_ that fair-use doctrine maintains naturally _built-in limiting principles_ that keep copyright balanced and avoid the kinds of broad decisions that would either (1) eviscerate rightsholders' livelihoods and disintegrate license markets with the stroke of pen or, (2) alternatively, take an absolutist approach to copyright that would improperly subject broad swaths of society to liability in federal court.

2. _Examples_ abound in both the caselaw of the Supreme Court and of the Ninth Circuit where fair-use decisions have properly given key focus to the _specific use_ in question to ensure that the fair-use doctrine played its important role.

3. The doctrine's focus on specific use lends itself to a principled route to _narrowly reverse_ here—holding liable the instant unauthorized, near-identical commercial reproduction of Mr. Sedlik's artistry for advertising purposes by a (tattoo and social-media) business—_without_ limiting fair-use as to, or otherwise implicating, members of the public who just happen to have tattoos. No such parade of horribles

7

arises when the specific-use emphasis of the *Warhol* decision is respected and abided.

* * * * *

Fair-use analysis has always focused on the <u>*specific uses*</u> asserted to be infringing.

After all, the federal courts routinely "recognize that determinations of fair use are highly contextual and fact specific[.]" *E.g.*, *Warhol*, 11 F.4th at 51 (2d Cir. 2021); *id.* at 52 (eschewing "simplistic formulas" to do "contextual balancing" instead). Indeed, the focus on the specific use in its specific context is so strong that, as the Supreme Court has reiterated, even "[t]he same copying may be fair when used for one purpose but not another." *Warhol*, 598 U.S. at 533; *see also Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 20 (2021) (fair-use "application may well vary depending upon context").

JUSTICE GORSUCH's concurrence in *Warhol* suggested a similarly central distinction between various types of specific uses. *Warhol*, 598 U.S. at 557-558 ("If, for example, the Foundation had sought to display Mr. Warhol's image of Prince in a nonprofit museum or a for-profit book commenting on 20th-century art, the purpose and character of that use might well point to fair use. But those cases are not this case.").

8

So had JUSTICE GINSBURG. *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 584 (2013) (Ginsburg, J., dissenting) ("Displaying a work of art as part of a museum exhibition might also qualify as a 'fair use' under 17 U.S.C. §107.").

For example, even the same accused work might fare differently under fair-use analysis depending upon whether the use was for *advertising* purposes (as Ms. von Drachenberg did when deploying the infringing work to *advertise* her businesses), or not. *Id.* (citing *Campbell*, 510 U.S at 585); *id.* (citing *Sony*, 464 U. S. 417, 449-451 (1984), as "contrasting the recording of TV 'for a commercial or profit-making purpose' with 'private home use'"); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 (1994) ("The use, for example, of a copyrighted work to <u>*advertise*</u> a product, even in a parody, will be entitled to <u>*less indulgence under the first factor*</u> of the fair use enquiry than the sale of a parody for its own sake, let alone one performed a single time by students in school.").

Ordinarily, we'd think of a *parody* as a fair use. Put that parody in a school context, and it's claim for fairness is markedly stronger. Yet, put that same parody in a commercial-advertising or promotional context, and the claim to fairness "diminishes accordingly (if it does not vanish)." *See Warhol*, 598 U.S. at 531.

9

A seminal example of the specific-use focus is *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 543 (1985). *Harper* involved news reporting and journalism on a presidential memoir, but a key factual detail of the specific use proved determinative—namely that the news reporting had stolen the infringed work and published it *first*. *Id.* ("Two to three weeks before the Time article's scheduled release, an unidentified person secretly brought a copy of the Ford manuscript to Victor Navasky, editor of The Nation, a political commentary magazine"—who then published key excerpts before Time Magazine, the lawful licensee).

Ordinarily, certain types of factual new reporting are among the types of uses that perhaps more likely to be considered fair use fair. *See* 17 U.S.C. § 107 ("such as criticism, comment, *news reporting*"). Yet, as the Supreme Court explained, fair-use analysis requires a "<u>*case-by-case*</u> determination whether a <u>*particular use*</u> is fair"—an analysis that will turn on particularized details about the use, the context, *etc.*—and not some talismanic label like news reporting or transformation. *Harper*, 471 U.S. at 539; *see also McGucken v. Pub. Ocean Ltd.*, 42 F.4th 1149, 1153 (9th Cir. 2022) (use of nature photography <u>*not*</u> fair use even in journalism context because such uses disrupted existing licensing markets). And, as *Warhol* reinforced, this isn't just courts, judges, and lawyers being persnickety.

