No. 24-3367

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JEFFREY B. SEDLIK,

*Plaintiff-Appellant*,

v.

KATHERINE VON DRACHENBERG (a.k.a. "KAT VON D"), an individual;
KAT VON D., INC., a California corporation; HIGH VOLTAGE TATTOO, INC., a
California corporation; and DOES 1 through 10, inclusive,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-01102-DSF-MRW
Hon. Dale S. Fischer

**APPELLEE'S ANSWERING BRIEF**

Allen B. Grodsky
GRODSKY, OLECKI & PURITSKY LLP
11111 Santa Monica Blvd., Ste. 1070
Los Angeles, CA 90025
Tel: (310) 315-3009
*allen@thegolawfirm.com*

*Attorneys for Defendants/Appellees*
Katherine Von Drachenberg, Kat Von D, Inc.
and High Voltage Tattoo, Inc.

## DISCLOSURE STATEMENT

There is no defendant corporation with a parent corporation or publicly

held corporation that owns 10% of more of its stock.


Date: December 16, 2024          GRODSKY, OLECKI & PURITSKY LLP

                                 */s/ Allen B. Grodsky*
                                 Allen B. Grodsky

                                 *Attorneys for Defendants/Appellees*
                                 Katherine Von Drachenberg, Kat Von D, Inc.
                                 and High Voltage Tattoo, Inc.

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT .................................................................. i

INTRODUCTION ........................................................................... 12

STATEMENT OF THE ISSUES ................................................................ 13

STATEMENT OF THE CASE .................................................................. 14

1. Summary of Facts At Trial ........................................................ 14

    A. Kat Von D and High Voltage Tattoo .............................................. 14

    B. Beginning Over A Decade Ago, Kat Von D Stopped Charging For Tattoos and Only Tattooed Friends And Acquaintances ........ 16

    C. In 2017, Kat Von D Agreed to Ink A Tattoo, Without Charge, For Her Friend, Blake Farmer ........................................... 16

    D. Farmer Texted A Photo He Wanted Used As A Reference For His Tattoo ..................................................................... 16

    E. The Process for Inking Farmer's Tattoo ......................................... 17

        (1) Creation of Line Drawing to Determine Placement and Size of the Tattoo ............................................ 18

        (2) Freehand Inking of Tattoo ....................................... 19

        (3) Farmer's Tattoo ................................................. 20

    F. Kat Von D Posts On Social Media Photos of Various Stages of The Tattoo But does Not Advertise Or Promote On Any of The Posts ............................................................. 22

        (1) Messy Progress Posts ............................................ 22

        (2) Process Posts ................................................... 23

    (3)   Instagram Story Reel ................................................. 24

    (4)   Finished Tattoo Post .................................................. 24

    (5)   Light Box Video Post ................................................ 24

G.   No Marketing or Sales ....................................................... 25

H.   Sedlik's Testimony Was Not Credible .............................. 25

    (1)   Sedlik Refused to Give Direct Answers to Simple Questions ................................................................... 25

    (2)   Sedlik's Testimony About The Sole "License" He Entered Into With Tattoo Artist Brian Vanegas Was Directly Contradicted By Vanegas ........................................ 26

    (3)   Though He Claimed His PLUS Organization Developed Standards for Photographer/Tattoo Artist Licenses, Sedlik Could Produce No Such License, Other Than The Sham Vanegas License ...................................................... 28

    (4)   Sedlik's Webpage Is An After-The-Fact Sham Created To Make It Look As If He Has Entered Into Licenses With Tattoo Artists .......................................................... 29

    (5)   Sedlik Could Not Prove That He Ever Licensed His Photograph For the Kind of Social Media Use At Issue Here ........................................................................... 30

    (6)   Sedlik Did Not Have Kat Von D's Social Media Posts Taken Down, But Rather Demanded That They Be Kept up ....................................................................... 31

2.   Relevant Procedural History ........................................................ 31

A.   The District Court Precluded Defendants' Expert Testimony ................ 31

B.   Sedlik's Counsel Proposes Having The Jury Decide The Ultimate Fair Use Question And Submits Jury Instructions and a Verdict Form To Have Them Do So ................................................................ 33

iii

SUMMARY OF THE ARGUMENT ........................................................... 33

ARGUMENT ......................................................................................... 38

1.  SEDLIK CANNOT APPEAL THE DENIAL OF HIS SUMMARY
    JUDGMENT MOTION ................................................................. 38

2.  THE TRIAL COURT'S DENIAL OF SEDLIK'S RULE 50(b) MOTION
    AS TO SUBSTANTIAL SIMILARITY SHOULD BE AFFIRMED ............. 40

    A.  The Jury Finding On The Intrinsic Test Should Not Be Reversed ........ 42

        (1)  The Intrinsic Test Examines An Ordinary Person's Holistic and
             Subjective Impressions Of The Similarities In The Works ........ 42

        (2)  The Ninth Circuit Has Repeatedly Stated That Reviewing
             Courts Should Not Second Guess a Jury's Application
             of the Intrinsic Test ................................................... 44

        (3)  *Unicolors* Does Not Help Sedlik ..................................... 46

    B.  There is Sufficient Evidence to Support The Jury's Finding
        On The Extrinsic Test ....................................................... 49

        (1)  Messy Progress Posts .................................................. 51

        (2)  Tattoo ................................................................. 52

        (3)  Kat Von D At Light Box Post ......................................... 54

3.  THE TRIAL COURT'S DENIAL OF SEDLIK'S RULE 50(B)
    MOTION AS TO FAIR USE SHOULD BE AFFIRMED ...................... 55

    A.  Sedlik Failed to Bring A Rule 50(a) Motion On Fair Use and
        Therefore Forfeited The Right Challenge Sufficiency of the
        Evidence .................................................................... 55

    B.  The Jury Found Only the Process Posts To Be A Fair Use and
        There Is Substantial Evidence To Support That Decision ............ 56

iv

(1)    There Is Sufficient Evidence For the Jury To Conclude That The Process Post Was Transformative and Non-Commercial ................................................................. 58

      (a)    Commerciality ................................................. 58

      (b)    Transformativeness ....................................... 61

(2)    There Was Sufficient Evidence To Support The Jury's Implied Finding on the Fourth Factor ................................... 64

(3)    Weighing of Fair Use Factors ................................................. 67

4.    THE DISTRICT COURT'S DENIAL OF SEDLIK'S MOTION FOR NEW TRIAL SHOULD BE AFFIRMED ........................................ 68

    A.    Sedlik Cannot Carry the Substantial Burden of Overturning the Denial of His Rule 59 Motion ……………………………….…68

    B.    The District Court Did Not Err in Submitting Fair Use to the Jury…...68

    C.    There Was No Error In the District Court's Instructions On The Second and Third Fair Use Factors ……………...…………...…70

5.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING SEDLIK'S TESTIMONY ................................................. 72

CONCLUSION ................................................................................................. 74

STATEMENT OF RELATED CASES ........................................................... 75

CERTIFICATE OF COMPLIANCE ............................................................. 76

CERTIFICATE OF SERVICE ....................................................................... 77

v

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021), *aff'd.,* 598 U.S. 508 (2023) ...... 50, 58

*Antonick v. Elec. Arts, Inc.*,
  841 F.3d 1062 (9th Cir. 2016), *cert. denied*, 583 U.S.
  969 (2017) .................................................................................. 46

*Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994),
  *cert. denied*, 513 U.S. 1184 (1995) ........................................42, 50

*Bell v. Moawad Grp., LLC*,
  326 F. Supp. 3d 918 (D. Ariz. 2018) ........................................ 59

*Bernal v. Paradigm Talent & Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) .................................... 48

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ...................................................... 65

*Brammer v. Violent Hues Prods., LLC*,
  922 F.3d 255 (4th Cir. 2019) .................................................... 60

*Bulgo v. Munoz*,
  853 F.2d 710 (9th Cir. 1988) .................................................... 71

*Cabrales v. Cnty. of Los Angeles*,
  864 F.2d 1454 (9th Cir. 1988), *vacated,* 490 U.S. 1087,
  *and opinion reinstated*, 886 F.2d 235 (9th Cir. 1989). ............. 56

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)………………………………………57, 64, 66

*Corbello v. Valli*,
  974 F.3d 965 (9th Cir. 2020), *cert. denied*,
  141 S.Ct. 2858 (2021) ............................................................... 44

*Danganan v. Am. Fam. Mut. Ins. Co.*,
    2018 WL 3660198 (D. Nev. Aug. 2, 2018) ............................... 72

*Deland v. Old Rep. Life Ins. Co.*,
    758 F.2d 1331 (9th Cir. 1985).................................................... 69

*Divine Dharma Meditation Int'l Inc. v.. Inst. of Latent Energy Stud.*,
    2021 WL 3721438 (9th Cir. Aug. 23, 2021) ..................... 36,57,70

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001).................................................... 52

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
    553 F. Supp. 3d 803 (S.D. Cal. 2021) ....................................... 47

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997).................................................. 50

*Dunlap v. Liberty Nat. Prod., Inc.*,
    878 F.3d 794 (9th Cir. 2017).................................................... 41

*Dupree v. Younger*,
    598 U.S. 729 (2023) ........................................................... 38, 39

*Escriba v. Foster Poultry Farms, Inc.*,
    743 F.3d 1236 (9th Cir. 2014)................................................. 41

*Estate of Diaz v. City of Anaheim*,
    840 F.3d 592 (9th Cir. 2016), *cert. denied*,
    581 U.S. 960 (2017).................................................................. 41

*Ets-Hokin v. Skyy Spirits, Inc.*,
    225 F.3d 1068 (9th Cir. 2000).................................................. 52

*Floyd v. Laws*,
    929 F.2d 1390 (9th Cir. 1991).................................................. 56

*Freund v. Nycomed Amersham*,
    347 F.3d 752 (9th Cir. 2003)............................................... 34, 56

*Funky Films, Inc. v. Time Warner Ent. Co.*,
    462 F.3d 1072 (9th Cir. 2006)......................................... 35, 42, 45

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021) ............................................................. 36, 57

*Gray v. Hudson*,
    28 F.4th 87 (9th Cir. 2022)................................................... 45, 46

*Griner v. King*,
    104 F.4th 1 (8th Cir. 2024)...................................................... 69

*Hannley v. Mann*,
    2023 WL 3407183 (C.D. Cal. Mar. 8, 2023) ............................ 60

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985) ........................................................ 59, 67

*Jensen v. EXC, Inc.*,
    82 F.4th 835 (9th Cir. 2023)..................................................... 39

*Johnson v. Grays Harbor Cmty. Hosp.*,
    2007 WL 4510313 (W.D. Wash. Dec. 18, 2007)...................... 72

*Kelley v. Morning Bee, Inc.*,
    2023 WL 6276690 (S.D.N.Y. Sept. 26, 2023) .......................... 62

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003).................................................... 65

*Kode v. Carlson*,
    596 F.3d 608 (9th Cir. 2010).................................................... 68

*Lanzilote v. Allwrite Commc'ns Inc.*,
    2024 WL 4005219 (N.D. Ga. July 18, 2024)............................ 60

*Leadsinger, Inc. v. BMG Music Pub.*,
    512 F.3d 522 (9th Cir. 2008).................................................... 60

