No. 24-3367

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JEFFREY B. SEDLIK,

*Plaintiff-Appellant,*

v.

KATHERINE VON DRACHENBERG,
KAT VON D, INC., HIGH VOLTAGE TATTOO, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-01102 (Hon. Dale S. Fischer)

---

## BRIEF OF *AMICUS CURIAE* AUTHORS ALLIANCE IN SUPPORT OF
## DEFENDANTS-APPELLEES AND AFFIRMANCE

---

Christopher Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Ave, Lewis Ctr, 4th Fl
Cambridge, MA 02138
617-496-5155
cbavitz@law.harvard.edu

Counsel for *Amicus Curiae*

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Authors Alliance does not have parent corporations and no publicly held corporation owns ten percent or more of its stock.

Dated: December 23, 2024

      /s/Christopher Bavitz
      Christopher Bavitz

i

## <u>STATEMENT OF COMPLIANCE WITH RULE 29</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amicus curiae* certifies that all parties have consented to the filing of this brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person—other than the *amicus curiae*, their members, or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

Dated: December 23, 2024

/s/Christopher Bavitz
Christopher Bavitz

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................... i

STATEMENT OF COMPLIANCE WITH RULE 29 ............................................... ii

TABLE OF CONTENTS ....................................................................................... iii

TABLE OF AUTHORITIES .................................................................................. iv

STATEMENT OF INTEREST OF AMICUS CURIAE ......................................... 1

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ............................................................................................................ 2

I. Under Warhol, the first fair use factor only requires the secondary use to have a distinct purpose. ......................................................................... 3

II. This Circuit should reject Plaintiff-Appellant's invitation to expand "commercial use" under the first factor. ............................................... 8

III. The fourth factor favors Defendants-Appellees, because "market substitution" considers only markets which are traditional, reasonable or likely to be developed. ........................................................................ 11

CONCLUSION ...................................................................................................... 15

CERTIFICATE OF COMPLIANCE ..................................................................... 16

CERTIFICATE OF SERVICE .............................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) ........ 9, 12

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) . 2, 3, 4, 5

*ASTM v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) ................. 2, 7

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) .................................. 10

*Bill Graham Archives v. Dorling Kindersley*, 448 F.3d 605 (2d Cir. 2005) ...... 7, 13

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932 (4th Cir. 2013)..... 8, 10, 11

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) ................ 12, 14

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).......................... 3, 12, 14

*Davidson v. United States*, 138 Fed. Cl. 159 (2018) .............................................. 10

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020) ............. 10

*Hachette Book Group, Inc., v. Internet Archive*. 115 F.4th 163 (2d Cir. 2024) . 9, 11

*Harper & Row, Publishers, Inc. v. Nation Enter.,* 471 U.S. 539 (1985)............... 14

*Keck v. Mix Creative Learning Ctr.,* 116 F.4th 448 (5th Cir. 2024) ........... 2, 6, 7, 10

*Kelly v. Arriba Soft Corp*, 336 F.3d 811 (9th Cir. 2002)....................................... 14

*Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003) .............. 10

*Monge v. Maya Mags.*, 688 F.3d 1164 (9th Cir. 2012) .......................................... 10

*Packingham v. North Carolina*, 582 U.S. 98 (2017) .............................................. 11

*Perfect 10 v. Amazon.com*, 508 F.3d 1146 (9th Cir. 2007) ................................ 1, 14

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) .............................. 11

*Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992).................. 9

Stewart v. Abend*, 495 U.S. 207 (1990)* .................................................................... 5

*Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130 (S.D.N.Y. 1968)............... 1, 8

*Tresona Multimedia, LLC V. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638 (9th Cir. 2020) ............................................................................................... 12, 13

*Whyte Monkee Prods., LLC v. Netflix, Inc.*, 97 F.4th 699 (10th Cir. 2024) ............. 2

**STATUTES**

17 U.S.C. § 107.......................................................................................................... 4

**OTHER AUTHORITIES**

Brief for Appellant, *Sedlik v. Von Drachenberg*, No. 24-3367 (9th Cir. Oct. 15, 2024)....................................................................................................... 4, 8, 11

*Code of Best Practices in Fair Use for the Visual Arts*, COLLEGE ARTS ASSOCIATION (2015)............................................................................... 8

