No. 24-3367

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

JEFFREY B. SEDLIK,

*Plaintiff-Appellant*,

v.

KATHERINE VON DRACHENBERG, KAT VON D, INC., HIGH
VOLTAGE TATTOO, INC.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-01102
Hon. Dale S. Fischer

_____

**BRIEF OF *AMICUS CURIAE* PROFESSOR PAMELA SAMUELSON
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

_____

Erik Stallman
Samuelson Law, Technology &
   Public Policy Clinic
UC Berkeley School of Law
353 Law Building
Berkeley, California 94720-7200
(510) 642-2485
estallman@clinical.law.berkeley.edu

*Attorney for Amicus Curiae
Pamela Samuelson*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF *AMICUS CURIAE* .......................................................1

SUMMARY OF ARGUMENT ...........................................................2

ARGUMENT ..............................................................................4

    I.    Juries Can Properly Decide The Question of Fair Use. .......................4

        A.    Appellant requested that the jury deliver a verdict on fair use...5

        B.    Tasking a jury with deciding the question of fair use is consistent with *Google v. Oracle* and the holistic nature of the fair use inquiry. ..............................................................6

    II.    *Warhol* Emphasizes That Fair Use Determinations Require a Use-Specific Inquiry. ....................................................................10

        A.    Commerciality. ........................................................12

        B.    Market effects. .........................................................14

        C.    Transformativeness. ..................................................17

    III.    *Warhol* Recognizes a Range of Valid Justifications for Borrowing...19

        A.    *Warhol*'s use-specific holding is narrow and consistent with established fair use jurisprudence. ...........................................20

        B.    *Warhol* endorses justifications beyond targeting the original work. .......................................................................21

    Conclusion ..............................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
  82 F.4th 1262 (D.C. Cir. 2023) ...................................................................17

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
  896 F.3d 437 (D.C. Cir. 2018) ...................................................................14

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*,
  No. 24-1895, slip op. (E.D. Pa. Oct. 2, 2024) .......................................12, 13

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
  598 U.S. 508 (2023) ...........................................................................passim

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ...........................................................9, 16, 21, 25

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*,
  27 F.4th 313 (5th Cir. 2022) .................................................................14, 15

*Bell v. Moawad Grp. LLC*,
  326 F. Supp. 3d 918 (D. Ariz. 2018) ...........................................................14

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ........................................................................24

*Brewer v. Hustler Magazine, Inc.*,
  749 F.2d 527 (9th Cir. 1982) ........................................................................7

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*,
  585 F.3d 267 (6th Cir. 2009) ........................................................................7

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ....................................................................16

*Campbell v. Acuff-Rose Music*,
  510 U.S. 569 (1994) ...........................................................................passim

*Compaq Comput. Corp. v. Ergonome Inc.*,
  387 F.3d 403 (5th Cir. 2004) ........................................................................7

*DC Comics Inc. v. Reel Fantasy, Inc.*,
  696 F.2d 24 (2d Cir. 1982) ...........................................................................7

*Estate of Smith v. Graham*,
    799 Fed. Appx. 36 (2d Cir. 2020) ................................................................15

*Facility Guidelines Inst., Inc. v. UpCodes, Inc.*,
    677 F. Supp. 3d 955 (E.D. Mo. 2023) ........................................................12

*Fox Broad. Co. v. Dish Network LLC*,
    747 F.3d 1060 (9th Cir. 2014) ....................................................................28

*Google LLC v. Oracle America Inc.*,
    593 U.S. 1 (2021) .................................................................................passim

*Griner v. King*,
    104 F.4th 1 (8th Cir. 2024) ...........................................................................7

*Jartech, Inc. v. Clancy*,
    666 F.2d 403 (9th Cir. 1982) ......................................................................27

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ......................................................................26

*Nunez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000) ........................................................................26

*Oracle America, Inc. v. Google Inc.*,
    2016 WL 3181206 (N.D. Cal. June 8, 2016) ..............................................18

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*,
    180 F.3d 1072 (9th Cir. 1999) ....................................................................28

*Religious Tech. Ctr. v. Wollersheim*,
    971 F.2d 364 (9th Cir. 1992) ......................................................................27

*Sedlik v. Von Drachenberg et al.*,
    No. 2:21-cv-01102-DSF-MRW (C.D. Cal. Feb. 7, 2021) ........................5, 8

*Sega Enters., Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ................................................12, 14, 17, 23

*SOFA Ent., Inc. v. Dodgers Prods.*,
    709 F.3d 1273 (9th Cir. 2013) ....................................................................27

*Sony Comput. Ent. Am., Inc. v. Bleem, LLC*,
    214 F.3d 1022 (9th Cir. 2000) ..............................................................10, 12

*Sony Comput. Ent. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ......................................................................12

iv

*Sony Corp. Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .......................................................................28

*Splunk Inc. v. Cribl, Inc.*,
    No C 22-072611 WHA (N.D. Cal. May 24, 2024) ......................18

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)....................................................13, 15

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intelligence, Inc.*,
    694 F. Supp. 3d 467 (D. Del. 2023) ............................................17

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020)........................................................15

*Ty, Inc. v. Publications International Ltd.*,
    292 F.3d 512 (7th Cir. 2002)........................................................18

