NO. 24-3367

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFFREY B. SEDLIK, an individual

PLAINTIFF-APPELLANT,

v.

KATHERINE VON DRACHENBERG,
an individual; AKA Kat Von D; et al.,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court
for the Central District of California, Los Angeles
2:21-cv-01102-DSF-MRW
The Honorable Dale S. Fischer

## BRIEF OF AMICUS CURIAE
## ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF
## DEFENDANTS - APPELLEES AND AFFIRMANCE

Corynne McSherry
Kit Walsh
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: corynne@eff.org
Telephone: (415) 436-9333
Fax:  (415) 436-9993

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: December 20, 2024                    By: */s/ Corynne McSherry*
                                                   Corynne McSherry

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES.................................................................... iii

STATEMENT OF INTEREST OF AMICUS ...........................................1

INTRODUCTION ...................................................................................1

ARGUMENT ...........................................................................................3

    I.    THE FAIR USE DOCTRINE IS DESIGNED TO BE A FLEXIBLE AND ADAPTABLE ...............................................................3

        A.    Any Presumption Favoring Uses That Target a Work Would Upend Decades of Fair Use Law...............................................3

        B.    The Possibility of Using Alternative Works for One's Purpose Does Not Tip Factor One Against Fair Use ................8

    II.    THE COURT SHOULD AFFIRM THAT COMMERCIALITY REQUIRES A CLOSE NEXUS BETWEEN THE USE AND THE ALLEGED PROFIT ..........................................................10

        A.    Many Noncommercial Fair Uses Indirectly Benefit the User ..10

        B.    Commerciality Properly Depends on a Close Nexus Between Improper Exploitation and Profit...............................................12

        C.    The Cases On Which Sedlik Relies Should be Confined to Their Unusual Facts, Not Expanded.........................................14

        D.    Documenting An Artistic Process That *Involves* Fair Use of a Work Is Not Evidence of a Commercial Purpose ...................16

CONCLUSION .....................................................................................17

CERTIFICATE OF COMPLIANCE ...................................................18

CERTIFICATE OF SERVICE..............................................................19

# TABLE OF AUTHORITIES

## Cases

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
    82 F.4th 1262 (D.C. Cir. 2023) ...................................................................... 7

*American Society for Testing & Materials v. Public.Resource.Org.*,
    896 F.3d 437 (D.C. Cir. 2018) ...................................................................... 13

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023) ........................................................................... *passim*

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ...................................................................... 4, 8

*Bell v. Eagle Mountain Saginaw Ind. Sch. Dist.*,
    27 F.4th 313 (5th Cir. 2022) ...................................................................... 15

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ........................................................................... 3, 4, 6

*Hachette Book Group Inc. v. Internet Archive*,
    115 F. 4th 163 (2d Cir. 2024) ...................................................... 11, 12, 15

*Nat'l Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*,
    15 F.3d 559 (6th Cir. 1994) ...................................................................... 13

*Oracle America Inc. v. Google LLC*,
    593 U.S. 1 (2021) ................................................................................ 5, 6

*Perfect 10, Inc. v. Amazon.com, Inc.*
    508 F.3d 1146 (9th Cir. 2007) ...................................................................... 8

*Sega Enterprises, Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ...................................................................... 7

*Sony Computer Entertainment, Inc. v. Connectix Corp*,
    203 F.3d 596 (9th Cir. 2000) ...................................................................... 7

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ........................................................................... 5, 6, 7

*Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020) ...................................................................... 13

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989) ...................................................................... 14, 15

*Worldwide Church of God v. Phila. Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) .......................................................................14, 15

## Other Authorities

ArtNXTLevel, "The Artistic Journey." ...................................................................16

Bennett Cypher and Gennie Gebhart, "New Documents Show That
   Facebook Has Never Deserved Your Trust .......................................................10

EFF, "Amicus Brief of Law Scholars" ..................................................................11

EFF, "The Saga of the Disappeared Baby Yoda Gifts." .........................................11

H. R. Rep. No. 94–1476, (1976) ..............................................................................6

Hachette Book Group Inc. v. Internet Archive, 2d Cir. 23-1260, "Brief of
   Wikimedia Foundation, Creative Commons, and Project Gutenberg
   Literary Archive Foundation as Amici Curiae in Support of
   Defendant-Appellant and Reversal," D.I. 113 (Dec. 22 2023)...........................11

Mathilde Berry, "How I document my art-making activities."...............................16

iv

**STATEMENT OF INTEREST OF AMICUS[1]**

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 35,000 dues-paying members that has worked for 30 years to ensure that technology supports freedom, justice, and innovation for all people of the world.

