No. 24-3367

# United States Court of Appeals for the Ninth Circuit

JEFFREY B. SEDLIK, an individual,

*Plaintiff-Appellant,*

– v. –

KATHERINE VON DRACHENBERG, an individual, AKA Kat Von D,
KAT VON D, INC., a California corporation and
HIGH VOLTAGE TATTOO, INC., a California corporation,

*Defendants-Appellees.*

ON APPEAL FROM A DECISION OF THE UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA,
NO. 2:21-CV-01102-DSF-MRW · HONORABLE DALE S. FISCHER

## *AMICI CURIAE* BRIEF OF THE AUTHORS GUILD, INC., ROMANCE WRITERS OF AMERICA, INC., SISTERS IN CRIME, THE SONGWRITERS GUILD OF AMERICA, THE SOCIETY OF COMPOSERS AND LYRICISTS, AND THE DRAMATISTS GUILD OF AMERICA, INC. IN SUPPORT OF PLAINTIFF-APPELLANT ON REHEARING EN BANC

NANCY E. WOLFF
LEO M. LICHTMAN
ELIZABETH SAFRAN
COWAN, DEBAETS, ABRAHAMS
& SHEPPARD LLP
*Counsel for Amici Curiae*
60 Broad Street, 30th Floor
New York, New York 10004
(212) 974-7474

CP COUNSEL PRESS    (800) 4-APPEAL • (390627)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* the Authors Guild, Inc., Romance Writers' of America, Inc., Sisters in Crime, the Songwriters Guild of America, the Society of Composers and Lyricists, and the Dramatists Guild of America, Inc. state that none has a parent corporation, and that no publicly held corporation owns 10% or more of *amici's* stock.

Dated: June 30, 2026

COWAN, DEBAETS, ABRAHAMS
& SHEPPARD LLP

By: /s/ Nancy E. Wolff
Nancy E. Wolff
60 Broad Street, 30th Floor
New York, NY 10004
Telephone: (212) 974-7474
Facsimile: (212) 974-8474

*Counsel for* Amici Curiae *The Authors Guild, Inc., Romance Writers of America, Inc., Sisters in Crime, The Songwriters Guild of America, The Society of Composers and Lyricists, and The Dramatists Guild of America, Inc.*

i

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES .................................................................................. iv

INTEREST OF *AMICI* .................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................ 4

ARGUMENT ...................................................................................................... 7

I.  THE NINTH CIRCUIT'S EXISTING
    SUBSTANTIAL SIMILARITY FRAMEWORK
    IS CONTRARY TO THE COPYRIGHT ACT .............................................. 7

    A.  The Amorphous Intrinsic Prong Leads to Verdicts That
    Squarely Contravene the Text of the Copyright Act. ........................... 7

        i.  Courts' Inability to Review Jury Determinations
        of Intrinsic Similarity Harms Authors ............................................ 11

        ii.  The Intrinsic Test is Unconnected From
        and Contravenes the Copyright Act.................................................. 12

    B.  The Ninth Circuit's Existing Substantial
    Similarity Framework Harms Authors'
    Protection of Their Derivative Work Right ........................................... 14

II.  THE NINTH CIRCUIT'S EXISTING FRAMEWORK
    IMPOSES AN UNFAIR BURDEN ON AUTHORS
    PROTECTING THEIR RIGHTS.................................................................... 21

    A.  The Ninth Circuit's Substantial Similarity Test
    Exacerbates Already Excessive Costs to Litigate.................................. 21

    B.  The Ninth Circuit's Substantial Similarity Test
    is an Outlier, Underscoring its Unworkability....................................... 26

CONCLUSION .................................................................................................. 29

ii

CERTIFICATE OF COMPLIANCE ........................................................................ 31

CERTIFICATE OF SERVICE.................................................................................. 32

iii

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Andy Warhol Foundation for the Visual Arts v. Goldsmith,*
598 U.S. 508 (2023) ............................................................................. 21

*Axelrod & Cherveny Architects, P.C. v. Winmar Homes*,
2007 WL 708798 (E.D.N.Y. Mar. 6, 2007) ...................................... 27

*Belair v. MGA Ent., Inc.*,
831 F. Supp. 2d 687 (S.D.N.Y. 2011) ............................................... 26

*Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998) .............................................................. 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................... 22

*Concord Music Grp., Inc. v. Antrhopic PBC*,
2025 WL 4808984 (N.D. Cal. Oct. 6, 2025) .................................... 20

*Dawson v. Hinshaw Music Inc.*,
905 F.2d 731 (4th Cir. 1990) ............................................................ 29

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) .......................................................... 14

*Devil's Advoc., LLC v. Zurich Am. Ins. Co.*,
666 F. App'x 256 (4th Cir. 2016) ..................................................... 29

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ...................................................... 16, 18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ..................................................................... 12, 13

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) ........................................................................... 25

*Folkens v. Wyland Worldwide, LLC*,
882 F.3d 768 (9th Cir. 2018) .............................................................. 9

iv

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc..,*
    772 F.2d 505 (9th Cir. 1985) ............................................................... 18

*Funky Films, Inc. v. Time Warner Ent. Co., L.P.*,
    462 F.3d 1072 (9th Cir. 2006) ................................................................ 8

*Goodis v. United Artists Television, Inc.*,
    425 F.2d 397 (2d Cir. 1970) ................................................................. 18

*Gray v. Hudson*,
    28 F.4th 87 (9th Cir. 2022) ...................................................... 8, 23, 28

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ............................................................................ 14

*Harper House, Inc. v. Thomas Nelson, Inc.*,
    889 F.2d 197 (9th Cir. 1989) ......................................................... 10, 14

*Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.)*,
    360 F.2d 1021 (2d Cir. 1966) ............................................................... 26

*Kadrey v. Meta Platforms, Inc.*,
    788 F. Supp. 3d 1026 (N.D. Cal. 2025) ............................................... 20

*Kalem Co. v. Harper Bros.*,
    222 U.S. 55 (1911) ........................................................................ 13, 18

*Lynx Ventures, LLC v. Miller*,
    45 F. App'x 68 (2d Cir. 2002) ............................................................. 27

*Masterson v. Walt Disney Co.*,
    821 F. App'x 779 (9th Cir. 2020) ........................................................ 22

