No. 24-3367

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Jeffrey B. Sedlik,

*Plaintiff-Appellant*,

v.

Katherine Von Drachenberg, Kat Von D, Inc., High Voltage Tattoo, Inc.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, District Judge
Case No. 2:21-cv-01102

## BRIEF OF *AMICUS CURIAE*
## MOTION PICTURE ASSOCIATION, INC.
## IN SUPPORT OF NEITHER PARTY

<div style="display:flex">

MOLLY M. LENS
KYLE M. GROSSMAN
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067-6035
(310) 553-6700

ANTON METLITSKY
DANIELLE R. FEUER
O'MELVENY & MYERS LLP
1301 Avenue of the
Americas
17th Floor
New York, NY 10019
(212) 326-2000

</div>

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Motion Picture Association, Inc. ("MPA") is a non-profit trade association, whose member companies are Amazon Studios LLC, Netflix Studios, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc.  The MPA does not have any parent companies, and no publicly held company owns 10 percent or more of the MPA.

Dated:  June 30, 2026                    O'MELVENY & MYERS LLP

By: */s/ Molly M. Lens*
                                            Molly M. Lens

i

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ................................................................1

SUMMARY OF ARGUMENT ....................................................................3

ARGUMENT ...............................................................................................5

    I.    THE COURT SHOULD NOT ABANDON THE INTRINSIC TEST, WHICH HAS BEEN SUCCESSFULLY USED IN THIS CIRCUIT FOR DECADES AND IS FAMILIAR TO COURTS AND LITIGANTS ..............................................................5

        A.    The Court should not use a case concerning a photograph of a person tattooed on a human body to overhaul the substantial similarity inquiry, which applies to all creative pursuits. ...........................................................6

        B.    The intrinsic test's decades-long application in this Circuit counsels against eliminating it. .......................................9

        C.    The intrinsic test serves as an important complement to the extrinsic test. ...................................................11

    II.    INSTEAD OF ABANDONING THE INTRINSIC TEST, THE COURT SHOULD REFINE IT TO AVOID POTENTIALLY CONTRADICTING THE COPYRIGHT ACT ................................14

CONCLUSION ..........................................................................................18

ii

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdin v. CBS Broad. Inc.*,
    971 F.3d 57 (2d Cir. 2020) ...............................................................................17

*Esplanade Prods., Inc. v. Walt Disney Co.*,
    768 F. App'x 732 (9th Cir. 2019) ......................................................................2

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)...........................................................................................4

*Funky Films, Inc. v. Time Warner Ent. Co.*,
    462 F 3d 1072 (9th Cir. 2006) ...........................................................................2

*Kimble v. Marvel Ent.*,
    576 U.S. 446 (2015).................................................................................. 10, 11

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*,
    900 F. Supp. 1287 (C.D. Cal. 1995) ..................................................................2

*Nichols v. Universal Pictures Corp.*,
    45 F.2d 119 (2d Cir. 1930) ...............................................................................14

*Paramount Pictures Corp. v. Axanar Prods., Inc.*,
    2017 WL 83506 (C.D. Cal. Mar. 9, 2020).........................................................2

*Pasillas v. McDonald's Corp.*,
    927 F.2d 440 (9th Cir. 1991) ...........................................................................13

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ......................................................... 7, 8, 12, 15

*Sedlik v. Von Drachenberg*,
    163 F.4th 667 (2026) ........................................................................... 7, 8, 14

*Shaw v. Lindheim*,
    919 F.2d 1353 (9th Cir. 1990) ......................................................... 9, 10, 11, 16

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977) ........................................................... 9, 12, 16

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) ................................................................10

*Universal City Studios, Inc. v. Film Ventures Int'l, Inc.*,
543 F. Supp. 1134 (C.D. Cal. 1982) ..........................................................2

**STATUTES**

17 U.S.C. § 102(b) ...................................................................... 3, 9, 14

**RULES**

Fed. R. App. P. 29(a)(4)(E)....................................................................1

iv

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Motion Picture Association, Inc. ("MPA") is a not-for-profit trade association founded in 1922. The MPA serves as the voice and advocate of the film and television industry, advancing the business and art of storytelling, protecting the creative and artistic freedoms of storytellers, and bringing entertainment and inspiration to audiences worldwide. The MPA has a particular interest in the proper interpretation of the Copyright Act, as well as a fair, balanced, and predictable copyright system, which is essential to its mission and to the ability of its members to finance, produce, and distribute compelling entertainment.

