No. 24-3367

# In the United States Court of Appeals for the Ninth Circuit

_____

JEFFREY B. SEDLIK, AN INDIVIDUAL,

*Plaintiff-Appellant,*

-V-

KATHERINE VON DRACHENBERG, AN INDIVIDUAL; A/K/A KAT VON D;
KAT VON D, INC., A CALIFORNIA CORPORATION;
HIGH VOLTAGE TATOO, INC., A CALIFORNIA CORPORATION,

*Defendants-Appellees.*

_____

On Appeal from the U.S. District Court for the Central District of California,
D.C. No. 2:21-CV-01102, Hon. Dale S. Fischer

---

**BRIEF OF AMICI CURIAE
AMERICAN PHOTOGRAPHIC ARTISTS;
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION;
AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS; AND
PROFESSIONAL PHOTOGRAPHERS OF AMERICA;
IN SUPPORT OF PLAINTIFF-APPELLANT ON REHEARING EN BANC**

---

Stephen M. Doniger
Doniger Burroughs PC
603 Rose Avenue
Venice, CA 90291
(310) 590-1820
stephen@donigerlawfirm.com
*Counsel for American Photographic Artists*

Thomas B. Maddrey
Chief Executive Officer
American Society of Media Photographers
4 Embarcadero Ctr., Ste. 1400
San Francisco, CA 94111
(214) 701-1875
maddrey@asmp.org
*Counsel for American Society
of Media Photographers*

Mickey H. Osterreicher
*General Counsel*
Alicia Wagner Calzada
*Deputy General Counsel*
National Press Photographers Association
120 Hooper St.
Athens, GA 30602
(716) 983-7800
lawyer@nppa.org
advocacy@nppa.org
*Counsel for National Press
Photographers Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, American Photographic Artists, American Society of Media Photographers, National Press Photographers Association, and Professional Photographers of America state that each are non-profit 501(c)(6) organizations and do not have a parent corporation and that no publicly held corporation owns 10% or more of any stock.

Respectfully submitted,

/s/ Stephen M. Doniger
Stephen M. Doniger
*Counsel for Amici Curiae*

Dated: June 30, 2026

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT...........................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF THE AMICI CURIAE ...........................................................1

INTRODUCTION ..................................................................................4

ARGUMENT .......................................................................................8

   I.   THE EXTRINSIC/INTRINSIC FRAMEWORK REFLECTS HOW HUMANS ACTUALLY EVALUATE SIMILARITY. ..............................................9

   II.  THE INTRINSIC TEST HAS ERRONEOUSLY BECOME UNTETHERED TO PROTECTABLE EXPRESSION. ........................................................11

   III. THE COURT SHOULD REFINE THE INTRINSIC TEST RATHER THAN ABOLISH IT. ....................................................................................14

      A.  The Intrinsic Test Should Be Explicitly Confined to Protectable Expression. ........................................................................14

      B.  The Intrinsic Test Should Be Reviewable and, in Exceptional Cases, Resolved as a Matter of Law for Either Party—as in *Unicolors*. .............16

      C.  A Properly Defined Intrinsic Test Is Consistent with the Second Circuit's Ordinary-Observer Test............................................18

   IV. APPLIED HERE, THE PROPOSED TEST DEMONSTRATES THE NEED FOR REVERSAL....................................................................................21

      A.  A Change of Medium Is Not a Defense; Reproducing a Photograph's Protectable Expression in Ink—on Skin or Paper—Violates the Act.......22

      B.  On This Record, No Reasonable Juror Could Find a Lack of Substantial Similarity in the Protected Expression at Issue and a Standardless Intrinsic Test Must Not Nullify That Copying. ...................23

      C.  The Court Should Remand with Instructions to Enter Judgment for Sedlik and Hold a New Trial on Damages. ............................................25

CONCLUSION ...................................................................................26

CERTIFICATE OF COMPLIANCE................................................................28

CERTIFICATE OF SERVICE ....................................................................29

# TABLE OF AUTHORITIES

Page

**CASES**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508, 143 S.Ct. 1258 (2023)..................................................................8

*Apple Computer, Inc. v. Microsoft Corp.*,
    35 F.3d 1435 (9th Cir. 1994) ............................................................... 12, 15, 24

*Boisson v. Banian, Ltd.*,
    273 F.3d 262 (2d Cir. 2001)......................................................................19

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) ....................................................................12

*Crispin v. Christian Audigier, Inc.*,
    839 F.Supp.2d 1086 (C.D. Cal. 2011) ......................................................23

*Dickerson v. United States*,
    530 U.S. 428 (2000) .................................................................................14

*Folio Impressions, Inc. v. Byer California*,
    937 F.2d 759 (2d Cir. 1991) .....................................................................20

