**No. 24-3367**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JEFFREY B. SEDLIK,
*Plaintiff-Appellant,*

v.

KATHERINE VON DRACHENBERG (AKA "KAT VON D", an individual,
KAT VON D, INC., a California corporation and
HIGH VOLTAGE TATTOO, INC., a California corporation,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:21-cv-01102-DSJ-MW (JLB); Hon. Dale S. Fischer

## BRIEF OF PROFESSORS EDWARD LEE AND ANDREW MOSHIRNIA AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

Donald M. Falk
SCHAERR|JAFFE LLP
One Embarcadero Center
Suite 1200
San Francisco, CA 94111
Telephone: (415) 562-4942
dfalk@schaerr-jaffe.com

*Attorney for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF INTEREST AND SOURCE OF AUTHORITY
TO FILE ................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 2

ARGUMENT................................................................................ 6

    I.    THE LAY AUDIENCE IS CENTRAL TO THE
DETERMINATION OF COPYRIGHT INFRINGEMENT......... 6

        A.    Empirical Studies Show That Individuals Trained in the
Law Do Not Reflect a Lay Audience.................................. 7

        B.    The Lay Audience Decides How Much Similarity Is
Substantial and Whether It Is Infringement.................... 13

            1.    Circuits Uniformly Accord the Lay Audience a
Central Role in Deciding Infringement ....................... 13

            2.    Reliance on a Lay Audience Reflects the Public's
Ordinary Perception of Works ..................................... 16

            3.    "Total Concept and Feel" Focuses on the Works as
People View Them in the World ................................. 17

        C.    De Minimis Doctrine Reinforces the Lay Audience's
Centrality to Deciding Infringement.............................. 24

    II.    THE DISTRICT COURT CORRECTLY REVIEWED THE
JURY'S VERDICT UNDER RULE 50(A)'S STANDARD......... 25

CONCLUSION ......................................................................... 29

CERTIFICATE OF COMPLIANCE ....................................... 30

CERTIFICATE OF SERVICE ............................................... 31

ii

# TABLE OF AUTHORITIES

**Cases**

*ABKO Music, Inc. v. Harrisongs, Ltd.*, 722 F.2d 988 (2d Cir. 1983) ........ 8

*Amini Innov. Corp. v. Anthony California, Inc.*, 439 F.3d 1365 (Fed. Cir. 2006) .................................................................................. 19

*Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946) ................................. 5, 17

*Atari Games Corp. v. Nintendo*, 975 F.2d 832 (Fed. Cir. 1992) ............. 15

*Atari, Inc. v. North Am. Philips Consumer Elec. Corp.*, 672 F.2d 607 (7th Cir. 1982) ............................................................................... 18

*Atkins v. Fischer*, 331 F.3d 988 (D.C. Cir. 2003) .................................... 19

*Baxter v. MCA, Inc.*, 812 F.2d 421 (9th Cir. 1987) .............................. 5, 19

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903) ............. 2

*Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) ............................ 20

*BUC Int'l v. Int'l Yacht Council*, 489 F.3d 1129 (11th Cir. 2007) .......... 19

*Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108 (N.D. Cal. 2010) ........................................................................................... 22

*Cartier v. Jackson*, 59 F.3d 1046 (10th Cir. 1995) ................................ 20

*Copeland v. Bieber*, 789 F.3d 484 (4th Cir. 2015) ............................ 16, 18

*Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280 (10th Cir. 1996) ............................................................................................. 15

*Dam Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548 (3d Cir. 2005) ............................................................................... 15

*Dawson v. Hinshaw Music Inc.*, 905 F.2d 731 (4th Cir. 1990) .............. 15

*Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763 (9th Cir. 2003) ........... 3, 21

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012) ................... 19

*Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277 (3d Cir. 1991) ........................................................................ 16

*Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072 (9th Cir. 2006) ......................................................................... 22

*Harold Lloyd Corp. v. Witwer*, 65 F.2d 1 (1933) ..................................... 5

*Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117 (8th Cir. 1987) ... 15, 16, 19

*Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir. 1971) ....................................................................... 4

*Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007 (7th Cir. 2005) ....................................................................... 15

*Johnson v. Gordon*, 409 F.3d 12 (1st Cir. 2005) ................................... 14

*Kohus v. Mariol*, 328 F.3d 848 (6th Cir. 2003)..................................... 15

*Leigh v. Warner Bros.*, 212 F.3d 1210 (11th Cir. 2000) ........................ 27

*Litchfield v. Spielberg*, 736 F.2d 1352 (9th Cir. 1984)........................... 26

*Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312 (6th Cir. 2004) ................................................. 20

*Newton v. Diamond*, 388 F.3d 1189 (9th Cir. 2004) .............................. 24

*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821 (11th Cir. 1982) ......................................................... 15

*Peel & Co. v. Rug Market*, 238 F.3d 391 (5th Cir. 2001) ....................... 15

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487 (2d Cir. 1960) ...................................................................... 4

*Peters v. West*, 692 F.3d 629 (7th Cir. 2012) .......................................... 5

*Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357 (5th Cir. 2005)................................................................ 16, 18

*Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018) ............... passim

*Rey v. Lafferty*, 990 F.2d 1379 (1st Cir. 1993)....................................... 18

*Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976)................................................................................................. 18

*Roth Greetings Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir. 1970)........................................................................................... 17, 22

*Scott v. Harris*, 550 U.S. 372 (2007) ..................................................... 12

*Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp*, 562 F.2d 1157 (9th Cir. 1977) ........................................... 4, 13, 14, 17, 23

*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) ........................................................... 3

*Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002) ....... 15

*Twentieth Century-Fox Film Corp. v. Stonesifer*, 140 F.2d 579 (9th Cir. 1944) ....................................................................................... 14

*Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980 (9th Cir. 2017)................................................................................................. 27

*VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871 (9th Cir. 2016) ................. 24

*West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833 (E.D.N.Y. 1909)................................................................................................. 24

*Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222 (3d Cir. 1986) ................................................................................ 16, 18

*Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018) ............................... 8, 21

*Woodland v. Hill*, 136 F.4th 1199 (9th Cir. 2025) ................................... 4

*Yonay v. Paramount Pictures Corp.*, 163 F.3d 685 (9th Cir. 2026)........ 22

**Rules**

FED. R. CIV. P. 50(a) .............................................................................. 25

**Treatises**

4 NIMMER ON COPYRIGHT § 13D.10(A) (2026) ........................................ 4

v

## Other Authorities

9TH CIR. CIV. JUR. INSTR ............................................................... 23

John Bedell, *Harpocrates*, BENSOZIA (Jul. 19, 2010) ........................... 26

JOHN BERGER, WAYS OF SEEING 10 (1972) ............................................. 12

*Cary Grant With Finger to Mouth*, GETTY IMAGES............................... 27

*Case Details: Leigh v. Warner Brothers, Inc.*, KERNOCHAN CTR.
    LAW, MEDIA & THE ARTS ..................................................................... 28

Susan Daicoff, *Lawyer, Know Thyself: A Review of Empirical
    Research on Attorney Attributes Bearing on Professionalism*, 46
    AM. U. L. REV. 1137 (1997) ................................................................ 11

Melissa Drier, *David Bowie Photo Exhibition to Bow in Berlin*,
    WWD (Feb. 16, 2016)........................................................................ 27

Meirav Furth-Matzkin & Roseanna Sommers, *Consumer
    Psychology and the Problem of Fine-Print Fraud*, 72 STAN. L.
    REV. 503 (2020) ................................................................................ 10

Dan M. Kahan, David A. Hoffman & Donald Braman, *Whose Eyes
    Are You Going to Believe?* Scott v. Harris *and the Perils of
    Cognitive Illiberalism*, 122 HARV. L. REV. 837 (2009).................... 11, 28

Edward Lee & Andrew Moshirnia, *Do Experts Matter? A Study of
    the Effect of Musicologist Testimony in Music Cases*, 2022 UNIV.
    ILL. L. REV. 706 .......................................................................... 7, 8, 9

Edward Lee & Andrew Moshirnia, *Does Fair Use Matter? An
    Empirical Study of Music Cases*, 94 S. CAL. L. REV. 471 (2021) ... 7, 8, 9

Eirini Panou, *The* Signum Harpocraticum *in the 8th-Century
    Christian Art of Nubia*, 5 ACTUAL PROBLEMS OF THEORY &
    HISTORY OF ART 246 (2015)................................................................ 26

MERRIAM-WEBSTER DICTIONARY.............................................................. 22

Note, *Defining the Scope of Copyright Protection for Computer
    Software*, 38 STAN. L. REV. 497 (1986) ............................................. 18

*Silence*, AUSTRALIAN WAR MEMORIAL........................................................ 26

*The Silence: John Ducreux, 1790*, ART HISTORY PROJECT ...................... 26

Kevin Tobia, *Experimental Jurisprudence*, 89 U. CHI. L. REV. 735
    (2022) .................................................................................. 8, 28

*Topic: Silence & Security (Posters)*, NORMAN ROCKWELL IMAGINING
    FREEDOMS ...................................................................................... 27

U.S. Census Bureau, *Statistical Quality Standard E1: Analyzing
    Data*, CENSUS.................................................................................. 10

## STATEMENT OF INTEREST AND
## SOURCE OF AUTHORITY TO FILE

*Amici* Professors Edward Lee and Andrew Moshirnia are scholars whose research focuses on copyright law. Their scholarship includes a series of behavioral experiments they conducted to test how people decide copyright lawsuits and other socially important issues. Their copyright studies have been published in leading law reviews; relevant ones are cited below. *Amici* have no direct interest in this litigation or connection to the parties. They share a professional interest in seeing copyright law applied in ways that serve the broader public interest, consistent with the Copyright Clause's goal of promoting the progress of science. Because their empirical research relates to the issues raised by this case, *Amici* are uniquely positioned to provide the Court with a perspective not conveyed by the parties.

*Amici* have moved for leave to file this brief.[1]

---

[1] No party or counsel for a party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Lay people are better suited than lawyers or judges to determine the ordinary lay audience's view of works. Two empirical studies we conducted using simulated copyright lawsuits showed that people who had legal training consistently reached the *opposite* result on substantial similarity from the one reached by lay respondents. Entrusting the final decision of substantial similarity to legal-trained people will likely distort results in a systematic way that is less representative of the ordinary lay audience or a fair cross-section of the community.