10

Rather, the focus on the specific use in the "specific instance" is important because it provides a "limiting principle"—to allow courts to find balance by requiring payments in commercial, non-transformative settings that would copyright affect markets at scale (as happened here), but also using fair use to insulate non-profit, public-interest, non-commercial uses (such as applying fair use to protect an ordinary citizen merely for *having* / *wearing* a tattoo, while a commercial tattoo business would still need to pay for a license). *See Warhol*, 598 U.S. at 54.

An alternative position—one that would conflate commercial uses (what happened here) with non-commercial uses (like merely wearing a tattoo) offers "[n]o reason why [Defendant] was justified in using [Sedlik's] original work *in this specific instance*" and offers "no limiting principle" for such a position. *See id.* This is especially so insofar as the infringement here was done "as accurately as possible"—insofar Defendants sought to copy Mr. Sedlik's *expression*, without change, without commentary, and without transformation. *See Dr. Seuss Enters., Ltd. P'ship v. ComicMix Ltd. Liab. Co.*, 983 F.3d 443, 450 (9th Cir. 2020).

Likewise, this Court's decision in *Tresóna Multimedia, Ltd. Liab. Co. v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 642 (9th Cir. 2020), is instructive. Ordinarily, a music group performing someone else's copyrighted music at various venues would be infringing.

Yet, as this Court properly held, "Burbank High School's music education program [which] includes instructional classes and five competitive show choirs" made a fair use when they performed copyrighted music at various venues—the same use but in a different context. *Id.* The key point is that *who* is undertaking the accused use—high-school kids in a nonprofit education setting versus commercial actors in a market setting for promotional benefit—makes worlds of difference in a fair-use analysis, even though its just one factual nuance.

In sum, the *Warhol* majority viewed the "dissent, however, [as] focus[ing] on a case that is not before the Court" because the *Warhol* "dissent assumes that any and all uses of an original work entail the same first-factor analysis based solely on the content of a secondary work." *Id.* at 534 n.10. But that's not true.

The same tattoo derivative could be fair or not fair—depending upon its particular and specific use at issue and upon whether the work or its subject are being targeted.

12

For example, one reasonable concern that might come to mind is about the potential downstream effects of reversal: would reversing as to the commercial, advertising, and promotional uses at issue here have downstream effects for ordinary citizens who're simply wearing a tattoo?

Would reversal subject ordinary citizens to liability merely for what their tattoo artists did when the *tattoo artist* infringed?  These are valid and understandable concerns.

Yet, the fair-use doctrine's focus on the *specific use* in question should fully assuage such concerns.  Fair use doctrine is well-equipped to draw principled distinctions between the tattoo artist using infringing derivatives for commercial promotion and advertising (or in return for a direct fee) versus the ordinary citizen who merely *gets a tattoo*.  As *Warhol* itself emphasized, even "[t]he ***same copying*** may be fair when used for one purpose but not another."  *Warhol*, 598 U.S. at 533.

Wearing a tattoo for intimate expressive purposes on your own body is a far different purpose from running a commercial establishment where the underlying tattoo—the underlying raw materials of the business—are sold to customers without paying the creator of the art, *even though both the tattoo business and tattoo recipient could be two sides of the same transaction.*

13

That's because, for ordinary citizens, they're merely wearing a tattoo on their body. For the business, the purpose and use is different. The business is trying to simply avoid paying a customary and fair price for the raw materials of its business.

That's not fair use. *See Warhol*, 11 F.4th 26, 52 (2d Cir. 2021) ("We merely insist that, just as artists must pay for their paint, canvas, neon tubes, marble, film, or digital cameras, if they choose to incorporate the existing copyrighted expression of other artists in ways that draw their purpose and character from that work[…], they must pay for that material as well.").