*Locricchio v. Legal Servs. Corp.*,
    833 F.2d 1352 (9th Cir. 1987).................................................. 40

*LuMetta v. United States Robotics, Inc.*,
    824 F.2d 768 (9th Cir.1987).................................................... 72

*McGillvary v. Netflix, Inc.*,
    2024 WL 3588043 (C.D. Cal. July 30, 2024)............................ 63

*McGucken v. Pub Ocean Ltd.*,
    42 F.4th 1149 (9th Cir. 2022)................................................... 67

*McGuinn v. Crist*,
　　657 F.2d 1107 (9th Cir. 1981), *cert. denied*,
　　455 U.S. 990 (1982)...................................................................... 71

*N. Coast Indus. v. Jason Maxwell, Inc.*,
　　972 F.2d 1031 (9th Cir. 1992).................................................... 47

*N. Jersey Media Grp. Inc. v. Pirro*,
　　74 F. Supp. 3d 605 (S.D.N.Y. 2015)........................................... 59

*Oracle Am., Inc. v. Google LLC*,
　　886 F.3d 1179 (Fed. Cir. 2018), *reversed in part*,
　　593 U.S. 1 (2021).....................................................................36, 57

*Oriol v. H&M Hennes & Mauritz L.P.*,
　　2014 WL 12589636 (C.D. Cal. Feb. 10, 2014)......................... 52

*Ortiz v. Jordan*,
　　562 U.S. 180 (2011) .............................................................. 34, 38

*Philpot v. Indep. J. Rev.*,
　　92 F.4th 252 (4th Cir. 2024)....................................................... 60

*Rentmeester v. Nike, Inc.*,
　　883 F.3d 1111 (9th Cir. 2018), *cert. denied*,
　　139 S.Ct. 1375 (2019)…......……………....35,42,43,49,50,52,53,54

*Rogers v. Koons*,
　　960 F.2d 301 (2d Cir.), *cert. denied*, 506 U.S. 934 (1992)......... 50

*Sandoval v. New Line Cinema Corp.*,
　　147 F.3d 215 (2d Cir. 1998)....................................................... 55

*Seltzer v. Green Day, Inc.*,
　　725 F.3d 1170 (9th Cir. 2013).............................................. 64, 67

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
　　562 F.2d 1157 (9th Cir. 1977).................................................... 45

*Skidmore v. Led Zeppelin*,
　　952 F.3d 1051 (9th Cir.), *cert. denied*,
　　141 S. Ct. 453 (2020)…......…………………………35, 40, 45, 48

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .................................................. 58

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) .................................. 44

*Taylor v. Burlington N. R. Co.*,
787 F.2d 1309 (9th Cir. 1986) ............................... 72

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000), *cert. denied*,
531 U.S. 1126 (2001) ............................................. 44

*Tortu v. Las Vegas Metro. Police Dep't*,
556 F.3d 1075 (9th Cir. 2009) ............................... 55

*Tresóna Multimedia LLC v. Burbank High School Vocal Music Ass'n*,
953 F.3d 638 (2020) ......................................... 65, 66

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983) ............................... 48

*Unicolors, Inc. v. H &M Hennes & Mauritz, L.P.*,
2017 WL 11489792 (C.D. Cal. Nov. 15, 2017) ....................... 72

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
853 F.3d 980 (9th Cir. 2017) .................................. 46

*United States v. Hui Hsiung*,
778 F.3d 738 (9th Cir.),*cert. denied, 576 U.S. 1022 (2015)* ..... 70

*U.S. Bank Nat. Ass'n v. Vill. at Lakeridge, LLC*,
583 U.S. 387 (2018) .............................................. 69

*Valdez v. Rosenbaum*,
302 F.3d 1039 (9th Cir. 2002), *cert. denied*,
538 U.S. 1047 (2003) ............................................ 54

*Wallace v. City of San Diego*,
479 F.3d 616 (9th Cir. 2007) .................................. 41

*Williams v. Gaye*,
895 F.3d 1106 (9th Cir. 2018)………………………...34, 39, 44, 68

x

*Williams v. Kaag Manufacturers, Inc.*,
    338 F.2d 949 (9th Cir. 1964).......................................................... 45

**Other Authorities**

4 M. Nimmer & D. Nimmer, *Nimmer on Copyright*
    §13.05[A][4] (2019)……………………………………………….65

Federal Rules of Civil Procedure, Rule 37……………………………..73

## INTRODUCTION

Appellee Katherine Von Drachenberg ("Kat Von D") is a tattoo artist who inked a tattoo of Miles Davis for free on her friend Blake Farmer. At this time, she only tattooed friends and acquaintances as a gift. In inking the tattoo, Kat Von D used as a reference a photograph of Davis provided to her by Farmer. She drew her portrait freehand, creating her own interpretation of Davis. Appellant Sedlik, the photographer who created the reference photo, sued Kat Von D, her now closed tattoo studio and another of her companies claiming the tattoo, several social media posts showing the process of the creation of the tattoo, and a line drawing she used to fix the size and placement of the tattoo infringed his copyright.

After a trial on the merits, the jury unanimously concluded that the photograph on the one hand, and the tattoo (which they viewed on Farmer's arm) and virtually all the social media posts, on the other, were not substantially similar and that the one social media post that showed both the tattoo and the photographic reference was a fair use.

Sedlik now appeals, and his opening brief ignores most of the facts in the record and well-established Ninth Circuit law. He purports to appeal from the denial of his summary judgment motion even though the law is clear that he cannot following a trial on the merits. While review of the denial of a Rule 50(b) motion requires the Court to construe all facts in the prevailing party's favor, Sedlik

ignores every single fact in the record that supports the jury's verdict including those showing his testimony to be not credible.  He purports to challenge the jury's findings on substantial similarity but mistakenly believes that proof of copying is sufficient to establish unlawful appropriation, when it as a matter of law, it is not. He attempts to challenge the fair use verdict but fails to mention that he never filed a Rule 50(a) motion as to fair use (and therefore cannot appeal from it).  He complains that the jury decided the ultimate fair use issue, but fails to inform the Court that it was *his attorney* who proposed having the jury do so and that his attorneys submitted jury instructions and a verdict form providing for the jury to do so.

Sedlik has failed to show any reason to overturn the jury's verdict here and the judgment for Defendants should be affirmed.

## STATEMENT OF THE ISSUES

1.    May Sedlik appeal the denial of his summary judgment motion based on triable issues of fact after a trial on the merits?

2.    Construing the evidence in the light most favorable to Defendants, is there substantial evidence to support the jury's implied findings on the intrinsic and extrinsic substantial similarity tests even if contrary findings are also possible?

3.    Did Sedlik forfeit the right to appeal from the jury's finding on fair

use by failing to bring a Rule 50(a) motion on fair use?

4.      Construing the evidence in the light most favorable to Defendants, is there substantial evidence to support the jury's implied findings on the first and fourth factors of the fair use test as to the Process Posts, the only alleged infringement found to be a fair use?

5.      Has Sedlik shown an absolute absence of evidence sufficient to establish that the denial of his Rule 59 motion was an abuse of discretion?

6.      Did the District Court err in submitting the ultimate fair use question to the jury and, if so, was that error invited by Sedlik?

7.      Did the District Court abuse its discretion in excluding Sedlik's rebuttal expert testimony and, if so, was the error harmless given that there was no expert testimony to rebut?

8.      Did the District Court abuse its discretion in sustaining objections to several questions posed to Sedlik and, if so, was the error harmless?

## STATEMENT OF THE CASE

**1.    Summary Of Facts At Trial.**

**A.    Kat Von D and High Voltage Tattoo.**

Kat Von D started tattooing at the age of 14, after dropping out of high school.  2-ER-201, 231.  She became a professional tattoo artist at the age of 16.

14

1-SER-77.

She was the first female tattoo artist on the reality television series Miami Ink. 1-SER-87-88. She started to become known for portrait tattoos when, on the show, she tattooed a portrait of her client's two-year-old daughter who was dying of a rare disease. 1-SER-89-90. This tattoo changed the perception of who got tattoos and resulted in an influx of requests for portrait tattoos by Kat Von D. 1-SER-90.

Kat Von D later opened her own tattoo shop called High Voltage Tattoo. 2-ER-201; 1-SER-75, 90-91. High Voltage was a creative space for tattoo artists, and a space where Kat Von D could tattoo her friends in private. 2-ER-232.

Other tattoo artists at High Voltage paid a small percentage of what they earned towards overhead. 2-ER-232. High Voltage wasn't how Kat Von D made money; a majority of the time she had to pay to keep the shop open. 2-ER-232.

High Voltage closed in November of 2022 and Ms. Von D moved to Indiana where she is now a stay-at-home mother. 1-SER-91.

**B.**   **Beginning Over A Decade Ago, Kat Von D Stopped Charging For Tattoos And Only Tattooed Friends and Acquaintances.**

Kat Von D stopped charging for tattoos prior to 2014. 1-SER-77; 2-ER-232. When she first started tattooing, she made a promise to herself that she would work hard and when she got to the place where she was successful and making money in

15

other ways, she would stop charging for tattooing and it would be a gift she gave to people.  1-SER-78; 2-ER-203.

Since that time, she only inked tattoos for friends and close acquaintances. 1-SER-78; 2-ER-203.  It was not possible to book an appointment for a tattoo with her.  2-ER-223.

### C.   In 2017, Kat Von D Agreed to Ink A Tattoo, Without Charge, For Her Friend, Blake Farmer.

Blake Farmer is a friend of Kat Von D.  2-ER-204.  One day, Farmer told Kat Von D that he played the trumpet and how important Miles Davis was to him. 1-SER-95-96.  Ms. Von D offered that, if he wanted a tattoo of Davis, she would love to do it.  2-ER-200; 1-SER-72-73, 96.

The tattoo took two sessions, the first of which was in March 2017.  1-SER-79, 99-100.  Farmer did not pay anything to Kat Von D for the tattoo, nor did he provide products or services in exchange for the tattoo.   1-SER-70, 98.

### D.   Farmer Texted A Photo He Wanted Used As A Reference For His Tattoo.

Prior to the first session, Farmer texted to Kat Von D's assistant a digital file of a photograph which he wanted used as a reference.  1-SER-69-70; 2-ER-207, 262-64.  He chose that photograph because "it was simple" and other photographs of Davis that he had seen depicted him playing the trumpet and

16

Farmer didn't think a trumpet would be suitable for an arm tattoo. 2-ER-200.

Kat Von D did not try to determine who photographed the reference photo. 2-ER-208. She had never previously obtained permission from a photographer to use a photograph as a reference for a tattoo, nor heard of anybody in the tattoo industry who has done so. 2-ER-209; 1-SER-92-93, 115.

She had never previously received any complaints about photographs on social media of her portrait tattoos inked based on photograph references. 1-SER-115. To the contrary, when photographers contacted her about tattoos based on their photographs, they always considered it "one of the biggest compliments." 1-SER-94.

### E.    The Process for Inking Farmer's Tattoo.

Sedlik's opening brief makes it seem as if Kat Von D's process in inking Farmer's tattoo was to slavishly copy Sedlik's photograph. Her testimony was to the contrary.

Kat Von D used Sedlik's photograph as an artistic reference. 2-ER-208. She always used references for portrait tattoos. 1-SER-76.