*Documentary Filmmakers' Statement of Best Practices in Fair Use*, CENTER FOR MEDIA & SOCIAL IMPACT (2005)........................................................ 8

*Fred Von Lohmann, Fair Use Has a Posse – Now with Insurance!,* ELECTRONIC FRONTIER FOUNDATION (Feb. 23, 2007), https://www.eff.org/deeplinks/2007/02/fair-use-has-posse-now-insurance.......... 8

J.D. Biersdorfer, *Why That Digital Photo Print Is Fuzzy*, NEW YORK TIMES (Jun. 12, 2018), https://www.nytimes.com/2018/06/12/technology/personaltech/why-that-digital-photo-print-is-fuzzy.html............................. 13

Pamela Samuelson, *Unbundling Fair Use*, 77 FORDHAM L. REV. 2537 (2009)... 1, 8

*Sedlik v. Von Drachenberg*, No. 2:21-CV-01102 (C.D. Cal. Jan 26, 2024)............. 2

*Sedlik v. Von Drachenberg*, No. 2:21-CV-01102, 2024 WL 4327404 (C.D. Cal. May 3, 2024). ................................................................................................ 13

## STATEMENT OF INTEREST OF AMICUS CURIAE

Authors Alliance is a 501(c)(3) nonprofit with over 2,800 members. Authors Alliance aims to help authors understand and enjoy their rights and promotes policies that enable knowledge and culture to be widely available and discoverable. Members of Authors Alliance hope to see their work widely disseminated and read. Member authors rely on fair use every day in their research and writing— uses that could be significantly constrained by the decision in this case.

## SUMMARY OF ARGUMENT

The process of making new creative works inevitably requires borrowing from past works. Consequently, maintaining a robust fair use right is of central concern to authors and creators whose craft depends on borrowing. A narrow interpretation of fair use, as proposed by Plaintiff-Appellant, would stifle creativity by threatening well-established practices among creators. Courts have consistently recognized the significance of fair use for authors and have deemed uses of source material as fair use; these uses include proving a point, setting historical context, or like Defendants-Appellees, making use of reference works. Pamela Samuelson, *Unbundling Fair Use*, 77 FORDHAM L. REV. 2537, 2571 (2009); *see also Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1168 (9th Cir. 2007) (finding that a search engine's use of images for the purpose of navigating the internet was fair use); *Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (recognizing the use

1

of images from a film to provide historical context as fair use). Such uses are well within the scope of fair use even in the wake of the Court's recent decision in *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). *See Keck v. Mix Creative Learning Ctr.,* 116 F.4th 448, 454–55 (5th Cir. 2024) (copying an artist's works to teach students was fair under *Warhol* even though no commentary was made on the expressive value of the original works); *ASTM v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1267–68 (D.C. Cir. 2023) (copying and publishing technical standards in whole was fair under *Warhol* because it provided the public with a "repository of the law"). At present, the Tenth Circuit is the only Circuit to interpret *Warhol* narrowly but was quick to grant rehearing. *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 97 F.4th 699, 714 (10th Cir. 2024), *reh'g granted and opinion vacated*, 101 F.4th 787 (10th Cir. 2024). To avoid divergent applications of fair use, this Circuit should hold that Defendants-Appellees' social media posts were fair use.[1]

## **ARGUMENT**

Fair use facilitates artistic progress for the public good by allowing others to build upon copyrighted material, recognizing that "every [item] in literature, science

---

[1] This brief does not address whether the tattoo in question was fair use, as the jury found the tattoo was not substantially similar to Plaintiff-Appellant's portrait. Verdict Form at 2, *Sedlik v. Von Drachenberg*, No. 2:21-CV-01102 (C.D. Cal. Jan 26, 2024).

and art . . . must necessarily borrow" from material "well known and used before." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (citation omitted). Given the importance of fair use to the promotion of creativity and dissemination of knowledge, this Circuit should carefully weigh the impact of its decision in this case on the wider spectrum of uses dependent on this right.