*U. S. Bank N. A. v. Village at Lakeridge, LLC*,
    583 U.S. 387 (2018)........................................................................8

*U.S. v. Guthrie*, 931 F.2d 564, 567 (9th Cir. 1991) ...........................4

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000)......................................................13

## Other Authorities

4 Nimmer on Copyright § 13F.04 (2024) ...........................................7

4 Nimmer on Copyright § 13F.11 (2024) ...........................................9

## Rules

Pamela Samuelson & Clark D. Asay, *Saving Software's Fair Use Future*,
    31 Harv. J. L. & Tech. 536 (2018) ...............................................23

Pamela Samuelson, *Unbundling Fair Uses*,
    77 Fordham L. Rev. 2537 (2009)................................................21

Pierre N. Leval, *Toward a Fair Use Standard*,
    103 Harv. L. Rev. 1105 (1990) .....................................................9

## INTEREST OF *AMICUS CURIAE*

Professor Pamela Samuelson is the Richard M. Sherman Distinguished Professor of Law at UC Berkeley Law. She has been teaching and writing about copyright law since 1981 and has published seven law review articles analyzing the fair use doctrine. Her sole interest in this case is to preserve breathing space for secondary uses that further the purposes of the Copyright Act and confer significant public benefits, and that an overly restrictive interpretation of the Supreme Court's *Warhol* decision would undermine.[1]

---

[1] All parties have given blanket consent to the filing of amicus briefs. No party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution to fund the preparation or submission of this brief. No person or entity made a monetary contribution to the preparation or submission of this brief. Professor Samuelson thanks Berkeley Law students Roma Bhojwani, Angelica Kang, and Sandeep Stanley for their assistance in preparing this brief.

## SUMMARY OF ARGUMENT

The Supreme Court's recent decisions in *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508 (2023) [hereinafter *Warhol*] and *Google LLC v. Oracle America Inc.*, 593 U.S. 1 (2021) [hereinafter *Google* or *Google v. Oracle*] do not support—let alone require—the revision and narrowing of fair use doctrine sought by Appellant here. That narrowing would destabilize fair use's role in enabling secondary uses of original works that further the purposes of copyright and confer substantial public benefit.

The Supreme Court's *Google* decision reaffirmed that fair use is a mixed question of law and fact. When litigants agree that there are no disputes of material fact between the parties, summary judgment is an efficient way to resolve whether challenged uses were fair or unfair. Where, as here and as in *Google*, there were disputes of material fact, juries can weigh the facts presented at trial and properly answer the ultimate question of fair use, particularly when parties ask them to do so. Fair use is not a rigid, factor-by-factor checklist but a holistic inquiry requiring the factors to be considered together, as emphasized in *Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994) [hereinafter *Campbell*].

*Warhol* instructs courts, juries, and parties to address the question of fair use in light of the details of each specific use contested. The jury form used below

2

properly followed this instruction. Use-specific details matter, especially where, as here, there are material disputes about those details. Commerciality, market effects, and transformativeness are matters of degree and interrelated considerations that must be assessed in the context of each specific use. The District Court's instructions and the jury's verdict were consistent with this understanding and with this Court's precedents.

The *Warhol* decision did not work a sea-change in fair use jurisprudence and in fact sought to remain faithful to "longstanding principles of fair use." *Warhol*, 598 U.S. at 549. It addressed only the first factor of the fair use inquiry and clarified that a new message or meaning alone does not suffice to tip the first factor in favor of the secondary use when that use serves the same purpose and market as the original work. *Warhol*'s discussion of targeting does not diminish or narrow the range of valid justifications for secondary uses beyond criticism or comment on expression in the original work.

*Warhol* and *Google* are important cases, but they do not support upending the equally important fair use precedents and principles they are built on. This Court should affirm.

3

## ARGUMENT

### I.  JURIES CAN PROPERLY DECIDE THE QUESTION OF FAIR USE.

A party should not be allowed to request that a jury decide the question of fair use and then object to the jury doing so after it reaches an unfavorable verdict. *See U.S. v. Guthrie*, 931 F.2d 564, 567 (9th Cir. 1991) ("invited error" doctrine bars a party from attacking on appeal a jury instruction proposed by that party). The Supreme Court in *Google* did not hold that the lower court erred in sending the fair use issue to the jury and did not question that juries could answer the ultimate question of fair use. *See Google*, 593 U.S. at 16–19. Weighing each of the fair use factors individually and collectively to determine whether the challenged use was justified requires both legal and factual work. Where there are no material disputes of fact, deciding fair use on summary judgment is appropriate. However, when unresolved factual questions drive the holistic fair use inquiry, it is entirely appropriate for juries to decide the question of fair use.

The Supreme Court has never questioned that juries can render verdicts on fair use or limited the jury's role to making merely subsidiary factual determinations, and this Court should not do so here. To do so would depart unnecessarily from the common practice of allowing parties to request that juries decide the fair use question when material facts are in dispute.

4

## A. Appellant requested that the jury deliver a verdict on fair use.

As noted by the District Court and Appellee, there are substantial questions as to whether Appellant properly preserved the fair use issues he now brings before this Court. *See, e.g.*, Order on Renewed Mot. for Judgment as a Matter of Law and Request for New Trial, ER-6–7 (noting Appellant's failure to bring a motion for new trial under Rule 50(a) before bringing a renewed motion for new trial under Rule 50(b)). Although this brief focuses on fair use rather than civil procedure, three related procedural points make this case a uniquely poor vehicle to decide whether *Google v. Oracle* imposes any limits on a jury's role in fair use cases.