**INTRODUCTION**

This case come before this Court in an important time for fair use, as courts nationwide consider how the Supreme Court's decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith* may apply to the copyright cases before them. 598 U.S. 508 (2023). Keeping in mind the potential impact of any appellate precedents in particular, *amicus* urges the Court to reject Appellant Jeffrey Sedlik's suggestions that (1) the Supreme Court deviated from decades of precedent to create a new standard for fair use purposes that do not involve "targeting" the work in question; and (2) that the definition of "commercial purpose" may be satisfied whenever the user benefits at all, whether or not there is a close nexus between exploitation and profit.

Traditional limitations on copyright such as fair use are intended to ensure

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amicus certifies that no person or entity, other than amicus curiae, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

that the incentives for copyright owners are balanced against the public interest in add-on expression and innovation. For decades, this Court has defended this balance, issuing forward-looking decisions that give innovators the clarity they need to be confident their own work and investments won't be blocked by the veto of an overreaching copyright owner. The Supreme Court has done the same, in cases invoving uses as disparate as home video recording and smartphone software.

*Warhol* did not reject these crucial underpinnings of creativity and technical innovation, but expressly endorsed them. Nor does *Warhol*, or any other case, support the view that any form of benefit suffices to show a commercial purpose. Rather, the overwhelming weight of case law suggests that there must be a close nexus between commercial benefit and the use in question.

The facts of this case are narrow and specific, and the Court can rule based on well-established precedents that *Warhol* deliberately left undisturbed. Embracing Sedlik's effort to both narrow Factor One with respect to transformativeness, and expand it with respect to commerciality, by contrast, could have unintended consequences for a wide range of fair uses. *Amicus* urges the Court to reject it, and thereby ensure that innovators and non-profit users can continue to depend upon fair use.

## ARGUMENT

### I.    THE FAIR USE DOCTRINE IS DESIGNED TO BE A FLEXIBLE AND ADAPTABLE

Sedlik's brief invites this Court to read *Warhol* to embrace rigid, bright-line rules, with respect to Factor One, that could automatically tilt this factor against any number of commonplace fair uses. This Court should refuse that invitation.

#### A.    Any Presumption Favoring Uses That Target a Work Would Upend Decades of Fair Use Law

Sedlik suggests, explicitly and implicitly, that *Warhol* introduced an analytical shortcut with respect to Factor One: that a secondary user that "targets" the original work is almost automatically in the clear, while all other users must shoulder additional burdens. Opening Brief of Appellant Jeffrey B. Sedlik, D.I. 14 (Oct. 15, 2024) ("Sedlik Br.") at 46-47.

If Sedlik were correct, the Supreme Court would have upended decades of decisions warning against oversimplifying the fair use analysis. That tradition is reflected in *Campbell v. Acuff-Rose Music, Inc.*, for example, where the Court explained that the purposes described in the preamble of Section 107 were "illustrative and not limitative" 510 U.S. 569, 577 (1994). These uses are simply "the sorts of copying that courts and Congress most commonly had found to be fair uses," when fair use was codified. *Id.* at 577-78. But there is no presumption that a use falling outside of these exemplars is not fair or cannot serve a purpose

weighing in favor of fair use.

Moreover, *Warhol* is clear a fair use need not "target" an original work at all; rather, the copying must simply be "reasonably necessary to achieve the user's new purpose." *Warhol*, 598 U.S. at 511. As this language suggests, the Court's understanding of what makes a "compelling" justification is not a substantive change from *Campbell's* rule that parody or other appropriate purposes can tilt Factor One in favor of fair use. *Campbell*, 510 U.S. at 579. As it did in *Campbell*, the Court took guidance from Judge Pierre Leval, who explained in *Authors Guild v. Google, Inc*., that "a taking from another author's work for the purpose of making points that have no bearing on the original may well be fair use, but the taker would need to show a justification." 804 F.3d 202, 215 (2d Cir. 2015). That justification may take many forms; there, it was providing "otherwise unavailable information about the originals." *Id.*