*Matter of McLinn*,
    739 F.2d 1395 (9th Cir. 1984) ............................................................. 11

*Moore v. Columbia Pictures Indus., Inc.*,
    972 F.2d 939 (8th Cir. 1992) ............................................................... 29

*Peker v. Masters Collection*,
    96 F. Supp. 2d 216 (E.D.N.Y. 2000) ................................................... 27

v

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) ...................................................... 21

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) .......................................................... 18

*Sedlik v. Von Drachenberg*,
  163 F.4th 667 (9th Cir.) ....................................................... passim

*See v. Durang*,
  711 F.2d 141 (9th Cir. 1983) ........................................................ 22

*Shaw v. Lindheim*,
  919 F.2d 1353 (9th Cir. 1990) ........................................................ 8

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
  689 F.3d 29 (1st Cir. 2012) ......................................................... 18

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ................................................................. 25

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) .............................................................. 9, 10

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ........................................................ 18

*Ward v. Barnes & Noble, Inc.*,
  93 F. Supp. 3d 193 (S.D.N.Y. 2015) ................................................. 27

*White v. Samsung Elecs. Am., Inc.*,
  989 F.2d 1512 (9th Cir. 1993) ....................................................... 17

*Williams v. Bridgeport Music, Inc.*,
  2015 WL 4479500 (C.D. Cal. July 14, 2015) .......................................... 10

*Yonay v. Paramount Pictures Corp.*,
  163 F.4th 685 (9th Cir. 2026) ...................................................... 8, 9

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001) ......................................................... 27

vi

## Constitutional Provisions and Statutes

17 U.S.C. § 101 ............................................................................................. 17, 19

17 U.S.C. § 102(b) ............................................................................................. 12

17 U.S.C. § 106(2) ............................................................................................. 15

U.S. Const. art. I, § 8, cl. 8 ............................................................................... 13

## Other Authorities

*A Fresh Look at Tests for Nonliteral Copyright Infringement*,
107 Nw. U. L. Rev. 1821 (2013) ...................................................................... 10

*An Empirical Study of Copyright's Substantial Similarity Test*,
13 U.C. Irvine L. Rev. 35 (2022) ...................................................................... 26

*Derivative Rights and Derivative Works in Copyright*,
30 J. Copyright Soc'y U.S.A. 209 (1983) ........................................................ 16

H.R. Rep. No. 94-1476 ...................................................................................... 13

H.R. Rep. No. 105-551 ...................................................................................... 25

*Jury Decision Making*,
7 Psychol. Pub. Pol'y & L. 622 (2001) .............................................................. 9

*The Grapes of Roth*,
99 Wash. L. Rev. 1093 (2024) .......................................................................... 12

Pursuant to Federal Rule of Appellate Procedure 29(b) and Circuit Rule 29-2(a), *amici curiae* respectfully submits this brief in support of Plaintiff-Appellant Jeffrey B. Sedlik. This brief is submitted with consent of all parties.[1]

### INTEREST OF *AMICI*

*Amici curiae* comprise leading industry associations committed to supporting creators and their rights. Members of the *amici* rely heavily on copyright law to protect their work and provide them with the financial ability to continue to create for the public good. As such, the *amici* and their members have a strong interest in the proper application of copyright law, including by the courts in this Circuit as to assessing substantial similarity in copyright infringement actions. *Amici* submit this brief to help the Court understand the substantial adverse impact that the Ninth Circuit's present extrinsic-intrinsic framework has on creators, as illustrated by the illogical outcome of this case at the district level.

**The Authors Guild, Inc.** (the "Guild") is the nation's oldest and largest professional organization for all writers. It is a national non-profit association of almost 18,000 writers of all genres including historians, biographers,

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party authored this brief in whole or in part, and no party or counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. Only *amici curiae* or their counsel made such a monetary contribution that was intended to fund preparing or submitting this brief. Pursuant to Fed. R. App. P. 29(a) and Circuit Rule 29-2, all parties consented to the filing of this amicus curiae brief.

1

academicians, journalists and other writers of nonfiction and fiction. The Guild works to promote the rights and professional interests of authors to copyright, freedom of expression, and fair contracts. Although the Guild has an interest in the theory, law and practice of copyrights, property rights, and contracts, it has no other stake in the outcome of this particular case. Rather, the Guild is interested in ensuring that copyright law develops in a way that best promotes creativity, innovation, and competition throughout the world.

**Romance Writers of America, Inc.** (the "RWA"), founded in 1980, is a nonprofit trade association, with a membership of more than 1,500 romance writers and related industry professionals, whose mission is to advance the professional interests of career-focused romance writers through networking and advocacy. RWA works to support the efforts of its members to earn a living and to make a full-time career out of writing romance, or a part-time one that supplements RWA members' main income.

**Sisters in Crime** ("SinC") was founded in 1986 as an advocacy organization for women crime writers. Its mission, "to promote the ongoing advancement, recognition and professional development of women crime writers," has been expanded in recent years to include other marginalized writers. SinC supports its over 4,000 members by providing craft and business webinars, rich online resources, a robust online community, and advocacy for the entire genre. Its members include

authors at all stages of their writing journey as well as other advocates for the community, such as librarians, booksellers, readers, and agents. SinC has more than 50 chapters worldwide.

**The Songwriters Guild of America** ("SGA") has, since 1931, fought to protect songwriters, the music they create and their ability to earn a living for themselves and their families. The SGA carries out its mission in three ways: through its music advocacy on Capitol Hill and elsewhere throughout the world; through services to professional and developing songwriters; and through community outreach via the Songwriters Guild of America Foundation.

**The Society of Composers and Lyricists** ("SCL") is the primary organization for professional film, television, video game, and musical theatre composers and lyricists, and those working in the industry such as orchestrators, arrangers, music supervisors, music agents, music attorneys, music editors, copyists, recording engineers, and allied professions, with a distinguished 80-year history in the fine art of creating music for visual media. Current SCL members include the foremost professionals in their fields whose experience, expertise and advocacy are focused on the many artistic, technological, legislative, legal, newsworthy and other issues as they relate to media music creators.