The MPA's members are Amazon Studios LLC, Netflix Studios, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc. These entities and their affiliates are the leading producers and distributors in the theatrical, television, and home-entertainment markets in the United States and abroad. They own copyrights in tens of thousands of the most valuable works ever created.

---

[1] Counsel for *amicus curiae* states that no counsel for a party authored this brief in whole or in part, no party or party counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amicus curiae*, its members, or its counsel contributed money intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

The MPA's members litigate as copyright plaintiffs and as copyright defendants. As plaintiffs, they vigorously enforce their rights in those works against infringers. *See*, *e.g.*, *Paramount Pictures Corp. v. Axanar Prods., Inc.*, 2017 WL 83506 (C.D. Cal. Mar. 9, 2020) (*Star Trek*); *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287 (C.D. Cal. 1995) (*James Bond*); *Universal City Studios, Inc. v. Film Ventures Int'l, Inc.*, 543 F. Supp. 1134 (C.D. Cal. 1982) (*Jaws*). And they defend against claims that their creative expression infringes another's copyright. *See*, *e.g.*, *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072 (9th Cir. 2006) (*Six Feet Under*); *Esplanade Prods., Inc. v. Walt Disney Co.*, 768 F. App'x 732 (9th Cir. 2019) (*Zootopia*). As underscored by their position as both copyright plaintiffs and defendants, the MPA's members seek a fair and predictable test for infringement that allows all copyright holders to understand their respective, exclusive rights, and that accurately and efficiently distinguishes valid from meritless claims.

The MPA does not take a position on whether or to what extent the Court should affirm the jury's finding of non-infringement in the specific, fact-bound case before the Court.[2] Rather, the MPA participates in this case to advance its

---

[2] Nor does the MPA take a position on the appropriate standard of review applicable to a jury's finding under the intrinsic test. The MPA understands that other *amici curiae* will be addressing this question.

2

strong interest in ensuring that the Ninth Circuit retains a workable standard for measuring substantial similarity. The MPA regularly participates as *amicus curiae* in copyright cases that affect its members' interests, is well positioned to provide the Court with a balanced perspective on the proper contours of the substantial similarity test, and, in this regard, submits this *amicus curiae* brief for the Court's consideration.

## SUMMARY OF ARGUMENT

The Ninth Circuit's two-part, extrinsic-intrinsic test for substantial similarity has protected creative expression in this Circuit for nearly half a century. While that test may require refinement at the margins, the basic structure and principles of the test should be preserved. That includes the intrinsic test, which Appellant Jeffrey Sedlik asks the Court to abandon entirely. This Court should reject that invitation.

To be sure, the concurring opinions in the panel decision identified a discrete issue that may warrant modification: the intrinsic test's use of the phrase "total concept and feel" may invite jurors to consider "concepts," even though the Copyright Act expressly excludes concepts from copyright protection. 17 U.S.C. § 102(b). But, to the extent this concerns the Court, it should use a scalpel rather than a sledgehammer to address it by focusing the jury on the overall "artistic effect" or "artistic impression" of the works at issue—a refinement of the test that

3

would ensure consistency with the Copyright Act. But the Court should not discard an entire analytical framework that courts, litigants, and creative industries have relied on for decades, and, more importantly, has appropriately and fairly balanced the interests of rights holders against the need to encourage free expression of ideas. *Cf. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991) ("[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work.").

That is so for three reasons. First, this case involves a highly unusual factual scenario: a photograph of a person—a difficult subject of copyright analysis in its own right—tattooed onto another person's arm, with only the jury witness to the actual tattoo in question. This case thus provides a poor vehicle for examining how the intrinsic test works beyond this unique circumstance, such as in a narrative context—and an even poorer one for rewriting a test designed to apply across all creative mediums, such as motion pictures, television, music, and literature. Second, discarding settled precedent would upset the expectations of courts and litigants who have structured decades of copyright practice around the extrinsic-intrinsic framework. And third, the intrinsic test serves an important function: that the factfinder can consider whether a defendant appropriated a plaintiff's protected expression when looking at the works as a whole, even in those cases when the

4

substantial similarity of expressive elements cannot be determined as an objective matter.