*Funky Films, Inc. v. Time Warner Entm't Co.*,
    462 F.3d 1072 (9th Cir. 2006) ..................................................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................................14

*Hamil America, Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999) .......................................................................20

*Knitwaves, Inc. v. Lollytogs Ltd.*,
    71 F.3d 996 (2d Cir. 1995)................................................................. 19, 20

*LA Printex Industries, Inc. v Aeropostale, Inc.*,
    676 F.3d 841 (9th Cir. 2012) ............................................................. 7, 19, 20

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*,
    274 F.2d 487 (2d Cir. 1960) .....................................................................18

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ............................................................. 11, 12, 22

*Sedlik v. Drachenberg*,
    163 F.4th 667 (9th Cir. 2026) ..................................................................16

## TABLE OF AUTHORITIES—Continued

Page

*Shaw v. Lindheim*,
919 F.2d 1353 (9th Cir. 1990) ..................................................................13

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
562 F.2d 1157 (9th Cir. 1977) ..................................................................13

*Skidmore v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) ..................................................................14

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983)................................................................ 17, 18

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
853 F.3d 980 (9th Cir. 2017) ............................... 6, 16, 17, 18, 23, 26

*Zalewski v. Cicero Builder Dev., Inc.*,
754 F.3d 95 (2d Cir. 2014) ........................................................................19

**STATUTES**

17 U.S.C. § 101 ........................................................................................22

17 U.S.C. § 106(1).....................................................................................22

17 U.S.C. § 106(2).....................................................................................22

17 U.S.C. § 113(a).....................................................................................22

**JUDICIAL RULES**

9th Cir. R. 29-2 ..........................................................................................1

Fed. R. App. P. 26.1 .................................................................................... i

Fed. R. App. P. 29(a)(4)(E).........................................................................1

Fed. R. Civ. P. 50 ................................................................................ 16, 24

Fed. R. Civ. P. 50(a)..................................................................................21

Fed. R. Civ. P. 50(b) .................................................................................21

Fed. R. Civ. P. 56 ......................................................................................16

# TABLE OF AUTHORITIES—Continued

Page

## OTHER AUTHORITIES

Amos Tversky,
*Features of Similarity*, 84 PSYCHOL. REV. 327 (1977)..............................................9

Dedre Gentner & Arthur B. Markman,
*Structure Mapping in Analogy and Similarity*,
52 AM. PSYCHOLOGIST 45 (1997) ..............................................................9

Jeanne C. Fromer & Mark A. Lemley,
*The Audience in Intellectual Property Infringement*,
112 MICH. L. REV. 1251 (2014) ........................................................10

Shyamkrishna Balganesh, Irina D. Manta & Tess Wilkinson-Ryan,
*Judging Similarity*, 100 IOWA L. REV. 267 (2014) ..............................................10

## INTEREST OF THE AMICI CURIAE[1]

**American Photographic Artists ("APA")** is a leading nonprofit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.

**The American Society of Media Photographers ("ASMP")** is a 501(c)(6) not-for-profit trade association, established in 1944 to protect and promote the interests of professional photographers who earn their living by making photographs intended for publication, licensing fees and other compensation derived from the bundle of rights arising under the Copyright Act. With more than 7,400 members nationwide working in every genre of commercial photography, ASMP is a leading trade organization representing professional photographers' interests.

**The National Press Photographers Association ("NPPA")** is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in the creation, editing and distribution of copyrighted works. NPPA's members

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than amici, their members, or counsel, contributed money intended to fund preparation or submission of this brief.

Per 9th Cir. R. 29-2, all parties have consented to the filing of this amici curiae brief.

include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, as the *Voice of Visual* Journalists, NPPA has vigorously promoted and defended the rights of photographers and journalists, including intellectual property rights and freedom of the press in all its forms, especially as it relates to visual journalism.

**Professional Photographers of America (PPA)**, the world's largest photographic trade association, represents over 33,000 photographers and photographic artists from dozens of specialty areas including portrait, wedding, commercial, advertising, and art. The professional photographers represented by the PPA have been the primary caretakers of world events and family histories for the last 150 years and have shared their creative works with the public secure in the knowledge that their rights in those works would be protected.

Each of these entities represent copyrights-holding content creators, including thousands of photographers, whose works are readily capable of being adapted to different mediums as was done in this case. The livelihoods of many of those members depend on both how their works are perceived by the public and on the full protections of U.S. Copyright law, including a copyright holders' exclusive rights to display and create derivative works from their original creations. As such, each *amici* has a compelling interest in ensuring the application of a substantial

2

similarity standard that fairly reflects how works of visual art are perceived and protected.