To borrow Justice Holmes's sage words on artistic merit, it would be a "dangerous undertaking" to let "persons trained only to the law to constitute themselves final judges of" substantial similarity. *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903). In reviewing the jury's finding on substantial similarity, this Court should not devise a new infringement test just to erase the jury's result, but instead should apply Rule 50(a)'s standard of review—as the district court did.

Once a jury has reached its finding, Federal Rule of Civil Procedure 50(a) limits a court's power to overturn the jury's finding. Applying Rule 50(a)'s strict standard, the district court correctly avoided substituting

2

its own view of the facts for the jury's. 1-ER-2. Based on the evidence, including a close-up examination of how the tattoo on Blake Farmer's arm looks in person, a reasonable jury could conclude that (1) a person's face and a pose are uncopyrightable, (2) a tattoo artist's copying these unprotected elements from a photograph is not infringement, and (3) whatever protected element the artist copied was not substantial. *Cf. Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1122-23 (9th Cir. 2018) (Michael Jordan's "dunk in a pose inspired by ballet's *grand jeté*" in a photograph is uncopyrightable), *overruled in part on other grounds*, *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (en banc). For example, this Court held that a photograph of a Skyy bottle did not infringe a similar photograph because their similarities stemmed from a "shared *concept*." *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 765-66 (9th Cir. 2003) (photograph of bottle not infringed under merger doctrine and scene a faire) (emphasis added).

Reasonable minds can disagree on where to draw the line of substantial similarity. This possibility is a feature, not a bug, of copyright law. *See Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp*, 562 F.2d 1157, 1164 (9th Cir. 1977) ("Decisions must … inevitably be ad

3

hoc.") (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.)), *overruled in part on other grounds*, *Skidmore*, 952 F.3d at 1069. As this Court stated, "The critical distinction between 'idea' and 'expression' is difficult to draw." *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971). That is especially so for photographs, which "are not easily 'dissected into protected and unprotected elements.'" *Woodland v. Hill*, 136 F.4th 1199, 1210 (9th Cir. 2025) (quoting *Rentmeester*, 883 F.3d at 1119).

Adding to this inherent difficulty, no formula exists for determining "when similarity in selection and arrangement becomes 'substantial.'" *Rentmeester*, 883 F.3d at 1121. That determination "presents one of the most difficult questions in copyright law," and is "among the least susceptible of helpful generalizations." 4 NIMMER ON COPYRIGHT § 13D.10(A) (2026). This determination "will necessarily turn on the unique facts of each case." *Rentmeester*, 883 F.3d at 1121. Accordingly, the ultimate question of substantial similarity is left to the trier of fact, *Krofft*, 562 F.2d at 1164, based on the view of the "ordinary reasonable observer, with no expert assistance." *Skidmore*, 952 F.3d at 1064 (cleaned up).

4

This Court should reject the calls by Sedlik and some *amici* to undo the jury's result by jettisoning this Court's longstanding test of infringement. All circuits recognize the centrality of the ordinary lay audience to determine substantial similarity. This Court did so in 1933, *Harold Lloyd Corp. v. Witwer*, 65 F.2d 1, 18 (1933), and has adhered to that understanding ever since. Critically, whether infringement occurred ultimately turns on "'the response of the ordinary lay hearer,'" which reflects "the effect of the alleged infringing [work] upon the public." *Krofft*, 562 F.2d at 1164 (quoting *Arnstein v. Porter*, 154 F.2d 464, 468-69 (2d Cir. 1946)); *see Baxter v. MCA, Inc.*, 812 F.2d 421, 424 (9th Cir. 1987) (same). And nearly all circuits have adopted or applied this Court's approach to consider, as one part of the overall analysis, the "total concept and feel," or the works as a whole—meaning how the public views them in the world.

Sedlik and some *amici* quibble over this Court's choice of terms. But, as the Seventh Circuit recognized, the differing "nomenclature" used in the circuits' tests of infringement presents at most a "pseudo-conflict" because "the outcomes do not appear to differ" under the tests. *Peters v. West*, 692 F.3d 629, 633 (7th Cir. 2012). Indeed, Sedlik cannot identify a

5

single past case—across a half-century of decisions—that was wrongly decided under what he calls a "flawed" test. Such a "flaw" cannot justify discarding this Court's test of infringement, under which this Court has carefully—and correctly—resolved disputes for decades.

## ARGUMENT

## I. THE LAY AUDIENCE IS CENTRAL TO THE DETERMINATION OF COPYRIGHT INFRINGEMENT

This Court's precedents leave the question of substantial similarity to the view of the ordinary observer, or lay audience, which is distinguished from experts. The "intrinsic test" correctly trains the infringement analysis on how the public encounters the works in real life. Although the terminology used to describe the test varies, all circuits recognize the centrality of the lay audience—not legal experts—in determining the ultimate question of copyright infringement. This allocation of duties makes a difference—and an appropriate one. Juries most closely approximate a lay audience, and lay audiences perceive substantial similarity and other matters of copyright infringement quite differently from persons with legal training.