Accordingly, this Court should narrowly reverse—perhaps clarifying that, likely, the mere receiving by a private customer of a tattoo (even an unlicensed one) is likely a ready-made fair use *for that customer*. Yet, such an opinion should reverse because what the Defendants did here was worlds apart from that—and the specifics and particulars of the infringer's use, her purpose, and the context matter a lot. Here, all those specifics weigh decisively in favor of a narrow reversal.

14

II. **UNDER THE FIRST FACTOR, THE LACK OF TARGETING OR OTHER STRONG JUSTIFICATION FOR THE USE OF THIS PARTICULAR WORK RENDERS IT PLAINLY NOT A TRANSFORMATIVE USE AS A MATTER OF LAW.**

In *Warhol*, the Supreme Court explained that transformative fair-use ordinarily requires "targeting"—which is copyright parlance for commentary upon the work itself. *See Warhol*, 598 U.S. at 527 (targets means "comments on, criticizes, or provides otherwise unavailable information about the original"). *Warhol* makes clear that transformative uses should be analyzing the underlying work, educating about the work, commenting upon it, *etc.* That's what it means to "target" an underlying work.

Indeed, *Warhol* made clear that a failure to target—or comment upon—the copyrighted work itself weighs heavily <u>*against*</u> fair use. *Id.* at 530 ("targets an author or work"); *id.* at 532 ("targets an original work"); *id.* at 540 ("does not target the photograph"). Yet, here, Defendant's work makes <u>*no*</u> commentary upon Mr. Sedlik's work. In *Warhol*'s parlance, Defendants' use fails to "target" Mr. Sedlik's work. *See Warhol*, 598 U.S. at 547 ("does not target an original work"); *id.* at 531 ("*no* critical bearing on the substance or style of the original composition" such that "the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)").

As such, this appeal really involves what, for copyright, is a run-of-the-mill, garden-variety infringement—not a fair use.

15

What's at issue here is wholesale copying without any _commentary_ on the underlying work itself. The only unique wrinkle is that the copier put the infringing work into a person's skin (rather than just on paper or canvas). That may well be a differentiator _for a fair-use analysis as to the individual bearing the tattoo_, but that's not a differentiator as to the person doing the copyright (_i.e._, Kat Von D here). That's because the copier/infringer was not targeting the underlying work—and the fact that Defendant tattooed the photograph doesn't change that fact. _See_ Warhol, 598 U.S. at 540 ("does not target the photograph").

Notably, there is an exception in _Warhol_ that clarifies that targeting is not _always_ required. There are of course exceptions to the general rule that a transformative fair use ordinarily requires targeting (or commenting) on the underlying work:

> The dissent wonders: Why does targeting matter? The reason, as this opinion explains, is the first factor's attention to justification. Compare, for example, a film adaptation of Gone With the Wind with a novel, The Wind Done Gone, that "inverts" the original's "portrait of race relations" to expose its "romantic, idealized" portrayal of the antebellum South. Or, to build from one of the artistic works the dissent chooses to feature, consider a secondary use that borrows from Manet's Olympia to shed light on the original's depiction of race and sex. _Although targeting is not always required, fair use is an affirmative defense, and AWF bears the burden to justify its taking of Goldsmith's work with some reason other than, "I can make it better."_

_Warhol_, 598 U.S. at 547 n.21.

16

However, this exception to the general rule that targeting is required is just that—an exception.

It's not an exception that swallows the rule. As such, absent targeting (or commenting) there must be some particularly strong and profound justification for the unauthorized use. *See id.* ("the first factor's attention to ***justification***"); ("bears the burden to ***justify*** its taking").

In *Warhol*, the Supreme Court stressed its "repeated emphasis on ***justification***." *Warhol*, 598 U.S. at 549.

Indeed, the *Warhol* Court expressly cautioned that cases like "Campbell *cannot be read* to mean that §107(1) weighs in favor or any use that adds some new expression, meaning, or message." *Id.* at 541. That misreading of the caselaw would erroneously permit "'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works." *Warhol*, 598 U.S. at 541. Simply put, the rule is that ordinarily transformative use requires a targeting. And, the specific exception in footnote 21 of *Warhol* is just that: an exception–not an exception that swallows the rule.