When using a photograph reference, Kat Von D does *not* copy the photograph; she does her own interpretation in collaboration with the client (with whom she first consults about his or her ideas). 1-SER-84-85, 95-97.

Her goal is not to copy the photograph as closely as possible. 1-SER-97.

Rather, when she tattoos a portrait, she tries to capture the sentiment of the person that is being tattooed. 1-SER-76; 2-ER-202. That's who the person getting the tattoo admires and wants to get on his or her arm. 1-SER-97.

The process of creating Farmer's tattoo (and tattoos in general) is as follows:

      **(1)**    <u>**Creation of Line Drawing To Determine Placement and Size of the Tattoo.**</u>

The first step was to determine the size and placement of the tattoo on Farmer's arm. Here is how she did that:

First, Kat Von D created a line drawing, using tracing paper on the photographic reference. 2-ER-210-11; 2-SER-276. She did *not* trace the photo, however. 2-ER-210-11. Rather, she mapped out the placement of the eyes, nose, and mouth. 2-ER-210-11; 2-SER-276.

The second preliminary step was to convert the line drawing onto carbon paper using a thermal fax machine and apply that to Farmer's arm. 2-ER-213-14; 2-SER-277. This created a purple image on the skin when the thermal paper was peeled off. 1-SER-102.

This is an opportunity for the person being tattooed to approve the size and location of the tattoo. 2-ER-214; 1-SER-97-98, 101. Kat Von D would warn the client that the stencil is not what the final tattoo is going to look like. 1-SER-101.

The stencil is not permanent; it washes off and *none of it remains* when the

tattoo is finished.  1-SER-98.

Exhibit 202 is Kat Von D's line drawing of Farmer's tattoo.  1-SER-101, 2-SER-261.



None of the lines on the line drawing were in the final tattoo.  1-SER-101, 2-ER-233.

This line drawing was one of the claimed infringements by Sedlik.  1-ER-20.

### (2)    <u>Freehand Inking of Tattoo</u>.

Once the placement and size of the tattoo was approved, Kat Von D then used a skin pen to draw her composition on Farmer's arm.  2-SER-277.  She did not merely re-trace the lines of the line drawing that was temporarily transferred to Farmer's skin.  2-SER-277.  She then used a liner machine to permanently set the skin pen drawings and to sketch a topographical map of where her freehand shading would go.  2-ER-214-15; 2-SER-279.  Then the freehand shading started.  2-ER-394.

99% of the tattoo consisted of freehand shading.  1-SER-82.  Some of the

19

lines were also freehand, like the wrinkles in Davis's face.  1-SER-82-83.

### (3)    **Farmer's Tattoo.**

The jury (and the judge) got the opportunity to see the actual three-dimensional tattoo when Farmer displayed his arm to them.  1-SER-71, 74.  In addition, Exhibit 217 is a video of the tattoo that shows the entire radius of the tattoo including detail not visible in the still photo.  1-SER-106-107.



1-SER-7.

As Kat Von D testified[1] and confirmed by comparison of the actual tattoo on Farmer's arm and Sedlik's photograph, there are numerous material differences between the tattoo and the photograph including:

Kat Von D's free hand shading was her own interpretation of the lighting and highlights on Davis's face.  2-ER-218; 1-SER-82-83, 2-SER-278 ("my interpretation of the tattoo added shading, highlights, and texture to a number of

---

[1]    We cite both to Ms. Von D's trial testimony and to her declaration which was admitted into evidence at trial.  1-SER-34.

parts of Miles Davis's face").

As a result, the jawline "does not match the photograph itself." 1-SER-107. She put the jawline intuitively where she thought it would go. 2-ER-233.

The forehead is different: she didn't put veins in his temple and the brow is not furrowed like in the photo. 1-SER-103.

The eyes are Ms. Von D's own interpretation: for example, Sedlik's reflection is visible in the photograph but not in the tattoo. 2-ER-233; 1-SER-103.

The waves and highlights in Davis's hair are her own interpretation and different from the photograph. 1-SER-81, 107; 1-SER-80 ("The hairline is different because it's my interpretation of telling the story"); 2-SER-279 ("The smoke swirls through Miles Davis's hair and hand, creating a kind of 'visual noise' that flies all around the tattoo and gives the sense of movement").

Kat Von D's version of Davis's hair was going to lead into further tattoos on Farmer's arm; Farmer wanted to get an entire sleeve of Davis inspired tattoos. 2-ER-220, 234; 1-SER-70, 80, 96. These differences were part of her composition and her interpretation. 1-SER-80.

The wrist in the tattoo is not the wrist in the photograph: "instead of like fully polishing and rendering it," she "just wanted to make it more abstract and give . . . almost like a watercolor feeling." 1-SER-104.

None of the clothing from the photograph appears in the tattoo. 1-SER-103.

The background contains texture and movement not included in the original photograph.  2-ER-216, 234 ("I started putting like the negative space and you see like that texture that kind of is a little bit smoky"); 2-SER-278 ("The original photograph had a stark, black background and this blended into the black clothing that Miles Davis was wearing.  I chose not to have a stark black background . . . and instead used the shading process to create dimension, shadows, and highlights and create an altogether lighter and softer image.  In this way, Miles Davis's face seems to stand out from the skin and maps onto the contours of Mr. Farmer's upper arm.")

### F.     <u>Kat Von D Posts On Social Media Photos of Various Stages of The Tattoo But Does Not Advertise Or Promote On Any Of The Posts</u>.

Kat Von D uses social media to share her life with fans and followers.  (2-ER-223.)   The majority of posts are personal posts, such as Ms. Von D hanging out with friends or photos of relationships.  1-SER-108-109.  She has never done paid advertisements on her social media.  1-SER-86.

The social media posts involving the tattoo fall into several categories:

### (1)     <u>Messy Progress Posts</u>

While working on shading on Farmer's tattoo, Ms. Von D took a photo of what she thought was an interesting perspective on the process of a tattoo.  1-SER-112.  She thought "the realness of the grit and the ink . . . a little bit of [Farmer's]

blood at the bottom . . . was a really like cool photo to show [her] followers and

fans." 1-SER-112. She posted this photo on Instagram (and it was automatically

posted as well on Facebook). 1-SER-109, 111-112. The post appeared as follows:



3-ER-470-71.

The Messy Progress Posts did not include links for any products being sold,

nor was Kat Von D trying try to promote anything with them. 1-SER-112, 113.

**(2)    Process Posts**

There were four social media posts which depicted a photograph of Kat Von

D in the process of inking Farmer's tattoo and showing Sedlik's photograph in the

background. 3-ER-468-69, 475-76. The posts appeared as follows:



Kat Von D made these Process Posts because she likes to share the process of her

daily life with friends and followers.  1-SER-110.

None of the Process Posts had a link where products could be purchased.  1-SER-111.  She was not promoting any kind of product with the posts.  1-SER-111.

### (3) Instagram Story Reel.

Kat Von D also posted an Instagram "story" which consisted of a five-minute long series of videos of Ms. Von D in the process of inking different tattoos.  3-ER-484, 1-SER-47, 67, 2-SER-265-74.  About 15 seconds of this Instagram Story Reel was of Ms. Von D inking Farmer's tattoo.   1-SER-67.

### (4) Finished Tattoo Post

Kat Von D posted on her social media a photograph she took of the completed tattoo on Farmer's arm.  3-ER-472-74, 3-ER-477-79; 1-SER-113.  She wasn't trying to promote anything when she made this post.  1-SER-114-115.

### (5) Light Box Video Post

Sedlik also complained about a social media post displaying Kat Von D working on the line drawing at a light box, depicting an unrecognizable, blurred version of Sedlik's photograph.



1-ER-60, 3-ER-511.

### G.     No Marketing or Sales

Kat Von D never sold or manufactured merchandise containing the tattoo, nor did she make any money in connection with it.  1-SER-104.

### H.     Sedlik's Testimony Was Not Credible.

Aside from being a photographer and professor, Sedlik works as a expert witness, promoting himself on www.photographyexpertwitness.com.  1-SER-55-56.

His testimony lacked credibility for a number of reasons:

### (1)     Sedlik Refused To Give Direct Answers to Simple Questions.

Sedlik gave rambling, non-responsive answers to simple questions and the district court repeatedly admonished him for not answering the question asked.  1-SER-39, 49-50, 64; *see also* 1-SER-58 ("Your client's an expert witness.  He's testified apparently quite a few times.  If he can't answer a question once with a

25

'no' instead of going on to have him ask it three times, I'm going to count that against you.  He knows exactly what he's doing.").

**(2)** **Sedlik's Testimony About The Sole "License" He Entered Into With Tattoo Artist Brian Vanegas Was Directly Contradicted By Vanegas.**

Sedlik insisted that he had entered licenses with tattoo artists for use of photographic references but the only example he could give was of a license with Bryan Vanegas.  1-SER-41.  This license was first produced by Sedlik after discovery-cut off and resulted in the reopening of discovery so that Defendants could depose Vanegas.  1-SER-160-63.  Vanegas' videotaped deposition was played at trial and starkly contrasted Sedlik's testimony.  1-SER-117, 122-147.

Vanegas testified that, about ten years ago, he inked a tattoo of Davis, using Sedlik's photograph as a reference.  1-SER-133-134.  This was the first portrait Vanegas had ever done and he inked it on a friend for free.  1-SER-133-134.  Consistent with Kat Von D's testimony about the tattoo industry, Vanegas did not ask Sedlik for a license before inking the tattoo.  1-SER-134.

Vanegas posted a photograph of the tattoo on a social media account, and, though Sedlik swore the account had only "three" followers, he somehow found the post and contacted Vanegas.  2-ER-160.

It is what happened after that is disputed.  Sedlik claims that he called

Vanegas "[t]o ask whether or not he had a license" and "without mentioning anything about court or lawsuits." 1-SER-62. Sedlik testified that, because Vanegas was "appreciative and apologetic," he decided to "grant him a retroactive license and use that as an educational opportunity." 2-ER-160.

Vanegas's testimony told a completely different story: Vanegas testified that he received a written message from Sedlik accusing Vanegas of stealing his photograph and threatening to sue Vanegas for ten thousand dollars or more. 1-SER-131-33, 135-36, 140, 141-43. Referring to the social media post on which Vanegas posted a photograph of the tattoo, Sedlik said: "Those are my likes; those are my comments. You don't deserve them." 1-SER-136, 141-143. Vanegas testified: "it seemed very bullying, like some guy on the West Coast was coming after a young, not even known tattoo artist at the time, and threatening to sue for, like I said, around $10,000." 1-SER-144.

Sedlik's attitude quickly changed when Vanegas said he didn't have any money. 1-SER-137-138, 145. Sedlik then told Vanegas that they were going to "present or act like [Vanegas] had asked for permission." *Id.*[2]

Sedlik then sent Vanegas a document which purportedly "retroactively" licensed Vanegas the right to use Sedlik's photograph as an artist's reference "in

---

[2]     Sedlik swore this conversation never happened and similarly denied that he had threatened a lawsuit against Vanegas or told Vanegas the dollar amount he'd have to pay if he got sued. 1-SER-60-61, 63.

perpetuity" "on one person only."  3-ER-493-44; 1-SER-137-39.  The License listed a license fee of "$0.00" but noted a "$5,000 license fee waived as a professional courtesy."  3-ER-493.  Per Vanegas, Sedlik never discussed any license fee and Vanegas never paid anything to Sedlik.  1-SER-140.