### I. Under *Warhol*, the first fair use factor only requires the secondary use to have a distinct purpose.

Because *Warhol* was the product of such specific facts, this Circuit should avoid applying *Warhol* in a manner that inadvertently expands its holding. *Warhol's* outcome reflects the Court's concern with a very particular set of transactions in a highly structured market. The Warhol foundation had licensed a portrait of Prince, based on an original photograph by Lynn Goldsmith, to be featured on the cover of a magazine. 598 U.S. at 525. Goldsmith, however, created her photograph for the express purpose of licensing it to magazines, and did so on several occasions. *Id.* at 534–35. The special concerns raised by the portraits competing in the same licensing market prompted the Court to apply the first fair use factor in a more rigorous manner than they would have otherwise. *Id.* at 535 (because the purpose of Warhol's use was "*so similar* to the photograph's typical use", the Court declared a "particularly compelling justification" was needed to find Warhol's use transformative) (emphasis added). Naturally, this led the Court to focus heavily on whether Warhol's use functioned as a "commentary or criticism" that "target[ed]" Goldsmith's

3

photograph." *Id.* at 532. Under this more demanding standard, the Court held Warhol's use was not transformative. *Id.* at 535.

*Warhol* does not impose the threshold requirement that a use must either "target" an underlying work or have a "compelling justification" to be favored under the first factor, as Plaintiff-Appellant contends. *Id.* at 532, 535; Brief for Appellant, *Sedlik v. Von Drachenberg*, No. 24-3367 (9th Cir. Oct. 15, 2024) (Dkt 14.1) ("Sedlik Br.") at 45. The *Warhol* Court merely cited "target[ing]" as an example of a use that carries an "independent justification," as copying is "reasonably necessary" to achieve its purpose. *Id.* at 532 (the Court also referred to parody as "an example" of a justified use because it "needs to mimic an original to make its point").

*Warhol* stands for the narrower proposition that uses are favored under the first factor if they have a "distinct purpose," mirroring the language of the fair use statute. *Id.* at 531 (a use that has a "distinct purpose is justified because it furthers the goals of copyright . . . to promote the progress of science and the arts"); 17 U.S.C. § 107 (the first factor focuses on the "*purpose* and character of the use") (emphasis added). Under *Warhol*, this applies even if copyrighted material is reused in its entirety. *See Warhol*, 598 U.S. at 537 (stating "derivative works borrowing heavily from an original" can be fair uses and endorsing Warhol's "Soup Cans" as fair use even though it "precisely replicates" a copyrighted logo).

4

The language of *Warhol* eschews brightline rules and leaves open just how different the new purpose, or how "transformative" a work must be to be considered as having a "distinct purpose" and favored under the first factor. The Court stated its analysis was limited to the "specific use" at issue and that it "expresse[d] no opinion as to the creation, display, or sale of the original Prince Series works," highlighting the fact-specific nature of its holding. *Id.* at 511. The Court also reminded observers that "a further purpose or different character ... is a matter of degree," and likewise, transformativeness is a "matter of degree," *id.* at 525, 529, and that fair use requires "flexible" application depending on the facts, *id.* at 527. This language reinforces the common law conception of fair use as an "equitable rule of reason," permitting courts to avoid "rigid application of the copyright statute when . . . it would stifle the very creativity which [copyright law] is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal quotation marks omitted). Justice Gorsuch's concurrence in *Warhol* also endorses a flexible conception of fair use by suggesting that the portrait may have been transformative if placed in a museum or book detailing 20[2]-century art. 598 U.S. at 557-558.

---

[2] Additionally, the Court endorses Warhol's own "Soup Cans" as an "artistic commentary on consumerism," since its purpose is "orthogonal" to the original's commercial purpose advertisement of soup. *Warhol*, 598 U.S. at 539–40. Had Warhol not licensed the portrait to a magazine, its "comment on celebrity" could similarly be considered "orthogonal" to the photograph's commercial purpose, *see id.* at 540, another strong argument for fair use under the first factor.

In the wake of *Warhol*, several circuits have held copying an entire work is fair where the secondary use serves a distinct purpose. In *Keck*, the Fifth Circuit concluded that a children's art studio fairly used the plaintiff's artwork in the sale of their online art kits. 116 F.4th at 454–55.