First, a fair reading of the record below suggests that Appellant asked to give the ultimate question of fair use to the jury and supplied language for the verdict form. *See* ER-14–15; Plaintiff's Proposed Verdict Form, *Sedlik v. Von Drachenberg et al.*, No. 2:21-cv-01102-DSF-MRW (Doc. No. 106-1) (C.D. Cal. Feb. 7, 2021) ("Do you find by a preponderance of the evidence that Defendants proved that their use of the Miles Davis Photograph was a fair use?"). Second, he actively participated in the drafting of the jury instructions. The District Court noted that Appellant "was intimately involved in the drafting of the jury instructions and the verdict form. Never once did he suggest that the issue of fair use was not fit for a jury, or that the Court should bifurcate the verdict between factual and legal issues." ER-14–15. Third, he also appears to have challenged the

5

propriety of the jury deciding that question only after it reached a verdict in Appellees' favor. ER-14.

By accepting—or, indeed, requesting—the jury's role from the start, parties uphold the structured, fact-driven approach that fair use determinations demand, fostering legal stability and respect for the nuanced and holistic nature of the fair use inquiry. Allowing a party to wait until after a jury returns an unfavorable verdict to argue that the jury never should have been allowed to make a fair use determination in the first instance would create procedural uncertainty and compromise the finality of jury verdicts in fair use cases. Nothing in the Supreme Court's *Google* decision compels that result.

**B.    Tasking a jury with deciding the question of fair use is consistent with *Google v. Oracle* and the holistic nature of the fair use inquiry.**

One need not look further than *Google v. Oracle* for an example of a jury properly deciding the ultimate question of fair use. The District Court there tasked the jury with answering "has Google shown by a preponderance of the evidence that its use constitutes a 'fair use' under the Copyright Act?" *Google*, 593 U.S. at 19 (cleaned up). After three days of deliberation, the jury answered the question in the affirmative. *Id.* at 16. While the Supreme Court rejected Google's argument that a reviewing court may examine a jury's fair use verdict only to determine

6

whether substantial evidence supports that verdict, nowhere did it suggest that giving the fair use question to the jury in the first instance was incorrect. *See id*.

Indeed, the Supreme Court repeatedly referred to what the jury had heard at several points on its way to reaching the same conclusion on that question that the jury did. *See, e.g.*, *id.* at 30 ("The jury heard that Google limited its use of the Sun Java API to tasks and specific programming demands related to Android."); *see also* 4 Nimmer on Copyright § 13F.04 (2024) ("the factual findings implicit in the jury's verdict in favor of Google justified resolving factors one, two, and four in Google's favor"). Juries have properly made fair use determinations both before and after the *Google* decision. *See, e.g.*, *Griner v. King*, 104 F.4th 1, 8 (8th Cir. 2024); *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 278 (6th Cir. 2009); *Compaq Comput. Corp. v. Ergonome Inc.*, 387 F.3d 403, 410–11 (5th Cir. 2004); *DC Comics Inc. v. Reel Fantasy, Inc.*, 696 F.2d 24, 28 (2d Cir. 1982); *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 529 (9th Cir. 1982).

In clarifying the standard of review to apply to the District Court's decision in *Google v. Oracle*, the Supreme Court explained that reviewing courts should break questions down to separate factual and legal components. *Google*, 593 U.S. at 24. However, it never stated that in every case, the jury's role should be confined to resolving subsidiary issues in the fair use determination. Instead, it noted that "when a question can be reduced no further, we have added that 'the

7

standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work.'" *Id.* (citing *U. S. Bank N. A. v. Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018)). "In *this* case," the Supreme Court explained, "the ultimate 'fair use' question primarily involves legal work." *Id*. (emphasis added).

But the *Sedlik* case is different. Given the number of contested questions of fact, there are stronger indicia here than in *Google* that the ultimate fair use question involves factual work. For example, *Google* characterized as factual the question whether there was harm to the actual or potential markets for the copyright work. *Google*, 593 U.S. at 24. Here, the existence and reasonableness of an actual or potential market for the licensing of photographs as reference images for tattoos and the effect of Defendants' use on those markets were central issues in the resolution of the fair use question. The jury heard conflicting evidence on this issue and could reasonably have resolved this dispute in Appellees' favor. *Compare* Transcript of Proceedings at 635–37, *Sedlik v. Von Drachenberg et al.*, No. 2:21-cv-01102-DSF-MRW (No. 228) (C.D. Cal. 2024) (Plaintiff's summary of evidence on market harm) *with* Transcript of Proceedings at 667–76, *Sedlik v. Von Drachenberg et al.*, No. CV 21-1102-DSF-MRW (No. 228) (C.D. Cal. 2024) (Defendants' summary of evidence on market harm).