Amici stress this point because any presumption favoring "targeting" uses is could undermine America's tradition of technological innovation, especially in an era where such innovation commonly depends on fair uses such as reverse engineering, intermediate copying, and facilitating others' personal copying. Copyright law has evolved over time to respond to new technologies, but those statutory changes inevitably lag behind the pace of development. Fair use has stepped in to fill the gap, from *Sony Corp. of America v. Universal City Studios,*

*Inc.*, 464 U.S. 417 (1984) to *Oracle America Inc. v. Google LLC*, 593 U.S. 1 (2021), precisely because it, unlike statutory exceptions, is designed to adapt to new developments.

In *Sony*, for example, the Supreme Court considered whether marketing video recording technology qualified as secondary infringement. Noting that Congress had not yet revised the Copyright Act to respond to this new technology, and that the VCR enabled fair uses as well as infringing ones, the Court ruled for the VCR developers:

> Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.
>
> In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests.

464 U.S. at 431.

Almost forty years later, in *Oracle v. Google*, the Court reaffirmed this tradition, finding that copying an interface that was "created for use in desktop and laptop computers," as needed for "tasks that would be useful in smartphones" evidenced a new and different purpose, favoring fair use. *Oracle*, 593 U.S. at 30. More broadly, the Court affirmed the particular role fair use plays "in determining the lawful scope of a computer program copyright:"

It can help to distinguish among technologies. It can distinguish between expressive and functional features of computer code where those features are mixed. It can focus on the legitimate need to provide incentives to produce copyrighted material while examining the extent to which yet further protection creates unrelated or illegitimate harms in other markets or to the development of other products. In a word, it can carry out its basic purpose of providing a context-based check that can help to keep a copyright monopoly within its lawful bounds.

593 U.S. at 22, *citing* H. R. Rep. No. 94–1476, pp. 65–66 (1976) (courts are to "adapt the doctrine [of fair use] to particular situations on a case-by-case basis" and in light of "rapid technological change") (additional citations omitted)

The *Warhol* decision expressly embraced *Oracle v. Google*'s reasoning, noting that there were additional justifications for copying: enabling software interoperability and the ability of programmers to use skills acquired in one computing environment in another. *Id.* The purposes recognized as fair in *Sony* and *Oracle* – private noncommercial time-shifting and smartphone software development – might well qualify as "compelling" under the Factor One analysis. But they may also simply qualify as "new and different" under *Campbell*'s formulation. Either way, they are sheltered fair uses, because *Warhol* did not rewrite *Campbell.*

Several of this Court's own precedents also embody this flexible approach, particularly a line of cases finding it was fair use to copy the operating systems of video game consoles in order to learn how they worked and develop original, interoperable software. *Sony Computer Entertainment, Inc. v. Connectix Corp*, 203

F.3d 596, 603-608 (9th Cir. 2000); *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1521-27 (9th Cir. 1992). In *Connectix*, Factor One favored fair use in *Connectix* because the defendant's "Virtual Game Station" enabled people to play purchased game CDs on their computers and not just on consoles and constituted an original work consisting of entirely new code. *Connectix*, 596 F.3d at 606. Likewise, in *Sega*, this Court emphasized that the second comer's purpose in using the copyrighted code was to "study the functional requirements for Genesis compatibility" so that it could make interoperable games. 977 F.2d at 1522.

Other circuits follow the same approach. In one case, for example, a nonprofit posted standards that had been incorporated into law. *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) *("ASTM II").* The D.C. Circuit found that Factor One favored fair use not because the poster intended to comment on the standards, but rather because its purpose was to improve public access to law. *Id.* at 1267-68.

Indeed, in many fair use cases, the user's purpose has been totally agnostic as to the content of the works used. In *Sony*, for example, the Supreme Court did not consider whether the acts of recording somehow "targeted" the videos that were being shifted to a different format and device. 464 U.S. at 431. In *Perfect 10, Inc. v. Amazon.com, Inc.*, plaintiff Perfect 10 sought to enjoin the use of its photographs to prepare and display thumbnail images as part of a search engine.