**The Dramatists Guild of America, Inc.** ("DGA") is the only professional organization promoting the interests of playwrights, composers, lyricists, and

3

librettists writing for the stage. Established over 100 years ago for the purpose of aiding dramatists in protecting both the artistic and economic integrity of their work, DGA continues to educate, and advocate on behalf of its over 8,000 members. DGA believes a vibrant, vital theater is an essential element of this country's ongoing cultural debate and seeks to protect those individuals who write for the theater to ensure its continued success.

Members of the *amici* rely heavily on copyright law to protect and commercialize their works, which in turn incentivizes the creation of new works and promotes the progress of the arts. They have a strong interest in ensuring the proper application of copyright law and that copyright cases are decided correctly. Specifically, they have a strong interest in the proper application of copyright law in this instance, where defendant-appellee Katherine Von Drachenberg conceded exactly replicating plaintiff-appellant Jeffrey Sedlik's ("Sedlik" or "Appellant") photograph on a customer's tattoo, yet, owing to the Court's flawed substantial similarity framework, evaded liability based on an unreviewable, confused jury verdict. Allowing such outcome borne of this Circuit's concededly flawed extrinsic-intrinsic standard has critically damaging consequences for *amici's* members, contravenes the law, and undermines the very purpose of copyright.

## SUMMARY OF ARGUMENT

The *amici* echo Appellant and Judges Johnstone and Wardlaw's sentiment that

it is "time to discard" the flawed intrinsic test. *Sedlik v. Von Drachenberg*, 163 F.4th 667, 685 (9th Cir.), *reh'g en banc granted, opinion vacated*, 177 F.4th 964 (9th Cir. 2026) (Johnstone, J., concurring). In a case where a defendant admitted to painstakingly replicating an image, it is absurd that a judge-made framework could so mislead a jury that it returned a verdict of no substantial similarity. Far from upholding Appellant's exclusive rights under the Copyright Act, this Court's extrinsic-intrinsic substantial similarity framework creates an additional required element to proving infringement beyond actionable copying, which, applied here, led to a clearly erroneous verdict that could not be overturned. But the issues lie beyond a single dispute or aggrieved party. As this case exemplifies, the current framework affects all creators who may at any point find their works infringed and seek recourse in a court in this Circuit.

First, by asking juries to assess the ill-definable qualities of the "total concept and feel" of the works at issue, the intrinsic test inserts a secondary, subjective inquiry over what should be an objective comparison of protectable, copyrightable expression. As a result, juries are likely to consider uncopyrightable aspects of the works that should not inform their analysis and may lead to biased and flawed verdicts. This issue is of particular concern for authors, songwriters, and other creators who rely upon a robust market for derivative works. As the jury verdict demonstrated, and as the concurrences understood, the holistic nature of the intrinsic

5

test can be particularly confusing where the alleged infringing work has been incorporated into a different medium from the original—as with a photograph to a tattoo, a book to a film, a painting to a poster, a song to a live theater production, and so on.

Second, owing to the structure of the Ninth Circuit's two-part framework whereby the intrinsic test remains the province of the jury, the current framework yields an unfair asymmetry. Because both the extrinsic and intrinsic tests must be satisfied, the former—whereby protectable elements of works are compared objectively—provides defendants with a crucial safety valve, allowing them to defeat meritless infringement claims on the pleadings, at summary judgment, or if necessary, through post-trial motions; while the latter must necessarily be established only by convincing the fact-finder to subjectively decide that the works are similar enough under an amorphous "total concept and feel" standard to warrant holding the defendant liable. And if the jury gets it wrong—as they did here—the plaintiff is left without the recourse of judicial review. The financial burdens this imposes on those in the creator community, who contribute outsized cultural and economic gains to society yet often struggle to maintain their own livelihoods, cannot be overstated. Most often, it means that creators simply cannot afford to protect their copyrights, the foundation of their livelihoods. The Court should take this opportunity to retire and replace the flawed substantial similarity test with one

6

that simply and objectively asks whether the allegedly infringing work is substantially similar to the copyrightable aspects of the original work.

## **ARGUMENT**

### I. THE NINTH CIRCUIT'S EXISTING SUBSTANTIAL SIMILARITY FRAMEWORK IS CONTRARY TO THE COPYRIGHT ACT

As this case exemplifies, upholding the extrinsic-intrinsic test in its current form would force authors to protect their rights with a hand tied behind their backs. In no situation should authors, already facing the prohibitive costs of litigation, have their ability to enforce their copyright stripped away where an infringer copies their work to a tee, and then brags about the remarkable similarities. But as this case demonstrates, this is a very real risk under the Ninth Circuit's current test.

### A. The Amorphous Intrinsic Prong Leads to Verdicts That Squarely Contravene the Text of the Copyright Act

Because the intrinsic prong of the Ninth Circuit's substantial similarity test tasks juries with an avowedly subjective undertaking to determine what a work feels like to them, jury verdicts remain a black box, insulated from judicial review even when the findings are questionable. Rather than invoke actual legal analysis that accounts for "analytic dissection and expert testimony," *Sedlik,* 163 F.4th at 676 (Wardlaw, J., concurring), jurors undertake a "holistic comparison that focuses on whether the works are substantially similar in the[ir] total concept and feel . . . ." *Id.* at 679 (Johnstone, J., concurring).

7

Contrasted with the extrinsic prong, which requires courts to filter out and disregard a work's non-protectible elements and compare the remaining articulable similarities, *see Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 692 (9th Cir. 2026), the intrinsic test is "exclusively the province of the jury." *Funky Films, Inc. v. Time Warner Ent. Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). In this way, intrinsic analysis stems from "an ordinary person's *subjective impressions*" as to the overall works. *Id.* (emphasis added). The issues with such a subjective test are manifold.

"[A] jury's job is to find facts, not feelings," *Sedlik*, 163 F.4th at 680 (Johnstone, J., concurring), and yet the intrinsic test relies upon the jury's variable and subjective impressions, unrestrained by objective criteria. *Id.* at 682 (recognizing that as the two-part framework evolved, the "increasingly 'lengthy list of concrete elements' considered 'under the extrinsic test'" left the intrinsic test to "become a mere subjective judgment as to whether two . . . works are or are not similar'") (quoting *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990)). A substantial similarity analysis should consist of measured assessment as to the similarities between the *protected* elements of two works, and, in the context of the extrinsic prong, the Ninth Circuit has made this abundantly clear.[2] Yet under the intrinsic

---

[2] *See, e.g., Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022) ("Because the requirement is one of substantial similarity to protected elements of the copyrighted

prong, jurors are invited to translate their gut feelings and understanding of the concepts underlying a work, giving material weight to its uncopyrightable aspects. In practice, any number of factors may inform the "subjective perception" that drives this assessment, such as personal biases, intuitions, values, and interpersonal dynamics. And ultimately, these subjective determinations, lacking any basis for judicial review, become the final word on substantial similarity.