Rather than dispensing with the intrinsic test, the Court could easily refine it, should it be inclined to do so. A refined intrinsic test—focused on overall artistic effect or impression rather than "concepts"—would preserve its important function while ensuring consistency with the Copyright Act.

## ARGUMENT

**I. THE COURT SHOULD NOT ABANDON THE INTRINSIC TEST, WHICH HAS BEEN SUCCESSFULLY USED IN THIS CIRCUIT FOR DECADES AND IS FAMILIAR TO COURTS AND LITIGANTS**

As members of this Court have explained, the intrinsic test's use of the phrase "total concept and feel" could be seen as inconsistent with the Copyright Act, which excludes from its protections ideas and concepts. If the en banc Court believes that is a problem, it should fix it. But the Court need not fully abandon the test, as Sedlik asks it to do.

As an initial matter, this case involves the unique circumstance of a photograph of a person's face tattooed onto a living person's arm. Sedlik contends that the jury's finding in this case—that the tattoo is not substantially similar to the photograph—illustrates the fundamental flaws in this Circuit's intrinsic test. In fact, however, the unique circumstances of this case preclude any sort of general lesson to be drawn from the jury's verdict. For one thing, the Court has not seen

5

the physical tattoo in question—only the jury has.  Even more important, a jury's evaluation of a tattoo does not imply anything about how the intrinsic test works across narrative art forms such as motion pictures, television, music, and literature.

And while the unique posture of this jury verdict evades generalized lessons, history shows this Circuit's extrinsic-intrinsic substantial similarity test works. That test has applied to every creative work in this Circuit for nearly 50 years. Abandoning it would upset the settled expectations of courts and litigants in this Circuit.  Moreover, the intrinsic test makes good sense—focused on a holistic inquiry, it provides an important complement to objective, element-by-element extrinsic analysis, and works in the vast majority of cases.

**A.      The Court should not use a case concerning a photograph of a person tattooed on a human body to overhaul the substantial similarity inquiry, which applies to all creative pursuits.**

A case concerning a photograph of a person reveals little about the operation of the intrinsic test in different, more frequently occurring, contexts. Photographs—and especially photographs of people—present unique challenges for copyright analysis.  On top of this, the photograph in question was tattooed onto a human body, with only the jury actually being able to examine the tattoo in question.  Whatever the merits of the jury's verdict, it sheds no light on the substantial similarity inquiry—or the intrinsic test—more broadly.  The Court should not use this case to upend its long-standing substantial similarity

inquiry—which applies across all artistic endeavors, not just photography—based on the test's application by a single jury to this specific photograph in this particular use.

As Judge Wardlaw noted in her panel concurrence, photographs of people "are notoriously tricky subjects of copyright analysis, given that many components of a photograph, such as a person's facial features and pose, are not protected by copyright when 'viewed in isolation,' and '[w]hat *is* protected by copyright is the photographer's selection and arrangement of the photo's otherwise unprotected elements.'" *Sedlik v. Von Drachenberg*, 163 F.4th 667, 676 (2026) (Wardlaw, J., concurring) (emphasis in original) (quoting *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1119 (9th Cir. 2018)). Indeed, "choices related to subject matter, pose, lighting, camera angle, depth of field, and the like" are not copyrightable on their own. *Rentmeester*, 883 F.3d at 1119. A photographer cannot copyright a photograph's subject matter because "no photographer can claim a monopoly on the right to photograph a particular subject just because he was the first to capture it on film." *Id.* In other words, analyzing the copyrightability of photographs, particularly those of people, is difficult for anyone—be it an expert, jurist, or lay observer. That is especially true in this case. The photograph is of just a face and a hand, significantly limiting the amount of subject matter that could be subject to copyright protection in the first place. And there is the "additional wrinkle" that

7

the allegedly infringing work was not simply another photograph, but a *tattoo* on a human body. *Sedlik*, 163 F.4th at 676 (Wardlaw, J., concurring).

But photograph-specific difficulties do not apply to other types of works. Other creative pursuits, such as narrative motion pictures and television, can "more readily" be "dissected into protected and unprotected elements." *Rentmeester*, 883 F.3d at 1118. Plot, themes, dialogue, mood, setting, pace, characters, and sequence of events can all be protected expression. *Id.* at 1118-19. Sedlik, too, recognizes that people may experience visual works differently from literary works that tell a story, and that visual works "are experienced primarily through the initial, holistic delineation of the object" rather than through separate parts. Dkt. 100, Appellant's Pet. for Reh'g En Banc ("Pet.") at 16.