This case sent shock waves through the visual arts community as the jury seemingly nullified copyright law, and now that same community fears that some proposed solutions may make it harder, not easier, for copyright holders to protect their works. If the verdict in this case is left to stand, or if this Circuit's substantial similarity test is not properly corrected, it could invite a rights-grab of potentially millions of copyrighted photos, illustrations, animations, and other works of visual art merely by changing the medium in which they appear, thus depriving holders of the intended protections of the Copyright Act.

**INTRODUCTION**

This Court granted rehearing en banc to decide whether to keep, reform, or jettison the "intrinsic test" for substantial similarity. *Amici* urge the middle course. The two-part extrinsic/intrinsic framework is sound at its core and with relatively modest reform this Court can ensure that the intrinsic test cannot be used to vitiate the derivative right or any other rights under the Copyright Act. Indeed, the problem that this case exposed is a discrete drift in the intrinsic prong, which some courts have allowed to float free of copyright's bedrock rule that only protectable expression may be compared. The cure is to redefine the intrinsic test so that it is anchored to protectable expression and is meaningfully reviewable by courts—not to discard a framework that, properly understood, tracks how people actually judge similarity.

The extrinsic/intrinsic structure is not a doctrinal artifact; it mirrors human cognition. Decades of research show that similarity judgments are a hybrid of feature-level decomposition and holistic integration. A test that first asks about objective, articulable similarities (extrinsic) and then about the overall "concept and feel" (intrinsic) of those similarities captures both processes that the human mind in fact uses. It is precisely this cognition that provides the basis for the most core function of art; to be seen and to be understood. At the same time, it is possible for a derivative work to differ from the original both by including unprotected content and by presenting on a different medium, but still be infringing because

4

the protectable elements are the same. Thus the question is not about the "vibe" of the infringing work, but about whether the protectable elements from the original were improperly reused.

The intrinsic test serves a genuine and valuable function—it preserves the holistic, audience-oriented judgment that copyright has always demanded—but it has erroneously developed, in some hands, into a standardless inquiry untethered from protectable expression. That drift is contrary to this Court's own precedent, which has always required that unprotectable elements be filtered before any comparison "as a whole."

Properly correcting this drift is critical to *amici* and the hundreds of thousands of creators and copyright holders who live and work under the umbrella of this Court. Because visual arts are at the core of what gives our society its visual identity, visual artists are fundamentally concerned with how their original creative works are viewed and protected. Copyright law plays a particularly important role in protecting photographers and other visual creators whose original expression is uniquely susceptible to unauthorized reproduction, adaptation, and dissemination across different media. Whether they are visual journalists documenting matters of public concern, commercial photographers creating advertising imagery, portrait and wedding photographers preserving personal histories, or fine art photographers producing expressive works, each contributes to the visual record through original

creative choices. Those choices frequently lie not in the underlying subject itself, but in the creator's selection of composition, framing, perspective, timing, lighting, depth of field, moment selection, and other expressive elements that distinguish one work from countless others depicting the same subject.

The remedy to the problem raised in this case is definition, not abolition. By ensuring that the intrinsic test is tethered to protectable expression this Court can ensure that the test is not rudderless, can be properly reviewed by the Courts, and in exceptional cases may be resolved as a matter of law—for either party—as this Court already held in *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980 (9th Cir. 2017). So defined, the Ninth Circuit's test converges with the Second Circuit's "more discerning ordinary observer" test—confirming that reform, not repeal, is the disciplined path.

An intrinsic test confined to protectable expression also promotes predictability and consistency. Copyright owners, accused infringers, trial courts, and juries all benefit when the governing standard identifies the legally relevant similarities. A doctrine that permits liability or nonliability to turn on unstructured impressions creates uncertainty, increases litigation costs, and makes it more difficult for creators and users alike to assess their rights and obligations. That uncertainty falls most heavily on independent creators and small businesses whose ability to license and enforce their work depends upon predictable application of copyright principles.

6

By tethering the intrinsic inquiry to protectable expression, the Court would provide clearer guidance while preserving the jury's traditional role.

Under a proper substantial similarity standard, there can be no real question that judgment should have been entered in favor of Sedlik in this case on his tattoo claims.[2] The originality of a photograph generally lies not in the underlying subject matter but in the creator's selection of composition, framing, perspective, timing, lighting, depth of field, and other expressive choices—precisely what was reproduced in this case. And given the "gazillion" ways those elements can be selected and arranged, the protection of the photographer's copyright in a case like this is broad.[3] The only way the jury could find a lack of similarity in that protectable expression is by disregarding those protectable choices through an unconstrained inquiry into overall impressions and/or improperly fixating on dissimilarities. The Ninth Circuit should take this opportunity to reiterate that neither a focus on dissimilarities or a determination rooted in unprotectable elements is proper, and remand this case to the trial court with instructions to enter judgment in favor of Sedlik and hold a new trial on damages.