6

### A. Empirical Studies Show That Individuals Trained in the Law Do Not Reflect a Lay Audience

This Court's careful calibration of the infringement test over decades entrusts the trier of fact to make the determination of substantial similarity in the view of the ordinary lay audience. A jury drawn from a fair-cross section of the community is far better suited than judges to make that factual determination. A possible disagreement with one result cannot justify dismantling a near-century's worth of the Court's copyright precedent. That precedent carefully allocates roles for both the court and the jury in the infringement analysis—the latter ultimately is reviewable under the standard of Rule 50(a).

Two empirical studies we conducted showed that people with legal training consistently reached the opposite result when compared to lay respondents in deciding if two works were substantially similar. *See* Edward Lee & Andrew Moshirnia, *Does Fair Use Matter? An Empirical Study of Music Cases*, 94 S. CAL. L. REV. 471, 550-53 (2021) [*Fair Use*]; Edward Lee & Andrew Moshirnia, *Do Experts Matter? A Study of the Effect of Musicologist Testimony in Music Cases*, 2022 UNIV. ILL. L. REV.

706, 752 [*Experts*].[2] Both studies involved online experiments asking respondents to decide simplified copyright cases modeled on the disputes in *Williams v. Gaye*, 895 F.3d 1106 (9th Cir. 2018), and *ABKO Music, Inc. v. Harrisongs, Ltd.*, 722 F.2d 988 (2d Cir. 1983). The results showed significant differences between the legal-trained and lay respondents in deciding whether the respective songs were "substantially similar to the ordinary, reasonable listener." *Fair Use*, *supra*, at 528-29; *Experts*, *supra*, at 742-43.

Our first experiment involved 503 subjects ($N = 503$), a sizeable portion of which self-reported legal training ($n = 47$). *Fair Use*, *supra*, at 523. Legal-trained people found substantial similarity at much higher rates than lay people. In the first dispute with a pair of songs of lower similarity, 80.85% of legal-trained people (38 of 47) found liability versus 34.87% of lay people ($p < .001$). *Id.* at 550-52 figs. 5-6 (figs. 5-6 shown as nonliability rates for substantial similarity). In the second dispute with two songs of higher similarity, the same disparity existed: 89.36% of

---

[2] For background on empirical studies, see Kevin Tobia, *Experimental Jurisprudence*, 89 U. CHI. L. REV. 735, 741-43 (2022) ("The experimental approach, which studies large samples of people and assigns them to consider different versions of thought experiments, can help detect more subtle patterns of judgment, including ones that are not obvious or even introspectively accessible to an individual legal theorist.").

legal-trained (42 of 47) found liability versus 56.36% of lay respondents ($p < .001$). *Id.*[3]

Our second experiment taken at a different time with a different group of people showed the same disparity between lay and legal-trained respondents. The second experiment involved 174 respondents ($n = 174$) who self-reported legal training out of a total of 742 respondents ($N = 742$). *Experts, supra*, at 737. In the case with songs of lower similarity, respondents with legal training found infringement at a rate of 81.3% (61 of 75), compared to 35.9% among lay respondents, a significant gap of more than 45% ($p < .001$). *Id.* at 752. In the case with a higher similarity between songs, the same pattern existed: 86.3% of legally trained subjects (69 of 80) found infringement compared with 71.8% of lay respondents ($p = .009$). *Id.* As indicated by the probability values, or *p*-values, these results were all statistically significant. *Cf.* U.S. Census

---

[3] We administered the studies through Amazon Mechanical Turk. *Fair Use, supra*, at 522. Our jury instruction was simplified and designed to train the respondents' focus on specific variables we were testing and to respect the respondents' time. Our instruction was consistent in length with past experiments of other researchers. *Id.* at 528-29. No experiment can replicate an entire trial. But our studies provide insights on how different people decide whether two works are substantially similar to the ordinary lay audience.

Bureau, *Statistical Quality Standard E1: Analyzing Data*, CENSUS (using *p*-value of 0.10 or below as the cut-off for statistical significance, and stating that *p*-values "below 0.01 constitute strong evidence against the null [hypothesis]," or a result simply from random chance), https://tinyurl.com/3wyen535.

Our finding is qualified because most legal-trained respondents in the studies also reported music knowledge, making it difficult to segregate the two effects. Because both forms of knowledge were directly relevant to the question posed, the results indicate that a relevant specialized knowledge affects infringement determinations. This concern applies to judges, who may acquire greater familiarity with various types of works through repeated exposure to them in cases.

Empirical studies have found similar disparities between how lay people and legal-trained people view other controversies. *See, e.g.*, Meirav Furth-Matzkin & Roseanna Sommers, *Consumer Psychology and the Problem of Fine-Print Fraud*, 72 STAN. L. REV. 503, 519-23 fig. 1 (2020) (lay people's perception of contract terms were more formalistic than legal-trained respondents); *see also* Tobia, *supra*, at 766 (behavioral

10

experiments can provide insights on lay people's perceptions v. legal-trained ones, such as for juries).

These results are unsurprising. Legal training teaches lawyers to think differently from lay people. *See* Susan Daicoff, *Lawyer, Know Thyself: A Review of Empirical Research on Attorney Attributes Bearing on Professionalism*, 46 AM. U. L. REV. 1137, 1385-86 (1997) (law school teaches to "think like a lawyer").