One recognized non-targeting justification that fits the *Warhol* exception to the targeting requirement would be historical documentarian uses. For example, consider a *historical* documentarian using *historical* archival footage might present a non-targeting example of justification for unauthorized use.

17

After all, a historical documentarian cannot just go back in time and independently create a work.

As such, courts do recognize *historical* documentarian uses can be justified use even absent targeting—in certain limited circumstances. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006); *Brammer v. Violent Hues, Prods, LLC*, 922 F.3d 255, 264 (4th Cir. 2019). Such uses can present a strong justification that "serve documentary purposes and may be important to the accurate representations of historical events." *Brammer*, 922 F.3d 255, 264.

Yet, even for historical-use cases, a *specific* justification is still required for the specific use—*i.e.*, there is no blanket assumption of fair use. *See McGucken v. Pub. Ocean Ltd.*, 42 F.4th 1149, 1160 (9th Cir. 2022) ("determination was *not* based on a blanket conclusion about the documentary as a whole, as [Defendant] would have it. Rather, we made *a fine-grained analysis of each use*[.]"); *Bill Graham*, 448 F.3d at 609 ("there are no categories of presumptively fair use"); *Bouchat*, 619 F.3d at 309 (4th Cir. 2010) ("Merely labeling a use as historical does not create a presumption of fair use."). As such, merely labeling or classifying a work as a historical use work isn't a talisman. *Cf. Warhol*, 598 U.S. at 528 n.4.

And, even in historical/documentary use cases, the law is clear that whether the customary licensing price for the specific use was paid, remains an important

18

consideration for whether a use was justified. *E.g.*, *Harper*, 471 U.S. at 562 ("without paying the customary price"); *Bill Graham*, 448 F.3d at 612 (same); *Elvis*, 349 F.3d at 627-628 (9th Cir. 2003) (same); *id.* at 628 ("without a license"); *Bouchat*, 619 F.3d at 311 ("did not receive the customary price"); *Brammer*, 922 F.3d at 265 ("failure to pay the customary fee was exploitative"). Indeed, even in historical use cases courts still must ask the pertinent question: could *this* steaming use have been made by "paying the customary price"? *See Harper*, 471 U.S. at 562.

So, in such contexts, there *can* be justification under certain circumstances . Nevertheless, even in such historical use contexts, the specific use will require a specific justification for the unlicensed use. *See Warhol*, 598 U.S. at 547 n.21 (2023) ("bears the burden to justify its taking"). The Defendant will still need to explain why the use could not be licenses or achieved through available means. They must explain why they had to use this specific work (as opposed to another or making their own) and why they could. They must give a strong justification: the absence of an available license and the absence of an available alternative.

In such contexts, there *can* be justification independent of targeting, under certain circumstances, if there is a particularly strong, specific justifications for the specific use.

19

Here, by stark contrast, there is no such justification—let alone a strong justification—for Defendant's unauthorized, non-targeting use. Rather, this case presents a simple case of complete copying for commercial interest and commercial promotion. That's plainly not transformative and does not display the type of strong justification that would forgive a non-targeting copying. Defendants cannot merely copy so as to "avoid[ing] the drudgery" of independent creation. *See Campbell*, 510 U.S. at 580 ("avoid the drudgery"); *Brammer*, 922 F.3d at 263 ("avoid the drudgery"). *Warhol* makes clear there must be some compelling justification or need to take and use this specific work.

Moreover, this lack of justification is particularly problematic in light of the alternatives to unauthorized uses of Mr. Sedlik's work. After all, justification in using one work should require a reason to use that work rather than alternative works–especially, where other works are freely available. *See Brammer v. Violent Hues Prods, LLC*, 922 F.3d 255, 268 (4th Cir. 2019) ("Violent Hues could just as easily have accomplished its goal of depicting Adams Morgan by taking its own photograph or *finding an image under free license*.").

Indeed, in the Age of the Internet, Courts should consider the availability of readily available alternatives–freely available under Creative Commons licenses– when conducting fair use analysis. *See Brammer*, 922 F.3d at 268.