The license had no signature line for Vanegas (though it did have a place for him to initial on the second page.)  3-ER-493-94.  Sedlik didn't ask him to sign the license and Vanegas never did.  1-SER-139.  Vanegas immediately took his post down.  1-SER-146-47.

### (3)  Though He Claimed His PLUS Organization Developed Standards for Photographer/Tattoo Artist Licenses, Sedlik Could Produce No Such License, Other Than The Sham Vanegas License.

Sedlik is the president of the PLUS Coalition, an organization that he contends "work[s] to simplify the communication of rights information between people who create images . . . and the people who distribute those art works."  1-SER-38.  Sedlik testified that the PLUS Coalition has tattoo artist members.  1-SER-40.

Sedlik testified that the PLUS Coalition had "1500 people" working in 2004-2005 developing "standards" for the licensing of photographs for use as references for tattoos.  1-SER-39.  Sedlik offered no documents to support that any such

standards were ever developed (or that anyone was working to develop such standards) and could not produce a single witness or document (with the exception of the "license" he bullied Vanegas into "acting as if" they entered into) evidencing *any* license actually entered into between a tattoo artist and a photographer.  1-SER-27-36.

### (4) Sedlik's Webpage Is An After-The-Fact Creation To Make It Look As If He Has Entered Into Licenses With Tattoo Artists.

Sedlik introduced into evidence a page from his website, printed out in February 2022, which lists all the different ways he would license out his photographs.  3-ER-285-90.  "Tattoos" are – conveniently – listed as the *first example* of an artist reference.  3-ER-286.  Sedlik admitted that the webpage has been changed over the years and that he has no record of those revisions or of when the word "tattoo" first appeared on the webpage.  1-SER-59-60.  Sedlik therefore could not establish that this was not a change he made – to bolster his lawsuit – *after* he discovered Farmer's tattoo, and Defendants' counsel specifically argued to the jury that Sedlik's testimony on this was not credible.   1-SER-54, 121.

**(5)**     **Sedlik Could Not Prove That He Ever Licensed His Photograph For the Kind of Social Media Use At Issue Here.**

Sedlik testified that he "typically charge[d]" $1,500 to $2,000 for a license to use one of his photographs in a social media post and $1,000 and $2,000 for a "typical license" for use of one of his photographs on Twitter to a user with greater than a million but less than 10 million followers.  2-ER-199, 1-SER-51.  On Sedlik's webpage, he invited private social media users to contact him for a license if they wish to post his photo to their personal Facebook or Instagram pages.  1-SER-61-62.

But despite producing over 10,000 pages of documents, Sedlik was unable to offer as an exhibit a single one of these supposedly "typical" licenses nor, for that matter, evidence that anybody ever paid him to license the use of his photograph solely on a social media post.  1-SER-27-36, 57.

Indeed, the sole license introduced by Sedlik that even mentions social media is a very different kind of license between Sedlik and an artist who was going to add colors and designs to Sedlik's photograph and sell 30 printed reproductions.  1-SER-65-66; 3-ER-493-500.  That license allowed display of the painted photograph on social media.  (*Id.*)

**(6)** **Sedlik Did Not Have Kat Von D's Social Media Posts Taken Down, But Rather Demanded That They Be Kept Up.**

Sedlik is experienced in sending DMCA takedown requests, but admitted making a deliberate decision not to takedown the social media posts at issue here. 1-SER-52-53.  To the contrary, when he first sent a demand letter by e-mail to Kat Von D – at 1:39 a.m. on Christmas Eve, 2020, more than 1 ½ years after he claims to have discovered the posts – Sedlik demanded that Kat Von D "preserve" and not "delete or destroy" the posts.  3-ER-455-56.  Sedlik's failure to make any effort to have these posts taken down revealed the lack of credibility in Sedlik's testimony that the mere existence of these posts "affects [his] ability drastically to be able to license [his] work."  2-ER-189.

Sedlik also conceded that nobody ever told him that they wouldn't buy a print of his photograph because of Kat Von D's social media posts.  1-SER-116-17.

**2.** **Relevant Procedural History.**

**A.** **The District Court Precluded Defendants' Expert Testimony.**

Defendants timely designated three expert witnesses:

Dr. Anna Friedman, a Ph.D. art historian specializing in tattoo history and culture, is one of the world's foremost experts on tattooing and taught college level art classes about global, interdisciplinary tattooing at the School of Art Institute in

31

Chicago.  1-SER-174-95.  Dr. Friedman had extensive experience in visual, structural, and comparative analysis of photographs compared to artwork in other genres.  1-SER-164-73.  Dr. Friedman's report provided a detailed analysis of significant differences between the elements Sedlik claimed made his photograph distinctive and the tattoo itself.  1-SER-183-86.

Defendants offered two experts to testify on the absence of (and non-likelihood of development of) a market in the tattoo industry for the licensing of photographic references:  Prof. David Lane, a sociology professor, who studied and researched the tattoo profession and tattoo workers from an academic perspective, and published numerous articles about tattooing in academic journals, and Catherine Montie, a tattoo artist and tattoo shop owner with 47 years of experience in the profession, having worked at and owned tattoo shops all over the country.  1-SER-196-202, 2-SER-205-54.

The district court excluded Friedman's testimony entirely, and allowed Defendants to call either Montie or Lane but solely for the purpose of testifying about custom and practice in the tattoo industry with respect to obtaining licenses for use of references and *only* for the limited purpose of addressing the issue of willfulness.  2-ER-284-86.  The court precluded use of Lane's and Montie's opinions in support of the fourth fair use factor, and held that Friedman didn't have sufficient specialized knowledge to be able to compare the tattoo and photograph.

1-ER-130, 281, 284.

### B. Sedlik's Counsel Proposed Having The Jury Decide The Ultimate Fair Use Question And Submitted Jury Instructions and a Verdict Form To Have Them Do So.

Though he now claims it was error to have the jury decide the ultimate fair use issue, it was Sedlik's counsel who proposed that fair use be determined by the jury: "the jury is entitled to make the determination of fair use. . . . [Y]our honor would be in a position to instruct the jury on existing understanding of fair use, and under these facts, it would be their determination."  1-SER-20.

Sedlik's counsel also submitted jury instructions and a special verdict form providing for the ultimate fair use question to be decided by the jury.  1-SER-148-59.


## SUMMARY OF THE ARGUMENT

In his brief, Sedlik seeks reversal of orders that cannot be appealed, and, for those orders that are appealable, ignores the standard under which such orders are to be reviewed, misclassifying highly factual disputes as "issues of law."  He does all this while ignoring the vast amount of the record that supports the jury's verdict and actions of his counsel which invited the error about which he now complains.

Sedlik cannot appeal the denial of his motion for summary judgment

because there was a full trial on the merits and "the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Ortiz v. Jordan*, 562 U.S. 180, 183-84 (2011).  While there is a narrow exception to this rule for a "purely legal question. . . whose answer is independent of disputed facts," the denial of his motion was based on numerous triable issues of fact which are not the kind of "purely legal" questions that the exception contemplates.  *See, e.g. Williams v. Gaye*, 895 F.3d 1106, 1122 (9th Cir. 2018) (refusing to consider appeal from denial of summary judgment on copyright infringement because "application of the extrinsic test of similarity was a factbound inquiry" and [the District Court's] ruling "bears little resemblance to legal issues we have reviewed pursuant to our exception").

Nor does Sedlik fare better with his appeal from the denial of his Rule 50(b) motion.  He didn't bring a Rule 50(a) motion as to fair use and cannot challenge that part of the verdict at all.  *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

Though he did bring a Rule 50(a) motion on substantial similarity, to overturn the jury verdict Sedlik must show that the record lacks substantial evidence for *both* the intrinsic test and extrinsic test and he cannot do either.  The Ninth Circuit has repeatedly stated that reviewing courts should not second guess a jury's application of the intrinsic test, which examines "an ordinary person's

34

subjective impressions of the similarities between two works." *Funky Films, Inc.*
*v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006), *overruled on other*
*grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir.), *cert. denied*, 141
S.Ct. 453 (2020). Sedlik offers no valid reason for this Court to overturn the jury's
subjective decision on the intrinsic test (nor has he shown that the Court has ever
done so before). Rather, Sedlik confuses the two prongs of the substantial
similarity test – copying and unlawful appropriation – trying to bootstrap evidence
of copying (which establishes only the first prong) into proving the second prong
of unlawful appropriation. There is no basis for this Court to overturn the jury's
holistic and subjective determination under the intrinsic test and that alone is
reason to affirm the judgment.

The same is true for the extrinsic test in which the jury assessed the
objective similarities between the combination of creative choices made by Sedlik
and the challenged tattoo and social media posts. *Rentmeester v. Nike, Inc.*, 883
F.3d 1111, 1118 (9th Cir. 2018), *cert. denied*, 139 S.Ct. 1375 (2019).[3] For certain
of the challenged uses -- the Messy Progress Posts and the KVD at the Light Box
video – there are virtually no similarities at all. As for the tattoo, critical creative
choices made by Sedlik, such as lighting, shading, clothing, and the appearance of
Davis's hair, are not in the least bit similar. That is substantial evidence for the

---

[3]     *Rentmeester* was overruled on other grounds in *Skidmore*, 952 F.3d 1051.

jury to have decided that the extrinsic test favored Defendants.

Even had Sedlik not waived the right to challenge the fair use verdict, there is no basis to overturn the only finding the jury made on fair use with respect to the Process Posts.  Because the verdict form did not ask the jury to articulate its fact findings in detail, this Court must assume that they jury resolved *all factual issues* relating to the historical facts in favor of the verdict.  *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 23-24 (2021); *Divine Dharma Meditation Int'l Inc. v. Inst. of Latent Energy Stud.*, 2021 WL 3721438, at *1 (9th Cir. Aug. 23, 2021).

There was more than sufficient evidence in the record to support the jury's implied factual findings in favor of Defendants on the first and fourth fair use factor.  Because the Process Posts had no advertising and promoted no product, and because Kat Von D was no longer providing tattoo services for sale, the jury's implied finding of noncommerciality should not be reversed.  Similarly, the record shows that the purposes of Sedlik's photograph and the Process Posts were not the same:  the photograph was to display the image of Miles Davis while the Process Posts were to show Kat Von D's process of creating a tattoo.  There was substantial evidence from which the jury could find that the Process Posts were transformative.

On the fourth factor, the Process Posts are obviously not a substitute for Sedlik's photographs.  The jury had every reason to disbelieve Sedlik's testimony

36

and – given his claimed "experience" in creating standards for licensing photographs for use in tattoos – could infer the lack of any existing or potential market from Sedlik's inability to produce any witness or document showing that anybody had ever licensed a photograph for use in a tattoo other than the sham Vanegas license. In any event, because the Process Posts were transformative, market harm is less easily inferred. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). Therefore, there was substantial evidence to support the jury's inferred findings on the first and fourth fair use factors and, given the importance of those factors, the Process Posts were a fair use.

Sedlik's complaints about jury instructions are both meritless and invited error. It was *his counsel* who insisted that the jury decide the fair use issue and his lawyers submitted jury instructions and special verdict forms calling for them to do so. Moreover, having the jury decide the ultimate fair use question (to be reviewed by the district court de novo) is precisely the approach approved in *Google*, 593 U.S. at 16, 24-25.