Ad for the Defendant's Art Kit in *Keck*

Applying *Warhol*, the Fifth Circuit observed the kits "had an educational purpose that was significantly different from the original, decorative purpose" of the plaintiff's artworks. *Id.* at 454. The kits did not draw on the plaintiff's art to target its "inherent expressive value," but instead to "teach students" and "inspire [them] to create their own art." *Id.* Likewise, in *ASTM*, the D.C. Circuit found a non-profit's copying of entire technical documents created by standard-setting organizations to be transformative, as the non-profit's purpose of publishing a "comprehensive

repository of the law" was distinct from the standard-setting organizations' purpose of establishing best practices to "advance science." 82 F.4th at 1265–68. The notion that "distinct purposes" justify reusing copyrighted material in its entirety is also consistent with caselaw preceding *Warhol*. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley*, 448 F.3d 605, 610 (2d Cir. 2005) (copying of entire Grateful Dead concert posters in a book about the history of the band was fair because the book's purpose was "separate and distinct from the original . . . promotional purpose" of the posters).

If *Warhol* is read as limiting fair use to those that "target" an underlying work or otherwise have a "compelling justification," then many core works of authorship historically favored by courts will be invalidated. Authors copy for a host of reasons beyond commenting on or critiquing an underlying work. Copying for "reporting," "research," and "teaching"—all paradigmatic and routine fair uses under § 107—do not inherently target copyrighted material and are prone to be mislabeled as lacking some special compelling justifications whenever alternative works are available on the market. *See, e.g.*, *Keck*, 116 F.4th at 454 (defendant's purpose in copying artwork was to teach students, not target the artwork, and the use is *only* justified in the broad sense that "it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create"). Authors also copy to memorialize, preserve, or provide historical context. *See* Samuelson, *Unbundling*

7

*Fair Use*, 77 FORDHAM L. REV. at 2570. For example, in *Bernard Geis*, a book containing images copied from the famous Zapruder film depicting President Kennedy's assassination was found to be fair since the copying was essential to conveying the "fullest information" on the assassination to the public.[3] 293 F. Supp. at 146. By subjecting these uses to a heightened standard for either targeting or having a compelling justification for using the original work, Plaintiff-Appellant's reading of *Warhol* all but guarantees fewer works of authorship will be created.

## II. This Circuit should reject Plaintiff-Appellant's invitation to expand "commercial use" under the first factor.

Plaintiff-Appellant's request to designate Defendants-Appellees' uses as "commercial" under the first factor merely because they "drive traffic" to her social media, Sedlik Br. at 20–21, 54–55, stands against the principle that commercially successful entities can make non-commercial fair uses of copyrighted works. Courts have consistently deemed certain uses non-commercial even where such uses reside within a "larger commercial enterprise." *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 942 (4th Cir. 2013), *as amended* (Jan. 14, 2014). (NFL's use of

---

[3] Many industries have relied on decisions like *Bernard Geis* in constructing best practice guides for copyright compliance. *See, e.g., Fred Von Lohmann, Fair Use Has a Posse – Now with Insurance!,* ELECTRONIC FRONTIER FOUNDATION (Feb. 23, 2007), https://www.eff.org/deeplinks/2007/02/fair-use-has-posse-now-insurance (describing how documentary filmmakers who follow industry Best Practice guides receive lower insurance costs); *Code of Best Practices in Fair Use for the Visual Arts*, COLLEGE ARTS ASSOCIATION (2015); *Documentary Filmmakers' Statement of Best Practices in Fair Use*, CENTER FOR MEDIA & SOCIAL IMPACT (2005).

copyrighted logo in video was "incidental to the larger commercial enterprise of creating historical videos for profit"); *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992), *as amended* (Jan. 6, 1993) (gaming company's use of Sega's copyrighted code was fair as they did so "to study the functional requirements" of the Genesis console, even if the company's ultimate goal was to "release [] Genesis-compatible games for sale"); *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (defining "commercial exploitation" as "when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material"). As in these cases, Defendants-Appellees' social media posts are "incidental" to her brand. Nowhere do her posts expressly promote her other products and services, and any residual "link" between Defendants-Appellees' posts and profit generated via traffic on the social media profile is "too attenuated" for her use to be characterized as "commercial."[4] *Hachette Book Group, Inc., v. Internet Archive*. 115 F.4th 163, 185 (2d Cir. 2024). The social media posts are unlike other uses courts find to be commercial, which typically

---

[4] In *Hachette*, the Second Circuit considered whether non-profit Internet Archive's practice of soliciting donations and taking a "cut" of revenue generated by its promotion of another library, both occurring on their website, made an adjacent display of copyrighted material "commercial." 115 F.4th at 185. The Second Circuit found against "commercial use", cautioning that conflating the commercial and non-commercial aspects of Internet Archive's activities would "render commercial the activities of virtually any nonprofit." *Id.* The same reasoning applies here— designating Defendants-Appellees' use "commercial" merely because it was displayed next to promotions would render all of the posts commercial.