Allowing the jury to decide the question of fair use is also consistent with the holistic and interrelated nature of the fair use inquiry. *See Campbell*, 510 U.S. at 578 (fair use factors cannot be considered in isolation but must be weighed together "in light of the purposes of copyright"); *see also Warhol*, 598 U.S. at 551 (citing *Campbell*); Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110 (1990) ("The factors do not represent a score card that promises victory to the winner of the majority"). Fair use is a relational and interdependent inquiry in which factors such as the amount and substantiality of the portion of the original work used cannot be divorced from the inquiry into the purpose of the secondary use. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015) [hereinafter *Authors Guild*]. Individual factors can and often do point in a different direction from the ultimate answer. *See, e.g.*, *Campbell*, 510 U.S. at 586 (holding that the second factor, the nature of the copyrighted work, weighed against fair use).

The fair use factors provide indispensable context for each other. 4 Nimmer on Copyright § 13F.11. The assessment of any given factor is often a matter of degree and is seldom dispositive. Further, considerations often must be weighed even *within* a given factor, such as the relationship between transformativeness and commerciality under factor one. *Campbell*, 510 U.S. at 579. As a result, fact-finders—and especially juries—can correctly decide whether a challenged use is

9

fair only after considering every aspect of the question. The District Court recognized the potential for confusion if the jury was instructed on factors in isolation and allowed it to consider the entire fair use question in the holistic manner required by *Campbell* and *Google*. ER–14. This was proper and consistent with guidance from this Court. *See Sony Comput. Ent. Am., Inc. v. Bleem, LLC*, 214 F.3d 1022, 1026 (9th Cir. 2000) ("The four factors are to be considered together in light of the purposes of copyright, not in isolation.").

## II. *WARHOL* EMPHASIZES THAT FAIR USE DETERMINATIONS REQUIRE A USE-SPECIFIC INQUIRY.

*Warhol*'s clearest teaching is that fair use must be assessed on a use-by-use basis. 598 U.S. at 533. Judges or juries must apply fair use factors with particularity to each challenged use. Parties cannot take shortcuts by lumping all challenged uses together. *Contra* Appellant Br. at 54 (claiming that because appellee runs a business, all her activities are commercial as a matter of law). Nor can parties resort to bright-line rules to evade the required use-specific inquiry.

Indeed, the *Warhol* decision and the precedents it builds on teach the exact opposite—the inquiry is designed to be flexible, resisting "rigid, bright-line approach[es]" in favor of adaptability to the specific facts of each use. *Campbell*, 510 U.S. at 584; *Warhol*, 598 U.S. at 527 (noting that the fair use is a "flexible concept" designed to "avoid rigid application of the copyright statute") (cleaned

10

up). It is inconsistent with this flexible design to say, for example, that because a second comer runs a business that all secondary uses should be deemed commercial. This is precisely the type of rigid, bright-line approach that fair use precedents resist.

The Supreme Court in *Warhol* considered only the fairness of the grant of one commercial license for the use of Orange Prince for magazine coverage about the singer and limited its analysis accordingly. 598 U.S. at 534. Believing that Goldsmith had abandoned her claim that the 1984 creation of the Prince Series infringed her derivative work right, the Court did not assess fair use as to those works. *Id.* at 534 n.9. However, it suggested that the Andy Warhol Foundation might be able to use the Prince Series for purposes for which Goldsmith's photograph would not be a suitable substitute. *Id.* at 534 n.10 ("Had AWF's use been solely for teaching purposes, that clearly would affect the analysis."). It would be improper to conflate the analyses of two distinct uses of a secondary work, let alone the analyses of two different secondary works. *See id.* (faulting the dissent for assuming "that any and all uses of an original work entail the same first-factor analysis based solely on the content of the secondary work").

The jury verdict form below follows this guidance, asking the jury to make an individual determination for each specific use where substantial similarity was not contested. However, that use-specific assessment is absent in Appellant's brief

11

to this Court. *See, e.g.*, Appellant's Br. at 48–49 (discussing all fifteen uses collectively when discussing transformativeness). An analysis of the three most contested issues in this case—commerciality, market effects, and transformativeness—demonstrates both the wisdom of use-specific fair use determinations and the propriety of a jury making those determinations here.

## A. Commerciality.

Commerciality requires a contextual and use-specific inquiry that eschews rigid, bright-line rules. At the outset, this Court has held repeatedly that secondary uses with commercial considerations can nevertheless be fair. *Sony Comput. Ent. v. Connectix Corp.*, 203 F.3d 596, 606–07 (9th Cir. 2000), *Sony Comput. Ent. Am., Inc. v. Bleem, LLC*, 214 F.3d 1022, 1027 (9th Cir. 2000), and *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) [hereinafter *Sega*].

Further, that a secondary user is a commercial actor does not automatically render the secondary use commercial. For example, multiple courts have found that a secondary user's posting of copyrighted standards on its website was "largely of a non-commercial nature," although that secondary user was a for-profit company. *Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, 677 F. Supp. 3d 955, 971 (E.D. Mo. 2023); *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, No. 24-1895, slip op. at 21 (E.D. Pa. Oct. 2, 2024). The courts considered relevant that the standards were accessible free of charge and that the company "derives no direct monetary

profit" from the publication. *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, No. 24-1895, slip op. at 22; *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (holding that the link between the defendant's copying and profit was "too attenuated" to establish commercial considerations). Again, the details of the specific use matter. There is a vast difference between a professional musician playing a cover song to a packed concert venue and the same musician playing a personalized cover song to cheer up an ailing friend in their home. A jury would be within its rights to decide that this case is closer to the latter performance than the former.