7

508 F.3d 1146 (9th Cir. 2007). Factor One strongly favored this use because the purpose and effect of the use was to enable a new function: to point users to information and create an electronic reference tool, which was different from the purpose of the original photographs. *Id.* at 1165. In *Authors Guild, Inc. v. HathiTrust*, the fair users made no judgment or comment about whether the books were well-written or made good arguments; rather, the use entailed "every type of work imaginable." 755 F.3d 87, 98 (2d Cir. 2014).

### B.    The Possibility of Using Alternative Works for One's Purpose Does Not Tip Factor One Against Fair Use

Sedlik also argues that the first factor weighs against fair use if its purpose could have been accomplished using a different original work because this means it was not specifically targeting the work used. Sedlik Br. at 46-47.

This argument is doubly flawed. First, as explained above, there is no rule relegating non-targeting fair uses to a disfavored status.

Second, *Warhol* explains that a use *can* "target" an original even where alternatives exist. Using Andy Warhol's famous Campbell's Soup Can series as an example, the Supreme Court explained that the artwork's new and different purpose, which would support a finding of fair use, was to comment on consumerism rather than to advertise soup. *Warhol* at 539-40. Recognizing that Warhol could have used any number of other famous logos instead of Campbell's Soup, the Court explained that it was suitable for the fair use purpose because it

was "well known to the public, designed to be reproduced, and a symbol of an everyday item for mass consumption." *Id.* at 540.

*Warhol* thus stands for the unremarkable proposition that a use is more likely to be fair if the original work actually is suitable for the new purpose the second comer seeks to pursue. But the decision cannot fairly be read to say that Factor One weighs *against* fair use if the second comer might have achieved their purpose by using a different work instead.

Indeed, requiring that a particular work be uniquely suited to a fair user's purpose would lead to absurd results. Fair users select from amongst various alternatives for both aesthetic and practical reasons. A film professor might know of several films that expertly demonstrate a technique, but could be penalized for choosing a single one to show in class. A musician seeking to comment on the portrayal of women in popular music might have many songs to choose from, but could be penalized for choosing to parody Roy Orbison's *Pretty Woman* in particular. A news program alerting viewers to developing events could face greater legal jeopardy if there were multiple recordings of the event from different sources.

Making it more legally hazardous to create and innovate where multiple works could potentially achieve the fair user's purpose, would chill the development of new technologies as well. Innovators must often make decisions

9

about which software to interoperate with or analyze in order to develop research tools and build on existing technology. Accolade and Connectix, to take just two examples, could have chosen to interoperate with different video game consoles. And, of course, search engines could index different web pages.

## II.   THE COURT SHOULD AFFIRM THAT COMMERCIALITY REQUIRES A CLOSE NEXUS BETWEEN THE USE AND THE ALLEGED PROFIT

Sedlik and amicus Copyright Alliance erroneously argue that defendants' social media posts documenting the tattooing process were necessarily commercial because "profit includes *any* advantage or benefit…." Sedlik Br. at 50 (emphasis added); Amicus Brief of the Copyright Alliance, D.I. 19 (Oct. 22, 2024), at 17-18. This expansive view of commerciality would render the concept essentially meaningless, which is one reason multiple appellate courts have rejected it. This Court should do so here.

### A.   Many Noncommercial Fair Uses Indirectly Benefit the User

Sedlik's interpretation of "commercial purpose" would tilt Factor One against a wide variety of nonprofit uses. Amicus EFF, for example, makes fair uses on its website all the time, such as when it quotes from publications as part of commenting on a case,[2] creates a "Takedown Hall of Shame" to illustrate the

---

[2] Bennett Cypher and Gennie Gebhart, "New Documents Show That Facebook Has Never Deserved Your Trust" available at https://www.eff.org/deeplinks/2018/12/new-documents-show-facebook).

effects of copyright abuse on online speech;[3] or posts briefs other parties have filed on one of its case pages.[4] EFF arguably benefits from these uses by drawing traffic to its site, although most users likely come to the site for EFF's own commentary and information. If some of those visitors decide to donate to EFF, the organization will also benefit financially. But these uses of copyrighted works are not motivated by the desire for recognition or financial support, but rather the organization's mission – to ensure that technology and law serve, rather than thwart, our civil liberties.