The intrinsic test's subjective nature also limits courts' recourse to adequately instruct jurors on how to carry it out, further exacerbating the risk that emotionally-driven factors will govern similarity determinations. Courts in other contexts have widely cautioned against the "potential that juries will use their verdicts to express biases," whether that be against big business, *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003), or, as here, in favor of popular cultural icons, such as a widely-known celebrity tattoo artist. *See also* Dennis J. Devine et al., *Jury Decision Making*, 7 PSYCHOL. PUB. POL'Y & L. 622, 699 (2001) ("Jurors often do not make decisions in the manner intended by the courts, regardless of how they are instructed," but base them on "past experience in the form of scripts, schemas, stereotypes, and other cognitive mechanisms as well as personal beliefs and values about what is right, wrong, and fair"). Handed an "empty standard," *Sedlik*, 163 F.4th

---

work, it is essential to distinguish between protected and unprotected material in a plaintiff's work."); *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 774 (9th Cir. 2018) (same).

at 685 (Johnstone, J., concurring), comprised of "[v]ague" instructions that provide "little to aid the decisionmaker in its task," *State Farm*, 538 U.S. at 418, jurors are left to search their feelings about two works and substitute this subjective morass for a verdict.

The vagaries of the rudderless intrinsic test permit juries to sweep unprotectable ideas or concepts, filtered out at the extrinsic step, back into the comparison. Jurors are instructed to consider the "concept" of the works, even though concepts and ideas are expressly excluded from protection under Section 102(b) of the Copyright Act. *See* Pamela Samuelson, *A Fresh Look at Tests for Nonliteral Copyright Infringement*, 107 Nw. U. L. Rev. 1821, 1832 (2013) [hereinafter Samuelson, *A Fresh Look*] (the intrinsic test "practically directs the trier of fact to consider conceptual similarities as a basis for infringement, even though concepts have never been protectable by U.S. copyright law"). Jurors will, of course, naturally compare uncopyrightable concepts when asked to consider the "overall concept and feel" and conduct a "'freewheeling assessment of similarity based on any and all elements of the [] work, or the work as a whole.'" *See Williams v. Bridgeport Music, Inc.*, 2015 WL 4479500, at \*17–18 (C.D. Cal. July 14, 2015), *aff'd in part sub nom.*, *Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018) (outlining objection to substantial similarity jury instruction); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 207 (9th Cir. 1989) (jury instructions did not adequately

distinguish between protectable and unprotectable material, due to "highly subjective" reference to "total impact and effect" test). Pursuant to the intrinsic test, jurors' decisions may rest on nothing more than feelings about the concepts or ideas embodied in the works, rather than an assessment of actual similarities between the works' protectable expression.

The results occasioned by this unrestrained and subjective exercise are unpredictable at best, unreviewable at worst, and likely to result in decisions that contradict the basic premises of copyright law.

i.   Courts' Inability to Review Jury Determinations of Intrinsic Similarity Harms Authors

Owing to the subjective nature of the intrinsic test, even the most baffling verdicts to emerge from the black box of a jury's analysis are insulated from judicial review. Such results contravene legal process. Appeals mechanisms are a bedrock of the judicial process, with appellate courts "review[ing] for correctness" as well as providing the overarching "institutional function of announcing, clarifying, and harmonizing the rules of decision employed by the legal system in which they serve." *Matter of McLinn*, 739 F.2d 1395, 1401 (9th Cir. 1984). A judicially-derived test that insulates itself from review or correction runs contrary to both appellate functions, as both individual litigants and future ones similarly situated are left to suffer the consequences.

Judges, lawyers, scholars, and creators have for decades flagged issues with

11

the extrinsic-intrinsic test, including that intrinsic determinations are "all but unreviewable." *Sedlik*, 163 F.4th at 680 (Johnstone, J., concurring); *see also* Bruce E. Boyden, *The Grapes of Roth*, 99 WASH. L. REV. 1093, 1095–96 (2024) [hereinafter Boyden, *Grapes of Roth*]. With no mechanism to right erroneous outcomes, authors and other creators are left without recourse to correct holdings that devastate their ability to control the use of their works. As the subjective nature of the intrinsic test essentially precludes a summary judgment finding, thereby forcing plaintiff-side authors to litigate through trial, *infra*, Section II.A, maintaining the test leaves cases decidedly stacked against authors whose works are infringed, many of whom simply do not have the resources to protect their rights, and as a result, may be disincentivized from creating further works.

ii. The Intrinsic Test is Unconnected From and Contravenes the Copyright Act

By tasking factfinders with assessing the total "concept and feel" of a work, the intrinsic test subverts the "very essence of copyright," which is to protect original expression, not ideas. 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13D.31[C] (2025). Fundamentally, "ideas" and "concepts" are not protected by copyright law, 17 U.S.C. § 102(b); authors' original "expression" of them is. *Id.* § 102; *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–50 (1991) ("'[N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the

author's originality.'"). By affording protection only to an author's original expression, *id.* at 350, copyright law upholds its ultimate aim, the progress of science and the arts. See U.S. Const. art. I, § 8, cl. 8. And in doing so, it creates a workable concept: authors maintain protection over their own, original expression, while also having the freedom to build off the creative building blocks that others may have left before. *See* H.R. Rep. No. 94-1476 at 56–57 (1976) (noting Congressional intent to uphold "basic dichotomy between expression and idea" so as to "not preclude others from using the ideas or information revealed by [an] author's work").