This Court's substantial similarity inquiry has been used to safeguard copyright protections in all types of creative works, not just photography. While Sedlik and some commentators may disagree with the jury's findings here, those findings do not undermine the usefulness (or correctness) of the substantial similarity test (or its intrinsic component) as a general matter. The Court should not use this case with its unique facts to abandon a test that applies (and, as explained below, has long been applied successfully) across creative works more broadly.

8

**B.      The intrinsic test's decades-long application in this Circuit counsels against eliminating it.**

The Court should be hesitant to discard a test that has been used—and refined—in this Circuit for decades.

Back in 1977, in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, the Court established its two-step, extrinsic-intrinsic test for determining substantial similarity.  562 F.2d 1157, 1164 (9th Cir. 1977).  The Court initially described the extrinsic test as a "test for similarity of *ideas*," which can use "analytic dissection and expert testimony" as guidance and "may often be decided as a matter of law."  *Id.* (emphasis added).  The intrinsic test, by contrast, was "to be applied in determining whether there is substantial similarity in *expressions*" and depends "on the response of the ordinary reasonable person" rather than analytic dissection and expert testimony.  *Id.* (emphasis added).

The Court's initial formulation of the extrinsic test focusing on "similarity of ideas" did not last.  The Copyright Act does not protect "ideas."  *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea ….").  But rather than discarding the extrinsic test entirely, the Court appropriately clarified it.  In *Shaw v. Lindheim*, the Court examined how caselaw had developed in the years after *Krofft*, explaining that the extrinsic test could "no longer be seen as a test for mere similarity of ideas."  919 F.2d 1353, 1357 (9th Cir. 1990).  Instead, the test had developed to incorporate "all objective

9

manifestations of creativity," and was "more sensibly" described as an "objective" analysis of "*expression*." *Id.* at 1357 (emphasis in original). *Shaw* then framed the intrinsic test as the extrinsic test's "subjective" corollary. *Id.*

Courts and litigants have been applying the existing version of the substantial similarity inquiry for over 30 years. Indeed, as recently as 2020, this Court, sitting en banc, reaffirmed that this Circuit uses the two-part, extrinsic-intrinsic test to determine if works are substantially similar. *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc).

The long pedigree of the extrinsic-intrinsic test counsels against radical revision. Certainly, it counsels against suddenly dispensing with one-half of the equation. Adhering to settled law "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Kimble v. Marvel Ent.*, 576 U.S. 446, 455 (2015) (quotations omitted). A party seeking to overturn a decades-old precedent on which an entire industry has relied thus necessarily carries a heavy burden of showing that the precedent does not work. Sedlik cannot possibly satisfy that burden, not only because the intrinsic test *does* work, *see infra* Part I.C, but also because a single jury verdict in a factually unique tattoo case simply cannot do the work of demonstrating that a decades-old

10

test should be jettisoned wholesale, *see supra* Part I.A.

Such caution is especially warranted here, moreover, because the substantial similarity inquiry (including the intrinsic test) is this Circuit's long-standing interpretation of a statute (the Copyright Act), so "Congress can correct any mistake it sees." *Kimble*, 576 U.S. at 456. If Congress believed that this Circuit—one of the busiest and most influential in the nation for copyright cases—had been fundamentally misapplying the Copyright Act for half a century, Congress could have intervened. *See id.* It has not done so.

### C. The intrinsic test serves as an important complement to the extrinsic test.

The Court also should not abandon the intrinsic test because both the extrinsic and intrinsic tests serve important functions in an infringement analysis. While the extrinsic test focuses on the "objective manifestations of creativity" and can involve granular analyses of distinct pieces of a work, the intrinsic test focuses on the subjective analysis of expression on the whole. *See Shaw*, 919 F.2d at 1357. Abandoning the intrinsic test for an objective-only inquiry would improperly and unnaturally divorce the substantial similarity inquiry from the way creative works are often experienced—in Sedlik's words, "through the initial, holistic delineation of the object" rather than through separate parts. Pet. 16.