---

[2] Amici take no position, for purposes of this brief, on the jury's findings regarding the social media posts and fair use findings.

[3] *LA Printex Industries, Inc. v Aeropostale, Inc.*, 676 F.3d 841, 850-51 (9th Cir. 2012) (finding artwork to be entitled to broad protection where "there are gazillions of ways to select and combine constituent elements."

## ARGUMENT

To reach a determination on the second element of copyright infringement—that a defendant copied original aspects of the work—a court analyzing a claim must "isolate and vindicate" the original elements of the copyrighted work that have been copied, and then analyze those elements for substantial similarity. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 557, 143 S.Ct. 1258, 1291 (2023) (Gorsuch, J., concurring). This circuit's history of splitting the substantial similarity question into two parts—the extrinsic and intrinsic tests—can be reformed to arrive at the correct result by staying true to the command to isolate the protectable elements for both the extrinsic and intrinsic parts of the substantial similarity test and allowing judicial findings on both, particularly where—as here —a work was clearly copied. By focusing the analysis on the protectable elements, the intrinsic test will ensure that a different "impression" caused by a changed medium will not thwart the proper enforcement of copyright law, and will no longer allow courts or juries to endorse the copying of a work onto a new medium by deciding that the medium itself changes the "concept and feeling" of the work—which swallows the derivative right provided in the Copyright Act.

8

## I.  THE EXTRINSIC/INTRINSIC FRAMEWORK REFLECTS HOW HUMANS ACTUALLY EVALUATE SIMILARITY.

Because substantial-similarity analysis is, at its core, concerned with how the works at issue are perceived, it is appropriate to begin by asking how human beings, in fact, perceive similarity—the answer vindicates the two-part structure this Circuit has developed and used. Cognitive science has long recognized that similarity assessment is not a single, undifferentiated impression. It is a hybrid process combining (a) decomposition of a stimulus into features and attributes and (b) holistic, configural integration of the whole.

The foundational work is Amos Tversky's "contrast model," which demonstrated that similarity judgments are a weighted function of common and distinctive features, and are context-dependent rather than fixed. *See* Amos Tversky, *Features of Similarity*, 84 PSYCHOL. REV. 327 (1977). Structural-alignment research confirms that observers both match discrete attributes and align the relational structure of competing stimuli. *See* Dedre Gentner & Arthur B. Markman, *Structure Mapping in Analogy and Similarity*, 52 AM. PSYCHOLOGIST 45 (1997). In other words, the mind does precisely what the two-part test asks the factfinder to do: it identifies concrete, articulable points of overlap, and it forms an overall impression of the whole.

This is why a single, purely holistic "gestalt" inquiry would be a worse model of perception, not a better one. Collapsing the analysis into one undifferentiated

9

impression discards the feature-level comparison that observers demonstrably perform and that copyright law requires in order to separate protected from unprotected matter. The extrinsic prong supplies the analytic, feature-level step; the intrinsic prong supplies the holistic step. Legal scholarship analyzing the "audience" in infringement reaches the same conclusion—that sound doctrine must attend to both the analytic and the ordinary-observer perspectives rather than choosing one to the exclusion of the other. *See* Jeanne C. Fromer & Mark A. Lemley, *The Audience in Intellectual Property Infringement*, 112 MICH. L. REV. 1251 (2014); *see also* Shyamkrishna Balganesh, Irina D. Manta & Tess Wilkinson-Ryan, *Judging Similarity*, 100 IOWA L. REV. 267 (2014) (empirically showing that the framing of the inquiry affects similarity judgments, underscoring the value of a disciplined, sequenced test).

The practical significance of this distinction is particularly evident in visual works. Photographers routinely create original expression through the arrangement and selection of visual elements rather than through the creation of the underlying subject itself. A substantial similarity analysis that doesn't identify those elements or assess the effect of those elements when combined risks an absurd result like the one here—in which the jury found a work that was intended to be as near an exact reproduction as possible to lack substantial similarity based on little more than a change in (unprotectable) medium.

The two-part framework is both theoretically sound and provides a practical and useful mechanism for evaluating originality and appropriation in photographic works. It is a workable framework that best fits the cognitive reality the substantial similarity doctrine aims to measure. That is a powerful reason to refine it rather than replace it.

## II. THE INTRINSIC TEST HAS ERRONEOUSLY BECOME UNTETHERED TO PROTECTABLE EXPRESSION.

The intrinsic test performs an indispensable function. After the protectable elements are identified, copyright still asks whether, taken together, the works share a substantially similar "total concept and feel" in the eyes of the ordinary observer. That holistic judgment guards against the opposite error of hyper-dissection—the temptation to declare two manifestly similar works dissimilar by cataloging trivial point-by-point differences that don't really change the impression of the works. *See Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018) (intrinsic test "requires a more holistic, subjective comparison of the works to determine whether they are substantially similar in 'total concept and feel'").