> Empirical data collected over the last forty years indicates … that lawyers differ significantly and in consistent ways from the general adult population, particularly in their decision-making approaches, in certain personality characteristics, and in their values.

*Id.* at 1341. For that reason, courts eschew empaneling a jury entirely of lawyers because lawyers do not represent a fair cross-section of the community.

Empirical studies in other fields show that people are diverse and often view the world differently, informed by their experiences. *See, e.g.*, Dan M. Kahan, David A. Hoffman & Donald Braman, *Whose Eyes Are You Going to Believe?* Scott v. Harris *and the Perils of Cognitive Illiberalism*, 122 HARV. L. REV. 837, 864-65 fig. 2 (2009) (empirical study showing "marked differences in perceptions across identifiable

11

subgroups" who watched video of police officer in high-speed chase, the subject of *Scott v. Harris*, 550 U.S. 372, 378-80 (2007)). What may appear "obvious" in viewing a video or photograph belies the complexities of human perception and different viewers' own interpretations. *See* JOHN BERGER, WAYS OF SEEING 10 (1972) ("[A]lthough every image embodies a way of seeing, our perception or appreciation of an image depends also upon our own way of seeing.").

The notion that courts can just look at visual works and determine better than a jury how an ordinary lay audience would view the works' similarity is illusory. Our empirical studies counsel great caution before this Court dismantles an infringement test that has stood the test of time. *See* Motion Picture Assn. Br. (ECF 110) 4 ("[T]he Court should not discard an entire analytical framework that courts, litigants, and creative industries have relied on for decades, and, more importantly, has appropriately and fairly balanced the interests of rights holders against the need to encourage free expression of ideas."). For good reason, all other circuits have adopted aspects of it or similar approaches.

12

### B. The Lay Audience Decides How Much Similarity Is Substantial and Whether It Is Infringement

#### 1. Circuits Uniformly Accord the Lay Audience a Central Role in Deciding Infringement

This Court and the other courts of appeals recognize the difference between lay and judicial perception, and have allocated responsibilities for deciding copyright infringement accordingly. In enunciating the test for copyright infringement, this Court set forth two steps to determine substantial similarity—whether the defendant has copied too much from the plaintiff's work. First, applying the "extrinsic test," the court examines whether the defendant has copied protected expression from the plaintiff's work. *Rentmeester*, 883 F.3d at 1118. The extrinsic test permits "analytic dissection [of the works] and expert testimony," and "may often be decided as a matter of law" by the court. *Krofft*, 562 F.2d at 1164. Second, if the extrinsic test yields evidence that protected elements were copied, the trier of fact determines the ultimate question of infringement: "the trier of fact must decide whether there is substantial similarity in the expressions … to constitute infringement." *Id.* Critically, the ultimate determination of infringement is viewed from the ordinary lay audience's perspective. *Id.* at 1165; *see also Harold*

13

*Lloyd*, 65 F.2d at 18 ("the effect of the alleged infringing play upon the public, that is, upon the average reasonable man").

As this Court explained: "'The two works involved … should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator.'" *Krofft*, 562 F.2d at 1165 (quoting *Twentieth Century-Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 582 (9th Cir. 1944)). No expert testimony is permitted on this ultimate question. *Id.* at 1164.

This Court reiterated this two-part test in its most recent *en banc* copyright case only six years ago. *See Skidmore*, 952 F.3d at 1064. And although the terminology and formulation of the infringement test may differ, the circuits are uniform in adopting a test of infringement that includes at least two basic inquiries: (i) a defendant's copying of protected elements and (ii) substantial similarity. All circuits recognize the ultimate question is decided from the view of the ordinary, lay audience, as opposed to the views of experts with specialized knowledge. *See Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir. 2005) (2-prong test for wrongful copying with ultimate question of substantial similarity to "ordinary observer"); *Arnstein*, 154 F.2d at 469, 473 ("lay public"); *Dam*

14

*Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548, 562 (3d Cir. 2005) ("lay-observer"); *Peel & Co. v. Rug Market*, 238 F.3d 391, 398 (5th Cir. 2001) ("ordinary observer" or "layman"); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) ("ordinary observer"); *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir. 1987) ("ordinary, reasonable person"); *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996) ("ordinary observer"); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982) ("average lay observer") (internal quotations and citation omitted); *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1296 (D.C. Cir. 2002) ("ordinary reasonable person"); *see also Atari Games Corp. v. Nintendo*, 975 F.2d 832, 844 (Fed. Cir. 1992) (applying Ninth Circuit's test in case from N.D. California). Two circuits also test substantial similarity from the perspective of a specialized audience if that was the intended audience rather than the lay, general public. *See Dawson v. Hinshaw Music Inc.*, 905 F.2d 731, 736-37 (4th Cir. 1990); *Kohus v. Mariol*, 328 F.3d 848, 856-57 (6th Cir. 2003) (same).

In addition, three circuits have explicitly relied on this Court's extrinsic-intrinsic test in analyzing infringement. *See Whelan Assocs.,*

15

*Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1232 (3d Cir. 1986) (citing *Krofft*); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) (citing *Whelan*); *Copeland v. Bieber*, 789 F.3d 484, 489-90 (4th Cir. 2015); *Hartman*, 833 F.2d at 120 (8th Cir. 1987); *see also Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 374 n.13 (5th Cir. 2005) (Fifth Circuit test "is similar to the Ninth Circuit's intrinsic test").