20

Respectfully, this Court should consider how the ample availability of works subject to a Creative Commons license presents another important dimension to the fair use analysis and lack of justification here. *See Great Minds v. Office Depot, Inc*, 945 F.3d 1106, 1108 n.1 (9th Cir. 2019) (explaining that creative Commons is a non-profit organization that offers free copyright license templates to be used to share creative works); *e.g.*, https://creativecommons.org/licenses/by-sa/3.0/?ref=openverse.

Creative Commons is a nonprofit corporation that has developed and popularized certain standardized licenses that allow copyright holders to distribute and license works, often for free. *See* "Creative Commons: Share Your Work," accessed Oct. 29, 2018, https://creativecommons.org/share-your-work/.

Through partnerships with major online media platforms, including Flickr, YouTube, and Vimeo, Creative Commons has helped to establish an online ecosystem where over 1.4 billion creative works are subject to Creative Commons licenses. *Id*. Many works are subject to licensing for free. Other are may be licensed for free if the licensee attributes the copyrighted work to the creator. Many photographs are available for free use via Creative Commons licenses. Indeed, a number of these works are photographs of Miles Davis–the person Defendants depicted in their infringing work. A few examples include:

21

- https://openverse.org/image/029de768-a37d-4cba-a025-032e1ea40a24?q=miles+davis

- https://openverse.org/image/aeb45bf1-24a5-48d5-bf0d-1df91b867747?q=miles+davis

- https://openverse.org/image/5fdab825-4acd-48de-8400-932d84a7bb5f?q=miles+davis

Such photographs are easily located and available for free on open-license repositories (such as openverse.org), which collect works under Creative Commons licenses. Notably, these freely available images were not hard to find. Such websites permits easy filtering by Creative Commons license, so that licenses available for free and for commercial use can be located with ease. They are just a few clicks away.

The doctrinal uptake of these available alternative photos is simple. Not only would the smallest of efforts have permitted *authorized* uses of works depicting Miles Davis. To boot, these works were available *for free* under a Creative Commons license. As such, the availability of freely available works places a greater burden on Defendant to justify why she took Mr. Sedlik's specific work—making *unauthorized* commercial uses of the latter. Why was she stealing from Mr. Sedlik when she could have gotten photographs of Miles Davis, for free, under a license, with a few clicks?

22

In that situation, stealing lacks justification entirely.

In sum, because Defendant could have easily used freely available works from Creative Commons and numerous other sources to achieve its purpose, the lack of justification for making unauthorized, commercial uses of Mr. Sedlik's photograph was particularly unreasonable and should weigh strongly against a finding of fair use.  The availability of other, freely available works depicting Miles Davis undermines the rationale and undermines the purported justification of using Mr. Sedlik's work without a license or permission.

It is no answer to say that Defendant chose to copy Mr. Sedlik's photograph because she liked his creative expression.  Taking another person's photo and making commercial use of it because you like it is not the type of justification that *Warhol* demands.   Rather Mr. Sedlik's creative, photographic expression is precisely what copyright law protects and has long afforded exclusive rights in. *See*, *e.g.*, *Ets-Hoking v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000) ("photography is a form of artistic expression, requiring numerous artistic judgments"); *id.* at 1074 ("that photography is art deserving protection reflects a longstanding view of Anglo-American law."); *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884) ("photograph to be an original work of art, the product of plaintiff's intellectual invention, of which plaintiff is the author, and of a

23

class of inventions for which the Constitution intended that Congress should secure to him the exclusive right to use, publish and sell").

If Defendant wanted to use that creative expression for its artistic appeal and value—especially for commercial purposes—then Defendant should have licensed that use. After all, under copyright law those creative choices and that creative expression and aesthetic appeal is precisely what Mr. Sedlik owns. *Warhol*, 598 U.S. 508, 526 ("The Copyright Act encourages creativity by granting to the author of an original work "a bundle of exclusive rights."). Those creative choices and aesthetic appeal *is* what Mr. Sedlik owns under copyright. That's what requires a license. And here, that's what was taken but not paid for.

24

### III.    THE DISTRICT COURT OVERLOOKED THE IMPORTANCE OF THE ARTISTIC-REFERENCE DERIVATIVE MARKET THAT WAS ADDRESSED BY THE SUPREME COURT IN *WARHOL*.