Sedlik also complains about the exclusion of his expert testimony, but fails to mention that he was designated only as a rebuttal expert and Defendants called no expert in its case so there was no testimony to rebut. In any event, the only subject on which Defendant's expert was permitted to testify was on custom and practice in the tattoo industry and the district court did not abuse its discretion in

concluding that Sedlik was no expert in that area.

The judgment in this case should be affirmed.

## ARGUMENT

1.   **SEDLIK CANNOT APPEAL THE DENIAL OF HIS SUMMARY JUDGMENT MOTION.**

Sedlik appeals from the denial of his motion for summary judgment. (Appellant's Opening Brief ("AOB"), pp. 3-4.)  But he cannot do so.

A party may not appeal an order denying summary judgment after a full trial on the merits.  *Ortiz*, 562 U.S. at 183-84.  Indeed, "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion."  *Id*.  *See also Dupree v. Younger*, 598 U.S. 729, 735–36 (2023) ("an appellate court's review of factual challenges after a trial is rooted in the complete trial record, which means that a district court's factual rulings based on the obsolete summary-judgment record are useless").[4]

There is an exception to the *Ortiz* rule when the summary judgment

---

[4]      The summary judgment record here is not the same as the trial court record. On substantial similarity, the jury (and Court) were able to view the tattoo on Farmer's arm in three dimensions at trial; that was not the case on summary judgment. 1-SER-71-74.  Sedlik acknowledged the importance of seeing the actual tattoo when he argued to exclude the testimony of Defendants' expert Friedman on the ground that "she had never personally examined the tattoo at issue in this case." 1-SER-257.  There are also differences in the record at trial versus summary judgment on the sources of alleged similarity – an essential element of the extrinsic test as discussed below.  *Compare* 2-ER-363-67 *with* 2-ER-314-26.

involved "a purely legal question," that is, "one whose answer is independent of disputed facts." *Jensen v. EXC, Inc.,* 82 F.4ᵗʰ 835, 857 (9th Cir. 2023), *quoting*, *Dupree*, 598 U.S. at 735-36. The orders denying Sedlik's summary judgment motion and motion for reconsideration, however, were based on the existence of multiple triable issues of fact on substantial similarity and fair use. 1-ER-101-06, 1-ER-122. Therefore, the exception does not apply. *See Williams*, 895 F.3d at 1122 (refusing to consider appeal from denial of summary judgment order in copyright infringement case because "[t]he district court's application of the extrinsic test of similarity was a factbound inquiry" and its ruling "bears little resemblance to legal issues we have reviewed pursuant to our exception").

Sedlik and his amicus briefs insist that the denial of the summary judgment motion was an "injustice" that this Court must correct. This is not the first time such an argument has been made and rejected by this Court:

> To be sure, the party moving for summary judgment suffers an injustice if his motion is improperly denied. This is true even if the jury decides in his favor. The injustice arguably is greater when the verdict goes against him. However, we believe it would be even more unjust to deprive a party of a jury verdict after the evidence was fully presented, on the basis of an appellate

39

> court's review of whether the pleadings and affidavits at
> the time of the summary judgment motion demonstrated
> the need for a trial.

*Locricchio v. Legal Servs. Corp.,* 833 F.2d 1352, 1359 (9th Cir. 1987).

Sedlik, therefore, cannot obtain review of the denial of his motion for summary judgment.

## 2. THE TRIAL COURT'S DENIAL OF SEDLIK'S RULE 50(b) MOTION AS TO SUBSTANTIAL SIMILARITY SHOULD BE AFFIRMED.

To prove copyright infringement, Sedlik had to prove that Defendants "copied protected aspects" of his work. *Skidmore,* 952 F.3d at 1064. That requires proof of two separate components: "copying" and "unlawful appropriation." *Id*. Defendants did not dispute the copying prong but did dispute unlawful appropriation. To prove unlawful appropriation, Sedlik had to prove substantial similarity between his work and the challenged works. *Id*. In the Ninth Circuit, to prove that defendant's work is substantially similar to plaintiff's copyrighted work, a plaintiff must satisfy both the intrinsic test and the extrinsic test. *Id*.

Though the district court's denial of his Rule 50(b) on substantial similarity is reviewed de novo, the Court must still "apply the same standard used by the

district court in evaluating the jury's verdict." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

That standard is whether "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017), *quoting, Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 604 (9th Cir. 2016), *cert. denied*, 581 U.S. 960 (2017). "A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Dunlap,* 878 F.3d at 797, *quoting, Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014). The court must "draw all reasonable inferences in favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Escriba*, 743 F.2d at 1242-43.

Sedlik's brief ignores these rules. He disregards all of the evidence in favor of Defendants; he does not draw inferences in Defendants' favor. Instead, he "cherry-picks" the evidence he likes and ignores everything else, and suggests that the Court should view the evidence as if this case never went to trial.

When all the evidence is viewed under the standards for review of an order denying a Rule 50(b) motion, there is no question but that there was substantial evidence from which a reasonable jury could find for Defendants on both the

intrinsic and extrinsic tests.[5]   We start first with a discussion of the intrinsic test because if the Court affirms the jury's implicit finding on the intrinsic test, it need not even address the extrinsic test.

**A.**     <u>**The Jury's Finding On The Intrinsic Test Should Not Be Reversed**</u>.

**(1)**     <u>**The Intrinsic Test Examines An Ordinary Person's Holistic and Subjective Impressions Of The Similarities In The Works**</u>.

Sedlik's brief never addresses what it is that the intrinsic test examines and it's not difficult to see why.  The intrinsic test examines "an ordinary person's subjective impressions of the similarities between two works." *Funky Films,* 462 F.3d at 1077.  It "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994), *cert. denied*, 513 U.S. 1184 (1995).  It "requires a more holistic, subjective comparison of the works to determine whether they are substantially similar in 'total concept and feel.'" *Rentmeester*, 883 F.3d at 1118.

---

[5]     The jury found that the tattoo and all but one of the social media posts (the Process Posts) were not substantially similar.  Because the Process Posts displayed Sedlik's actual photograph, Defendants admitted substantially similarity as to those posts only.

The jury here consisted of eight ordinary persons who gave their subjective and holistic impressions and unanimously concluded that there was no substantial similarity between Sedlik's photograph, on the one hand, and the tattoo, the Messy Progress Posts, Final Tattoo Posts, Instagram Story Reel, and Light Box Post, on the other hand.

In arguing that the jury's subjective conclusion should be rejected, Sedlik cites to testimony that both he and Kat Von D were trying to create a melancholy aesthetic or sentiment. (AOB 42.) But that has nothing to do with an ordinary observer's subjective impression of similarities and is irrelevant to the intrinsic test.

Sedlik also repeatedly states that Kat Von D "admitted" that she copied the photograph. But admission of copying only proves the first prong of the infringement test; it does _not_ prove unlawful appropriation. Sedlik has to prove more than just "actual" copying to prove unlawful appropriation and that is where the intrinsic and extrinsic tests come in. *See Rentmeester* 883 F.3d at 1117 ("Proof of unlawful appropriation—that is, illicit copying—is necessary because copyright law does not forbid all copying").

Finally, Sedlik and his amicus supporters in essence argue that *they know better than the jury* about what an ordinary person's subjective impressions would

43

be and assert the reasons *they* think there are substantial similarities. It's a circular argument: "I think they are substantially similar and therefore they are."

But whether Sedlik and his amici think there are substantial similarities just doesn't matter. The intrinsic test is a subjective one designed for the jury to reach a holistic conclusion and that is what they did. While not everybody would reach the same conclusion, these jurors did – having seen the actual tattoo on Farmer's arm as well as the relevant social media posts -- and their subjective conclusions should not be reversed.

### (2)    **The Ninth Circuit Has Repeatedly Stated That Reviewing Courts Should Not Second Guess a Jury's Application of the Intrinsic Test.**

The intrinsic test "involves questions of fact determined by the jury." *See Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2858 (2021).

The Ninth Circuit has repeatedly stated that reviewing courts should not second guess a jury's application of the intrinsic test. *Williams*, 895 F.3d at 1127, *quoting*, *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), *cert. denied*, 531 U.S. 1126 (2001) ("[W]e are generally reluctant to disturb the trier of fact's findings, and . . . [w]e will not second-guess the jury's application of the intrinsic test.'"). *See also Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004)

44

("the subjective question whether works are intrinsically similar must be left to the jury"); *Funky Films*, 462 F.3d at 1077 (the intrinsic test "is exclusively the province of the jury").

The reason why the intrinsic test is "uniquely suited for determination by the trier of fact" and that the court "must be reluctant to reverse it," is because of the "inappropriateness of substituting our judgment for that of the trial judge on questions of fact.  The more vague the test, the less inclined we are to intervene." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir. 1977), *overruled on other grounds by Skidmore,* 952 F.3d 1051, *quoting, Williams v. Kaag Manufacturers, Inc.*, 338 F.2d 949, 951 (9th Cir. 1964).

This is why Sedlik was unable to find a single case in which the Ninth Circuit reversed on the merits a jury's finding on the intrinsic test.  Indeed, the two cases Sedlik cites for the proposition that "[j]ury verdicts on substantial similarity may be reviewed and reversed by this Court" make Defendants' point.  Sedlik cites *Gray v. Hudson*, 28 F.4th 87, 97 (9th Cir. 2022), in which the Ninth Circuit affirmed the trial court's order vacating a jury's verdict for the plaintiff on copyright infringement on the ground that, as a matter of law, plaintiff failed to satisfy the *extrinsic* test.  The Ninth Circuit emphasized that review of a jury's decision on the extrinsic test is different than review of the jury's decision on the intrinsic test: "the intrinsic test for substantial similarity is 'uniquely suited for

45

determination by the trier of fact' because of its focus on the lay listener, and so 'this court must be reluctant to reverse' a jury's finding that two works are intrinsically similar." *Id.* at 97. *Gray* stands for the exact opposite proposition set forth by Sedlik.

Sedlik also cites *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016), *cert denied*, 583 U.S. 969 (2017), in which the Ninth Circuit affirmed the grant of a Rule 50 motion *because the alleged infringing work was not in evidence* and "[t]he jury therefore could not compare the works" and could not then have found in favor of Plaintiff on the intrinsic test. *Id.* Since the accused infringements were in evidence here, *Antonick* is irrelevant.

This Court should not second guess the jury's holistic and subjective determination of the intrinsic test and the judgment should be affirmed.

### (3)     *Unicolors* Does Not Help Sedlik.

Apparently recognizing that there is no valid basis to overturn the jury's conclusion on the intrinsic test, Sedlik argues that "the intrinsic test is not needed" because (he insists) the objective similarities are so "overwhelming." (AOB 41.) In support of this novel argument, Sedlik cites *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 986-87 (9th Cir. 2017). But *Unicolors* stands for no such thing.

In *Unicolors*, the Ninth Circuit affirmed the district court's order granting summary judgment in favor of plaintiff on a copyright infringement claim. The

Ninth Circuit did not hold that the intrinsic test was not needed; rather, it held that in "exceptional cases" where the works are "near duplicates," a Court on summary judgment can decide "that no reasonable jury could find that the works are not substantially similar in their overall concept and feel." *Id.* at 987.