involve direct merchandising. *See, e.g.*, *Monge v. Maya Mags.*, 688 F.3d 1164, 1176 (9th Cir. 2012) (sale of wedding photos in a magazine held commercial); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (sale of business cards and postcards found commercial); *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (selling a book held commercial); *Davidson v. United States*, 138 Fed. Cl. 159, 173 (2018) (using a photograph on a stamp for sale is commercial).

Regardless of whether Defendants-Appellees' use is "commercial," this Circuit's finding regarding commerciality should not drive its overall fair use analysis. *See Keck,* 116 F.4th at 454–56 (use of plaintiff's artwork in defendant's art kits was fair even though the kits were being sold online). Significantly elevating the "commercial use" inquiry would "eviscerate the concept of fair use." *Bouchat*, 737 F.3d at 941. "[T]he most universally accepted forms of fair use, such as news reporting and commentary, quotation in . . . books, reviews of books, and performances . . . are all normally done commercially for profit." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 219 (2d Cir. 2015). Precisely because "[v]ast numbers of fair uses occur in the course of commercial ventures," the Supreme Court has instructed courts not to overemphasize the "commercial use" inquiry. *Bouchat*, 737 F.3d at 941. This Circuit has held accordingly. *See Mattel*, 353 F.3d at 803 (noting

fair uses are commonly "conducted for profit in this country") (citations and quotations omitted).

As the Supreme Court has explained, social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and the "vast democratic forums of the Internet" act as today's "modern public square." *Packingham v. North Carolina*, 582 U.S. 98, 104, 107 (2017) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997)). Maintaining limits on the scope of "commercial use" in the context of social media is essential for authors to continue to share their creations with the world. Attracting attention is central to authorship—it is how authors spread their ideas, enhance their scholarly reputation, and to an extent, "keep the lights on." *Hachette*, 115 F.4th at 185. But the fact that authors invariably write to capture and build an audience through these sites does not automatically render their uses "commercial." *See id.* (explaining that merely because a non-profit solicits donations does not automatically render its uses "commercial"). To hold otherwise would swallow core examples of authorship listed in the fair use statute. *Bouchat*, 737 F.3d at 941.

### III. The fourth factor favors Defendants-Appellees, because "market substitution" considers only markets which are traditional, reasonable or likely to be developed.

In evaluating Plaintiff-Appellant's argument that Defendants-Appellees' use of his works harms a potential licensing market for him, Sedlik Br. at 22–23, this

11

Circuit should limit the scope of markets for potential uses to those "creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592; *see also Texaco*, 60 F.3d at 929–30 (recognizing limits on the concept of "potential licensing revenues" by considering only traditional, reasonable, or likely to be developed markets). This limitation is essential because expanding a "potential market" to include any "theoretical" use would render the fourth factor meaningless, as every secondary use would be considered "loss of a potential market." *Tresona Multimedia, LLC V. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020) (citation and quotation omitted). Misinterpreting the fourth factor to encompass any potential secondary market will endanger the works of authors who use copyrighted materials for historical context or research purposes. Limiting the scope of markets considered under the fourth factor to only those that exist or may reasonably be developed will, on the other hand, facilitate creativity. *See Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014) ("The goal of copyright is to stimulate the creation of new works, not to furnish copyright holders with control over all markets.").

Accordingly, speculative licensing markets for Plaintiff-Appellant's works are not automatically "reasonable" just because he has expressed a willingness to enter them. In *Bill Graham Archives*, the Second Circuit held that expressing a willingness to license images by itself neither establishes a market nor shows

impairment to a traditional market. 448 F.3d at 614. This Circuit has held that a copyright holder cannot prevent others from making fair use merely "by developing or licensing a market for . . . other transformative uses of its own creative work." *Tresona*, 953 F.3d at 652 (quoting *Bill Graham Archives*, 448 F.3d at 614–15). In its order denying Plaintiff-Appellant's motion for judgment and a new trial, the district court noted that he "never offered any evidence of a license for a social media post," and that "[n]one of the licenses offered by Plaintiff are quite analogous to the use at bar." *Sedlik v. Von Drachenberg*, No. 2:21-CV-01102, 2024 WL 4327404, at *5 (C.D. Cal. May 3, 2024).