For the same reason, *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000), does not establish a bright-line rule that nonmonetary benefits, such as attracting new congregants for a church, necessarily render a secondary use commercial. There, this Court described the use at issue in the offshoot congregation's copying of a religious text as attracting members—the *exact same purpose* of the founding church when authoring the original text. *See id.* at 1113, 1117–18. *Worldwide Church of God* thus simply expressed the key principle that the Supreme Court clarified in *Warhol*: that a secondary use made for the same purposes as the original work—copyright's "bête noire"—generally is not fair without a compelling justification for the taking. *See Warhol*, 598 U.S. at 528, 537–38.

13

Recent cases have rejected the expansive view of commerciality urged here. In *Bell v. Eagle Mountain Saginaw Independent School District*, the Fifth Circuit declined to find a use commercial when the plaintiff could not show with specificity how the alleged reputational gains would lead to future profits. 27 F.4th 313, 322 (5th Cir. 2022). *See also Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 449 (D.C. Cir. 2018) (potential enhancements to "fundraising appeal" insufficient to deem a secondary use commercial).

Determining whether contested uses are commercial or noncommercial turns on details of the intent and effect of each use. Those are questions of fact. *See, e.g.*, *Bell v. Moawad Grp. LLC*, 326 F. Supp. 3d 918, 926–27 (D. Ariz. 2018) ("dispute of fact" as to whether reproduction of an inspirational quote on a commercial website was a commercial or noncommercial use). And those details were in dispute in the proceedings below. Moreover, the question of commerciality is a matter of degree rather than a binary determination. *Sega*, 977 F.2d at 1522. It was therefore appropriate for the jury to consider commerciality as but one factor in its overall fair use determination.

### B. Market effects.

The Court in *Google* recognized that the effect of a secondary work on the original work's market or potential markets is a question of fact. 593 U.S. at 36;

14

*see also Campbell*, 510 U.S. at 590 n.21 ("[m]arket harm is a matter of degree"). And *Warhol* makes clear that answering that question depends on the specific use at issue. 598 U.S. at 533. This makes sense as answering the question requires first identifying reasonable and foreseeable markets, then determining the effects on those markets.

Plaintiffs may allege harm only to markets which they are in, are reasonably likely to develop, or license to others to develop. *Campbell*, 510 U.S. at 592. This rule prevents the "vice of circular reasoning" that would make the fourth factor tip against fair use in every case where a copyright owner asserts a right to license the secondary use. *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 91. Thus, in *Tresóna Multimedia, LLC v. Burbank High School Vocal Music Association*, this Court held that a plaintiffs' insistence on a license for the use of a 20-second excerpt of a composition rearranged in an original composition for a high school choir did not in itself create a cognizable market for such uses. 953 F.3d 638, 652 (9th Cir. 2020); *see also Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 325 (5th Cir. 2022); *Estate of Smith v. Graham*, 799 Fed. Appx. 36, 39 (2d Cir. 2020) ("Nor is there evidence of the existence of an active market for the 'Jimmy Smith Rap,' which is vital for defeating Defendants' fair use defense."). Focusing on the specific use at issue is essential to identifying relevant markets. Identifying those markets may also require a jury to consider and weigh conflicting evidence.

15

*See, e.g.*, *Google*, 593 U.S. at 37–38 (discussing conflicting evidence regarding Sun's ability to enter the smartphone market).

After identifying actual and potential markets, a judge or jury must determine whether there is or could be sufficient harm to that market to affect the copyright owner's incentives. The "central question under the fourth factor" is whether "Defendant's use—taking into account the harm that would occur if 'everybody did it'—would cause *substantial* market harm such that allowing it would frustrate the purposes of copyright by materially impairing [Plaintiff's] incentive to publish the work." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014) (emphasis in original); *Authors Guild*, 804 F.3d at 224 (asking whether the challenged use "threatens the rights holder with any significant harm to the value of their copyrights or diminish their harvest of copyright revenue"). Again, the specific use matters in determining the existence and extent of any market effects.

Here, the jury heard extensive and conflicting testimony on the market effects issue. And it appropriately considered that issue as part of a holistic inquiry. Ascertaining and weighing cognizable market effects requires a careful balancing of considerations presented by other fair use factors, including the public benefit the secondary use will likely produce and the secondary user's purpose in copying. For example, the Supreme Court in *Google* considered the public benefit of

16

innovation resulting from Google's use to counterbalance Oracle's alleged losses. 593 U.S. at 39; *see also Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc*., 82 F.4th 1262, 1271–72 (D.C. Cir. 2023) (holding post-*Warhol* that public benefits were enough to counterbalance potential harm to both primary and secondary markets).