Other nonprofits do the same. For example, as it explained in an amicus brief filed in support of the Internet Archive in *Hachette Book Group Inc. v. Internet Archive*, discussed below at II.B, the Wikimedia Foundation fundraises for its various projects—including Wikipedia—by asking for donations using banners that appear at the top of its webpages.[5] The organization also makes fair use of copyrighted works, but its inclusion of fair use material is not motivated by a

---

[3] *See e.g.* EFF, "The Saga of the Disappeared Baby Yoda Gifs," available at https://www.eff.org/takedowns/saga-disappeared-baby-yoda-gifs.

[4] *See e.g*. EFF, "Amicus Brief of Law Scholars" (ASTM available at https://www.eff.org/document/amicus-brief-law-scholars).

[5] 2d Cir. 23-1260, "Brief of Wikimedia Foundation, Creative Commons, and Project Gutenberg Literary Archive Foundation as Amici Curiae in Support of Defendant-Appellant and Reversal," D.I. 113 (Dec. 22 2023), available at https://www.eff.org/document/hachette-v-internet-archive-amicus-brief-wikimedia-foundation-creative-commons-and-project.

desire for increased donations, bolstered standing, or any other purportedly "commercial" benefits. Rather, the use of such content depends on the decisions of Wikipedia volunteers, pursuant to carefully crafted community guidelines.

It is absurd to think that these activities amount to commercial purposes. But that is precisely where Sedlik's view must lead: to a regime where virtually any mission-driven purpose for using a copyrighted work can be weighed against fair use.

**B.  Commerciality Properly Depends on a Close Nexus Between Improper Exploitation and Profit**

Multiple appellate courts have rejected similarly expansive definitions of commerciality under Factor One, requiring instead a close nexus between the use in question and the alleged benefit. In *Hachette Book Group Inc. v. Internet Archive*, for example, a district court initially held that a nonprofit organization's digital lending program had a commercial purpose because it earned a small amount of revenue via a partnership program (which it used to support the program) and because it solicited donations on its lending platform along with nearly every other page on its website. 115 F. 4th 163, 185 (2d Cir. 2024). The Second Circuit Court of Appeals disagreed, holding that the link between the pending program and incidental profits and general donation appeals was "too attenuated" to amount to a commercial purpose:

> Although [defendant] exploits the Works in Suit without paying the customary price, it does not profit directly from that exploitation.

*Id*. at 186 (citing *Harper & Row*, 471 U.S. at 562). As the court recognized, the district court's approach would make it practically untenable for most non-profits to engage in fair uses, given that they depend on donations to survive.

The Second Circuit's decision is consistent with the reasoning of other circuit courts, including this one. In *Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, , this Court found the use of a work in a choir performance to be noncommercial, even though portions of the proceeds were used to support the music program. 953 F.3d 638, 648-49 (9th Cir. 2020). In *American Society for Testing & Materials v. Public.Resource.Org.,* for example, the D.C. Circuit found noncommercial the posting of copyrighted technical standards online by a nonprofit whose mission was to make the law more accessible. 896 F.3d 437, 449 (D.C. Cir. 2018) ("ASTM I"). The organization "did not earn revenue directly from the display of the standards," but plaintiffs argued that "distributing the standards [was] part of [defendant's] fundraising appeal." *Id*. at 449. The court disagreed, holding that a fundraising appeal "hardly rises to the level of making this a 'commercial' use." *Id.*; *see also Nat'l Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994) (nonprofit's distribution of copyrighted list of legislators was noncommercial where primary benefit was "to further its own lobbying goals").

13

**C.** **The Cases On Which Sedlik Relies Should be Confined to Their Unusual Facts, Not Expanded**

Sedlik's theory relies primarily on decisions involving the unique contexts of academia and religion. Those circumstance-specific decisions do not extend to all nonprofit uses, nor do they suggest that any kind of tangential benefit can render a nonprofit use commercial.