But handing factfinders a test that asks them to subjectively assess the "total concept and feel" of works as a whole "threaten[s] to obliterate the line between expression and unprotectable ideas," in direct contravention of the law and Congress's intent. *See* Boyden, *Grapes of Roth*, at 1096. This not only undermines the freedom of authors to build upon ideas left by others; it also "subvert[s] . . . the protection of original *expression*," *Sedlik*, 163 F.4th at 677 (Wardlaw, J., concurring) (quoting Nimmer on Copyright 13D.31[C] (2025)). The intrinsic test does this by inviting factfinders to insulate infringers due to differences that should play no part in the legal analysis, such as those associated with copying an author's work into a different medium, *see Kalem Co. v. Harper Bros.*, 222 U.S. 55, 60 (1911) (affirming that public exhibition of motion picture which dramatized the book "Ben Hur" without authorization constituted copyright infringement), or copying adaptations of

13

an author's works. *See DC Comics v. Towle*, 802 F.3d 1012, 1024–25 (9th Cir. 2015) (infringement of underlying work can occur where infringer copies elements of an authorized derivative work); *see also infra*, Section I.B.

As the concurrences in this case outline, "total concept and feel" inadequately focuses the factfinder on the specific expressive elements of the works at issue, even though this is "what the infringement determination is supposed to measure." *See* Samuelson, *A Fresh Look*, at 1832; *see also Sedlik*, 163 F.4th at 677 (Wardlaw, J., concurring). Guided by the notion of "concept" and "feel," juries are at greater risk of failing to "limit [their] review to protectable material." *See Harper House*, 889 F.2d at 207–08. By such account, "an ordinary observer may find, in practice, that works in different media," such as a photograph versus a tattoo, "almost never have the same 'total concept and feel,'" *Sedlik*, 163 F.4th at 678 (Wardlaw, J., concurring), even when a defendant lifts significant portions of protectable material from the plaintiff's work. Rather than uphold copyright law's grant of exclusive rights, the intrinsic test subverts them.

**B.    The Ninth Circuit's Existing Substantial Similarity Framework Harms Authors' Protection of Their Derivative Work Right**

The economic viability of authorship is an essential bedrock of copyright law, yet the Ninth Circuit's existing substantial similarity framework hinders authors' abilities to effectively expand derivative markets for their works. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) ("[I]t should not be

forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create . . . ."). Copyright protects not only an author's exclusive right to control the reproduction of their works, but the exclusive right to "prepare derivative works" based upon that work. 17 U.S.C. § 106(2). At root, derivative works contain substantial differences from an underlying work and are "based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." *Id.* §101. Notwithstanding their differences, derivative works are by their very nature "substantially similar" to the underlying works that they "'recast, transform[], or adapt[].'" *See, e.g., Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 143 (2d Cir. 1998); *id* at 143 n.9 ("[I]f the secondary work sufficiently transforms the expression of the original work such that the two works cease to be substantially similar, then the secondary work is not a derivative work, and for that matter, does not infringe the copyright of the original work.").

The derivative work right is crucial for authors. Authors often earn relatively little for their efforts compared to the other creators, especially given that over 60%

15

have post-graduate education.[3] Consequently, the derivative work right creates particularly strong incentives for authors. Literary works enable robust secondary markets—such as film, television, and stage adaptations, audio books, translations, toys, games, companion books, video games, and more.[4] As such, the derivative work right enables authors "to proportion their investment in a work's expression to the returns expected not only from the market in which the copyrighted work is first published, but from other, derivative markets as well." Paul Goldstein, *Derivative Rights and Derivative Works in Copyright*, 30 J. COPYRIGHT SOC'Y U.S.A. 209, 216 (1983).

A robust derivative work right is therefore essential to an author's financial stability. Oftentimes, these rights provide vastly more lucrative financial opportunities for the author than the original market alone, which can strengthen

---

[3] *See Key Takeaways from the Authors Guild's 2023 Author Income Survey*, Authors Guild (last updated Oct. 25, 2023), https://authorsguild.org/news/key-takeaways-from-2023-author-income-survey [hereinafter *Key Takeaways*, Authors Guild] ("[H]alf of all full-time authors . . . earn below minimum wage in many states from *all* their writing related work, and well below the federal minimum wage . . . ."); *The songwriter's role is shifting: here's what the data shows*, MIDiA (July 10, 2025), https://www.midiaresearch.com/blog/the-songwriters-role-is-shifting-heres-what-the-data-shows ("Even among songwriters [] signed up to the appropriate collection agencies, most say they struggle to earn meaningful income.").

[4] Courts in this Circuit have taken note of the "myriad licensed works that [may] proliferate in the [derivative] market" for an underlying book, including in the case of "Dr. Suess's iconic works." *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 449 (9th Cir. 2020).

16

their bargaining power and the value of their copyright. "[T]he Court of Appeals for the Hollywood Circuit," *see White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1521 (9th Cir. 1993) (Kozinski, J., dissenting), is no stranger to the massive popularity of motion picture franchises owing their existence to authors, such as *Harry Potter* (based on books by J.K. Rowling), *Hunger Games* (based on books by Suzanne Collins); *James Bond* (based on a literary character created by Ian Fleming), *How to Train Your Dragon* (based on books by Cressida Crowell), *Jurassic Park* (based on a book by Michael Crichton), and many more. In these instances, changes to the literary work not only constitute changes in medium, but changes in form, and arguably, even in "concept and feel."[5] Yet these adaptations are unquestionably within the domain of the literary author's exclusive right to prepare derivative works. 17 U.S.C. § 101.

The amorphous nature of the Ninth Circuit's "intrinsic test" threatens this right, thereby undermining the value of authors' and other creatives' secondary markets. If a jury applying the intrinsic test could find that a nearly identical replica of an iconic photograph (save for changes in medium) was not infringing, what

---

[5] Stanley Kubrick's *The Shining* is of course an iconic and celebrated film, yet it is also famously criticized by Stephen King—who wrote the novel which served as source material—due to the many creative liberties taken by Kubrick. See Laura Miller, *What Stanley Kubrick got wrong about "The Shining"*, Salon (Oct. 1, 2013), https://www.salon.com/2013/10/01/what_stanley_kubrick_got_wrong_about_the_s hining/.