The extrinsic test requires filtering out "unprotectable elements of the plaintiff's work" and then comparing the remaining "protectable elements" to the

11

"corresponding elements of the defendant's work to assess similarities in the objective details of the works." *Rentmeester*, 883 F.3d at 1118. The intrinsic test, on the other hand, provides a balance to this separation of a work's components by requiring "a more holistic, subjective comparison," *id.*—not through the lens of an expert analyzing a work in litigation, but of an ordinary person who may actually be consuming the work as it was meant to be consumed. Accordingly, the substantial similarity inquiry "protects against dissecting a work into unprotectable elements in a way that misses the forest for the trees." Dkt. 43, Br. of *Amici Curiae* Copyright Law Professors in Support of Appellees & Affirmance at 10. While many cases can be resolved under an objective test, some cannot, and in such cases a holistic check is appropriate, as this Court has long recognized.

In practice, the tests have provided rights holders and creators useful guidance on what ordinary audiences perceive as protectable expression—and what they do not. Two cases involving McDonald's help illustrate the point for the intrinsic test. In *Krofft*, the jury found the combination of characters, costumes, and settings in McDonald's commercials to be substantially similar to those in the H. R. Pufnstuf children's series, even though a rigorous dissection of each individual element would have revealed objective differences. 562 F.2d at 1166-67. Affirming the verdict, the Court emphasized the importance of viewing the works through "the minds and imaginations of young people," *see id.* at

12

1166—an inquiry that no element-by-element analysis could fully capture. In *Pasillas v. McDonald's Corp.*, 927 F.2d 440 (9th Cir. 1991), by contrast, the Court affirmed summary judgment *for* McDonald's in an action accusing it of infringing the copyright in a Halloween mask depicting the man in the moon. *Id.* at 443. Applying the intrinsic test, the Court concluded that "no reasonable jury could conclude that the two masks are substantially similar in protectable *expression*." *Id.* (emphasis added). The masks depicted the same unprotectable concept—the man in the moon—but their expression of him was fundamentally different: one portrayed a "stylish, youthful, carefree persona," while the other portrayed a "careworn, fatherly character." *Id.*

Such decisions demonstrate the importance of the intrinsic test as a stopgap against the purely objective element-by-element test. An intrinsic aspect of the substantial similarity inquiry has long been part of this Court's substantial similarity analysis precisely because, while objective element-by-element analysis is certainly crucial, actual people do not experience works of art as protectable elements—they experience works of art as a whole. And a test that fails to account for how people experience artistic works may fail to properly determine whether such works are "substantially similar" in the eyes of a viewer or listener.

It is entirely possible that the jury's intrinsic analysis of the tattoo in this case was wrong. Courts have long recognized that determining where to "fix the

boundary" between protectable and unprotectable expression is a "troublesome" inquiry, *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (Hand, J.), so there may not be any test that will work perfectly in every circumstance. But the fact that a particular jury misapplied a legal test does not mean the legal test should be discarded. The intrinsic test is crucial—without it, the substantial similarity inquiry would omit a critical aspect of the way works are actually perceived. This Court should not eliminate a test that has served parties well for decades in favor of an artificially circumscribed substantial similarity test. Certainly, it should not do so to correct a perceived error in a single jury verdict in a factually unique case like this one.

## II. INSTEAD OF ABANDONING THE INTRINSIC TEST, THE COURT SHOULD REFINE IT TO AVOID POTENTIALLY CONTRADICTING THE COPYRIGHT ACT

While the Court should not abandon the intrinsic test for the reasons explained, it should refine the test to shift its current focus from "total concept and feel" to what copyright law actually protects: artistic expression.

The intrinsic test's focus on "total concept and feel" is subject to justifiable criticism. As Judges Wardlaw and Johnstone have recognized, the "total concept and feel" instruction contradicts the Copyright Act's statement that copyright protection does not "extend to any idea [or …] *concept*." 17 U.S.C. § 102(b) (emphasis added); *see Sedlik*, 163 F.4th at 677 (Wardlaw, J., concurring); *id.* at 680

14

(Johnstone, J., concurring). To address any perceived clash between the text of the Copyright Act and the intrinsic test's current formulation, the Court can refine the intrinsic test to ensure it focuses on the overall "artistic effect" or "artistic impression" of the works at issue.