The failure in this case occurred because (1) the intrinsic test has become unmoored from protectable expression, and (2) courts in this Circuit have largely found that the intrinsic test is not subject to meaningful judicial scrutiny. But this

11

Court's precedent has never sanctioned that drift. Indeed, in *Apple Computer, Inc. v. Microsoft Corp.*, this Circuit explained:

> Because only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copyright protection before works are considered "as a whole."

35 F.3d 1435, 1442–43 (9th Cir. 1994). *Apple* made clear that filtering is a precondition to the holistic comparison, not a substitute for it:

> This does not mean that at the end of the day, when the works are considered under the intrinsic test, they should not be compared as a whole. . . . However, the unprotectable elements have to be identified, or filtered, before the works can be considered as a whole.

*Id.* at 1446. And this Court reaffirmed the point for visual works in *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822–23 (9th Cir. 2002) ("[W]hen applying the extrinsic test, a court must filter out and disregard the non-protectible elements in making its substantial similarity determination."), and again in *Rentmeester*, 883 F.3d at 1118 (the court "must 'filter out' the unprotectable elements" before comparison).

The doctrinal history confirms that the holistic step was always meant to operate on protected expression to ensure that a fact finder charged with assessing substantial similarity of protectable expression would not focus on differences in unprotectable elements.

Indeed, in *Krofft* this Court originally divided idea (extrinsic) from expression (intrinsic) and explained that "[t]he test to be applied in determining whether there is substantial similarity in expressions shall be labeled an intrinsic one depending on the response of the ordinary reasonable person." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). Since copyright law is ultimately concerned with protectable artistic expression, this Court's instruction that the intrinsic test should evaluate "whether there is substantial similarity in expressions" necessarily called for a subjective evaluation of the similarities in protectable expression only.

This Court further clarified that the intrinsic test should be limited to an assessment of protectable expression in *Shaw v. Lindheim*, explaining that "the two tests are more sensibly described as objective and subjective analyses of *expression*." 919 F.2d 1353, 1357 (9th Cir. 1990) (emphasis in original).

At no point did the framework created by this Court license a free-floating "concept and feel" judgment about unprotected matter. To the extent the intrinsic test has been applied as though it did—inviting juries to find similarity based on things like differences in medium or changes to protectable expression necessitated by a change in medium—that application is an error to be corrected, not an inherent feature of the test.

And, as discussed below, an intrinsic test properly tethered to protectable expression is readily reviewable by courts such that summary judgment or judgment as a matter of law may be granted in favor of either side, and clearly erroneous jury determinations can be corrected, in appropriate cases.

## III. THE COURT SHOULD REFINE THE INTRINSIC TEST RATHER THAN ABOLISH IT.

When a settled rule develops a curable defect, the disciplined course is to refine it, not discard it. The Supreme Court modeled exactly this approach in *Halliburton Co. v. Erica P. John Fund, Inc.*, declining to overrule a presumption absent a "special justification," while refining the rule's operation to cure the identified problem. 573 U.S. 258, 266, 283-84 (2014) (citing *Dickerson v. United States*, 530 U.S. 428, 443 (2000)). This Court has done the same within copyright, reforming discrete doctrines while leaving the substantial-similarity framework intact. *See Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc) (abrogating the inverse-ratio rule as unsalvageable while retaining the extrinsic/intrinsic test). The same restraint is warranted here, and *amici* suggest adopting the following three refinements rather than abrogation:

### A. The Intrinsic Test Should Be Explicitly Confined to Protectable Expression.

The Court should hold expressly what its precedent already implies: the intrinsic "concept and feel" comparison is only properly applied to the protectable

expression that survives extrinsic filtration. Juries should be instructed accordingly —that they may not base a finding of substantial similarity (or in this case lack of substantial similarity) on things that are not protected by copyright law such as ideas, facts, *scènes à faire*, public-domain material, or (in this case) the medium on which the protectable expression appears. They must be clearly instructed that the "total concept and feel" they assess is the concept and feel *of the protected expression*— including, as appropriate, elements such as pose, moment, shadows and highlights, angle, position and focus, individually and in original selection and arrangement as appropriate, regardless of the medium in which they are presented. This single instruction restores the legal content the test is said to lack, without sacrificing the holistic judgment the test exists to provide. It is also faithful to *Apple*'s command that unprotectable elements "be identified, or filtered, before the works can be considered as a whole." 35 F.3d at 1446.

Such a holding should prevent what happened in this case from happening again because, as noted above, the originality of photographs frequently lies in the photographer's creative choices concerning timing, perspective, composition, lighting, framing, and moment selection—the creative choices that often distinguish a merely competent image from one that informs, influences, or endures—and if the intrinsic analysis were focused on *those* elements then judgement here would have been properly entered for Sedlik.