### 2. Reliance on a Lay Audience Reflects the Public's Ordinary Perception of Works

The circuits' uniform recognition of the lay audience's central role in deciding the ultimate question of substantial similarity serves a vital purpose in copyright law: the lay audience grounds infringement analysis in how the public would view the works in the world—instead of how lawyers or experts might view the works in litigation.

As this Court explained, quoting the Second Circuit's seminal case *Arnstein v. Porter*:

> The plaintiff's legally protected interest [is …] in the potential financial return from his compositions which derive from the lay public's approbation of his efforts. The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the (eyes and) ears of lay (persons), who comprise the audience for whom such popular (works are) composed, that

16

defendant wrongfully appropriated something which belongs to the plaintiff.

*Krofft*, 562 F.2d at 1165 (quoting *Arnstein*, 154 F.2d at 472-73). That, of course, is "an issue of fact which a jury is peculiarly fitted to determine," *id.* (quoting *Arnstein*, 154 F.2d at 473), because the jury is "uniquely suited" to decide the lay audience's view. *Id.* at 1166. Accordingly, "this court must be reluctant to reverse" a jury verdict on infringement. *Id.* This approach does not render a jury's verdict unreviewable, however. Rule 50 sets forth the standard of review for a jury's finding on factual issues in all federal cases decided by juries.

### 3. "Total Concept and Feel" Focuses on the Works as People View Them in the World

The intrinsic test frames the lay audience's view on the works as a whole—as they exist in the world and as how people encounter them. In 1970, this Court described this view as the "total concept and feel" of the works. *Roth Greetings Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970). In *Roth*, the total concept and feel of greeting cards included the selection and arrangement of various elements. *Id.* The parties' greeting cards were substantially similar even though the defendant's cards were "somewhat different." *Id.* The "total concept and

17

feel" avoids dissecting two works until their similarities disappear. And it grounds the test of infringement in how people encounter the works in the world. *See generally* Note, *Defining the Scope of Copyright Protection for Computer Software*, 38 STAN. L. REV. 497, 514 (1986) ("The total concept and feel of ordinary literary works is relevant because it is the basis on which potential purchasers of the work identify and choose them.").

Since *Roth*, all courts of appeals except for the Sixth and Tenth Circuits have adopted or applied the "total concept and feel" to refer to the lay audience's review of works in their entirety, as people encounter them in the world. *See Rey v. Lafferty*, 990 F.2d 1379, 1395 (1st Cir. 1993) (citing *Roth*); *Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976) (same); *Whelan*, 797 F.2d at 1234 (3d Cir. 1986) (same); *Copeland*, 789 F.3d at 491 (4th Cir. 2015) (applying "total concept and feel" in intrinsic analysis); *Positive Black Talk*, 394 F.3d at 373 (5th Cir. 2005) (affirming jury verdict of noninfringement based on jury instruction including "total concept and feel"); *Atari, Inc. v. North Am. Philips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982) (citing *Roth*), *overruled in part on other grounds, Flava Works, Inc. v. Gunter*,

18

689 F.3d 754, 755 (7th Cir. 2012) (preliminary injunction standard); *Hartman*, 833 F.2d at 120-21 (8th Cir. 1987) (citing *Baxter*, 812 F.2d at 424 (9th Cir. 1987)); *BUC Int'l v. Int'l Yacht Council*, 489 F.3d 1129, 1146 (11th Cir. 2007) (affirming jury verdict of infringement based on instruction that included "total concept and feel"); *Atkins v. Fischer*, 331 F.3d 988, 993–95 (D.C. Cir. 2003) (reversing grant of summary judgment of non-infringement because a reasonable jury could find substantial similarity based on "total concept and feel"); *see also Amini Innov. Corp. v. Anthony California, Inc.*, 439 F.3d 1365, 1369-70 (Fed. Cir. 2006) (reversing grant of summary judgment of non-infringement because a reasonable jury could find infringement based on "total concept and feel" of the works' arrangement of elements in a case from Central District of California).

The only two circuits that have not adopted "total concept and feel" have either adopted a similar approach or affirmed a jury verdict that included a jury instruction on "total concept and feel." The Sixth Circuit recognized that infringement analysis includes examination of the works "as a whole," even stating that it is similar to this Court's intrinsic test. *Murray Hill Publ's, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d

19

312, 319 (6th Cir. 2004) ("The second part of our test, and the Ninth Circuit's *intrinsic* test, both address the question of whether the two works are, taken as a whole, substantially similar in look and feel to a jury."). And the Tenth Circuit rejected a plaintiff's argument that including the "total concept and feel" in a jury instruction was plain error because the Tenth Circuit had not officially adopted it. *Cartier v. Jackson*, 59 F.3d 1046, 1050 (10th Cir. 1995) (noting that "this test is accepted law in other circuits").

These cases show that "total concept and feel" is a helpful reminder that copyright may protect an original selection and arrangement of unprotected elements. *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 273 (2d Cir. 2001) (need to consider "the arrangement of the whole" in examining work's "total concept and feel"). Eliminating that inquiry would likely cause juries to ignore the overall arrangement of elements as potentially a protected work, to the detriment of copyright holders.