Fair use's fourth factor requires courts to assess the "effect of the use upon the potential market for or value of the copyrighted work" when assessing the issue of fair use. *See Warhol*, 598 U.S. at 551; 17 U.S.C. § 107.  The Supreme Court has described this fourth factor——the potential market harm factor—as "the most important" factor.  *See id.* at 555 (Gorsuch, J., concurring); *Harper*, 471 U.S. at 566.  Regarding this fourth factor, the existence of what's called "artist reference" licenses, demonstrates an existing licensing market for the types of uses that Defendant made of Mr. Sedlik's Miles photograph.  Such licenses speak to the concrete market harms that resulted here when Defendant made unauthorized and unlicensed uses and commercial exploitations of Mr. Sedlik's photograph.

Notably, the Supreme Court's *Warhol* decision discussed this common type of license for use of photographic works—an "artist reference" license.  *See Warhol*, 598 U.S. at 515 ("In 1984, Vanity Fair sought to license one of Goldsmith's Prince photographs for use as an "artist reference.").  In *Warhol*, the magazine Vanity Fair wanted to use Ms. Goldsmith's copyrighted photograph "to help illustrate a story about the musician" Prince.  Accordingly, the magazine procured and paid for what is known as an artist reference license, and Goldsmith issued a license expressly granting "artist reference" use.

25

As required under Goldsmith's license, the magazine "credited Goldsmith for the 'source photograph' and it paid her $400." *See Warhol*, 598 U.S. at 515. That authorized and licensed use speaks to the existing licensing market for such uses of the photograph. When an artist wants to use a photographer's work to create a new work, the norm is to procure an artist reference license.

Of course, the *Warhol* dispute arose when Andy Warhol far exceeded the scope of that artist reference license making numerous unauthorized and unlicensed commercial exploitations of Ms. Goldsmiths photo. In *Warhol*, Ms. Goldsmith had "agreed, on the condition that the use of her photo be for 'one time' only" and Vanity fair hired Andy Warhol to make that licensed one time use. *Id.* at 515. Warhol, however, then made a series of unauthorized uses. *Id.* ("Warhol, however, did not stop there. From Goldsmith's photograph, he derived 15 additional works. Later, the Andy Warhol Foundation for the Visual Arts, Inc. (AWF) licensed one of those works to Condé Nast, again for the purpose of illustrating a magazine story about Prince. AWF came away with $10,000 Goldsmith received nothing.").

The point for present purposes—a point critical to assessing the fourth fair use factor here–is that the *Warhol* decision discusses and demonstrates the existence and use of "artist reference" licenses—licenses that are commonly used when making uses of photographs.

26

Here, the evidence of multiple artist reference licenses produced by Sedlik speaks to the real and potential market harms caused by Defendant's unauthorized, unlicensed commercial exploitations of Mr. Sedlik's photo. Such licenses for use of photographs are commonplace. Moreover, Mr. Sedlik himself has repeatedly licensed the Miles photograph to other artists who want to make use of his photograph.

For example, he has granted an artist reference license of the same Miles photograph to a painter to make a painting and reproductions of the painting and to post those to social media. Mr. Sedlik also has granted artist reference licenses of the *same* Miles photograph for use in creating a sculpture and related promotions in France. Indeed, Mr. Sedlik has granted an artist reference license of the *same* Miles photograph to a *tattoo* artist to create a *tattoo* and post it to social media. 321. Accordingly, if Defendant wanted to make a commercial use of Mr. Sedlik's work she should have just done what many other artists–including other tattoo artists–have done: get a license.

Such artist reference licenses demonstrate the market for and value of licensed uses of Mr. Sedlik's Miles photograph. Permitting Defendant here to make free, unlicensed commercial exploitation would harm that market for such licensed uses. And, that demonstrates why the fourth factor here should weigh decisively against fair use.

27

## IV. THE DISTRICT COURT'S JURY INSTRUCTION PLAGUED THE FAIR-USE DECISION BY CONFUSING HOW HEAVILY A FACTOR WEIGHED WITH WHICH DIRECTION IT POINTED.