*Unicolors* does not apply for several reasons. First, Sedlik's summary judgment motion was denied and, as noted above, he cannot appeal it, so what would or should have happened on summary judgment does not matter. No court has relied on *Unicolors* to overturn a jury verdict on substantial similarity.

Second, this is not an exceptional case. Historically, the cases applying *Unicolors* to find in favor of a plaintiff on the intrinsic test are "exceedingly limited." *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 553 F. Supp. 3d 803, 815 (S.D. Cal. 2021).[6] Kat Von D's hand-inked tattoo is by no means identical to Sedlik's photograph (let alone the Messy Progress Post which is not at all similar). The fact that a jury found they were not similar *and* the district court found that there was a dispute of fact on similarity is sufficient to show that this case is not the kind of exceptional case to which *Unicolor* was referring.

---

[6]     *N. Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1034 (9th Cir. 1992), a case before *Unicolors*, stated the test slightly differently: "summary judgment has been granted where no reasonable trier-of-fact could find even trivial differences." This is not a case where no reasonable trier of fact could find "trivial differences."

47

Moreover, it is not at all clear that *Unicolor* survives the Ninth Circuit's decision in *Skidmore*. In *Unicolor*, the Court did not separate the tests for copying and unlawful appropriation as now required by *Skidmore*. To the contrary, it required only a proof of "copying," established by proof of access and substantial similarity. *Unicolors*, 853 F.3d at 956. *Unicolors* then held that a court can decide the intrinsic test as a matter of law if the works are "so overwhelmingly identical that *the possibility of independent creation is precluded*." *Id.* at 987, *quoting Twentieth Century–Fox Film Corp. v. MCA, Inc.,* 715 F.2d 1327, 1330 (9th Cir. 1983) (emphasis added).

But that holding conflicts with *Skidmore* which requires showing of both copying *and* unlawful appropriation. Copying is established by evidence of direct copying or evidence of access and "similarities between the two works are due to 'copying rather than . . . coincidence, independent creation, or prior common source." *Skidmore*, 952 F.3d at 1064, *quoting*, *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010). Under *Skidmore*, evidence that works are "so overwhelmingly identical that the possibility of independent creation is precluded" can be used to prove the first prong: copying, but is not sufficient to prove the second prong, unlawful appropriation, where the extrinsic and intrinsic tests come into play.

There is more than sufficient evidence for the jury to have found in Defendants' favor on the intrinsic test and no reason for the Court to second guess the jury's application of this test.

**B.      There Is Sufficient Evidence To Support The Jury's Finding On The Extrinsic Test.**

If there was sufficient evidence for the jury to have found in Defendants' favor on the intrinsic test, that ends the discussion. But there was also sufficient evidence to support the jury's decision on the extrinsic test.

The extrinsic test assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression. *Rentmeester*, 883 F.3d at 1118. In *Rentmeester*, the Ninth Circuit held that while photographs "can be broken down into objective elements that reflect the various creative choices the photographer made in composing the image—choices related to subject matter, pose, lighting, camera angle, depth of field, and the like," "none of those elements is subject to copyright protection when viewed in isolation." *Id.* at 1119.

Therefore, "[w]hat is protected by copyright is the photographer's selection and arrangement of the photo's otherwise unprotected elements." *Id.* "If sufficiently original, the *combination* of subject matter, pose, camera angle, etc., receives protection, not any of the individual elements standing alone." *Id.*

49

(emphasis added). It was Sedlik's burden to identify those otherwise unprotected elements. *Apple Computer,* 35 F.3d at 1443. There is not "a well-defined standard for assessing when similarity in selection and arrangement becomes 'substantial,' and in truth no hard-and-fast rule could be devised to guide determinations that will necessarily turn on the unique facts of each case." *Rentmeester*, 883 F.3d at 1121

In his brief, Sedlik addresses <u>none</u> of this controlling law and fails to analyze the challenged works separately. Rather his motion is a hodge-podge of "facts" from the case (many which are misstated) and citation to cases that do not apply the controlling tests.[7] Moreover, Sedlik again ignores that on review of the denial of Sedlik's Rule 50(b) motion, the evidence must be construed in the light most favorable to the nonmoving party, and the jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings.[8]

---

[7]    *See, e.g., Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir.), *cert. denied*, 506 U.S. 934 (1992) (determining similarity by the "ordinary observer test"); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 53 (2d Cir. 2021), *aff'd.,* 598 U.S. 508 (2023) (applying "more discerning observer test").

[8]    Thus, Sedlik's reliance on *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997), is misplaced. The Court did not conclude that the drawing at issue was infringing as a matter of law, but rather that "the court's findings that [Defendants'] infringed on [Plaintiff's] copyrights are not clearly erroneous." Neither is the jury's verdict here.

As shown below, the evidence does not permit only one conclusion under the extrinsic test and there was sufficient evidence for the jury to conclude that the extrinsic test favored Defendants as to each of the challenged uses.

**(1)    Messy Progress Posts**.

Application of the extrinsic test to the Messy Progress Posts is not a close call.

Sedlik identified the individually unprotectible elements, the combination of which he believed was protected by copyright:  placement and arrangement of Davis's fingers, the wardrobe and jewelry he selected, how he modelled Davis's jacket, how he caused Davis's hair to be styled, including placing a lock over his ears, the way in which Sedlik was reflected in Davis's eyes, the furrowing of Davis's brow, the shading and shadowing created by his lighting.  2-ER-163-65, 178; 1-SER-42-46.

None of this can be found in the Messy Progress Posts.  Davis' fingers, wardrobe and jewelry are not visible in the Posts.  His eyes, brows and hair can barely be seen and none of Sedlik's contributions can be found.  The lighting and shading of the Posts are nothing like Sedlik's photograph.  2-ER-470-71.

In no way could any reasonable person argue that the only conclusion the jury could have reached in applying the extrinsic test to the Messy Progress Posts was in favor of Sedlik.

### (2)    **Tattoo**.

The general idea of Miles Davis making a "Shhh!" symbol with his fingers

is an unprotectible idea. *Rentmeester*, 883 F.3d at 1122-23. *See also Oriol v.*

*H&M Hennes & Mauritz L.P.,* 2014 WL 12589636, at *1 (C.D. Cal. Feb. 10, 2014)

(idea of "a person making the LA sign with their fingers" "cannot be copyrighted

only the expression thereof").

The placement of Davis's hand "necessarily flows from [the] commonplace

idea [of the Shhh! symbol]," and is thus not protectible. *See Ets-Hokin v. Skyy*

*Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000).

Similarly, Miles Davis's appearance is not protectible. *See Downing v.*

*Abercrombie & Fitch*, 265 F.3d 994, 1004 (9th Cir. 2001) ("A person's . . .

likeness is not a work of authorship. . . notwithstanding the fact that Appellants'

names and likenesses are embodied in a copyrightable photograph").

As noted above, Sedlik's individual "creative choices [he] made in

composing the image" are not "subject to copyright protection when viewed in

isolation." *Rentmeester*. at 1119.  The only thing that is protectable is "the

*combination* of subject matter, pose, camera angle, etc. . . . not any of the

individual elements standing alone." *Id.* (emphasis added).

Sedlik's brief mostly ignores this standard, only briefly stating that both the

Photograph and Tattoo have the same "combination of lighting, shadows,

perspective, pose, composition, and gaze." (AOB 36.) But there is more than

sufficient evidence for the jury – who, again, saw the actual tattoo on Farmer's arm

– to have reached the conclusion that the combination of Sedlik's individual

choices were not substantially similar to the tattoo. That includes:

- The lighting and shadows are absolutely not the same or similar at all.
  Kat Von D hand-inked the light and shadows in the tattoo and they are
  not copied from, nor the same as, Sedlik's photo. They are her own
  work.

- The composition is *not* the same. The hair is completely different.
  The clothing in the photograph is not seen in the tattoo and the jawline
  and wrist are completely different.

Those differences are sufficient for the jury to have concluded that the combination

of creative choices was not substantially similar under *Rentmeester*. Indeed, it is

exactly those differences to which the district court pointed in denying summary

judgment. 1-ER-121-22 ("the differences in the composition and selection and

arrangement of the unprotectible features – such as the light and shading on

Davis's face, the hairline and flowing hair on Davis's head, and background – that

a reasonable juror could find to be more than de minimis").[9]

---

[9]    The district court erred in excluding the testimony of Defendants' expert Dr.
Friedman who used her expertise in comparing photographs to other art to explain
in detail how the elements Sedlik claimed to be distinctive and protectable in his
photograph were not contained in the photograph. 1-SER-183-86. Had her

There was sufficient evidence for the jury to conclude that Kat Von D "made [her] own distinct choices" that "produced an image that differs from [Sedlik's] photo in more than just minor details." *Rentmeester*, 883 F.3d at 1121.  Though they "embody a similar idea or concept, they express it in different ways." *Id.* at 1122.

 It was not unreasonable for the jury to conclude that Kat Von D "made choices regarding selection and arrangement that produced an image unmistakably different from [Sedlik's] photo in material details" and that what the tattoo and photo share "are similarities in general ideas or concepts." *Id.* at 1122–23.  For that reason, the jury could reasonably have concluded that Sedlik failed to satisfy the extrinsic test as to the tattoo.[10]

### (3)    Kat Von D At Light Box Post

Sedlik apparently also challenges the jury's verdict as to the Kat Von D at the Light Box Post.  These posts show a blurry version of the photograph that can barely be made out.  It is not clear what Davis's hands are doing (let alone that they are making the "Shhh!" symbol) and his hair, ear, or clothing cannot be seen.

---

testimony been admitted at trial, it would have provided an additional basis to affirm the jury's verdict.  *See Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 (9th Cir. 2002), *cert. denied*, 538 U.S. 1047 (2003) ("as the prevailing parties, the defendants need not have filed cross-appeals in order . . . to preserve alternative grounds for affirming the judgment").

[10]    For the same reasons, the jury could reasonably have concluded that Plaintiff failed to meet his burden of proving that the Final Tattoo Posts or the Instagram Reel were substantially similar under the extrinsic test.

It barely looks like Miles Davis. *See Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 218 (2d Cir. 1998) ("defendants' copying of [Plaintiff's] photographs falls below the quantitative threshold of substantial similarity" because "photographs . . . are not displayed with sufficient detail for the average lay observer to identify even the subject matter of the photographs, much less the style used in creating them.").

Therefore, a jury could clearly reasonably conclude that Sedlik failed to satisfy the extrinsic test as to this post.

In sum, there was substantial evidence to support the jury's verdict on substantial similarity.

## 3. THE TRIAL COURT'S DENIAL OF SEDLIK'S RULE 50(B) MOTION AS TO FAIR USE SHOULD BE AFFIRMED.

### A. Sedlik Failed to Bring A Rule 50(a) Motion On Fair Use and Therefore Forfeited The Right Challenge Sufficiency of the Evidence.

"A Rule 50(b) motion may be considered only if a Rule 50(a) motion for judgment . . . has been previously made." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1081 (9th Cir. 2009). A party cannot "raise arguments in its post-

trial motion for judgment . . . that it did not raise in its preverdict Rule 50(a) motion." *Freund*, 347 F.3d at 761.