Further, Defendants-Appellees' social media posts do not damage the marketability of Plaintiff-Appellant's photograph, because they cannot serve as market substitutes for the original photo. The social media posts reduced the quality and definition of Plaintiff-Appellant's photo so much that the details of the original work are effectively lost. What remains is the general likeness of Miles Davis. Viewers of Defendants-Appellees' social media cannot simply download the posts and crop out Plaintiff-Appellant's photo for other uses, or the photo would be too fuzzy. J.D. Biersdorfer, *Why That Digital Photo Print Is Fuzzy*, NEW YORK TIMES (Jun. 12, 2018), https://www.nytimes.com/2018/06/12/technology/personaltech/why-that-digital-photo-print-is-fuzzy.html. Viewers therefore cannot obtain a high-fidelity copy of Plaintiff-Appellant's photo without

13

securing an additional license from Plaintiff-Appellant. The social media posts do not harm the market for Plaintiff-Appellant's full-size image in the same way that thumbnails cannot substitute full-sized images due to their reduced resolution. *Perfect 10*, 508 F.3d at 1168; *see also Kelly v. Arriba Soft Corp*, 336 F.3d 811, 821 (9th Cir. 2002) (holding that the use of copyrighted photography in thumbnail images did not harm the market to license the original works because "[i]f a user wanted to view or download a quality image, he or she would have to visit Kelly's web site.").

Additionally, Defendants-Appellees' use did not harm the Plaintiff-Appellant's licensing market for documenting artistic processes because no such market exists or is likely to emerge. *See Campbell*, 510 U.S. at 592. Defendants-Appellees' social media posts serve to document her artistic process. Analysis under the fourth factor asks whether such use would cause substantial economic harm if "everybody did it." *Cambridge Univ. Press*, 769 F.3d at 1276 (quoting *Harper & Row, Publishers, Inc. v. Nation Enter.,* 471 U.S. 539, 566–67 (1985)). Everybody *is* doing it—in the absence of a licensing market for documenting process, creators and artists have always documented the progress of their work by relying on fair use, as long as their uses do not serve as market substitutes for the original works.

Holding that Defendants-Appellees' use was not fair in this case would disincentivize artists from documenting their works-in-progress. By requiring artists

14

to secure licenses for copyrighted material appearing in work-in-progress photos, this Circuit's decision would make documentation cumbersome and expensive, leading to fewer artists chronicling their creative processes. This in turn would hinder the studies of historians, art critics, and documentary filmmakers. Moreover, it is unclear that copyright owners would generally agree to license works for such purpose. Without the preservation of history, downstream research will be impoverished.

## **CONCLUSION**

For the foregoing reasons, *Amicus* respectfully requests that this Court affirm the decision of the district court.

Dated: December 23, 2024                    Respectfully submitted,

 /s/Christopher Bavitz
Christopher Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Ave, Lewis Ctr, 4th Fl
Cambridge, MA 02138
(617) 496-5155
cbavitz@law.harvard.edu

Counsel for *Amicus Curiae*[5]

---

[5] *Amicus* thanks fall 2024 Harvard Cyberlaw Clinic students Anthony Daoud, Kitty Luo, and Mickey McMahon for their valuable contributions to this brief.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to the Fed. R. App. P. 32(a)(7)(C), I hereby certify that:

This brief complies with the type volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b) and Ninth Circuit Rule 32-1(a) because it contains 3,557 words as calculated by the word count feature of Microsoft Word, exclusive of sections exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5)(A) and (a)(6) because it uses 14-point proportionally spaced Times New Roman font.

Dated: December 23, 2024

/s/Christopher Bavitz
Christopher Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Ave, Lewis Ctr, 4th Fl
Cambridge, MA 02138
617-496-5155
cbavitz@law.harvard.edu

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of *Amicus Curiae* Authors Alliance in Support of Defendants-Appellees and Affirmance with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 19th, 2024. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECC system.

Dated: December 23, 2024

/s/Christopher Bavitz

Christopher Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Ave, Lewis Ctr, 4th Fl
Cambridge, MA 02138
617-496-5155
cbavitz@law.harvard.edu