### C.    Transformativeness.

Stepping through each challenged use is particularly important during the assessment of transformativeness under the first fair use factor. Like commerciality, transformativeness is a matter of degree. *Warhol*, 598 U.S. at 529; *Sega*, 977 F.2d at 1522. One recent decision has ruled that it was proper for a jury to decide whether a defendant had a transformative purpose in using Westlaw headnotes to train an artificial intelligence model. *Thomson Reuters Enterprise Centre GmbH v. Ross Intelligence, Inc.*, 694 F. Supp. 3d 467 (D. Del. 2023) [hereinafter *Ross Intelligence*]. The district court rejected the "black-and-white picture on transformativeness" offered by the plaintiff. *Ross Intelligence*, 694 F. Supp. 3d at 482. The court further noted that the question of transformativeness turned on nuanced distinctions about the nature of the model's intermediate copying and whether Ross Intelligence's purpose in copying "untransformed text" was to train its model to "replicate and reproduce the creative drafting done by Westlaw's attorney-editors." *Ross Intelligence*, 694 F. Supp. 3d at 484. There were

17

"material question[s] of fact that the jury needs to decide" to resolve the ultimate question of fair use. *Id.*; *see also* Mem. Op. on Fair Use at 3, *Splunk Inc. v. Cribl, Inc.*, No C 22-072611 WHA (N.D. Cal. May 24, 2024) (jury asked to answer whether a use of software for reverse engineering was "a transformative use resulting from [Defendant's] copying and use of [Plaintiff's software]").

Nuanced distinctions in the nature of the copying also factored into the Seventh Circuit's reasoning in *Ty, Inc. v. Publications International Ltd.*, 292 F.3d 512 (7th Cir. 2002). There, the Seventh Circuit noted distinctions between the different accused works and held that summary judgment would be inappropriate because the lower court had not engaged in a work-by-work assessment that fair use requires. *Id.* at 521–23. The court explained that "the proper characterization of [the secondary works] is the kind of fact-laden issue appropriate for summary judgment only in extreme cases." *Id.* at 519.

In this case, the parties disagreed about Appellees' purpose in copying Appellant's photograph. Moreover, that purpose may differ for each of the contested secondary uses. Determining the intent and purposes for copying is often a fact-intensive inquiry. *See, e.g.*, *Oracle America, Inc. v. Google Inc.*, 2016 WL 3181206 (N.D. Cal. June 8, 2016) at *7 (noting how "fact-bound the issue [of Google's purpose in copying elements of the Java API] was, another classic role of a jury to resolve"). It was proper for the jury to make that determination for each

18

secondary use on which substantially similarity was not contested, and that determination is similarly fact-bound. The jury could have determined that Appellees' purpose in creating and posting the "process" social media posts was wholly different from Appellant's purpose in creating and exploiting the original photograph, and thus transformative under *Warhol*.

This brief takes no position on whether the specific uses on which the jury reached the question of fair use were or were not transformative or commercial, or did or did not affect the cognizable markets for the Miles Davis photograph. It notes only that it was proper for the jury to consider these and other questions, the answers to which turn on the details of the specific uses the jury was asked to consider. This Court should reject attempts to elide distinctions among those uses.

### III.    *WARHOL* RECOGNIZES A RANGE OF VALID JUSTIFICATIONS FOR BORROWING.

*Warhol* did not confine the range of justifications for secondary uses of original works to those that involve targeting the original for criticism or comment. While clarifying that "*Campbell* cannot be read to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message," *Warhol*, 598 U.S. at 511–12, the decision does not otherwise narrow or diminish the range of justifications that this Court and others have held to weigh in favor of fair use. *Warhol* sought to maintain consistency with those precedents, in part by citing

19

approvingly to cases where reviewing courts found a secondary use justified for purposes beyond targeting or commenting on the original work.

**A.** ***Warhol*'s use-specific holding is narrow and consistent with established fair use jurisprudence.**

Appellant misreads *Warhol* when asserting that it rejected arguments similar to the ones Appellees made below regarding substantial similarity and fair use as they pertain to the use of a photograph to make new expressive work. *See* Appellant Br. at 1. *Warhol* never addressed substantial similarity, never rejected fair use with respect to the creation of the Prince Series works, and, indeed, never went beyond the first factor of the fair use analysis. *Warhol*, 598 U.S. at 516. The decision addressed only Condé Nast's licensing of Orange Prince, having concluded that Goldsmith had abandoned any claims with respect to the original Prince Series works themselves. *Warhol*, 598 U.S. at 535 n.9. Thus, the Supreme Court evaluated only whether the first fair use factor weighed in favor of the Andy Warhol Foundation's commercial licensing to Condé Nast. *Warhol*, 598 U.S. at 516.

In that evaluation, the Court repeatedly emphasized that its discussion of a secondary work's purpose was entirely consistent with established fair use principles. *See Warhol*, 598 U.S. at 549, 543 n.18 (noting that "the same concepts of use and justification that the Court relied on in *Google* are the ones that it

20

applies today"). This consistency is crucial, as it leaves intact precedents that enable essential and lawful uses of works that neither "target" the original work in a narrow sense nor fit squarely into one of § 107's preamble uses.