In *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000), for example, this Court noted that, "like academia, religion is generally regarded as 'not dollar-dominated.'" *Worldwide Church*, 227 F.3d at 1118. As the court explained, the religious organization's use "unquestionably profits [it] by providing it at no cost with the core text essential to its members' religious observance, by attracting through distribution of [the text] new members who tithe ten percent of their income to [the organization], and by enabling the ministry's growth." *Id.*

In *Weissmann v. Freeman*, a professor copied his student's article for use in a lecture course, but presented it as his own. 868 F.2d 1313, 1316 (2d Cir. 1989). The Second Circuit found his use commercial because he gained "recognition among his peers in the profession and authorship credit." *Id.* at 1324. The Court emphasized that its holding was "context specific," explaining that profit is not measured in dollars "in the academic setting." *Id.* Instead, "what is valuable is

recognition because it so often influences professional advancement and academic tenure." *Id.*

Notably, the "profit" the infringers obtained in these cases was the same "profit" the original author—be it student researcher or religious leader—sought when creating the work. That reasoning does not necessarily extend to an artist's social media posts documenting her process, even if those posts display her skill and thereby enhance her reputation. Further, the parties in those cases were competitors in their respective "markets"—the former competed for believers, that latter for status in their fields, and the works at issue were directly related to that competition. *See Bell v. Eagle Mountain Saginaw Ind. Sch. Dist.*, 27 F.4th 313, 322 (5th Cir. 2022) (distinguishing school district's tweet of copyrighted quote from *Weissmann* "because scientists are judged by the quality of their research, so a scientist who takes credit for another's good work enhances her professional status and likely her salary down the road").

Finally, in both cases there was in fact a close nexus between the use and the alleged benefit. As the Second Circuit later noted, the defendant in *Weissman* stood to gain the "direct reputational benefits that accompany presenting a work as one's own" without doing the actual work of scientific research and writing. *Hachette,* 115 F. 4th at 186.  In *Worldwide Church of God*, the defendant built its congregation in substantial part on the work at issue; the direct relationship could

15

hardly be closer.

### D. Documenting An Artistic Process That *Involves* Fair Use of a Work Is Not Evidence of a Commercial Purpose

Given the overwhelming weight of appellate case law suggest that indirect reputational or financial benefits do not by themselves amount to a commercial purpose, amicus further urges the Court to reject any suggestion that documenting one's artistic process on social media is necessarily commercial if the artist uses social media to gain recognition.

Such documentation is commonplace in the art world and important both for the artist's self-expression and for public education. Painter Sergio Gomez, for example, urges artists to organize and document their creative process in order to "preserve our artistic legacy, inspire others, and contribute to the collective creativity of the world," and does so himself by creating dedicated blog posts for every painting.[6] Painter Mathilde Berry documents her process on YouTube and Instagram and urges budding artists to take similar steps in order to "get engagement from potential collectors and encouragement from fellow artists, friends and family."[7]

---

[6] *See* ArtNXTLevel, "The Artistic Journey," available at https://www.theartistnextlevel.com/blog/the-artistic-journey-documenting-and-organizing-your-creative-legacy.

[7] Mathilde Berry, "How I document my art-making activities," available at https://mathildeberry.com/behind-the-scenes-part-6-6-how-i-document-my-art-making-activities.

A particular use may be noncommercial even where the artist also uses the same social media channel for purposes that *are* commercial. Again, commerciality in the fair uses analysis should depend on whether the artist reaps a direct benefit from the specific use of the work in question. That may well be the case in many instances, but it should not be presumed, lest that presumption tilt Factor One away from fair use in otherwise valuable and even largely noncommercial artistic activities.

## CONCLUSION

For the reasons stated above, this Court should ensure that fair use remains a flexible doctrine that can accommodate diverse purposes and uses, rather than creating new hurdles to trip up innovators and mission-driven nonprofits.

Dated: December 20, 2024

By: _/s/ *Corynne McSherry*_
Corynne McSherry

Kit Walsh
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:  (415) 436-9333
Fax:  (415) 436-9993
corynne@eff.org

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.     This Brief of Amicus Curiae the Electronic Frontier Foundation in Support of Defendants – Appellees and Affirmance with the type-volume limitation of Fed. R. App. P. 32(a)(5) because this brief contains 3,843 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated:  December 20, 2024          By:  */s/ Corynne McSherry*
                                            Corynne McSherry

                                            *Counsel for Amicus Curiae*

18

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system on December 20, 2024.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

Dated:  December 20, 2024                 By:  /s/ *Corynne McSherry*
                                               Corynne McSherry

                                               *Counsel for Amicus Curiae*

19