17

would prevent a jury applying the intrinsic test in the future from finding that an unauthorized sequel, *see Salinger v. Colting*, 607 F.3d 68, 71–72 (2d Cir. 2010), stage production, *see Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,772 F.2d 505 (9th Cir. 1985), mash-up, *see Dr. Seuss Enters*., 983 F.3d at 448, film treatment, *see Kalem*, 222 U.S. at 60, television series, *see Goodis v. United Artists Television, Inc.*, 425 F.2d 397, 399 (2d Cir. 1970), companion book, *see Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1370 (2d Cir. 1993), or translation, *see Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 35 (1st Cir. 2012), is also not infringing? And as this case exemplifies, the subjective nature of the "total concept and feel" analysis may insulate from review a jury verdict guided by differences in the works that should have no impact on the analysis.

As these examples illustrate, authors control the right to prepare derivative works, notwithstanding the substantial changes which accompany them. Therefore, in addition to the "almost universal opinion among copyright scholars that 'total concept and feel' is a horrible test for infringement," it is also a horrible litmus for protecting the livelihoods of writers under copyright law. *See* Boyden, *Grapes of Roth*, at 1095. Under the existing substantial similarity test, a jury may find no substantial similarity even when infringement is evident; this risk is exacerbated when the infringers' works exist in different "forms" or media, such as a photograph and a tattoo. *See Sedlik*, 163 F.4th at 678 (Wardlaw, J., concurring).

18

As such, the Ninth Circuit's current formulation of "total concept and feel" undermines author's control over their market for derivative works, which are substantially similar to the underlying work notwithstanding their inherent transformation. *See* 17 U.S.C. §101. As recognized by this panel, when untethered from the dissection of protectable and unprotectable elements, the intrinsic test's "holistic" analysis allows the factfinder to inject inappropriate findings into their verdict, basing a finding of infringement on similarities or dissimilarities outside copyright's scope. *See Sedlik*, 163 F.4th at 678 (Wardlaw, J., concurring) ("[A]n ordinary observer may find, in practice, that works in different media almost never have the same 'total concept and feel.' Thus, the intrinsic test leaves the artist's work vulnerable to 'clever thieves.'").

Creators in overlapping industries face the same issues. The music industry depends on the derivative work right, particularly as to remixes, sampling, and arrangements, yet is also facing severe financial hits in this context, with one study estimating that market substitution by generative AI will reduce revenues for music and audiovisual creators by 24%. *Global economic study shows human creators' future at risk from generative AI*, CISAC (Dec. 4, 2024), https://www.cisac.org/Newsroom/news-releases/global-economic-study-shows-

19

human-creators-future-risk-generative-ai.[6] News media depends on the derivative work right for income and to subsidize their work in the face of increasing technological advances that have curtailed the use of traditional publication formats. *See generally How Google Abuses Its Position as a Market Dominant Platform to Strong-Arm News Publishers and Hurt Journalism,* News Media Alliance (last updated Sept. 2022), https://www.newsmediaalliance.org/wp-content/uploads/2022/09/NMA-White-Paper_REVISED-Sept-2022.pdf; *see also Newspapers Fact Sheet*, Pew Research Center (Nov. 10, 2023), http://www.journalism.org/fact-sheet/newspapers/ (finding that press publisher advertising revenues have fallen in the past 15 years from approximately $50 billion in 2005 to an estimated $9.8 billion in 2022). And the motion picture industry has likewise always depended on a robust derivative work right, since "motion pictures are often derivative works based on preexisting works, i.e., a screenplay, which in turn may be based on a book, treatment, or story. . . . Licensed sequels, remakes,

---

[6] With the rise of generative AI, the issues with the intrinsic test will become even more pronounced. District Court judges within this Circuit have already noted the potential risks to an author's market due to language learning models that can "generate works that are similar enough (in subject matter or genre) that they will compete with the originals . . . ." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1051 (N.D. Cal. 2025). And numerous cases have been filed over the unauthorized use of musical works to train generative AI models, which have resulted in unauthorized outputs to users that reproduce copyrighted lyrics. *See Concord Music Grp., Inc. v. Antrhopic PBC*, 2025 WL 4808984 (N.D. Cal. Oct. 6, 2025).

spinoffs, adaptations, and similar derivative works . . . are a bedrock of the motion picture and television businesses." Brief for the Motion Picture Association, Inc. as Amici Curiae in Support of Neither Party at 20, *Andy Warhol Foundation for the Visual Arts v. Goldsmith,* 598 U.S. 508 (2023) (No. 21-869).

The derivative work right is of paramount importance to authors and creators and fuels the creator economy and creative ecosystems. As this case illustrates, a nebulous, unreviewable infringement analysis can lead factfinders applying the intrinsic test to unwittingly jeopardize that right.

## II.   THE NINTH CIRCUIT'S EXISTING FRAMEWORK IMPOSES AN UNFAIR BURDEN ON AUTHORS PROTECTING THEIR RIGHTS

### A.   The Ninth Circuit's Substantial Similarity Test Exacerbates Already Excessive Costs to Litigate

The legacy of the current substantial similarity framework is that plaintiffs in the Ninth Circuit may be faced with litigating even cut-and-dry cases of copying to trial. Without recourse to present even the most obvious cases of substantial similarity for disposition at summary judgment, authors must submit their case to the jury, and hope that a "holistic, subjective" comparison of the works, *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018), which the court cannot second-guess, *Sedlik*, 163 F.4th at 676, will be in their favor. While there are judicial stopgaps throughout

21

litigation that a copyright defendant can utilize to avoid an erroneous result,[7] authors with even the most obvious infringement claims are all but forced to trial.

Such preordained outcome contravenes the purpose of summary judgment, whereby "factually unsupported claims or defenses" may be "dispose[d] of" at a much less costly pre-trial juncture—a tool that is crucial for plaintiffs and defendants alike. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Authors enforcing their rights benefit when courts narrow the issues that must be proven at trial, leading to proceedings that are less expensive and more manageable. Conversely, authors defending against meritless infringement allegations benefit when courts correctly gatekeep to prevent legally untenable copyright claims (such as those built on alleged infringement of unprotectable ideas). *See Durang*, 711 F.2d at 142–43.