This refinement would have several advantages. First, and most obviously, it would avoid any conflict with the text of the Copyright Act. A focus on total artistic effect or impression accords with the general notion that the substantial similarity test safeguards the creative *expression* of ideas and concepts rather than ideas or concepts themselves. *See Rentmeester*, 883 F.3d at 1118 ("[A] defendant incurs no liability if he copies only the 'ideas' or 'concepts' used in the plaintiff's work. To infringe, the defendant must also copy enough of the plaintiff's expression of those ideas or concepts to render the two works 'substantially similar.'").

Second, this approach would maintain stability and predictability in this Court's precedents. By refining the intrinsic test rather than dispensing with it entirely, this reframing would maintain a test familiar to courts and litigants and used in this Circuit for decades, rather than imposing a new test that might introduce widespread confusion in the Circuit and effectively wipe out half a century of law. This approach also would be entirely consistent with earlier Circuit caselaw. It would reaffirm *Krofft*'s initial statement that the intrinsic test

15

measures "substantial similarity in *expressions*" from the view of an "ordinary reasonable person." 562 F.2d at 1164 (emphasis added). And it would align with the Court's approach in *Shaw*, which long ago eliminated an inconsistency between the extrinsic test and the Copyright Act—in that case, by avoiding any suggestion that "ideas" are protected—rather than eliminating the test entirely. 919 F.2d at 1357.

Third, this approach would continue to provide the ordinary observer an important role in the substantial similarity analysis. The perspective of an ordinary observer has value because creative works are made for real-world audiences, and not every aesthetic judgment can be reduced to its component parts (as the extrinsic test often requires). Refining the intrinsic test to focus on total artistic effect or impression instead of "concepts" can preserve that audience-facing judgment, while ensuring that jurors are instructed to consider only protected creative expression.

For his part, Sedlik requests that the Court simply "discard the intrinsic test," leaving a "one-step, objective test." Pet. 13. But for all the reasons explained above, the Court should not simply eliminate the intrinsic test. *See supra* Part I. Nor would doing so actually resolve the concurrences' concerns, because while the concurrences identify a problem with the intrinsic test that can be solved, they do not suggest that a purely objective test would be a good idea, let alone consistent

16

with the Copyright Act. Jettisoning the intrinsic test would certainly achieve the case-specific result that Sedlik seeks, but that obviously should not suffice to discard decades of precedent for all creative works, not just the unique work at issue in this case.

Relatedly, Sedlik favorably cites the Second Circuit's approach to substantial similarity. *See* Pet. 18. But that approach also focuses on "total concept and feel." While the precise contours of the Second Circuit's test vary depending on the work, "[n]o matter which test is applied," the Second Circuit examines "the similarities in such aspects as *the total concept and feel*, theme, characters, plot, sequence, pace, and setting." *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (emphasis added) (quotations omitted). Adopting the Second Circuit's approach wholesale would thus not solve the concerns that have been identified with this Circuit's intrinsic test.

Rather than adopting a different court's framework, the Court should build on the strengths of its own precedent by refining the intrinsic test's language to ensure that it is tethered to protected expression—not unprotectable ideas or concepts. And the path to do so is easy and clear. The Court can refine the intrinsic test to measure total "artistic effect" or "artistic impression," aligning it with its purpose of protecting creative expression.

17

## CONCLUSION

The Court should not abandon the intrinsic test. Instead, it should refine the test by replacing its focus on "total concept and feel" with a formulation that focuses on the protected expression in the works at issue—such as total "artistic effect" or "artistic impression." This approach would correct the doctrinal tension with the Copyright Act's exclusion of "concepts" from protection, maintain the stability and predictability that courts and litigants have relied upon for nearly fifty years to effectively protect creative expression and guard against illicit copying, and preserve the ordinary observer's important role as a safeguard against the over-dissection of creative works.

Dated:  June 30, 2026                    O'MELVENY & MYERS LLP

By:  /s/ *Molly M. Lens*
     Molly M. Lens
     Kyle M. Grossman
     O'MELVENY & MYERS LLP
     1999 Avenue of the Stars
     8th Floor
     Los Angeles, CA 90067-6035
     (310) 553-6700

     Anton Metlitsky
     Danielle R. Feuer
     O'MELVENY & MYERS LLP
     1301 Avenue of the Americas
     17th Floor
     New York, NY 10019
     (212) 326-2000

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number 24-3367**

I am the attorney or self-represented party.

**This brief contains 4,081 words,** including no words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated:  June 30, 2026        O'MELVENY & MYERS LLP

                         By: */s/ Molly M. Lens*
                            Molly M. Lens