15

Unless the intrinsic inquiry remains tethered to protectable expression, juries may inadvertently attribute significance to similarities, or dissimilarities, that copyright law does not protect while overlooking the creative choices that it does. A substantial similarity standard that permits those protectable expressive choices to be disregarded undermines both the value of visual arts and the Copyright Act's role in encouraging its creation. Such a standard cannot be permitted to stand.

### B. The Intrinsic Test Should Be Reviewable and, in Exceptional Cases, Resolved as a Matter of Law for Either Party—as in *Unicolors*.

A properly defined intrinsic test should not be immune from judicial review. Once it is anchored to protectable expression, a court can assess whether a reasonable jury could find substantial similarity in that protected expression—the same inquiry courts perform under Rules 50 and 56 throughout the law.

The panel below correctly pointed out the practical unfairness of disallowing judicial review of the intrinsic test and explained that "[f]unctionally precluding summary judgment for copyright plaintiffs favors defendants" and "substantially dilutes the effect of Rule 56." *Sedlik v. Drachenberg*, 163 F.4th 667, 683 (9th Cir. 2026) (Johnstone, J., concurring). But that disallowance is not a feature of a properly applied intrinsic test, it is a feature of the erroneous drift in the application of that test that this Court now has the opportunity to correct.

16

Indeed, this Court has already confirmed that the intrinsic test may, in exceptional cases, be resolved as a matter of law. In *Unicolors, Inc. v. Urban Outfitters, Inc.*, the defendant argued—just as the abolitionist position assumes—that "only a jury may apply the intrinsic test" and that copyright cases therefore "cannot be resolved at summary judgment." 853 F.3d 980, 985 (9th Cir. 2017). The Court squarely rejected that premise, explaining that it "cannot be reconciled with our prior recognition that, in exceptional cases, works may be so identical that summary judgment in favor of a plaintiff is warranted." The Court explained that where, as here, "the works are so overwhelmingly similar that the possibility of independent creation is precluded," a court may grant summary judgment for the plaintiff, because "no reasonable juror could conclude under the intrinsic test that the works are not substantially similar in total concept and feel." *Id.* at 987. *Unicolors* thus establishes two propositions central to this appeal: the intrinsic test is reviewable and, in a sufficiently clear case, can be decided as a matter of law.

The bidirectional character of this rule is not new. Over forty years ago this Court explained that the substantial-similarity question may be resolved as a matter of law for *either* party in the clear case. *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983) ("A grant of summary judgment for plaintiff is proper where works are so overwhelmingly identical that the possibility of indepen-

dent creation is precluded. . . . Similarly, summary judgment for defendant is appropriate where works are so dissimilar that a claim of infringement is without merit."). *Unicolors* then applied the first half of that rule, granting judgment for the plaintiff where the works were so "overwhelmingly similar that the possibility of independent creation is precluded." 853 F.3d at 987 (citing *Twentieth Century-Fox*, 715 F.2d at 1330).

A reviewable, expression-anchored intrinsic test thus makes the standard symmetric and honest: in the ordinary case it remains "the province of the jury," *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006), but in the rare case admitting only one reasonable answer, a court may decide it for whichever party that answer favors.

## C. A Properly Defined Intrinsic Test Is Consistent with the Second Circuit's Ordinary-Observer Test.

Refining—rather than abolishing—the intrinsic test does not isolate this Circuit. It *aligns* it with the Second Circuit, whose ordinary-observer test performs the very same two operations within a single inquiry. The classic formulation asks whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (Hand, J.). But where a work contains unprotectable elements, the Second Circuit applies the "more

18

discerning ordinary observer" test, which builds filtration directly into the observer's viewpoint.

As the court explained in *Zalewski v. Cicero Builder Dev., Inc.*: "[A] work's aesthetic appeal will [often] be due largely to unprotected elements. In these cases, we must be more discerning, [and] ignore those aspects of [the] work that are unprotectible. . . . " 754 F.3d 95, 101–02 (2d Cir. 2014). The Second Circuit thus filters first and then compares the protected expression as a whole—precisely the sequence amici propose here. *See also Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996 (2d Cir. 1995); *Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001).

The mirror image protects defendants as well: where, after filtering, the protected expression is so different that no reasonable juror could find a similar total concept and feel, judgment for the defendant follows. *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 851 (9th Cir. 2012) (assessing on the visual record whether "no reasonable juror" could find substantial similarity, and reversing summary judgment because the protectable similarities created a triable issue). In *LA Printex*, this Court recognized that the Second Circuit's approach was consistent with this Circuit's extrinsic / intrinsic analysis, explaining:

> Though the Second Circuit's "ordinary observer" and "more discerning ordinary observer" tests differ somewhat from our two-part extrinsic/ intrinsic test for substantial similarity, its reasoning, at least in the context of fabric designs, is persuasive, and it guides our comparison of the designs in this case.