Sedlik's proposed one-step test misses this essential component. Reh'g Pet. (ECF 100) 13. While criticizing the district court's use of the word "holistic" (*id.* at 2, 11), Sedlik uses the exact same word in describing how "visual works are experienced primarily through the

20

initial, *holistic* delineation of the object and through context clues, such that an infringement test that merely focuses on its isolated features would be divorced from how the artwork is perceived and thus expressed." *Id.* at 16 (emphasis added).

The near consensus in the courts of appeals in adopting or applying the "total concept and feel" counsels caution before discarding it. Some *amici* quibble over "concept" and "feel," suggesting the terms allow the protection of concepts in violation of the Copyright Act's exclusion of ideas or empower a jury to make decisions based on "feelings." *See* RIAA Br. (ECF 107) 5; Authors Guild Br. (ECF 108) 8.

These *amici*'s criticisms improperly isolate the intrinsic inquiry from this Court's entire infringement test, which includes the extrinsic test and involves dissection of the works in question and identification of the defendant's copying of *protected expression. Cf. Williams*, 895 F.3d at 1123 (courts examine jury instructions as a whole, not one in isolation). Given this Court's two-element test, any fear that juries or courts are protecting concepts alone is unfounded. No *amicus* points to any prior case from this or any other circuit that protects a mere idea or concept. *Cf. Ets-Hokin*, 323 F.3d at 766 ("shared concept" in photographs did not

21

prove infringement). Nor have they identified a prior case in which the "total concept and feel" rendered the wrong result. A parade of imagined horribles cannot justify overruling this Court's longstanding test.

Moreover, the "feel" of a work is not the same as one's personal "feelings." Instead, "feel" means the "quality or atmosphere" of the work. MERRIAM-WEBSTER DICTIONARY (noun, def. 3(b)), https://www.merriam-webster.com/dictionary/feel. A synonym is the "mood" of a work, such as expression that conveys a tragic, somber scenario rather than a happy, upbeat story. *See Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1114 (N.D. Cal. 2010). *Roth* made clear that the "total concept and feel" of works may include "*the mood* they portrayed." *Roth*, 429 F.2d at 1110 (emphasis added); *see also Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 692 (9th Cir. 2026) ("mood" of a literary work may be part of its arrangement); *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006) ("mood" of works may be part of its "total sequence"), *overruled in part on other grounds*, *Skidmore*, 952 F.3d at 1069.

The "total concept and feel" is just one element of the Court's carefully calibrated infringement test. This Court has refrained from

22

drafting a pattern jury instruction on infringement but has instead given lower courts flexibility to draft instructions tailored to the specific works at issue. *See* 9TH CIR. CIV. JURY INSTR. 17.19 (Mar. 2026). Especially for visual works and photographs, "total concept and feel" reminds the jury that an overall selection and arrangement of unprotected elements (e.g., visual facts in the world) can be protected. *See Rentmeester*, 883 F.3d at 1120 (elements in a photograph are "equivalent of unprotectable 'facts' that anyone may use to create new works").

If this Court is inclined to revisit the term "total concept and feel," we recommend simpler wording: "*The intrinsic test examines whether the works as a whole are substantially similar based on how the ordinary lay audience would view them.*" *Cf. Krofft*, 562 F.2d at 1169 n.12 (one jury instruction given: "In comparing the [two works] to determine whether there has been copyright infringement, you must consider and compare each of the works as a whole. That is, you must not simply focus on isolated elements of each work to the exclusion of the other elements, combination of elements, and expressions therein."). When coupled with the extrinsic analysis that focuses on dissecting and identifying *protected* elements of the plaintiff's work that were copied, this revised intrinsic

23

test captures the essence of the "total concept and feel" while avoiding a legal term of art.

## C. De Minimis Doctrine Reinforces the Lay Audience's Centrality to Deciding Infringement

This Court's de minimis doctrine reinforces the lay audience's centrality to infringement analysis. As this Court explained, "a use is de minimis only if the average audience would not recognize the appropriation." *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004). "This observation reflects the relationship between the de minimis maxim and the general test for substantial similarity, which also looks to the response of the average audience, or ordinary observer, to determine whether a use is infringing." *Id.*

Under copyright law, "'[s]ome copying is permitted.'" *Id.* at 1192 (quoting *West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833, 861 (E.D.N.Y. 1909)). Like the intrinsic test, the de minimis doctrine compares the two works "as a whole." *Id.* at 1196 (holding that "an average audience would not discern Newton's hand as a composer, apart from his talent as a performer, from Beastie Boys' use of the sample"); *see also VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 879 (9th Cir. 2016) ("a

24

reasonable jury could *not* conclude that an average audience would recognize" Madonna's song's sound of horn hits as copied from plaintiff's).

## II. THE DISTRICT COURT CORRECTLY REVIEWED THE JURY'S VERDICT UNDER RULE 50(A)'S STANDARD

Despite Sedlik's protestations that this Court has rendered the jury's verdict "unreviewable," the district court correctly applied the standard of review under Federal Rule of Civil Procedure 50(a). 1-ER-2. Under Rule 50, the court's analysis is limited to whether "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" FED. R. CIV. P. 50(a). Thus, the question under Rule 50 is whether there was no legally sufficient evidentiary basis for a reasonable jury to have found non-infringement. The district court correctly concluded this "very high" burden had not been met. 1-ER-3.