The District Court improperly permitted the jury to evaluate whether either Factor Two or Factor Three, somehow weighed in favor of fair use—despite the District Court properly holding that both factors weigh *against* fair use as a matter of law. In doing so, the District Court confused properly permitting the jury to decide how heavily these factors weighed against fair use with which direction (for or against) these factors weighed. In short, on Factors Two and Three, the District Court's instruction confused permitting the jury to decide *how much weight* a factor should get with *which way it weighed*. That confusion plagued the jury instruction on fair use and proved problematic.

The District Court had properly found that Factors Two and Three weighed *against* fair use as a matter of law for all of Defendants' uses. 1-ER-101-04; 1-ER-129. That makes sense. After all, under Factor Two, creative works get broad protection against appropriation and photographs are creative works. *E.g.*, *Sofa Entm Inc. v. Dodger Prods.*, 709 F.3d 1273, 1279 (9th Cir. 2013) ("The second fair use factor recognizes that some works — generally **creative** works […] 'are closer to the core of intended copyright protection than others.' An alleged infringer will have a more difficult time establishing fair use when he appropriates a work of that nature."); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074 (9th Cir. 2000)

28

("Courts as well as photographers have recognized the artistic nature of photography."). And, as to Factor Three, Defendants copied the entirety of Sedlik's work. *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 744 (9th Cir. 2019) ("Copying an **entire work** militates against a finding of fair use.")

As such, the District Court was right to find that Factors Two and Three weighed against fair use as a matter of law. Nevertheless, the District Court then refused to inform the jury that Factors Two and Three weighed *against* fair use. Instead, the District Court presented those factors as clean slates and instructed the jury to decide them, compounding the problem by inviting the jury to find that these factors somehow weighed in favor of fair use.

For example, consider the jury instruction addressing Factor Three:

"When an accused work copies little of the original work, this factor weighs in favor of fair use... If the secondary user copies only as much as is necessary for a transformative use, then this factor will not weigh against fair use."

1-ER-46 (instructions as to Factor Three).

Understandably, the District Court wanted to ensure the jury was free to conduct a balancing of the various factors–yet seemed unsure how to do that when *some* factors have been decided as a matter of law and other factors hadn't. 1-ER-92. Yet critically, there's a difference between permitting the jury to decide *how much* a factor weighs against fair use, as opposed to deciding *which way* that factor goes.

29

There's a difference between deciding what side of a see-saw something sits and how much weight that thing has. The District Court's jury instruction confused permitting the jury to decide how much weight a factor should receive with what direction that factor cut.

Below, the jury instruction improperly invited the jury to reconsider whether Factor Two and Factor Three weighed for or against fair use–despite the judge appropriately finding that these factors necessarily weighed *against* fair use as a matter of law.

That confused and confusing jury instruction led the jury astray, yielding the peculiar fair use determination below. And, that confusion could've been avoided had the District Court simply informed the jury of its finding that Factors Two and Three weighed against fair use, while permitting the jury to determine how much weight to attribute those factors in fair uses overall balancing.

## CONCLUSION

Ultimately, a narrow reversal here will simply be doing what copyright is meant to do: ensure that creators get paid for their creations in a manner that incentivizes good creations.

Notably, fair use is not the only defense to copyright infringement: "copyright law is replete with escape valves: the idea-expression distinction; the general rule that facts may not receive protection; the requirement of originality; the legal standard for actionable copying; the limited duration of copyright; and, yes, the defense of fair use, including all its factors[.]" *Warhol*, 598 U.S. at 550. They ensure the copyright system is well-balanced—and it is undoubtedly an important system: "If the last century of American art, literature, music, and film is any indication, the existing copyright law, of which today's opinion is a continuation, is a powerful engine of creativity." *Id.*

*Amici curiae* respectfully request that this Court correct the legal errors of the District Court and narrowly reverse.

31

Date: October 22, 2024

Respectfully submitted,

DIGITAL JUSTICE FOUNDATION

*/s/ Andrew Grimm*
Andrew Grimm.
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

*Attorney for Amici Curiae*

32

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3667 _____

I am the attorney or self-represented party.

**This brief contains 6,478 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Andrew Grimm* _____ **Date** October 22, 2024 _____
        *(use "s/[typed name]" to sign electronically-filed documents)*

33

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit via the Court's ACMS.

Date: October 22, 2024

Respectfully submitted,

*/s/ Andrew Grimm*
Andrew Grimm