By failing to bring a Rule 50(a) motion at the close of the evidence, "a party cannot question the sufficiency of the evidence . . . on appeal." *Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454, 1459 (9th Cir. 1988), *vacated,* 490 U.S. 1087, *and opinion reinstated*, 886 F.2d 235 (9th Cir. 1989).

While Sedlik brought a Rule 50(a) motion on substantial similarity, he did not bring such a motion on fair use. 2-ER-230, 1-SER-118-119. Therefore, Sedlik forfeited the right to bring a Rule 50(b) motion on fair use and cannot challenge the sufficiency of the evidence on fair use.

## B.     **The Jury Found Only the Process Posts To Be A Fair Use and There Is Substantial Evidence To Support That Decision.**

Because the jury decided that all the other challenged uses were not substantially similar, it decided the issue of fair use as to only one challenged use: the Process Posts. 1-ER-61.[11]

---

[11]     While the jury also answered the fair use question as to the Final Tattoo Posts, they were not supposed to have done so because they found them not substantially similar. 1-ER-61 ("Skip any work for which you answered 'no' in Question No. 1.") When a jury gives "superfluous answers in violation of a trial court's express instructions contained on the special verdict form," those answers "do not constitute legitimate or viable findings of fact" and "[t]he trial court must therefore dismiss them as surplusage, as a matter of law." *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991).

Even if the Court could review this portion of the jury verdict, it must "defer to the jury's findings of underlying facts, but review de novo whether those facts establish fair use of a copyrighted work." *Google LLC*, 593 U.S. at 23-24. "Because the verdict form . . . did not ask the jury to articulate its fact findings in any detail, [the Court] must assume that they jury resolved all factual issues relating to the historical facts in favor of the verdict." *Divine Dharma Meditation*, 2021 WL 3721438, at *1, *quoting*, *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1195 (Fed. Cir. 2018), *overruled on other grounds by Google*, 593 U.S. 1.

Fair use is determined by examining four statutory factors with "the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. Defendants conceded in closing argument that the second and third factors weighed against fair use as to the Process Posts. 2-ER-247. But this Court must assume that the jury determined all factual findings regarding the first and fourth factors in Defendants' favor and there was more than sufficient evidence for the jury to reach those conclusions and the factors then weigh heavily in favor of fair use).

**(1)**     <u>There Is Sufficient Evidence For the Jury To Conclude</u>

                <u>That The Process Post Was Transformative and Non-</u>

                <u>Commercial.</u>

Under the first factor, whether the challenged use has a "commercial nature" "is to be weighed against the degree to which the use has a further purpose or different character," that is, whether it is transformative. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 531 (2023). There is evidence sufficient to support the jury's implicit findings on both elements of this first factor.

        **(a)**     <u>Commerciality</u>

"There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google*, 593 U.S. at 32. Noncommercial use of a copyrighted work is presumptively fair. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449 (1984) ("If the Betamax were used to make copies for a commercial or profit-making purpose, such use would presumptively be unfair. The contrary presumption is appropriate here, however, because the District Court's findings plainly establish that time-shifting for private home use must be characterized as a noncommercial, nonprofit activity").

"The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation

of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985).

Defendants presented facts sufficient to support the jury's implied finding that Defendants did not stand to profit from the exploitation of the copyrighted material. The evidence at trial established that *none* of the Process Posts advertised or promoted any product or service offered by Kat Von D and that Kat Von D no longer charged for tattooing services and had not done so for years. 1-SER-77, 111; 2-ER-232. The only evidence on which Sedlik relies to prove commerciality are *other social media posts that do not display* Sedlik's photograph or Farmer's tattoo. (AOB 51-53.)

That created a dispute of fact from which the jury could reasonably have concluded that the Process Posts were not commercial. While the Ninth Circuit has not addressed a case like this, several lower courts have and they support Defendants' position here. *See Bell v. Moawad Grp., LLC*, 326 F. Supp. 3d 918, 926-27 (D. Ariz. 2018) (finding triable issue of fact on commerciality where there was "no evidence suggesting that Defendants actually profited from posting an image" but the evidence did show that these social media accounts were "associated with a commercial enterprise" and that Defendants' "logo, website, and business description [were] prominently displayed on the accounts"); *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 618 (S.D.N.Y. 2015) (finding a

59

triable issue of fact as to whether Fox News posted the infringing photograph "for the purely expressive purpose of commenting on the events of September 11, 2001, or whether it did so for the commercial purpose of promoting [Fox News' program]"); *Hannley v. Mann*, 2023 WL 3407183, at *4 (C.D. Cal. Mar. 8, 2023) (finding social media post to be non-commercial because "there is no evidence that the Twitter, website, or Youtube pages generated any profits"); *Lanzilote v. Allwrite Commc'ns Inc.*, 2024 WL 4005219, at *3 (N.D. Ga. July 18, 2024) (testimony that "the website is free" and "no money was made from the article in question" is not "not dispositive on the issue of fair use" but raises triable issue of fact on commerciality).

On the contrary, Sedlik relies solely on cases where, unlike this case, there is evidence of the defendant *directly* profiting from the alleged fair use. *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 525 (9th Cir. 2008) (karaoke machine offered for sale is a commercial use); *Philpot v. Indep. J. Rev.*, 92 F.4th 252, 260 (4th Cir. 2024) (use of photograph on website for which defendant "earned some advertising revenue"); *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 265 (4th Cir. 2019) ("used the Photo on its website to promote a for-profit film festival").

Because there was no evidence that the Process Posts generated revenue or were specifically used to promote anything, then there was sufficient evidence to support the jury's imputed finding of non-commerciality.

### (b)    Transformativeness.

The first factor also "asks 'whether *and to what extent*' the use at issue has a purpose or character different from the original." *Warhol*, 598 U.S. at 510 (emphasis in original).  Warhol goes on to state that "[t]he larger the difference, the more likely the first factor weighs in favor of fair use [and t]he smaller the difference, the less likely." *Id*.  A use with further purpose or different character "is said to be 'transformative.'" *Id*.  On the other hand, "use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or 'supplan[t]' the work." *Id*. at 528.

Warhol explains that "[t]he fair use provision, and the first factor in particular, requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Id*. at 533.  Thus, "[t]he same copying may be fair when used for one purpose but not another." *Id*.

Ultimately, the *Warhol* Court concluded that the purpose of the single challenged use in the case – the licensing of a photo of Warhol's "Orange Prince" to a magazine – was substantially the same as that of the primary use of plaintiff's photograph: "Both are portraits of Prince used in magazines to illustrate stories

about Prince." *Id.* at 535. Because such "environments" were not "distinct and different," licensing of the Orange Prince image "shared the objectives" of plaintiff's photograph. *Id.* at 535-36.

There was more than sufficient evidence to show that the Process Posts have a different purpose and character than Sedlik's photograph. Sedlik's photograph was for the purpose of displaying a portrait of Miles Davis. The Process Post was for the purpose of showing Kat Von D *in the process of* creating a tattoo, in this case, a tattoo in which the Sedlik photograph was used as a reference. Use of the photograph in this social media post does not in any way "achieve a purpose that is the same as, or highly similar to, that of the original work" and does not "substitute for" or supplant the photograph. *Id*. at 528.

Sedlik insists that *Warhol* holds that a use cannot be transformative unless it targets or "comments on" the original. (AOB 45.) But *Warhol* says the opposite: "targeting is not always required." *Id*. at 546-47 n.20, 21.

While the Ninth Circuit has not yet interpreted *Warhol,* other courts have. In *Kelley v. Morning Bee, Inc.*, 2023 WL 6276690 (S.D.N.Y. Sept. 26, 2023), plaintiff, a professional photographer, whose photographs of architecture and aircrafts have appeared in publications and advertisements for clients, sued a production company for copyright infringement because his photographs briefly appeared in the background of various scenes of a documentary about the singer

Billy Eilish.  The photographs were part of an exhibit at an airport in New Zealand where Eilish was visiting.  *Id*.

The Court found that the documentary was transformative and a fair use, *despite the fact that it in no way commented on or targeted the copyrighted photographs*.  To the contrary, the Court found that the documentary "'adds something new, with a further purpose or different character' to that of the underlying work—the photographs."  *Id.* at \*12.  What was the something new?  The photographs "comment upon and capture the spirit of modern aviation" while the film has a "larger purpose of documenting Eilish's life and career, including her world tour that took her to the New Zealand airport."  *Id.  See also McGillvary v. Netflix, Inc.*, 2024 WL 3588043, at \*8 (C.D. Cal. July 30, 2024) (finding transformative the use of YouTube clips of Plaintiff singing and playing guitar in a documentary about Plaintiff's background, rise to fame, and murder conviction, despite the fact that the documentary does not "comment" on the YouTube clips).

Just like in *Kelley* and *McGillvary*, the Process Posts serve a different purpose than Sedlik's photograph.  The photograph is a depiction of Miles Davis.  The Process Posts have a larger purpose of documenting Kat Von D's life and her process in creating tattoos.  The Process Posts are therefore transformative.

Therefore, the jury could reasonably have concluded that the first factor weighs in favor of a finding of fair use. The Process Posts are not commercial (and are therefore presumptively fair) and are transformative as well.

### (2) There Was Sufficient Evidence To Support The Jury's Implied Finding on the Fourth Factor.

The fourth fair use factor considers "the extent of market harm caused by the particular actions of the alleged infringer [and] also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013), *quoting Campbell*, 510 U.S. at 591. "[W]hether there was harm to the actual or potential markets for the copyrighted work" is a question of fact, implicitly decided by the jury in Defendants' favor. *Google*, 593 U.S. at 24.

There was no market harm caused by the Process Posts. Sedlik admitted as much, testifying that nobody told him that they would not buy a copy of his photograph because of the social media posts. 1-SER-116-17. Sedlik never identified a single lost sale or license caused by the Process Posts. Furthermore, the Process Posts are clearly not a substitute for Sedlik's photograph; nobody who

wanted to buy or license Sedlik's photograph would want to use one of the Process Posts instead. *See Kelly v. Arriba Soft Corp.,* 336 F.3d 811, 821-22 (9th Cir. 2003) (use of plaintiff's photographs as thumbnails "would not harm [Plaintiff's] ability to sell or license his full-sized images [because Defendant] does not sell or license its thumbnails [and a]nyone who downloaded the thumbnails would not be successful selling full-sized images"); *Kelley,* 2023 WL 6276690 at *15 ("It seems highly implausible that someone in the market for Plaintiff's works could find a substitute in the obscured, ill-lit, fleeting images contained in the Film").

Nor is there damage to any potential market. The Ninth Circuit has made clear that "a copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing a market for . . . other transformative uses of its own creative work.'" *Tresóna Multimedia LLC v. Burbank High School Vocal Music Ass'n*, 953 F.3d 638, 652 (2020), *quoting, Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006). The Supreme Court has similarly cautioned that considering "unrealized licensing opportunities" poses a "danger of circularity," because "it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar." *Google*, 593 U.S. at 38, *quoting* 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05[A][4] (2019).

Sedlik testified about what he "would" charge to license his photograph in social media posts but offered no evidence that he ever *did* license his photographs for such uses. Indeed, when asked how he was damaged, Sedlik's response was that he lost license fees because Kat Von D did not pay him for a license for her social media posts. 2-ER-191. But that isn't sufficient to establish harm to an actual or potential market: "Nor does the decision by secondary users to pay, or not pay, establish whether fair use exists." *Tresóna*, 953 F.3d at 652.