**B.** *Warhol* **endorses justifications beyond targeting the original work.**

*Warhol* also made clear that "targeting is not always required," highlighting that uses unrelated to criticism or commentary—such as those that facilitate interoperability or reveal new information about the original work—can also be fair. *See Warhol*, 598 U.S. at 533 n.8, 547 n.21 (citing *Google v. Oracle* and *Authors Guild* as examples of justifications beyond traditional targeting). As Judge Leval noted in his *Authors Guild* decision, "[a] taking from another author's work for the purpose of making points that have no bearing on the original may well be fair use, but the taker would need to show a justification." 80 F.3d at 213–15. A use can be justified in a "narrower sense" if the "copying is reasonably necessary to achieve the user's new purpose," or a broad sense, if "it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Warhol*, 598 U.S. at 531–32; *see also* Pamela Samuelson, *Unbundling Fair Uses*, 77 Fordham L. Rev. 2537, 2545–46 (2009) (reviewing more than 300 fair use cases decided between 1978 and 2009, and providing a taxonomy for those cases based in part on the justification for borrowing). The *Warhol* decision leaves room for many types of justifications

21

beyond targeting the original work, as is apparent from the cases it cites when explaining when borrowing is justified.

### 1. Secondary uses that enable third-party creativity.

*Warhol* reaffirmed that Google's use of parts of the Java application programming interface ("API") in *Google v. Oracle* was justified because the copying was "necessary for different programs to speak to each other" and because it enabled programmers to reuse their skills. *See Warhol*, 598 U.S. at 533 n.8 (citation omitted). *Warhol* observed that the Court in *Google* "looked, first, to whether the purpose of the use was significantly different from that of the original; and, second, to the strength of other justifications for the use." *Id.* The Supreme Court in *Google* found that Google's reimplementation of the Java API gave "programmers a highly creative and innovative tool" and that such "creative progress" was consistent with the objective of copyright. *Google*, 593 U.S. at 30. *Warhol* agreed that this secondary use was "justified" because the reimplementation was "necessary if programmers [were] to be able to use their acquired skills." *Warhol*, 598 U.S. at 533 n.8 (citing *Google*, 593 U.S. at 39).

*Google* itself echoed earlier cases recognizing compatibility and interoperability as valid fair use justifications because they encourage the creation of new works and greater access to those works. For example, the copying at issue in *Sega* was justified because it served solely to discover functional requirements

22

for compatibility, which "led to an increase in the number of independently designed video game programs." *Sega*, 977 F.2d at 1522–23; s*ee also* Pamela Samuelson & Clark D. Asay, *Saving Software's Fair Use Future*, 31 Harv. J. L. & Tech. 536, 547–49 (2018) (discussing compatibility and interoperability cases). By endorsing *Google*'s recognition of a fair use justification in enabling programmers to create new works for new computing environments, *Warhol* maintains fidelity with established fair use jurisprudence.

### 2. Where the secondary use has a different and non-substitutional purpose.

The Supreme Court first used Warhol's artworks to clarify valid justifications for borrowing in its *Google* decision. There, it used an "artistic painting" that replicated a "copyrighted advertising logo" to illustrate a secondary use that has a further purpose that "adds something new and important." *Google*, 593 U.S. at 29 (cleaned up). The *Warhol* decision clarified this example further, emphasizing that the purpose of the Campbell's logo is "to advertise soup" and that "Warhol's canvases do not share that purpose." 593 U.S. at 539. What matters is that the secondary use "does not supersede the objects" of the original work. *Id.*

*Warhol* goes on to explain that a "further purpose" of Soup Cans was "at least in part" to target the logos themselves as part of a broader "artistic commentary on consumerism." *Id.* at 539–40. However, this was not the only or

even the primary justification for the use of the original. What matters was the distinct and non-substitutional purpose of the second comer. On this point, the majority opinion found agreement with Justice Gorsuch's concurrence, *id.* at 556 (focusing on whether the secondary work is a "competing product" or "commercial substitute" for the original). Because of their different purpose, these artworks were transformative under *Warhol*'s reasoning.

That reasoning echoes the Second Circuit's explanation of Jeffrey Koon's "Niagara" in *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006). The court there noted that the secondary use was closer to satire than parody and therefore required "justification for the very act of borrowing. *Blanch*, 467 F.3d at 255 (quoting *Campbell*, 510 U.S. at 580–81). It found that justification in the words of the artists, who explained that the original work's typicality "of a certain style of mass communication" were central to the point he sought to make. *Id.* As with Soup Cans, the use was justified even though the artist could have conceivably created the secondary work without reference to the original. *Id.* Again, commenting on the original work is but one justification among many.

### 3. Secondary uses that provide access to otherwise unavailable information.

*Warhol* cited approvingly the Second Circuit's decision in *Authors Guild* as a case where the secondary use was justified because it "provides otherwise unavailable information about the original." *See Warhol*, 598 U.S. at 545 (citation

24

omitted). In affirming a lower court ruling that Google's use was fair, the Second Circuit said Google had made a transformative use of the books because Google Book Search "augments public knowledge by making available information about Plaintiffs' books without providing the public with a substantial substitute" for the books Google digitized. *Authors Guild*, 804 F.3d at 207. In keeping with *Campbell*'s definition of transformative purposes, Google's use of the books was for a different purpose than the originals and in addition, enabled greater public access to information not just about the underlying works, but also about the languages and literary cultures they represented. *See Authors Guild*, 804 F.3d at 209 (discussing uses of the "ngrams" research tool).

*Warhol* agreed that this was a justifiable fair use purpose. It also quoted the Second Circuit opinion's explanation of the relationship between this "narrow" justification and the broader justification of furthering the purposes of copyright: "'The more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of the copyrighted work.'" *Warhol*, 598 U.S. at 31 (quoting *Authors Guild*, 804 F.3d at 214). These statements recognize a range of fair use justifications that go beyond targeting and echo justifications recognized by this Court in earlier cases. *See, e.g.*,

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) (noting the secondary use did not "supplant the need for the originals" and "benefit[s] the public by enhancing information gathering techniques").