But where courts "have stripped away any objective analysis from the intrinsic test," and can no longer "decide it as a matter of law, precluding summary judgment for almost all copyright plaintiffs," a fundamental asymmetry exists between copyright plaintiffs and defendants. *Sedlik*, 163 F.4th at 682 (Johnstone, J., concurring). With only the extrinsic test resolvable at summary judgment, plaintiffs who win on the extrinsic prong must necessarily continue to trial, where the jury must

---

[7] *See v. Durang*, 711 F.2d 141, 142–43 (9th Cir. 1983) (affirming grant of summary judgment for defendant because alleged similarities "follow obviously" from unprotected ideas); *Masterson v. Walt Disney Co.*, 821 F. App'x 779 (9th Cir. 2020) (affirming finding of no substantial similarity on motion to dismiss).

then subjectively compare the "total concept and feel" of the works, notwithstanding the need to dissect the protectable elements from the unprotectable elements, as the extrinsic test recognizes. By contrast, defendants have numerous mechanisms short of trial as outlined above, *supra* n.7, and, even when material issues of fact preclude a merits determination short of trial, the extrinsic test provides defendants with a meaningful opportunity to challenge clearly erroneous jury findings. *See Gray*, 28 F.4th at 97 (upholding trial court's decision to vacate jury's verdict in favor of plaintiff where extrinsic test was not met, and noting the extrinsic test is "objective" and "often resolved as a matter of law"). By contrast, because the intrinsic test is "uniquely suited for determination by the trier of fact," *Sedlik*, 163 F.4th at 673, Plaintiffs, meanwhile, are hard-pressed to appeal erroneous findings.

The inevitability of trial for authors—whose income necessarily depends on their ability to protect their exclusive rights—is onerous. Faced with insurmountable litigation costs, commonly numbering in the tens to hundreds of thousands of dollars, and at trial potentially tending towards the millions,[8] authors face financial ruin and

---

[8] The median costs of litigation for copyright cases from inception through trial are $1.4 million, where the amount in dispute is between $10 million and $25 million. *See 2023 Report of the Economy Survey*, Am. Intell. Prop. L. Assoc., https://www.aipla.org/home/news-publications/economic-survey/2023-report-of-the-economic-survey (last visited June 30, 2026); *Understanding the Cost of Copyright Infringement Lawsuits*, PISC Patent Insurance (June 28, 2024), https://ipisc.com/understanding-the-cost-of-copyright-infringement-lawsuits/.

professional upheaval when they are more likely to be forced to pursue their claims through trial. Notwithstanding their outsized economic and cultural contributions,[9] creatives already grapple with consistently declining incomes and financial instability, only compounded by incidents of infringement that frustrate their statutory right to monetize their creative works to sustain their businesses. *See, e.g.*, *Key Takeaways*, Authors Guild (median income for full-time authors from their books—including advances, royalties, and licensing and subsidiary rights fees—was below minimum wage in many states, amounting to merely $10,000, in 2022, which, combined with median earnings from additional author-related income leveled out at $20,000); *New Authors Guild Study: Only 25 Percent of Readers Paid for a New Copy of a Print Book or Ebook Read in the Previous Month*, Authors Guild (last updated June 12, 2026), https://authorsguild.org/news/new-authors-guild-study-only-25-percent-of-readers-paid-for-a-new-copy-of-a-book-or-audiobook/

---

[9] In California alone, intellectual property contributes to 3,052,711 or 12.2 percent of all jobs and $490.1 billion or 12.7 percent of California's GDP. *From Innovation to Employment: The Economic Impact of IP*, U.S. Chamber of Commerce (Apr. 8, 2025), https://www.uschamber.com/intellectual-property/from-innovation-to-employment?state=ca; *California*, Copyright Alliance, https://copyrightalliance.org/resources/states/california/(last visited June 30, 2026). Likewise, the latest U.S. Patent and Trademark Office study notes that IP-intensive industries account for at least 63 million U.S. jobs, or 44 percent of all U.S. employment. Andrew A. Toole, Ph.D., et al., *Intellectual Property and the U.S. Economy: Third Edition*, USPTO, at iii, https://www.uspto.gov/sites/default/files/documents/uspto-ip-us-economy-third-edition.pdf.

("[A]uthors' earnings have not kept pace with the abundant availability of books, but have been in steep decline for the last decade and a half."). Forcing authors to try clear-cut infringements of their works to a jury using an admittedly skewed test therefore stands to chill the creation of new works by forcing their already limited financial and time resources towards trial, and away from their creative pursuits. Such result is antithetical to copyright's purpose—to "enrich[] the general public through access to creative works." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

Ultimately, this harm will be borne by the public, which will be deprived of the works, and downstream derivatives such as films, television series, merchandise, and attractions, made possible by authors' ability to monetize their rights. *See* H.R. Rep. No. 105-551, pt. 2 at 35 (1998) ("Throughout our history, the ability of individual members of the public to access and to use copyrighted materials has been a vital factor in the advancement of America's economic dynamism, social development, and educational achievement."). Shifting authors' focus and resources to jury trials over even the most obvious cases of infringement serves to disincentivize creative pursuits, ultimately depriving the public of new creative works.

25

**B.** **The Ninth Circuit's Substantial Similarity Test is an Outlier, Underscoring its Unworkability**

As contrasted with nearly every other circuit's substantial similarity approach, the Ninth Circuit's extrinsic-intrinsic framework is anomalous in its reservation of an entirely subjective, unreviewable test for the jury.[10] Most other circuits, including the Second—where a majority of copyright cases are filed after the Ninth[11]—have adopted a substantial similarity framework that dissects unprotectable elements from the works prior to comparison. The Second Circuit applies the "ordinary observer" test, whereby courts examine whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyright work." *See Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.)*, 360 F.2d 1021, 1022 (2d Cir. 1966). In so doing, courts focus on the "expression of an idea or fact, not the similarity of the facts, ideas or concepts themselves." *See, e.g.*, *Belair v. MGA Ent., Inc.*, 831 F. Supp. 2d 687, 693 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 65 (2d Cir. 2012). Practically, where a work does contain unprotectable elements, Second Circuit courts extract them from

---

[10] As Judge Wardlaw notes, the intrinsic test is "created by our court and which the Supreme Court has never blessed." *Sedlik*, 163 F.4th at 676 (Wardlaw, J., concurring).