19

676 F.3d at 850. Applying that reasoning, the Court set aside the unprotectable "idea of a floral pattern" and the unprotectable elements within it, and then compared the parties' "original selection, coordination, and arrangement" of protectable elements, finding "objective similarities in protectible elements." *Id.* at 850–51 (relying on *Hamil America, Inc. v. GFI*, 193 F.3d 92, 102–03 (2d Cir. 1999), and *Knitwaves*, 71 F.3d at 1003–04).

That a panel of this Court could comfortably borrow the Second Circuit's ordinary-observer reasoning to resolve a substantial-similarity question while still filtering unprotectable matter under this Circuit's 2-part test confirms that the two frameworks are complementary, not competing. The panel pointed directly to the Second Circuit decisions articulating those tests. *See id.* at 850 n.2 (citing *Knitwaves*, 71 F.3d at 1002–03, and *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 766 (2d Cir. 1991)). It also confirms that confining the intrinsic test to protectable expression does not break no new ground; it merely restates what this Court did in *L.A. Printex*.

The lesson is that the choice this Court faces is not between two incompatible regimes. Both Circuits require the same two things: identification of protectable expression, then a holistic comparison limited to that expression. The Ninth Circuit's contribution is simply to make the two steps explicit. Defining the intrinsic test to involve only protectable expression therefore harmonizes this Circuit with the

20

Second—and accomplishes through refinement everything that abolition is said to offer, while preserving the holistic judgment that both Circuits have always demanded. And with proper guidance, it prevents juries and courts from analyzing unprotectable elements and arriving at the wrong results.

## IV. APPLIED HERE, THE PROPOSED TEST DEMONSTRATES THE NEED FOR REVERSAL.

The refinements *amici* propose are not abstract. Applied to the record in this case, they show both the value of the intrinsic test and the cost of leaving it standardless. That cost is great for photographers like Jeff Sedlik and others who are similarly situated. Properly defined and reviewed, the test would have required judgment as a matter of law for Sedlik on the Tattoo: copying of protectable elements was conceded, the Tattoo reproduces the protectable expression of the Photograph, as closely as possible[4] and the change of medium is no defense. Sedlik preserved the point through motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) and 50(b) . 1-ER-107, 1-ER-2.

---

[4] *See* 2-ER-200, 2-ER-207, 2-ER-212, 3-ER-480 (Farmer asked Kat Von D to make a tattoo that matched Sedlik's photo as closely as possible) and 2-ER-212, 2-ER-294, 2-ER-233, 3-ER-480, 3-ER-468 (Von D agreed and traced Sedlik's Photograph, transferred the tracing to Farmer's arm, replicated each detail when creating the tattoo, and admitted that her tracing "match[ed] up exactly" with the Photograph).

21

### A. A Change of Medium Is Not a Defense; Reproducing a Photograph's Protectable Expression in Ink—on Skin or Paper—Violates the Act.

The reproduction right is medium-neutral by statute. Section 106(1) grants the exclusive right to reproduce the work "in copies," and "copies" are defined as material objects "in which a work is fixed by any method now known or later developed." 17 U.S.C. §§ 106(1), 101. Section 113(a) removes any doubt as applied to images: the right "to reproduce a copyrighted pictorial, graphic, or sculptural work in copies under section 106 includes the right to reproduce the work in or on any kind of article, whether useful or otherwise." *Id.* § 113(a). A photograph is a pictorial work, and reproducing its protected expression as a tattoo—"in or on" skin—falls squarely within the owner's exclusive rights to reproduce and to prepare derivative works. *Id.* § 106(1)–(2). Skin is no more a refuge from infringement than canvas, fabric, or film.

Again, what is protected in a photograph is the photographer's creative choices—"subject matter, pose, lighting, camera angle, depth of field, and the like." *Rentmeester*, 883 F.3d at 1118–19. Sedlik's Photograph of Miles Davis embodies precisely such choices, and they are precisely what the Tattoo reproduces. The principle goes both ways, as tattoo artists have also sought to enforce copyrights in their original artwork even when it is reproduced in a different medium. *See, e.g. Crispin v. Christian Audigier, Inc.*, 839 F.Supp.2d 1086, 1088 (C.D. Cal.

22

2011) (Summary judgment denied in part in a case relating to claims by professional tattoo artist Buckley Crispin for the unauthorized use of his original artwork on condoms and other products). If a tattoo artist may stop the unauthorized reproduction of his tattoo design in other mediums, a photographer may equally stop the unauthorized reproduction of his photograph as a tattoo. Copyright does not protect some artists' expression and withhold protection from others; the right is the same whatever the input and output media.