Based on the evidence at trial, a reasonable jury could conclude that neither Miles Davis's face nor the "Shh" pose was protected by copyright, and that a tattoo artist's drawing of these unprotected elements onto human skin did not infringe the black-and-white photograph. *See* 1-ER-6 (jury could have concluded "it was the unprotected elements of the Portrait that were copied"). A reasonable jury could find the pose in the portrait was an unprotectable idea. 1-ER-119; *see Rentmeester*, 883 F.3d

25

at 1121 (*grand jeté*-inspired pose by Michael Jordan unprotectable). A reasonable jury could also find the overall arrangements of unprotected elements in the photograph versus the tattoo were not substantially similar, given the differences in light, shading, hairline and hair, and background. 1-ER-122. Accordingly, because a reasonable jury could so find, Sedlik's claim to a violation of the derivative work right fails because it requires proof of substantial similarity as well. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984).

Importantly, the "Shh" pose, or silence gesture, with an index finger to the mouth, dates back to antiquity and is associated with Harpocrates, the god of silence. *See* John Bedell, *Harpocrates*, BENSOZIA (Jul. 19, 2010), https://tinyurl.com/4ryvnzkj. Artworks throughout history have depicted this stock pose. *See, e.g.*, *The Silence: John Ducreux, 1790*, ART HISTORY PROJECT, https://tinyurl.com/54k4sf8f; Eirini Panou, *The* Signum Harpocraticum *in the 8th-Century Christian Art of Nubia*, 5 ACTUAL PROBLEMS OF THEORY & HISTORY OF ART 246, 249-50 (2015), https://doi.org/10.18688/aa155-2-25 (discussing artwork of St. Anne striking silence gesture); *Silence*, AUSTRALIAN WAR MEMORIAL, (1916 war poster), https://tinyurl.com/55n2yf7t; *Topic: Silence & Security (Posters)*,

NORMAN ROCKWELL IMAGINING FREEDOMS, (1943 poster), https://tinyurl.com/48dcsjts; *Cary Grant With Finger to Mouth*, GETTY IMAGES, (1951 photograph), https://tinyurl.com/5n7dv5c4; Melissa Drier, *David Bowie Photo Exhibition to Bow in Berlin*, WWD (Feb. 16, 2016) (1995 photograph), https://tinyurl.com/mry8d2wj. A reasonable jury could find this stock "Shh" pose was unprotected, along with Miles Davis's face in the portrait, in reaching a finding of non-infringement.

Although judgment as a matter of law may be warranted in some copyright cases where the evidence permits only one conclusion, such as identical copying of a work whose subject matter is protected, this case involves a work whose subject matter—a real person's face—involves unprotected elements at its core. *Compare Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 986 (9th Cir. 2017) (affirming summary judgment of infringement based on two nearly identical fabric designs) *with Rentmeester*, 883 F.3d at 1119 (Jordan pose unprotected). Determining substantial similarity based on a photograph of unprotected facts in the world, such as a real person or thing, is often fact-specific. *See Leigh v. Warner Bros.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (reversing grant of summary judgment to defendant while recognizing "[a] jury

27

ultimately may conclude that the similarities between the protected elements of the Leigh photograph and the Warner Brothers still shots are not 'substantial'"); *see also Case Details: Leigh v. Warner Brothers, Inc.*, KERNOCHAN CTR. LAW, MEDIA & THE ARTS, https://tinyurl.com/55ux8t7k.

"Our legal system conspicuously holds forth jury decisionmaking as a means of making the law responsive to, and hence legitimately binding on, individuals of diverse background." Kahan et al., *supra*, at 904. The Seventh Amendment enshrines the jury's role as a right protected in the Constitution. Lay people's role in deciding cases is vital to our democracy. The "law should reflect ordinary judgments and concepts to allow citizens a line of democratic input into the legal system." Tobia, *supra*, at 767. Rule 50, which the district court carefully applied, respects the jury's essential role.

## CONCLUSION

This Court should affirm the decision below.

July 13, 2026                                    Respectfully submitted,

                                                 */s/ Donald M. Falk*
                                                 Donald M. Falk
                                                 SCHAERR|JAFFE LLP
                                                 One Embarcadero Center
                                                 Suite 1200
                                                 San Francisco, CA 94111
                                                 Telephone: (415) 562-4942
                                                 dfalk@schaerr-jaffe.com

                                                 *Attorney for* Amici Curiae

29

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rules 5-2(b), 32-3(2), and Fed. R. App. P. 29(d)(5) because:

    ☒ this brief contains 5,619 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

    ☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook, *or*

    ☐ this brief has been prepared in a monospaced spaced typeface using (state name and version of word processing program) _____ with (state number of characters per inch and name of type style)_____.

*/s/ Donald M. Falk*
Donald M. Falk
*Attorney for Amici Curiae*

30

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of July 2026, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

July 13, 2026                    SCHAERR|JAFFE LLP

*/s/ Donald M. Falk*
Donald M. Falk
*Attorney for Amici Curiae*

31