Finally, when "the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred." *Campbell*, 510 U.S. at 591. *See also Tresóna*, 953 F.3d at 652 (affirming summary judgment for defendant on fair use, finding that "[b]ecause the use in this case 'falls within a transformative market,' [plaintiff] was not harmed by the loss of any fees for the licensing of [his work].").

The Process Posts were transformative and are in no way a substitute for Sedlik's photograph. Sedlik's customers would not find their needs fulfilled by purchasing the social media posts (which were not for sale) and Sedlik cannot show market harm by asserting that he would want to charge Kat Von D for using his photograph in the Process Posts.

There was more than sufficient evidence, then, for the jury to conclude that this fourth factor weighed in favor of fair use.[12]

### (3)   Weighing Of Fair Use Factors.

There was substantial evidence at trial to conclude that the first and fourth factors weighed in favor of a finding of fair use and the second and third weighed against.

The fourth factor is "the single most important element of fair use." *Harper & Row*, 471 U.S. at 568. The second factor, on the other hand, "typically has not been terribly significant in the overall fair use balancing." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1161 (9th Cir. 2022) (citations omitted).

Given the foregoing, with two factors – including the most important factor – weighing in favor of fair use – and two others – including the least significant factor – weighing against, the jury (and the district court) did not err in concluding that the Process Posts were a fair use.

---

[12]   While the jury never reached the issue of fair use as to the tattoo itself, the court erred in excluding the expert testimony of Lane and Montie regarding the lack of a potential market in the tattoo industry for the licensing of photographic references. The fourth factor "considers any impact on 'traditional, reasonable, or likely to be developed markets.'" *Seltzer*, 725 F.3d at 1179. These experts in the tattoo industry would have offered testimony that there was no likely to be developed market for such photograph reference licenses. The exclusion of their testimony was error.

4.    **THE DISTRICT COURT'S DENIAL OF SEDLIK'S MOTION FOR NEW TRIAL SHOULD BE AFFIRMED.**

A.    **Sedlik Cannot Carry the Substantial Burden Of Overturning The Denial of His Rule 59 Motion.**

Where "the basis of a Rule 59 ruling is that the verdict is not against the weight of the evidence, the district court's denial of a Rule 59 motion is virtually unassailable." *Williams*, 895 F.3d at 1136, *quoting Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010). "[O]nly . . . an *absolute absence of evidence* to support the jury's verdict" will result in reversal. *Id., quoting, Kode*, 596 F.3d at 612 (emphasis in original.)

As set forth above, the verdict here is not against the great weight of the evidence nor did the jury reach an erroneous result. There was more than sufficient evidence for the jury to reach the verdict they did.

B.    **The District Court Did Not Err in Submitting Fair Use to the Jury.**

Sedlik argues that the issue of fair use should not have been given to the jury at all, and that under *Google*, 593 U.S. at 24-25, the jury should only have determined subsidiary factual determinations but not the ultimate question of fair use.

To the extent this was error, it was invited by Sedlik. His counsel argued at

68

the pretrial conference that fair use should be submitted to the jury. 1 SER 20. Moreover, the jury instructions and a special verdict form submitted by Sedlik provided for the jury to decide the ultimate fair use question. 1-SER-148-59. By these actions, Sedlik invited the error and cannot object on this ground now. *See Deland v. Old Rep. Life Ins. Co.*, 758 F.2d 1331, 1337 (9th Cir. 1985) (Appellant "will not be heard to complain on appeal," having offered a jury instruction that "permitted the jury to determine the very question [he] now argues on appeal should not have been submitted to the jury").

In any event, the submission of the fair use question to the jury was not error. In *Google*, the district court submitted the ultimate fair use question to the jury, who concluded that the use was a fair one, and that conclusion was reviewed *de novo* by the Federal Circuit, deferring to the jury's factual findings. 593 U.S. at 16. The Supreme Court stated that it *agreed* with the Federal Circuit's approach and noted that "the Federal Circuit carefully applied the fact/law principles . . . set forth in [*U.S. Bank Nat. Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 395-96 (2018)], leaving factual determinations to the jury and reviewing the ultimate question, a legal question, de novo." *Id. at* 24–25.

Other post-*Google* cases have followed the same approach, allowing the jury to make the ultimate decision, deferring to any express or implied factual findings by the jury, but reviewing the ultimate issue *de novo*. *See, e.g., Griner v. King*,

69

104 F.4th 1, 8 (8th Cir. 2024) ("The jury found that the Defendants did not make fair use of the Success Kid template"); *Divine Dharma Meditation*, 2021 WL 3721438, at *1 ("A jury found that the Institute made "fair use" of Divine Dharma's copyrighted work").

There was no error here, and if there was error, it was invited by Sedlik.

C.    **There Was No Error In the District Court's Instructions On The Second and Third Fair Use Factors.**

Sedlik argues that the jury instructions on the second and third fair use factors were erroneous because they did not inform the jury that the district court ruled on summary judgment that those factors weighed against fair use as a matter of law for all of Defendants' uses.  (AOB 61.)  This argument is wrong for multiple reasons.

First, the jury instruction on the second factor says that the factor "is more likely to weigh against fair use."  1-ER-45.  That is language that Sedlik's counsel agreed to – without objection -- and it was proposed jointly.  1-SER-3-4, ¶¶ 8-10; 1-SER-13-15.  Sedlik cannot object to this instruction now.  *See United States v. Hui Hsiung*, 778 F.3d 738, 747 (9th Cir.), *cert. denied*, 576 U.S. 1022 (2015) ("Because the defendants were the ones who proposed the instruction in the first place, they cannot now claim that giving the instruction was error").

Second, regarding the third factor jury instruction (1-ER-46), the Court's

70

summary judgment decision did not "enter an order stating [that this issue on the third fair use factor] is not genuinely in dispute and treating the fact as established in the case" per FRCP 56(g). 1-ER-107-36. The Court could not have done so because the Court's summary judgment order analyzed only the tattoo in its examination of factor 3, not the other social media posts. 1-ER-129.

In any event, even if there were error, it is harmless. The only fair use verdict by the jury was on the Process Posts and in closing argument, Defendants' counsel told the jury that factor 3 weighed against a finding of fair use as to those posts. 2-ER-247 (regarding "the post of Kat working on the tattoo," "Factor 3 weighs against because they used the photograph in the back").

Given that Defendants' counsel conceded factor 3 weighed against fair use for the Process Posts (and the jury never reached the fair use issue as to any other challenged uses), any error was harmless. *See McGuinn v. Crist*, 657 F.2d 1107, 1109 (9th Cir. 1981), *cert. denied,* 455 U.S. 990 (1982) ("erroneous instruction with respect to an undisputed issue is harmless error"); *Bulgo v. Munoz*, 853 F.2d 710, 716-17 (9th Cir. 1988) ("any error [in instruction on comparative fault] was harmless" because the jury "never reached the issue of comparative responsibility").

The District Court did not err and, in any event, any error was harmless.

71

5.      **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING SEDLIK'S TESTIMONY.**

Sedlik complains about the district court's exclusion of his expert testimony. But Sedlik was designated as a *rebuttal* expert (2-ER-372) and Defendants did not call an expert at trial (Dkt 221): there was no testimony for Sedlik to rebut. While the Ninth Circuit has not directly addressed this issue, many district courts have. *See Johnson v. Grays Harbor Cmty. Hosp.*, 2007 WL 4510313, at *2 (W.D. Wash. Dec. 18, 2007) ("Plaintiff's rebuttal experts will be allowed to testify at trial only after Defendants' experts have testified"); *Danganan v. Am. Fam. Mut. Ins. Co.*, 2018 WL 3660198, at *3 (D. Nev. Aug. 2, 2018) ("A rebuttal expert witness may only testify after the opposing party's initial expert witness testifies"); *Unicolors, Inc. v. H &M Hennes & Mauritz, L.P.*, 2017 WL 11489792, at *2 (C.D. Cal. Nov. 15, 2017) ("Ms. Lake [a rebuttal expert] will not be permitted to offer expert testimony without Plaintiff first offering expert testimony to rebut.").

And even if Defendants had called an expert to testify, the district court properly concluded that Sedlik – who is not a tattoo artist – was not competent to testify about the custom and practice in the tattoo industry. (1-ER-82-83.) *See LuMetta v. United States Robotics, Inc.*, 824 F.2d 768, 771 (9th Cir.1987), *quoting Taylor v. Burlington N. R. Co.,* 787 F.2d 1309, 1315 (9th Cir. 1986) ("The trial court has broad discretion in admitting and excluding expert testimony, and the

72

court's action will be sustained unless it is manifestly erroneous.")

Moreover, Sedlik's expert report offers no testimony about the custom and practice in the tattoo industry; rather it talks only about what photographers "require," which isn't relevant to show the custom and practice *in the tattoo industry*. 3-ER-392-401. Sedlik could not provide expert testimony not contained in his report. FRCP 37(c)(1).

Sedlik also objects to the sustaining of objections to certain questions posed to Sedlik. For example, the court sustained a relevance objection to: "Are you concerned that Ms. Von D's unlicensed adaptation and use of your photograph will encourage others to use your work without a license?" Sedlik offers no explanation why his "concern" about his rank speculation would be relevant and offers no authority to support how such concern has any relevance to any issue in this case.

Sedlik also claims that the district court prevented him from putting on evidence of his past license use for use of his photograph on social media. (AOB 64.) This is again not accurate. Sedlik was permitted to testify as to what he typically charged for a license to use one of his photographs in a social media post and on Twitter. 2-ER-199; 1-SER-51. Whether the jury *believed* Sedlik's testimony given his inability to provide any written confirmation of the existence of such a license is another story.

73

The district court did not abuse its discretion on any of these rulings.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Date: December 16, 2024          GRODSKY, OLECKI & PURITSKY LLP


*/s/ Allen B. Grodsky*
Allen B. Grodsky

*Attorneys for Defendants/Appellees*
Katherine Von Drachenberg, Kat Von D, Inc.
and High Voltage Tattoo, Inc.

## STATEMENT OF RELATED CASES

Defendants/Appellees Katherine Von Drachenberg, Kat Von D, Inc. and

High Voltage Tattoo, Inc. are not aware of any related cases pending in this Court.

Date: December 16, 2024          GRODSKY, OLECKI & PURITSKY LLP

*/s/ Allen B. Grodsky*
Allen B. Grodsky

*Attorneys for Defendants/Appellees*
Katherine Von Drachenberg, Kat Von D, Inc.
and High Voltage Tattoo, Inc.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief contains 13,987 words, excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).   I certify that this brief complies with the word limit of Cir. R.

32-1.

Date: December 16, 2024          GRODSKY, OLECKI & PURITSKY LLP


*/s/ Allen B. Grodsky*
Allen B. Grodsky

*Attorneys for Defendants/Appellees*
Katherine Von Drachenberg, Kat Von D, Inc.
and High Voltage Tattoo, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Courts of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All counsel of record in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Date: December 16, 2024          GRODSKY, OLECKI & PURITSKY LLP


                                 */s/ Allen B. Grodsky*
                                 Allen B. Grodsky

                                 *Attorneys for Defendants/Appellees*
                                 Katherine Von Drachenberg, Kat Von D, Inc.
                                 and High Voltage Tattoo, Inc.