### 4. Evidentiary uses of the original work.

*Warhol* recognized that a secondary use may be justified when the original work is the "story" for reasons unrelated to its expressive content. The Court cited approvingly to the First Circuit's decision in *Nunez v. Caribbean Int'l News Corp.*, which held that a newspaper had a transformative purpose in reproducing a photographer's nude photographs of Miss Puerto Rico Universe because of the controversy about whether she should still wear that crown. 235 F.3d 18 (1st Cir. 2000). *Warhol* quoted that court's explanation: "[the] newspaper's reproduction, without alteration, of photograph[s] of beauty pageant winner to explain controversy over whether her title should be withdrawn had transformative purpose because 'the pictures were the story.'" *Warhol*, 598 U.S. at 529 n.5 (quoting *Nunez*, 135 F.3d at 21–23). The newspaper was not targeting the photographs to comment on or criticize the quality of Nunez's photographs. The secondary use did not target the artistic techniques of the photograph but rather the subject of the photograph. The photograph provided necessary context for readers, enabling them to understand the broader social debate surrounding the appropriateness of Giraud's candidacy.

26

This Court has similarly upheld fair use findings where the purpose and justification for the use of the original work is evidentiary and unrelated to its expressive elements In *SOFA Entertainment, Inc. v. Dodgers Productions*, a musical copied a 7-second clip from the Ed Sullivan Show, featuring Sullivan's introduction of the Four Seasons band. 709 F.3d 1273, 1277 (9th Cir. 2013). While there was no commentary on the original work, the use of the clip "as a biographical anchor" was justified because it provided historical evidence of the band's prominence during a time when the "British Invasion" overshadowed other American rock bands. *See id*. at 1278. The clearest cases are of course where the original work functions as actual evidence. *See Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 (9th Cir. 1992) (copying Scientology texts was justified when used to prepare expert testimony for litigation); *Jartech, Inc. v. Clancy*, 666 F.2d 403, 407 (9th Cir. 1982) (capturing photographs and sound recordings of an adult film as evidence for a public nuisance abatement hearing).

### 5. Private use with public benefits.

*Warhol* also recognized that certain uses were justifiable despite their non-transformative character, particularly when they are noncommercial. *Warhol* cites *Sony Corp. Am. v. Universal City Studios, Inc.*'s holding that consumers who used videotape recorders to make time-shift copies of broadcast television programs were fair users. *Warhol*, 598 U.S. at 533, citing *Sony Corp. Am. v. Universal City*

27

*Studios, Inc.*, 464 U.S. 417, 449–51 (1984). In *Fox Broad. Co. v. Dish Network LLC*, this Court similarly found that *Sony Corp. Am. v. Universal City Studios, Inc.* continues to "provide[] strong guidance" in assessing fair use claims regarding technology that enables copying for a "noncommercial, nonprofit activity." 747 F.3d 1060, 1068 (9th Cir. 2014) (citing *Sony Corp. Am. v. Universal City Studios, Inc.*, 464 U.S. at 449); *see also Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999) (copying for purposes of "space-shifting" a "paradigmatic noncommercial personal use entirely consistent with the purposes of the Act").

Although the copying at issue in *Sony* was for private home use, the Court acknowledged that this private, noncommercial activity had broader public benefit. *See Sony Corp. Am. v. Universal City Studios, Inc.*, 464 U.S. at 454 ("time-shifting expands public access to freely broadcast television programs" and "yields societal benefits"). And as *Google v. Oracle* made clear, public benefits and harms factor into both the assessment of fair use justifications and assessment of market effects. *Google*, 593 U.S. at 35–36. Nothing in *Warhol* casts new doubt on the continued relevance of those benefits in the fair use inquiry.

\*\*\*

*Warhol* leaves intact these precedents and fair use principles they exemplify. Fair use remains a flexible doctrine that embraces many justifications for

28

borrowing recognized by this Court and others. Fair use must maintain that flexibility if it is to continue furthering the purposes of copyright.

## CONCLUSION

For the reasons stated, this Court should affirm.

Dated: December 23, 2024

Respectfully submitted,

/s/ *Erik Stallman*
Erik Stallman
Samuelson Law, Technology &
  Public Policy Clinic
University of California, Berkeley
School of Law
353 Law Building
Berkeley, CA 94720

*Counsel for Amicus Curiae*
*Pamela Samuelson*

29

## **CERTIFICATE OF COMPLIANCE**

I, Erik Stallman, certify that the foregoing brief *amicus curiae* complies with the word limit of Fed. R. App. P. 29(a)(5) and Cir. R. 32-1 because it contains **6,646 words**, excluding the items exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac (version 16.92) in Times New Roman 14-point font.

Dated: December 23, 2024           /s/ *Erik Stallman*
                                   Erik Stallman

30

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I further certify that to my knowledge all participants in the case are registered ACMS users so service on them will be accomplished through the appellate ACMS system.


Dated: December 23, 2024                    /s/ *Erik Stallman*
                                             Erik Stallman

31