[11] "While the Second Circuit is the historical leader in the substantial similarity space, the Ninth Circuit has recently overtaken it, at least in its share of substantial similarity litigation." Clark D. Asay, *An Empirical Study of Copyright's Substantial Similarity Test*, 13 U.C. IRVINE L. REV. 35, 40 (2022) [hereinafter Asay, *Empirical Study*].

26

consideration, examining substantial similarity between only the protectable elements from the viewpoint of a more discerning observer. Although the Second Circuit does invoke the problematic phrase "total concept and feel" at times, *see Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001); *but see Lynx Ventures, LLC v. Miller*, 45 F. App'x 68, 70 (2d Cir. 2002) (recognizing inappropriateness of applying "total concept and feel" in context of verbatim wholesale copying of text descriptions in database), it is within the context of an analysis still rooted in an objective comparison of protected expression, and thus can be treated as a matter of law, promoting more resolution at summary judgment. *See e.g.*, *Ward v. Barnes & Noble, Inc.*, 93 F. Supp. 3d 193, 201–03 (S.D.N.Y. 2015) (deciding substantial similarity as a matter of law on summary judgment); *Axelrod & Cherveny Architects, P.C. v. Winmar Homes*, 2007 WL 708798, at *14 (E.D.N.Y. Mar. 6, 2007) (same); *Peker v. Masters Collection*, 96 F. Supp. 2d 216, 221–22 (E.D.N.Y. 2000) (same).

Overall, the most prevalent substantial similarity test across circuits is the Second Circuit's ordinary observer test, or some variation. *See, e.g.*, Asay, *Empirical Study*, at 80 ("[C]ourts use[] [the ordinary observer test] in nearly 28% of the opinions that purported to reach a decision on prong two," namely, assessing whether a defendant's copying took a substantial amount of protectible material, rising to 47% when considering only Second Circuit opinions). Particularly in lieu

27

of Supreme Court precedent on this issue, courts—often in jurisdictions with fewer copyright disputes—commonly cite outside authority in rendering decisions, with the Second Circuit being most cited. *See id.* at 96–97 (noting that 56% of opinions comprising empirical substantial similarity study cited to the Second Circuit).

That said, the terminology used across courts varies, even within individual circuits. Courts employ various standards, including the "average lay observer," "layperson," "audience," "intended audience," "ordinary reasonable person," and "reasonable observer," some of which may approximate the "ordinary observer" test or add a unique gloss. *Id.* at 46–47. Courts examine works' similarities from quantitative and qualitative perspectives, consider their "comprehensive nonliteral similarity," examine "fragmented literal similarity," or assess for "supersubstantial similarity." *Id.* at 48–49. Where substantial similarity is concerned, it is clear that variation abounds. Given the lack of uniformity, using "total concept and feel" as a guidepost subjective to the particular factfinder is, as Judge Johnstone acknowledges, "'a horrible test for infringement.'" *Sedlik*, 163 F.4th at 684 (Johnstone, J., concurring) (quoting Boyden, *Grapes of Roth*, at 1095). Perhaps this is why the Second Circuit's more objective and filtered approach—even notwithstanding its own flaws—has been adopted and employed by a majority of circuits. *See, e.g.*, Asay, *Empirical Study*, at 82 (analyzing subtest rates for the extrinsic-intrinsic test, which demonstrate that, as contrasted with the ordinary

28

observer test, it "is largely a tool that a single circuit, the Ninth Circuit, uses").

Other circuits, including the Fourth and Eighth, which have adopted or invoked some variation of the extrinsic-intrinsic test, have by and large implemented guardrails to ensure more predictable and statutorily-compliant results. For example, where the Fourth Circuit has utilized some form of an intrinsic test, it has done so from the standpoint of the "intended observer." *See Devil's Advoc., LLC v. Zurich Am. Ins. Co.*, 666 F. App'x 256, 263 (4th Cir. 2016); *Dawson v. Hinshaw Music Inc.,* 905 F.2d 731, 734 (4th Cir. 1990). Similarly, the Eighth Circuit analyzes the intrinsic test from the standpoint of the "ordinary, reasonable person." *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 945 (8th Cir. 1992).

Ultimately, courts' approach to substantial similarity demonstrate that it is possible to undertake this analysis in a manner that ensures more predictable, fair outcomes, and that the Ninth Circuit's outlier framework, in which the intrinsic test has evolved into a holistic standard that is not only amorphous, but outside the scope of judicial review, should be reconsidered.

## CONCLUSION

For the reasons set forth above, the Guild, RWA, SinC, SGA, SCL, and DGA as *amici curiae*, respectfully request that the Ninth Circuit abrogate its current extrinsic-intrinsic substantial similarity framework, reverse the district court, and vacate the jury verdict finding no substantial similarity.

29

Dated: June 30, 2026

COWAN DEBAETS ABRAHAMS & SHEPPARD LLP

/s/ Nancy E. Wolff
Nancy E. Wolff
Leo M. Lichtman
Elizabeth Safran
60 Broad Street, 30th Floor
New York, New York 10010
Tel.: (212) 974-7474
Fax: (212) 974-8474
nwolff@cdas.com

*Counsel for* Amici Curiae
*The Authors Guild, Inc.*, *Romance Writers of America, Inc.*, *Sisters in Crime, The Songwriters Guild of America, The Society of Composers and Lyricists, and The Dramatists Guild of America, Inc.*

30

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rules 29-2(c)(3) and 32-1 because it contains 6,988 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as counted by Microsoft® Word for Windows (Version 2402), the word processing software used to prepare this brief.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft® Word for Windows (Version 2402) in a proportionally spaced typeface, 14-point Times New Roman font.

Dated: June 30, 2026

/s/ Nancy E. Wolff
Nancy E. Wolff

*Counsel for* Amici Curiae

31

## CERTIFICATE OF SERVICE

I, Nancy E. Wolff, hereby certify that on June 30, 2026, a true and correct complete copy of the foregoing Brief for The Authors Guild, Inc., Romance Writers of America, Inc., Sisters in Crime, the Songwriters Guild of America, the Society of Composers and Lyricists, and the Dramatists Guild of America, Inc. as *Amici Curiae* in Support of Plaintiff-Appellant Jeffrey B. Sedlik was timely filed in with the Clerk of Court using the appellate CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

/s/ Nancy E. Wolff
Nancy E. Wolff

*Counsel for* Amici Curiae