### B. On This Record, No Reasonable Juror Could Find a Lack of Substantial Similarity in the Protected Expression at Issue and a Standardless Intrinsic Test Must Not Nullify That Copying.

Where works are "so overwhelmingly identical that the possibility of independent creation is precluded," judgment for the plaintiff is proper. *Twentieth Century-Fox*, 715 F.2d at 1330; *accord Unicolors*, 853 F.3d at 987. This is the paradigm of such a case. Von Drachenberg used the Photograph itself as the template for the Tattoo, and it was essentially undisputed that it was copied as faithfully as possible. Independent creation here is not merely improbable; it was expressly disclaimed. Because the Tattoo reproduces the Photograph's protected expression—its pose, composition, lighting, and distinctive treatment of the subject—no reasonable juror, comparing that protected expression, could find the two works not substantially similar in their protected "total concept and feel."

23

Under a properly defined intrinsic test, that is the only reasonable conclusion, and Rule 50 required judgment for Sedlik.

The contrary verdict was possible only because the intrinsic test was handed to the jury with instructions to compare "the total concept and feel of the works" and no further guidance.[5] And to sustain the verdict, the district court seemingly ignored all of the objective protectable similarities between the works, instead relying on an "inference" that the jury had found the works to have a different "concept and feel." 1-ER-5 That inference lays bare the very defect amici identify: a standardless intrinsic test allows a factfinder—or a court rationalizing a verdict after the fact—to treat the wholesale reproduction of protected expression as immaterial by attributing the resemblance to unprotected elements, even where the defendant copied the copyrighted work itself, and admits to doing so.

A jury's untethered holistic impression cannot be permitted to nullify a clear case of unauthorized copying of protectable expression. To do so undercuts the very foundation of the protections afforded by copyright law. Confining the intrinsic test to protected expression, and making it reviewable, is what prevents that nullification—and it is what the law has always required. *See Apple*, 35 F.3d at

---

[5] *See* Jury Instruction No. 21, in the District Court below at 2:21-cv-01102-DSF-MRW, Doc. 219, p. 25 (filed 01/26/24)

24

1446 (unprotectable elements "have to be identified, or filtered, before the works can be considered as a whole").

### C. The Court Should Remand with Instructions to Enter Judgment for Sedlik and Hold a New Trial on Damages.

Having clarified the intrinsic test, the Court should apply it and remand with instructions to enter judgment for Sedlik on his infringement claims related to the reproduction of his work in the Tattoo and to conduct a new trial limited to damages. That disposition would confirm, in the clearest terms, that photographers and other authors enjoy the same protection the law affords tattoo artists, and that a jury may not nullify the unauthorized copying of protectable expression through an unreviewable verdict. It would also give courts and juries a test that, has proper articulable standards instead of a standardless, rudderless test.

25

## CONCLUSION

Amici respectfully urges the Court to retain the two-part substantial-similarity framework and to refine the intrinsic test so that it (1) is confined to protectable expression, (2) is reviewable on the record, and (3) may, in exceptional cases, be resolved as a matter of law for either party, consistent with *Unicolors* and with the Second Circuit's ordinary-observer test. Applying that test to this record, the Court should reverse the denial of Sedlik's motion for judgment as a matter of law and remand with instructions to enter judgment for Sedlik on infringement of the Tattoo and to determine damages. The intrinsic test should be corrected, not discarded.

Respectfully submitted,

/s/ Stephen M. Doniger
DONIGER BURROUGHS PC
603 Rose Avenue
Venice, CA 90291
(310) 590-1820
stephen@donigerlawfirm.com
*Counsel for Amici Curiae*

Thomas B. Maddrey
Chief Executive Officer
AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS
4 Embarcadero Ctr., Ste. 1400
San Francisco, CA 94111
(214) 701-1875
maddrey@asmp.org
*Counsel for American Society of Media Photographers*

Mickey H. Osterreicher
  *General Counsel*
Alicia Wagner Calzada
  *Deputy General Counsel*
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
120 Hooper St.
Athens, GA 30602
(716) 983-7800
lawyer@nppa.org
advocacy@nppa.org

*Counsel for National Press Photographers Association*

Dated: June 30, 2026

# CERTIFICATE OF COMPLIANCE

I certify that:

This brief complies with the word limit of Ninth Circuit Rule 32-1 because this brief contains 5645 words, including words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6). Respectfully submitted,

/s/ Stephen M. Doniger
Stephen M. Doniger
*Counsel for Amici Curiae*

Dated: June 30, 2026

28

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Stephen M. Doniger
Stephen M. Doniger
*Counsel for Amici Curiae*

Dated: June 30, 2026

29